# 25-1136-cv

## United States Court of Appeals

*for the*

## Second Circuit

WANTAGH UNION FREE SCHOOL DISTRICT, WANTAGH UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION, ANTHONY GRECO, in his capacity as a Wantagh Board of Education Member and a Resident of the School Community,

*Plaintiffs-Appellants,*

WYANDANCH UNION FREE SCHOOL DISTRICT, WYANDANCH UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION, CHARLIE REED, in his capacity as a Wyandanch Board of Education Member and a Resident of the School Community,

*Plaintiffs,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

## APPENDIX

STEVEN C. STERN
CHELSEA WEISBORD
SOKOLOFF STERN LLP
*Attorneys for Plaintiffs-Appellants*
179 Westbury Avenue, 2nd Floor
Carle Place, New York 11514
(516) 334-4500

– v. –

NEW YORK STATE BOARD OF REGENTS, LESTER W. YOUNG, JR., in his official capacity as Chancellor of the New York State Board of Regents, JOSEPHINE VICTORIA FINN, in her official capacity as Vice Chancellor of the New York State Board of Regents, ROGER TILLES, in his official capacity as a member of the New York State Board of Regents, CHRISTINE D. CEA, in her official capacity as a member of the New York State Board of Regents, WADE S. NORWOOD, in his official capacity as a member of the New York State Board of Regents, KATHLEEN M. CASHIN, in her official capacity as a member of the New York State Board of Regents, JAMES E. COTRELL, in his official capacity as a member of the New York State Board of Regents, JUDITH CHIN, in her official capacity as a member of the New York State Board of Regents, CATHERINE COLLINS, in her official capacity as a member of the New York State Board of Regents, ELIZABETH S. HAKANSON, in her official capacity as a member of the New York State Board of Regents, LUIS O. REYES, in his official capacity as a member of the New York State Board of Regents, SUSAN W. MITTLER, in her official capacity as a member of the New York State Board of Regents, FRANCES G. WILLS, in her official capacity as a member of the New York State Board of Regents, ARAMINA VEGA FERRER, in her official capacity as a member of the New York State Board of Regents, SHINO TANIKAWA, in her official capacity as a member of the New York State Board of Regents, ROGER P. CATANIA, in his official capacity as a member of the New York State Board of Regents, ADRIAN I. HALE, in his official capacity as a member of the New York State Board of Regents,

*Defendants-Appellees.*

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Motion to Dismiss Amended Complaint by
Defendants, filed September 6, 2024
(Omitted herein)

Exhibit 1 to Motion Documents -
Background and Frequently Asked Questions
Regarding Part 123 of the Regulations of the
Commissioner of Education Relating to
Prohibiting the Use of Indigenous Names,
Mascots, and Logos by Public
Schools – May 2023 ............................................... A-23

Exhibit 2 to Motion Documents -
New York Commissioner of Education's
Decision in *Appeal of McMillan*, Decision
No. 18,058, dated Nov. 29, 2021 ........................... A-35

Exhibit 4 to Motion Documents -
Memorandum from Richard P. Mills, dated
April 5, 2001 ......................................................... A-43

Exhibit 5 to Motion Documents -
Memorandum from James N. Baldwin, dated
November 17, 2022 ................................................ A-47

Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss, filed
September 6, 2024
(Omitted herein)

Exhibit B to Opposition -
Amended Verified Complaint and Petition,
dated January 16, 2024 .......................................... A-50

ii

**Page**

Exhibit E to Opposition -
Part 123 of the Regulations of the Commissioner
of Education Relating to Prohibiting the Use of
Indigenous Names, Mascots, and Logos by
Public Schools, 8 NYCRR 123.*1 et seq.* ............... A-96

Exhibit F to Opposition -
Legislative History of the Dignity for All
Student Act............................................................ A-119

Exhibit G to Opposition -
Senate Bill No. 1549 and Assembly Bill No.
5443, introduced in 2021-2022 Legislative
Session .................................................................. A-174

Exhibit H to Opposition -
Senate Bill No. 4052, introduced in the
2023-24 Legislative Session ................................. A-179

Exhibit J to Opposition -
Wantagh Union Free School District's
Replacement Plan, dated June 1, 2023 ................. A-182

Exhibit K to Opposition -
Letter from Senator Steven D. Rhoads, dated
June 14, 2023, with Attachments .......................... A-189

Exhibit L to Opposition -
June 15, 2023 resolution adopted by the Wantagh
Union Free School District Board of Education.... A-198

Memorandum and Order of the Honorable Margo
K. Brodie, dated March 27, 2025 ......................... A-200

Letter from Chelsea Weisbord to the Honorable
Margo K. Brodie, dated April 25, 2025 ................ A-289

Clerk's Judgment, dated April 28, 2025,
Appealed From ..................................................... A-290

iii

**Page**

Notice of Appeal, filed April 28, 2025.......................... A-293

Annexed to Notice of Appeal -
Memorandum and Order of the Honorable Margo
K. Brodie, dated March 27, 2025
(Reproduced herein at pp. A-200-A-288)

Annexed to Notice of Appeal -
Clerk's Judgment, dated April 28, 2025,
Appealed From
(Reproduced herein at pp. A-290-A-291)

A-1

Query    Reports    Utilities    Help    Log Out

APPEAL,ACO,MJI

# U.S. District Court
## Eastern District of New York (Central Islip)
## CIVIL DOCKET FOR CASE #: 2:23-cv-07299-MKB-LGD

Wantagh Union Free School District et al v. New York State Board of Regents et al
Assigned to: Chief Judge Margo K. Brodie
Referred to: Magistrate Judge Lee G. Dunst
Cause: 42:1983 Civil Rights Act

Date Filed: 09/29/2023
Date Terminated: 04/28/2025
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Wantagh Union Free School District**                    represented by    **Chelsea Ella Weisbord**
Sokoloff Stern LLP
179 Westbury Avenue
Carle Place, NY 11514
(516)334-4500
Fax: (516)334-4501
Email: cweisbord@sokoloffstern.com
*ATTORNEY TO BE NOTICED*

**Steven C. Stern**
Sokoloff Stern LLP
179 Westbury Avenue
Carle Place, NY 11514
(516)334-4500
Fax: (516)334-4501
Email: sstern@sokoloffstern.com
*ATTORNEY TO BE NOTICED*

**Adam I. Kleinberg**
Guercio & Guercio LLP
New York
77 Conklin Street
Farmingdale, NY 11735
516-694-3000
Fax: 516-694-4738
Email: akleinberg@guerciolaw.com
*TERMINATED: 10/11/2024*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Wantagh Union Free School District**                    represented by    **Chelsea Ella Weisbord**
**Board of Education**                                                       (See above for address)
*ATTORNEY TO BE NOTICED*

**Steven C. Stern**
(See above for address)

A-2

*ATTORNEY TO BE NOTICED*

**Adam I. Kleinberg**
(See above for address)
*TERMINATED: 10/11/2024*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Wyandanch Union Free School District**          represented by   **Chelsea Ella Weisbord**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven C. Stern**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam I. Kleinberg**
(See above for address)
*TERMINATED: 10/11/2024*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Wyandanch Union Free School District
Board of Education**          represented by   **Chelsea Ella Weisbord**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven C. Stern**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam I. Kleinberg**
(See above for address)
*TERMINATED: 10/11/2024*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Anthony Greco**
*in his capacity as a Wantagh Board of
Education Member and a Resident of the
School Community*          represented by   **Chelsea Ella Weisbord**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven C. Stern**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam I. Kleinberg**
(See above for address)
*TERMINATED: 10/11/2024*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Charlie Reed**
*in his capacity as a Wyandanch Board of*          represented by   **Chelsea Ella Weisbord**
(See above for address)
*ATTORNEY TO BE NOTICED*

A-3

*Education Member and a Resident of the
School Community*

**Steven C. Stern**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam I. Kleinberg**
(See above for address)
*TERMINATED: 10/11/2024*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**New York State Board of Regents**    represented by    **Helena Ann Lynch**
NYS Office of The Attorney General
Nassau Regional Office
200 Old Country Road
Suite 240
Mineola, NY 11501
516-248-3312
Fax: 516-747-6432
Email: Helena.lynch@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
New York State Office of the Attorney
General
200 Old Country Road
Suite 240
Mineola, NY 11501
516-248-3200
Email: rakim.johnson@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**
NYS Office of The Attorney General
300 Motor Parkway
Ste 230
Hauppauge, NY 11788
631-231-2169
Email: rudolph.baptiste@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kathleen M. Cashin**    represented by    **Helena Ann Lynch**
*in her official capacity as a member of the*    (See above for address)
*New York State Board of Regents*    *ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**

A-4

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**James E. Cotrell**
*in his official capacity as a member of the*
*New York State Board of Regents*

represented by **Helena Ann Lynch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Judith Chin**
*in her official capacity as a member of the*
*New York State Board of Regents*

represented by **Helena Ann Lynch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Aramina Vega Ferrer**
*in her official capacity as a member of the*
*New York State Board of Regents*

represented by **Helena Ann Lynch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Shino Tanikawa**
*in her official capacity as a member of the*
*New York State Board of Regents*

represented by **Helena Ann Lynch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**

A-5

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Roger P. Catania**
*in his official capacity as a member of the New York State Board of Regents*

represented by **Helena Ann Lynch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Adrian I. Hale**
*in his official capacity as a member of the New York State Board of Regents*

represented by **Helena Ann Lynch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lester W. Young, Jr**
*in his official capacity as Chancellor of the New York State Board of Regents*

represented by **Helena Ann Lynch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Josephine Victoria Finn**
*in her official capacity as Vice Chancellor of the New York State Board of Regents,*

represented by **Helena Ann Lynch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**

A-6

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Roger Tilles**
*in his official capacity as a member of the
New York State Board of Regents*

represented by **Helena Ann Lynch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Christine D. Cea**
*in her official capacity as a member of the
New York State Board of Regents*

represented by **Helena Ann Lynch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Wade S. Norwood**
*in his official capacity as a member of the
New York State Board of Regents*

represented by **Helena Ann Lynch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Catherine Collins**
*in her official capacity as a member of the
New York State Board of Regents*

represented by **Helena Ann Lynch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**

A-7

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Elizabeth S. Hakanson**
*in her official capacity as a member of the*
*New York State Board of Regents*

represented by **Helena Ann Lynch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Luis O. Reyes**
*in his official capacity as a member of the*
*New York State Board of Regents,*

represented by **Helena Ann Lynch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Susan W. Mittler**
*in her official capacity as a member of the*
*New York State Board of Regents*

represented by **Helena Ann Lynch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Frances G. Wills**
*in her official capacity as a member of the*
*New York State Board of Regents*

represented by **Helena Ann Lynch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rakim Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rudolph Max Baptiste**

A-8

(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/29/2023 | 1 | COMPLAINT against Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr filing fee $ 402, receipt number ANYEDC-17135496 Was the Disclosure Statement on Civil Cover Sheet completed -No,, filed by Wantagh Union Free School District Board of Education, Wantagh Union Free School District, Charlie Reed, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education, Anthony Greco. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons) (Kleinberg, Adam) Modified on 10/3/2023 (LJ). (Entered: 09/29/2023) |
| 10/03/2023 | 2 | This attorney case opening filing has been checked for quality control. See the attachment for corrections that were made. (LJ) (Entered: 10/03/2023) |
| 10/03/2023 | | Case Assigned to Magistrate Judge Lee G. Dunst. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (LJ) (Entered: 10/03/2023) |
| 10/03/2023 | 3 | Clerks Notice Re: Consent. A magistrate judge has been assigned as the presiding judge in this case as part of a Pilot Program, governed by EDNY Administrative Order 2023-23. In accordance with Rule 73 of the Federal Rules of Civil Procedure, Local Rule 73.1, the parties are notified that if all parties consent, the assigned Magistrate Judge is available to conduct all proceedings in this action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to this Notice is a blank copy of the consent form that should be filled out, signed and filed electronically only if all parties wish to consent. The form is also available here: https://www.nyed.uscourts.gov/edny-direct-assignment-pilot-program. Any party may withhold its consent without adverse substantive consequences. Do NOT return or file the consent unless all parties have signed the consent. Unless all parties consent to the Magistrate Judge jurisdiction by the deadline set forth in the Administrative Order 2023-23, a District Judge will be assigned to the case. The parties are directed to review the terms of Administrative Order 2023-23 and other materials related to the Pilot Program on the Courts website: https://www.nyed.uscourts.gov/edny-direct-assignment-pilot-program. (LJ) (Entered: 10/03/2023) |
| 10/03/2023 | 4 | Summons Issued as to All Defendants. (LJ) (Entered: 10/03/2023) |
| 10/17/2023 | 5 | SUMMONS Returned Executed by Wantagh Union Free School District Board of Education, Wantagh Union Free School District, Charlie Reed, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education, Anthony Greco. Kathleen M. Cashin served on 10/11/2023, answer due 11/1/2023; Roger P. Catania served on 10/11/2023, answer due 11/1/2023; Christine D. Cea served on 10/11/2023, answer due 11/1/2023; Judith Chin served on 10/11/2023, answer due 11/1/2023; Catherine Collins served on 10/11/2023, answer due 11/1/2023; James E. Cotrell served on 10/11/2023, answer due 11/1/2023; Josephine Victoria Finn served on 10/11/2023, answer due 11/1/2023; Elizabeth S. Hakanson served on 10/11/2023, answer due 11/1/2023; Adrian I. Hale served on 10/11/2023, answer due 11/1/2023; Susan W. Mittler served on 10/11/2023, answer due 11/1/2023; New York State Board of Regents served on 10/11/2023, answer due 11/1/2023; Wade S. Norwood served on 10/11/2023, answer due 11/1/2023; Luis O. Reyes served on 10/11/2023, answer due 11/1/2023; Shino Tanikawa |

| | | |
|---|---|---|
| | | served on 10/11/2023, answer due 11/1/2023; Roger Tilles served on 10/11/2023, answer due 11/1/2023; Aramina Vega Ferrer served on 10/11/2023, answer due 11/1/2023; Frances G. Wills served on 10/11/2023, answer due 11/1/2023; Lester W. Young, Jr served on 10/11/2023, answer due 11/1/2023. (Attachments: # 1 Affidavit of Service Affidavit of Service on Aramina Vega Ferrer, # 2 Affidavit of Service Affidavit of Service on Catherine Collins, # 3 Affidavit of Service Affidavit of Service on Christine D Cea, # 4 Affidavit of Service Affidavit of Service on Elizabeth S Hakanson, # 5 Affidavit of Service Affidavit of Service on Frances G Wills, # 6 Affidavit of Service Affidavit of Service on James E Cotrell, # 7 Affidavit of Service Affidavit of Service on Josephine Victoria Finn, # 8 Affidavit of Service Affidavit of Service on Judith Chin, # 9 Affidavit of Service Affidavit of Service on Kathleen M Cashin, # 10 Affidavit of Service Affidavit of Service on Lester W Young Jr, # 11 Affidavit of Service Affidavit of Service on Luis O Reyes, # 12 Affidavit of Service Affidavit of Service on NEW YORK STATE BOARD OF REGENTS, # 13 Affidavit of Service Affidavit of Service on Roger P Catania, # 14 Affidavit of Service Affidavit of Service on Roger Tilles, # 15 Affidavit of Service Affidavit of Service on Shino Tanikawa, # 16 Affidavit of Service Affidavit of Service on Susan W Mittler, # 17 Affidavit of Service Affidavit of Service on Wade S Norwood) (Kleinberg, Adam) (Entered: 10/17/2023) |
| 10/23/2023 | 6 | NOTICE of Appearance by Rudolph Max Baptiste on behalf of All Defendants (aty to be noticed) (Baptiste, Rudolph) (Entered: 10/23/2023) |
| 10/23/2023 | 7 | Letter MOTION for Extension of Time to File Response/Reply as to 5 Summons Returned Executed,,,,,,,,,, 1 Complaint,,, by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr. (Baptiste, Rudolph) (Entered: 10/23/2023) |
| 10/23/2023 | 8 | NOTICE of Change of PRIMARY NOTICE EMAIL ADDRESS *FOR DEFENDANTS' COUNSEL* Once the filing has been made, you must login to www.pacer.gov and update your account. (Baptiste, Rudolph) (Entered: 10/23/2023) |
| 10/23/2023 | | SCHEDULING ORDER: The Court will hold an Initial Conference on 1/18/2024 at 11:00AM in Courtroom 830 of the Alfonse M. DAmato Federal Courthouse, Central Islip. The parties are directed to follow Judge Dunst's Individual Practice Rules, which are available on the Court's website, and submit a proposed discovery plan/scheduling order at least five business days prior to the initial conference pursuant to Judge Dunst's Individual Practice Rule IV.A.1. Ordered by Magistrate Judge Lee G. Dunst on 10/23/2023. (CT) (Entered: 10/23/2023) |
| 10/24/2023 | | ORDER granting 7 Motion for Extension of Time to File Response/Reply. Defendants' request at DE 7 for an extension of time to respond to Plaintiff's Complaint is GRANTED. Defendants shall have until **11/20/2023** to respond to Plaintiff's Complaint. Ordered by Magistrate Judge Lee G. Dunst on 10/24/2023. (CT) (Entered: 10/24/2023) |
| 10/25/2023 | 9 | Letter MOTION to Adjourn Conference by Anthony Greco, Charlie Reed, Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education. (Kleinberg, Adam) (Entered: 10/25/2023) |
| 10/26/2023 | | ORDER granting 9 Motion to Adjourn Conference. The Initial Conference previously scheduled for 1/18/2024 is ADJOURNED to 1/22/2024 at 12:00PM in Courtroom 830, Alfonse M. D'Amato U.S. Courthouse, Central Islip. Ordered by Magistrate Judge Lee G. Dunst on 10/26/2023. (CT) (Entered: 10/26/2023) |

| | | |
|---|---|---|
| 11/01/2023 | 10 | NOTICE of Appearance by Helena Ann Lynch on behalf of All Defendants (aty to be noticed) (Lynch, Helena) (Entered: 11/01/2023) |
| 11/01/2023 | 11 | NOTICE by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills *of filing of motion in captioned case for determination that captioned case is related to case docketed herein* (Attachments: # 1 Exhibit 1 (letter motion for determination that cases are related), # 2 Exhibit 2 (declaration of Helena Lynch and Ex. 1 thereto)) (Lynch, Helena) (Entered: 11/01/2023) |
| 11/07/2023 | | ORDER: Plaintiffs shall respond to DE 11 by 11/17/2023. Ordered by Magistrate Judge Lee G. Dunst on 11/7/2023. (CT) (Entered: 11/07/2023) |
| 11/17/2023 | 12 | REPLY in Opposition re 11 Notice(Other),, *Response to Defendants Premotion Letter* filed by All Plaintiffs. (Kleinberg, Adam) (Entered: 11/17/2023) |
| 11/20/2023 | 13 | Letter *pursuant to General Administrative Order No.: 2023-23 Stating Intent to Move to Dismiss the Complaint* by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr (Baptiste, Rudolph) (Entered: 11/20/2023) |
| 11/20/2023 | 14 | NOTICE of Appearance by Chelsea Ella Weisbord on behalf of All Plaintiffs (aty to be noticed) (Weisbord, Chelsea) (Entered: 11/20/2023) |
| 11/21/2023 | | SCHEDULING ORDER: The undersigned is assigned to four cases recently filed by four different school districts and others against the same set of defendants. *See Massapequa Union Free Sch. Dist. v. NYS Bd. of Regents, et al.*, No. 23-CV-7052 (MKB)(LGD); *Wantagh Union Free Sch. Dist., et al v. NYS Bd. of Regents, et al.*, No. 23-CV-07299 (LGD); *Connetquot Central Sch. Dist. et al v. NYS Bd. of Regents, et al.*, No. 23-CV-07696 (LGD); and *Amityville Union Free Sch. Dist. et al v. NYS Bd. of Regents et al.*, No. 23-CV-08011 (LGD). According to the identical first paragraph in all four complaints, "[t]his is a hybrid Article 78 proceeding and declaratory judgment action seeking to annul Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools (hereinafter 'Part 123') and enjoin its enforcement." *Id*. The parties are represented by the same attorneys in all four cases. *Id*. The parties have filed recent letters with Chief Judge Margo K. Brodie and/or the undersigned in these four cases on the following issues: (1) determination of whether these four cases are related under this Court's Local Rule 1.6 and Rule 3(b) of this Court's Division of Business Rules; (2) current and impending pre-motion conference requests regarding Defendants' anticipated motions to dismiss in all four cases; and (3) assignment of three of the aforementioned cases to the undersigned pursuant to the Court's Direct Assignment Pilot Program under General Administrative Order No.: 2023-23.<br><br>To address these topics, a Status Conference is scheduled for 12/4/2023 at 10:00AM in Courtroom 830 of the U.S. District Court E.D.N.Y. Long Island Courthouse, located at 100 Federal Plaza, Central Islip, New York. Finally, all upcoming deadlines in all four cases are stayed pending that 12/4/2023 conference. Ordered by Magistrate Judge Lee G. Dunst on 11/21/2023. (CT) (Entered: 11/21/2023) |
| 12/01/2023 | | ORDER: Pursuant to the Court's 11/21/2023 Order, the undersigned is conducting a status conference on 12/4/2023 at 10:00AM in the following four cases: *Massapequa Union Free Sch. Dist. v. NYS Bd. of Regents, et al.*, No. 23-CV-7052 (MKB)(LGD); *Wantagh Union* |

A-11

| | | |
|---|---|---|
| | | *Free Sch. Dist., et al v. NYS Bd. of Regents, et al.*, No. 23-CV-07299 (LGD); *Connetquot Central Sch. Dist. et al v. NYS Bd. of Regents, et al.*, No. 23-CV-07696 (LGD); and *Amityville Union Free Sch. Dist. et al v. NYS Bd. of Regents et al.*, No. 23-CV-08011 (LGD). The New York State Office of the Attorney General ("NYAG") represents Defendants in all four actions as follows: *Massapequa* (Ms. Helena Lynch); *Wantagh* (Ms. Lynch and Mr. Rudolph Baptiste); *Connetquot* (Ms. Lynch); and *Amityville* (Ms. Lynch and Mr. Baptiste). Notwithstanding the fact that the NYAG represents Defendants in all four actions, it *appears* that the NYAG seeks inconsistent relief as to (1) whether these cases should be related, and (2) whether they all should be reassigned to the same district court judge (presumably Chief Judge Margo K. Brodie who is presiding in the *Massapequa* case) or randomly to any district court judge. In the *Massapequa* case, Ms. Lynch's letter to Chief Judge Brodie requests that all four cases be related and presumably assigned to the Chief Judge. DE 12 at 3. In the *Wantagh* case, Ms. Lynch filed a copy of the same letter to Chief Judge Brodie regarding possible relatedness of these four actions (DE 11 ) and, in light of the intended dismissal motion, Mr. Baptiste separately requests that "the Clerk of the Court randomly reassign this matter to an Article III District Judge" (DE 13 at 1 (emphasis added)). In the *Connetquot* case, Ms. Lynch filed a copy of the same letter to Chief Judge Brodie regarding possible relatedness of these four actions (DE 8) and, in light of the intended dismissal motion, Ms. Lynch separately states that "*a District Judge* will be assigned to the matter" (DE 11 (emphasis added)). In the *Amityville* case, Ms. Lynch filed a copy of the same letter to Chief Judge Brodie regarding possible relatedness of these four actions (DE 7 ) and, in light of the intended dismissal motion, Mr. Baptiste separately requests that "the Clerk of the Court randomly reassign this matter to an *Article III District Judge*" (DE 9 at 1 (emphasis added)). In light of the apparent inconsistency and lack of clarity in the NYAG's submissions across these four cases, it is hereby ORDERED that Defendants submit a letter (limited to two pages and no exhibits) by **12/4/2023 at 9:00AM** that clearly and succinctly states what relief Defendants are seeking in all four actions as to possible relatedness and possible reassignment to a District Court Judge. Ordered by Magistrate Judge Lee G. Dunst on 12/1/2023. (CT) (Entered: 12/01/2023) |
| 12/02/2023 | 15 | Letter *pursuant to docket Order dated 12/1/2023 to clarify relief sought by Defendants with respect to related cases* by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr (Lynch, Helena) (Entered: 12/02/2023) |
| 12/04/2023 | 16 | Minute Entry for proceedings held on 12/4/2023 before Magistrate Judge Lee G. Dunst: Civil Cause for Status Conference. Counsel for Plaintiff: Chelsea Ella Weisbord, Adam I. Kleinberg. Counsel for Defendant: Helena Ann Lynch, Rudolph Max Baptiste. FTR #: 10:02-10:48. Case called. Counsel for all sides present. The parties are directed to meet and confer regarding (1) whether they agree that some or all of the referenced cases are related; (2) whether these cases should be assigned to the same District Judge or Magistrate Judge; and (3) whether the parties jointly consent to the undersigned for some or all purposes. The parties shall submit a joint letter by 12/18/2023 addressing these issues. All deadlines remain in abeyance while these issues are addressed. SO ORDERED by Magistrate Judge Lee G. Dunst on 12/4/2023. (CT) (Entered: 12/04/2023) |
| 12/14/2023 | 17 | Letter *on behalf of all parties* by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr (Lynch, Helena) (Entered: 12/14/2023) |
| 12/15/2023 | | OMNIBUS ORDER: The undersigned is in receipt of the identical joint 12/14/2023 letter from the parties in the following cases: *Massapequa Union Free Sch. Dist. v. NYS Bd. of* |

| | | |
|---|---|---|
| | | *Regents, et al.*, No. 23-CV-7052 (MKB)(LGD); *Wantagh Union Free Sch. Dist., et al v. NYS Bd. of Regents, et al.*, No. 23-CV-07299 (LGD); *Connetquot Central Sch. Dist. et al v. NYS Bd. of Regents, et al.*, No. 23-CV-07696 (LGD); and *Amityille Union Free Sch. Dist. et al v. NYS Bd. of Regents et al.*, No. 23-CV-08011 (LGD). It is hereby ORDERED as follows: (1) the parties' request to designate these four cases as related pursuant to Rule 3(a) of the Eastern District of New York's Division of Business Rules is GRANTED; (2) the parties' request to assign these four cases to the same District Judge is GRANTED; (3) all four cases shall be reassigned to Judge Margo K. Brodie; and (4) the parties shall meet and confer and submit by **1/4/2024** a proposed schedule for motion practice in the four related cases (including Plaintiff's anticipated motion to amend the complaint and Defendants' motion to dismiss) pursuant to Judge Brodie's Individual Practice Rules. Ordered by Magistrate Judge Lee G. Dunst on 12/15/2023. (MO) (Entered: 12/15/2023) |
| 12/15/2023 | | NOTICE to Assign District Judge: The Clerk of Court is directed to reassign this case to Judge Margo K. Brodie as related to *Massapequa Union Free Sch. Dist. v. NYS Bd. of Regents, et al.*, No. 23-CV-7052 (MKB)(LGD). Ordered by Magistrate Judge Lee G. Dunst on 12/15/2023. (MO) (Entered: 12/15/2023) |
| 01/03/2024 | 18 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on December 4, 2023, before Magistrate Judge Lee G. Dunst. Transcriber Fiore Reporting and Transcription Service, Inc., Telephone number 203-732-6461. Email address: cmfiore@sbcglobal.net. Transcript may be viewed at the court public terminal or purchased through the Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/24/2024. Redacted Transcript Deadline set for 2/5/2024. Release of Transcript Restriction set for 4/2/2024. (DC) (Entered: 01/03/2024) |
| 01/03/2024 | 19 | MOTION for Extension of Time to File *Proposed Briefing Schedule* by Anthony Greco, Charlie Reed, Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education. (Weisbord, Chelsea) (Entered: 01/03/2024) |
| 01/04/2024 | | ORDER granting 19 Motion for Extension of Time to File. The parties shall file a proposed briefing schedule by **1/11/2024**. Ordered by Magistrate Judge Lee G. Dunst on 1/4/2024. (CT) (Entered: 01/04/2024) |
| 01/04/2024 | | ORDER REASSIGNING CASE. Case reassigned to Chief Judge Margo K. Brodie for all further proceedings. Magistrate Judge Lee G. Dunst no longer assigned to case Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such.Ordered by Chief Judge Margo K. Brodie on 1/4/2024. (CV) (Entered: 01/04/2024) |
| 01/05/2024 | | Case Reassignment to Magistrate Judge Lee G. Dunst. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (CV) (Entered: 01/05/2024) |
| 01/10/2024 | 20 | Proposed Scheduling Order *for pls.' motion to amend, defs.' motion to dismiss* by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr (Lynch, Helena) (Entered: 01/10/2024) |
| 01/11/2024 | | ORDER: The proposed scheduling order at DE 20 is GRANTED. Plaintiffs shall file amended complaints by **1/16/2024**. Defendants shall file pre-motion letters consistent with |

| | | |
|---|---|---|
| | | Judge Brodie's Individual Practice Rules by **2/16/2024**. Plaintiffs shall file their responses by **3/1/2024**. Ordered by Magistrate Judge Lee G. Dunst on 1/11/2024. (CT) (Entered: 01/11/2024) |
| 01/16/2024 | 21 | Proposed Scheduling Order *and discovery plan* by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr (Lynch, Helena) (Entered: 01/16/2024) |
| 01/16/2024 | 22 | Proposed Scheduling Order *and discovery plan (Corrected)* by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr (Lynch, Helena) (Entered: 01/16/2024) |
| 01/16/2024 | 23 | Letter MOTION for Extension of Time to Amend *Complaint* by Anthony Greco, Charlie Reed, Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education. (Weisbord, Chelsea) (Entered: 01/16/2024) |
| 01/16/2024 | 24 | AMENDED COMPLAINT against All Defendants, filed by Wantagh Union Free School District Board of Education, Wantagh Union Free School District, Charlie Reed, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education, Anthony Greco. (Kleinberg, Adam) (Entered: 01/16/2024) |
| 01/22/2024 | 25 | Minute Entry for proceedings held on 1/22/2024 before Magistrate Judge Lee G. Dunst: Civil Cause for Initial Conference. Counsel for Plaintiff: Chelsea Ella Weisbord. Counsel for Defendant: Helena Ann Lynch, Rudolph Max Baptiste. Next Conference: Status Conference - 5/29/2024 at 12:00PM via AT&T Teleconference (877-402-9753 - Access Code: 2785175). FTR #: 12:06-12:22. Case called. Counsel for all sides present. For the reasons stated on the record, the proposed schedule is APPROVED as follows: The deadline for a proposed amendment of the pleadings to add claims or join additional parties is 3/29/2024. Any future motions to amend the pleadings on or after 3/30/2024 will be denied absent a showing of good cause, pursuant to Fed. R. Civ. P. 16(b)(4). *See Sacerdote v. New York University*, 9 F. 4th 95, 115 (2d CIr. 2021). Fact discovery shall be completed by 6/3/2024. Expert reports shall be exchanged by 7/31/2024. Expert discovery shall be completed by 9/15/2024. The deadline for submission of joint certification for the completion of all discovery is 9/30/2024. The deadline to take the first step in dispositive motion practice consistent with Chief Judge Brodie's Individual Practice Rules is 11/15/2024. Additionally, the motions at DE 23 in 2:23-cv-072999-MKB-LGD *Wantagh Union Free School District et al v. New York State Board of Regents et al* and DEs 12 , 14 , and 15 in 2:23-cv-07052-MKB-LGD *Massapequa Union Free School District et al v. New York State Board of Regents et al* are DENIED AS MOOT. SO ORDERED by Magistrate Judge Lee G. Dunst on 1/22/2024. (CT) (Entered: 01/23/2024) |
| 02/16/2024 | 26 | MOTION for pre motion conference *on Defendants' anticipated motion to dismiss pursuant to Rule 12(b)(1) and 12(b)(6)* by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr. (Lynch, Helena) (Entered: 02/16/2024) |

| | | |
|---|---|---|
| 03/01/2024 | 27 | REPLY in Opposition re 26 MOTION for pre motion conference *on Defendants' anticipated motion to dismiss pursuant to Rule 12(b)(1) and 12(b)(6) to dismiss the Amended Complaint* filed by All Plaintiffs. (Kleinberg, Adam) (Entered: 03/01/2024) |
| 03/05/2024 | | ORDER REFERRING MOTION: 26 MOTION for pre-motion conference on Defendants' anticipated motion to dismiss. The pre-motion conference is respectfully referred to Magistrate Judge Lee G. Dunst. Ordered by Chief Judge Margo K. Brodie on 3/5/2024. (WV) (Entered: 03/05/2024) |
| 03/08/2024 | | ORDER granting 26 Motion for Pre Motion Conference. The Court shall hold a pre-motion Conference on 3/20/2024 at 2:00PM in Courtroom 830 of the U.S. District Court E.D.N.Y. Long Island Courthouse, located at 100 Federal Plaza, Central Islip, New York. Ordered by Magistrate Judge Lee G. Dunst on 3/8/2024. (CT) (Entered: 03/08/2024) |
| 03/13/2024 | 28 | MOTION to Amend/Correct/Supplement *Defendants' pre-motion letter to assert additional defense* by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer. (Lynch, Helena) (Entered: 03/13/2024) |
| 03/14/2024 | | ORDER granting in part and denying in part 28 Motion to Amend/Correct/Supplement. Per DE 28 , Defendants seek to supplement their pre-motion conference letter to assert new bases for the proposed motion to dismiss. The motion to "supplement" is DENIED. The motion to seek to assert additional bases for the motion to dismiss is GRANTED. The previously-submitted pre-motion conference letter is deemed WITHDRAWN WITHOUT PREJUDICE. Defendants may submit a new pre-motion conference letter setting forth all bases for the motion to dismiss by 3/25/2024. Plaintiff's may respond by 4/8/2024. The motion conference previously scheduled for 3/20/2024 is ADJOURNED to 4/26/2024 at 2:00PM in Courtroom 830 of the U.S. District Court E.D.N.Y. Long Island Courthouse, located at 100 Federal Plaza, Central Islip, New York. Ordered by Magistrate Judge Lee G. Dunst on 3/14/2024. (CT) (Entered: 03/14/2024) |
| 03/25/2024 | 29 | MOTION for pre motion conference by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr. (Lynch, Helena) (Entered: 03/25/2024) |
| 04/08/2024 | 30 | REPLY in Opposition re 29 MOTION for pre motion conference filed by Charlie Reed, Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education. (Weisbord, Chelsea) (Entered: 04/08/2024) |
| 04/15/2024 | | ORDER: Defendants' pre-motion letters in *Amityville* (DE 25 ), *Connetquot* (DE 25 ), and *Wantagh* (DE 29 ) appear to refer to the wrong individual Plaintiffs and appear to copy and paste Plaintiff Caramore from the *Massapequa* case (DE 29 ). In contrast, Plaintiffs' opposition letters all refer to the correct parties in the four related actions. Defendants shall file a letter (limited to two pages) by 4/17/2024 at 4:30 PM that addresses their apparent mistake in their prior letters regarding the identity of the individual Plaintiffs. Ordered by Magistrate Judge Lee G. Dunst on 4/15/2024. (CT) (Entered: 04/15/2024) |
| 04/15/2024 | 31 | Letter *correcting names of individual plaintiffs referenced in pre-motion letter argument on First Amendment claim* by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, |

| | | Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr (Lynch, Helena) (Entered: 04/15/2024) |
|---|---|---|
| 04/26/2024 | [32](#) | Minute Order for proceedings held on 4/26/2024 before Magistrate Judge Lee G. Dunst: Civil Cause for Pre Motion Conference. Counsel for Plaintiff: Chelsea Ella Weisbord, Adam I. Kleinberg. Counsel for Defendant: Helena Ann Lynch, Rudolph Max Baptiste. Next Conference: Status Conference - 9/13/2024 at 2:00PM via Zoom. FTR #: 2:06-2:41. Case called. Counsel for all sides present. For the reasons stated on the record, the pre-motion requests at DEs [29 and [25](#) are GRANTED. The parties shall file a unified brief in each case. The briefing schedule is set as follows: Defendant shall serve its opening brief on Plaintiffs by 6/7/2024. Plaintiff shall serve its response by 7/12/2024. Defendant shall serve its reply by 8/9/2024. The briefs shall be filed on 8/9/2024 consistent with Chief Judge Brodie's Individual Rules. The opening and response briefs shall be limited to 40 pages. The reply brief shall be limited to 20 pages. SO ORDERED by Magistrate Judge Lee G. Dunst on 4/26/2024. (CT) (Entered: 04/29/2024) |
| 05/10/2024 | [33](#) | Joint MOTION for Extension of Time to Complete Discovery by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr. (Lynch, Helena) (Entered: 05/10/2024) |
| 05/13/2024 | | ORDER granting [33](#) Motion for Extension of Time to Complete Discovery: The motion at DE [33](#) for an extension of time to complete discovery is GRANTED. Fact discovery shall be completed by **7/31/2024**. Ordered by Magistrate Judge Lee G. Dunst on 5/13/2024. (MO) (Entered: 05/13/2024) |
| 06/03/2024 | [34](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on April 26, 2024, before Magistrate Judge Lee G. Dunst. Transcriber Aria Services, Inc., Telephone number 845-260-1377. Email address: Aria@leinen.net. Transcript may be viewed at the court public terminal or purchased through the Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/24/2024. Redacted Transcript Deadline set for 7/4/2024. Release of Transcript Restriction set for 9/2/2024. (DC) (Entered: 06/03/2024) |
| 06/07/2024 | [35](#) | Letter *Cover letter for Defendants' opening papers on their motion to dismiss* by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr (Lynch, Helena) (Entered: 06/07/2024) |
| 07/02/2024 | [36](#) | MOTION to Stay *further discovery pending motion to dismiss* by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr. (Lynch, Helena) (Entered: 07/02/2024) |
| 07/03/2024 | | ORDER denying [36](#) Motion to Stay. Defendants letter motion seeking to stay discovery is DENIED WITHOUT PREJUDICE due to the violation of the undersigned's Rule IV.D, which provides that the proper method to raise discovery issues with the Court is in a **joint** letter from the parties. Ordered by Magistrate Judge Lee G. Dunst on 7/3/2024. (CT) (Entered: 07/03/2024) |

A-16

| 07/10/2024 | 37 | Letter MOTION for Extension of Time to File Response/Reply by Anthony Greco, Charlie Reed, Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education. (Weisbord, Chelsea) (Entered: 07/10/2024) |
|---|---|---|
| 07/11/2024 | | ORDER granting 37 Motion for Extension of Time to File Response/Reply. Plaintiff's opposition to Defendant's motion to dismiss shall now be submitted by 7/26/2024. Defendant's reply shall be submitted by 8/14/2024. The parties shall file all motion papers by 8/14/2024. Ordered by Magistrate Judge Lee G. Dunst on 7/11/2024. (CT) (Entered: 07/11/2024) |
| 07/24/2024 | 38 | Letter MOTION for Leave to File Excess Pages by Anthony Greco, Charlie Reed, Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education. (Kleinberg, Adam) (Entered: 07/24/2024) |
| 07/25/2024 | | ORDER granting 38 Motion for Leave to File Excess Pages: Plaintiffs' opposition brief shall not exceed 65 pages and Defendants' reply brief shall not exceed 45 pages. Additionally, the parties are on notice that any supporting affidavits and exhibits must be "necessary for the decision of the motion." Local Civil Rule 7.1(a)(3). Submission of excessive supporting materials in violation of this Local Rule may result in rejection of the parties' filings. *See, e.g.*, *Field v. Bayerische Motoren Werke Aktiengesellshaft*, 594 F. Supp. 3d 530 (E.D.N.Y. 2022) (rejecting court filings due to the parties' failure to comply with (among other things) "the Local Rules of this District"); *CareMatrix Corp. v. Kaplan*, No. 05-CV3173, 2012 WL 13102106, at *2 (E.D.N.Y. July 3, 2012) (rejecting declaration that was not "limited to 'factual information and portions of the record necessary for decision of the motion'" (quoting Local Rule 7.1(a)(3))); *see also Losacco v. City of Middletown*, 71 F.3d 88, 92 (2d Cir. 1995) (affirming "the district court's interpretation and application of its own local rule" and noting such a decision is one to which the Second Circuit "must accord considerable deference"); *Shaoxing Daqin Imp. & Exp. Co. v. Notations, Inc.*, No. 19-CV-2732, 2019 WL 4198767, at *2 (S.D.N.Y. July 30, 2019) (holding it was "blatantly improper" for the parties to have "attached voluminous exhibits" to their motion to dismiss briefs); *Veliz v. Crown Lift Trucks*, 714 F. Supp. 49, 58 (E.D.N.Y. 1989) (noting that "the practice of throwing in the kitchen sink at times may be so abusive as to merit Rule 11 condemnation") (citation omitted).<br><br>Finally, in light of approval of the parties requests for additional briefing, the Court *sua sponte* extends the deadline for the parties to file all motion papers to **9/6/2024** and direct the parties to meet and confer regarding the need, if any, to adjust the previously-approved deadlines for the parties to serve the opposition and reply briefs (*see* 7/11/2024 Order) and advise the Court if they seek to revise that schedule. Ordered by Magistrate Judge Lee G. Dunst on 7/25/2024. (MO) (Entered: 07/25/2024) |
| 07/26/2024 | 39 | Joint MOTION for Extension of Time to Complete Discovery by Anthony Greco, Charlie Reed, Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education. (Weisbord, Chelsea) (Entered: 07/26/2024) |
| 07/29/2024 | | ORDER granting 39 Motion for Extension of Time to Complete Discovery. Fact discovery shall be completed by 8/16/2024. The deadline for Defendants to submit their reply papers is 9/6/2024. Ordered by Magistrate Judge Lee G. Dunst on 7/29/2024. (CT) (Entered: 07/29/2024) |
| 08/14/2024 | | STATUS REPORT ORDER: The Status Conference previously scheduled for 9/13/2024 is CANCELLED. The parties shall submit a joint status report by 9/13/2024. Ordered by Magistrate Judge Lee G. Dunst on 8/14/2024. (CT) (Entered: 08/14/2024) |

| 09/06/2024 | 40 | MOTION to Dismiss for Failure to State a Claim *and for lack of capacity and lack of jurisdiction* by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr. (Attachments: # 1 Memorandum in Support (combined memorandum of law for 4 related cases), # 2 Declaration of Helena Lynch, # 3 Exhibit 1 (Background, FAQs for Part 123), # 4 Exhibit 2 (Appeal of McMillan), # 5 Exhibit 3 (Cambridge decision - Albany Supreme), # 6 Exhibit 4 (2001 Mills Memo), # 7 Exhibit 5 (2022 Baldwin Memo)) (Lynch, Helena) (Entered: 09/06/2024) |
| --- | --- | --- |
| 09/06/2024 | 41 | AFFIDAVIT/DECLARATION in Opposition re 40 MOTION to Dismiss for Failure to State a Claim *and for lack of capacity and lack of jurisdiction* filed by Anthony Greco, Charlie Reed, Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education. (Attachments: # 1 Exhibit A (massapequa amended complaint), # 2 Exhibit B (Wantagh and Wyandanch Proposed Amended Complaint), # 3 Exhibit C (Connetquot Proposed Amended Complaint), # 4 Exhibit D (Amityville Amended Complaint), # 5 Exhibit E (full regulatory text for Part 123), # 6 Exhibit F Legislative History of the Dignity for All Students Act, # 7 Exhibit G Senate Bill No. 1549 and Assembly Bill No. 5443, which were introduced during the 2021-2022 Legislative Session, # 8 Exhibit H Senate Bill No. 4052 introduced in the 2023-24 session, # 9 Exhibit I Massapequa Union Free School Districts June 22, 2023 resolution, # 10 Exhibit J June 1, 2023 Wantagh Replacement Plan, # 11 Exhibit K Senator Rhoades letter, dated June 14, 2023, # 12 Exhibit L June 15, 2023 Wantagh Union Free School Districts resolution stipulation, # 13 Memorandum in Opposition) (Kleinberg, Adam) (Entered: 09/06/2024) |
| 09/06/2024 | 42 | REPLY in Support re 40 MOTION to Dismiss for Failure to State a Claim *and for lack of capacity and lack of jurisdiction* filed by All Defendants. (Lynch, Helena) (Entered: 09/06/2024) |
| 09/13/2024 | 43 | Letter MOTION for pre motion conference *to move for Summary Judgment and Preliminary Injuction* by Anthony Greco, Charlie Reed, Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education. (Weisbord, Chelsea) (Entered: 09/13/2024) |
| 09/13/2024 | 44 | STATUS REPORT *(Joint)* by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr (Lynch, Helena) (Entered: 09/13/2024) |
| 09/16/2024 | | ORDER re 43 Letter MOTION for pre-motion conference. The Court directs Defendants to respond to Plaintiffs' request for a pre-motion conference on or before September 23, 2024. Ordered by Chief Judge Margo K. Brodie on 9/16/2024. (AF) (Entered: 09/16/2024) |
| 09/20/2024 | 45 | RESPONSE to Motion re 43 Letter MOTION for pre motion conference *to move for Summary Judgment and Preliminary Injuction* filed by All Defendants. (Lynch, Helena) (Entered: 09/20/2024) |
| 09/30/2024 | 46 | STATUS REPORT *Joint Certificate of Completion of Discovery* by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger |

A-18

| | | Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr (Lynch, Helena) (Entered: 09/30/2024) |
|---|---|---|
| 10/09/2024 | | ORDER granting 43 Motion for Pre Motion Conference. A pre motion conference is scheduled for October 22, 2024 at 11:30 AM. The parties are directed to call 1-571-353-2301 using access code 152624281. If any party has any difficulty accessing the telephone conference, please contact chambers at 718-613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Ordered by Chief Judge Margo K. Brodie on 10/9/2024. (WV) (Entered: 10/09/2024) |
| 10/10/2024 | 47 | Letter *Request Permission to Withdraw as Counsel* by Wantagh Union Free School District (Kleinberg, Adam) (Entered: 10/10/2024) |
| 10/11/2024 | | ORDER: Per DE 47 , attorney Adam Kleinberg "request[s] permission from the Court to withdraw as counsel of record for the plaintiffs." This request is GRANTED. The Clerk of the Court is respectfully directed to terminate Adam Kleinberg as counsel of record for Plaintiffs. Ordered by Magistrate Judge Lee G. Dunst on 10/11/2024. (MO) (Entered: 10/11/2024) |
| 10/14/2024 | 48 | NOTICE of Appearance by Steven C. Stern on behalf of Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education, Anthony Greco, Charlie Reed (aty to be noticed) (Stern, Steven) (Entered: 10/14/2024) |
| 10/21/2024 | | ORDER: The parties should be prepared to argue the 40 Motion to Dismiss at the October 22, 2024 pre-motion conference. Ordered by Judge Margo K. Brodie on 10/21/2024. (EPM) (Entered: 10/21/2024) |
| 10/22/2024 | | MINUTE ORDER: The Court held a conference on October 22, 2024, to hear oral arguments regarding 40 defendants' motion to dismiss and 43 plaintiffs' proposed motions for summary judgment and preliminary injunction. Chelsea Ella Weisbord and Steven C. Stern appeared on behalf of plaintiffs. Helena Ann Lynch, Rakim Johnson, and Rudolph Baptiste appeared on behalf of defendants. The Court heard extensive discussion of the various issues raised in the motion to dismiss submissions, as well as arguments as to the proposed motion for preliminary injunction. For the reasons explained on the record, the Court declined to exercise supplemental jurisdiction over plaintiffs' first and second claims brought pursuant to Article 78 and dismisses those claims without prejudice. The Court reserved decision on plaintiffs' third, fourth, and fifth claims. The parties are directed to file an agreed upon schedule with the Court for submission of letter briefs with any additional legal arguments or case law to clarify the issues currently before the Court. The parties will also file additional briefing on the irreparable harm element of plaintiffs' motion for preliminary injunction pursuant to the agreed upon schedule: plaintiffs shall file any additional briefing on or before November 5, 2024; defendants shall file a response on or before November 19, 2024; and plaintiffs may file a reply, if any, on or before November 26, 2024. For the reasons explained on the record, the Court denied plaintiffs' request to move for summary judgment. (Entered: 11/07/2024) |

| | | |
|---|---|---|
| 10/23/2024 | 49 | Letter *to answer the Court's inquiry regarding possible postponment of compliance date for Part 123* by Judith Chin, Aramina Vega Ferrer, Shino Tanikawa, Roger P. Catania, Adrian I. Hale, Lester W. Young, Jr, Josephine Victoria Finn, Roger Tilles, Christine D. Cea, Wade S. Norwood, Catherine Collins, Elizabeth S. Hakanson, Luis O. Reyes, Susan W. Mittler, Frances G. Wills, New York State Board of Regents, Kathleen M. Cashin, James E. Cotrell (Lynch, Helena) (Entered: 10/23/2024) |
| 10/30/2024 | 50 | Letter *with agreed-upon proposed briefing schedule for supplemental briefing on motion to dismiss* by Judith Chin, Aramina Vega Ferrer, Shino Tanikawa, Roger P. Catania, Adrian I. Hale, Lester W. Young, Jr, Josephine Victoria Finn, Roger Tilles, Christine D. Cea, Wade S. Norwood, Catherine Collins, Elizabeth S. Hakanson, Luis O. Reyes, Susan W. Mittler, Frances G. Wills, New York State Board of Regents, Kathleen M. Cashin, James E. Cotrell (Lynch, Helena) (Entered: 10/30/2024) |
| 10/31/2024 | | Order granting 50 Proposed Briefing Schedule. The Court adopts the parties' briefing schedule for their supplemental letter briefs for Defendants' motion to dismiss. Defendants will serve their supplemental letter brief on or before November 5, 2024; plaintiffs will serve their response, if any, on or before November 19, 2024; defendants shall serve their reply, if any, on or before November 26, 2024. Ordered by Judge Margo K. Brodie on 10/31/2024. (MMB) (Entered: 10/31/2024) |
| 11/05/2024 | 51 | MEMORANDUM in Support re 40 MOTION to Dismiss for Failure to State a Claim *and for lack of capacity and lack of jurisdiction (supplemental letter brief)* filed by All Defendants. (Lynch, Helena) (Entered: 11/05/2024) |
| 11/05/2024 | 52 | MEMORANDUM in Support *of Plaintiffs' Motion for Preliminary Injunction (supplemental letter brief)* filed by Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education, Anthony Greco, Charlie Reed. (Weisbord, Chelsea) (Entered: 11/05/2024) |
| 11/19/2024 | 53 | REPLY in Opposition re 51 Memorandum in Support filed by Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education, Anthony Greco, Charlie Reed. (Weisbord, Chelsea) (Entered: 11/19/2024) |
| 11/19/2024 | 54 | MEMORANDUM in Opposition re 52 Memorandum in Support, *Response to Pls.' supplemental brief in support of PI motion* filed by All Defendants. (Lynch, Helena) (Entered: 11/19/2024) |
| 11/26/2024 | 55 | NOTICE of Appearance by Rakim Johnson on behalf of All Defendants (aty to be noticed) (Johnson, Rakim) (Entered: 11/26/2024) |
| 11/26/2024 | 56 | REPLY in Support re 51 Memorandum in Support *Response to Pls.' supplemental brief in opposition of Defs.' motion to dismiss* filed by All Defendants. (Johnson, Rakim) (Entered: 11/26/2024) |
| 11/26/2024 | 57 | Letter MOTION for Extension of Time to File Response/Reply *in further support of Plaintiffs-petitioners' Motion for a Preliminary Injunction (on consent )* by Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education, Anthony Greco. (Weisbord, Chelsea) (Entered: 11/26/2024) |
| 11/26/2024 | | ORDER granting 57 Motion for Extension of Time to File Response/Reply. Plaintiffs are now directed to file a reply as to the irreparable harm element of their motion for preliminary injunction on or by December 6, 2024. Ordered by Judge Margo K. Brodie on 11/26/2024. (EPM) (Entered: 11/26/2024) |

A-20

| | | |
|---|---|---|
| 12/06/2024 | 58 | REPLY in Support re 52 Memorandum in Support, *response to defendants November 19, 2024 letter and in further support of plaintiffs motion for a prohibitory preliminary injunction* filed by Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education, Anthony Greco, Charlie Reed. (Weisbord, Chelsea) (Entered: 12/06/2024) |
| 03/27/2025 | 59 | MEMORANDUM AND ORDER granting 40 Defendants' Motion to Dismiss. For the reasons stated in the attached Memorandum and Order, the Court grants Defendants' motion to dismiss. First, the Court grants Defendants' motion to dismiss the constitutional separation of powers claims, as well as the First Amendment and Fourteenth Amendment claims, of School District Plaintiffs, School Board Plaintiffs, and Individual Board Member Plaintiffs suing in their official capacity for lack of capacity. Second, the Court grants Defendants' motion to dismiss Plaintiffs' as-applied and facial vagueness claims for failure to state a claim. Third, the Court grants Defendants' motion to dismiss Plaintiffs' overbreadth claims for failure to state a claim and grants Individual Board Member Plaintiffs leave to amend their Complaints to allege specific facts supporting their First Amendment-based overbreadth claims in their personal capacity. Fourth, the Court grants Defendants motion to dismiss Individual Board Member Plaintiffs' First Amendment free speech claims and grants Individual Board Member Plaintiffs in their personal capacity leave to amend their Complaints to allege specific facts supporting their First Amendment free speech claims. Fifth, the Court grants Defendants motion to dismiss Individual Board Member Plaintiffs' federal separation of powers claim and declines to exercise supplemental jurisdiction over Plaintiffs' state separation of powers claim. Any amended complaint must be filed within thirty days of this Memorandum and Order. If an amended complaint is not timely filed, the Court will direct the Clerk of Court to enter judgment and close this case. The Court denies Plaintiffs' motion for a preliminary injunction. Ordered by Judge Margo K. Brodie on 3/27/2025. (MMB, EPM) (Entered: 03/27/2025) |
| 04/08/2025 | 60 | Letter MOTION for Hearing by Anthony Greco, Charlie Reed, Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education. (Stern, Steven) (Entered: 04/08/2025) |
| 04/09/2025 | | ORDER: The parties' request for a Settlement Conference is GRANTED. However, due to other calendar commitments, the Court is only available as follows:<br><br>Tuesday, April 22, 2025 at 10:00 AM (in person)<br>Monday, May 19, 2025 at 11:00 AM (by Zoom)<br>Wednesday, May 21, 2025 at 11:00 AM (by Zoom)<br>Friday, June 6, 2025 at 10:00 AM (in person)<br><br>The parties shall advise the Court by **4/11/2025** of their preferred choice.<br><br>Ordered by Magistrate Judge Lee G. Dunst on 4/9/2025. (MJG) (Entered: 04/09/2025) |
| 04/10/2025 | 61 | Letter *to the court in response to April 9, 2025 Order* by Anthony Greco, Charlie Reed, Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education (Weisbord, Chelsea) (Entered: 04/10/2025) |
| 04/10/2025 | | ORDER: The parties shall attend an in-person Settlement Conference on **4/22/2025 at 10:30 AM** in Courtroom 830 of the Alfonse M. D'Amato U.S. Courthouse, Central Islip. Clients and those with settlement authority shall attend the Settlement Conference.<br><br>Prior to the conference, the parties must review and comply with the undersigned's |

A-21

| | | Individual Practice Rule V, which requires **mandatory** exchange of an offer and demand (Rule V.B) that takes place **prior** to submission of mandatory *ex parte* settlement statements to chambers (Rule V.C). The parties shall submit their *ex parte* submissions by **4/16/2025 at 4:30 PM**. Finally, in light of the compressed schedule for the Settlement Conference (as requested by the parties and necessitated by the undersigned's calendar commitments in other cases), the parties' *ex parte* submissions shall be limited to five pages with no more than fifteen pages of exhibits. Ordered by Magistrate Judge Lee G. Dunst on 4/10/2025. (GS) (Entered: 04/10/2025) |
|---|---|---|
| 04/16/2025 | 62 | Letter *withdrawing consent for settlement conference* by Kathleen M. Cashin, Roger P. Catania, Christine D. Cea, Judith Chin, Catherine Collins, James E. Cotrell, Josephine Victoria Finn, Elizabeth S. Hakanson, Adrian I. Hale, Susan W. Mittler, New York State Board of Regents, Wade S. Norwood, Luis O. Reyes, Shino Tanikawa, Roger Tilles, Aramina Vega Ferrer, Frances G. Wills, Lester W. Young, Jr (Lynch, Helena) (Entered: 04/16/2025) |
| 04/17/2025 | | ORDER: The Court is in receipt of the parties' *ex parte* letters, as well as Defendants' publicly filed letter (DE 62 ), regarding the upcoming Settlement Conference. Notwithstanding Defendants' letter at DE 62 , the Court has an independent obligation to explore the potential for resolution of all cases. *See In re Tobacco Litig.*, 192 F.R.D. 90, 95 (E.D.N.Y. 2000) (describing the Court's "duty to take affirmative action assisting the parties in all possible settlement options"). The Court therefore DENIES Defendants' request to cancel the upcoming Settlement Conference on 4/22/2025. However, the Court CONVERTS the Settlement Conference to Zoom video and will circulate a Zoom link to the parties closer to the conference date. Ordered by Magistrate Judge Lee G. Dunst on 4/17/2025. (GS) (Entered: 04/17/2025) |
| 04/22/2025 | 63 | Minute Entry for proceedings held on 4/22/2025 before Magistrate Judge Lee G. Dunst: Civil Cause for Settlement Conference. Counsel for Plaintiff: Steven C. Stern, Chelsea Ella Weisbord. Counsel for Defendant: Helena Ann Lynch, Rakim Johnson. Case not settled. (CT) (Entered: 04/24/2025) |
| 04/25/2025 | 64 | Letter *requesting the Court to issue a final judgment* by Anthony Greco, Charlie Reed, Wantagh Union Free School District, Wantagh Union Free School District Board of Education, Wyandanch Union Free School District, Wyandanch Union Free School District Board of Education (Weisbord, Chelsea) (Entered: 04/25/2025) |
| 04/25/2025 | | ORDER regarding 64 Letter requesting the Court to issue a final judgment. In view of Plaintiffs' 64 letter motion informing the Court that Plaintiffs will not file a second amended complaint, the Court directs the Clerk of Court to enter judgment and close the case. Ordered by Judge Margo K. Brodie on 4/25/2025.(MMB) (Entered: 04/25/2025) |
| 04/28/2025 | 65 | CLERK'S JUDGMENT: that judgment is hereby entered in favor of defendants. Signed by Deputy Clerk, Jalitza Poveda, on behalf of Clerk of Court, Brenna B. Mahoney, on 4/28/2025. (JP) (Entered: 04/28/2025) |
| 04/28/2025 | 66 | NOTICE OF APPEAL as to 59 Order on Motion to Dismiss for Failure to State a Claim,,,,,,, 65 Clerk's Judgment by Anthony Greco, Wantagh Union Free School District, Wantagh Union Free School District Board of Education. Filing fee $ 605, receipt number ANYEDC-18996062. (Stern, Steven) (Entered: 04/28/2025) |
| 04/29/2025 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 66 Notice of Appeal, Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 04/29/2025) |

A-22

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/01/2025 13:41:27 | | | |
| **PACER Login:** | cpwashington16 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:23-cv-07299-MKB-LGD |
| **Billable Pages:** | 26 | **Cost:** | 2.60 |

# EXHIBIT 1

A-24

# Background and Frequently Asked Questions Regarding Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools

## May 2023



A-25

Commissioner's Regulation Part 123 Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools

# Table of Contents

Introduction ................................................................................................................................. 3

Timeline Summary ..................................................................................................................... 4

Additional Guidance ................................................................................................................. 5

Frequently Asked Questions ................................................................................................... 5

Commissioner's Regulation Part 123 Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools

**Introduction**

The New York State Board of Regents (BOR) voted unanimously to adopt a new Part 123 of the Regulations of the Commissioner of Education ("the regulation") relating to prohibiting the use of Indigenous team names, mascots, and logos by public schools on April 18, 2023.[1] This regulation was effective on May 3, 2023. The requirements of the regulation reflect a longstanding Department policy (dating back over twenty-two years) and are clear in their purpose. This guidance, in the form of a frequently asked questions document, reinforces such requirements for the limited number of districts still using such names, mascots, and logos, or using vestiges of their prior use, and provides an aid to implementation.

Specifically, **team names, mascots, and logos derived from, or that have connections to, Indigenous peoples, in the past or at present, which are being used without the express consent of such peoples are contrary to the requirements of the regulation and New York State's Dignity for All Students Act and must change**.

> "Speaking for myself as a tribal leader and as an Indigenous person, the message that is being sent by this is that we're not a symbol, we're not a mascot, we're not history. We're real people that are still here and still exist"
>
> Germain Smith, General Council Secretary, Shinnecock Indian Nation

> "The use of American Indian mascots as symbols in schools and university athletic programs is particularly troubling because schools are places of learning. These mascots are teaching stereotypical, misleading and too often, insulting images of American Indians. These negative lessons are not just affecting American Indian students; they are sending the wrong message to all students."
>
> Ronald F. Levant, EdD, Former American Psychological Association President

---

[1] April 2023 Regents Item: Proposed Addition of Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools

Commissioner's Regulation Part 123 Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools

Heeding Commissioner Rosa's 2022 statement on civility,[2] the New York State Education Department (NYSED) expects that districts across New York will collaborate with their communities to convey a sense of understanding and purpose about the removal of team names, mascots, and logos connected with Indigenous peoples.

**Timeline Summary**

| Timeframe | Action | Resource |
|-----------|--------|----------|
| April 2001 | Release of Memo by then Commissioner Mills calling upon communities using Indigenous symbols, names, or mascots to end their use. | Public Schools Use of Native American Names, Symbols, and Mascots |
| September 2010 | Adoption of New York State's Dignity for All Students Act (DASA) | Dignity for All Students Act website |
| November 2021 | Appeal of McMillan et al. to the Commissioner of Education. | Decision No. 18,058: Appeal of McMillan et al. to the Commissioner of Education |
| June 2022 | Supreme Court (Albany County) affirmation of the Commissioner's determination in McMillan et al. | |
| November 2022 | Release of Memo by Senior Deputy Commissioner James N. Baldwin stating that "public school districts are prohibited from utilizing Native American mascots" and must commit to changing them by the end of the 2022-23 academic year. | Use of Native American Mascots |
| December 2022 | Release of draft regulation proposing the addition of Part 123 of the Regulations of the Commissioner of Education relating to prohibiting the use of Indigenous Names, Mascots, and Logos by Public Schools. | Proposed Addition of Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools |
| April 2023 | Final adoption of regulation adding Part 123 of the Regulations of the Commissioner of Education relating to prohibiting the use of Indigenous Names, Mascots, and Logos by Public Schools. | Proposed Addition of Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools |
| Ongoing | Any district that requires assistance or has questions can contact NYSED by emailing the Office of Indigenous Education. | mascotadvisory@nysed.gov |
| May 3, 2023 | Effective date of Part 123 of the Regulations of the Commissioner of Education relating to prohibiting the use of Indigenous Names, Mascots, and Logos by Public Schools. | Proposed Addition of Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools |
| May 3, 2023 | If applicable, written agreements between federally or state-recognized tribal nations must be in effect. | § 123.4(b) |
| June 30, 2023 | Boards of education must commit, via resolution, to eliminating the use of all Indigenous names, logos, and mascots. | § 123.3(a) |
| June 30, 2025 | Prohibited team names, mascots, or logos shall be eliminated. | § 123.3(a) |

---

[2] February 2022 Statement on Civility from Commissioner Betty A. Rosa

A-28

Commissioner's Regulation Part 123 Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools

**Additional Guidance**

Many school districts across the state, large and small, urban, suburban, and rural, have engaged in extensive community-driven processes to rebrand their team names, mascots, and logos in the twenty-two years since the initial memo by Commissioner Mills. These exemplar districts can offer advice and guidance on how to successfully transition away from Indigenous team names, mascots, or logos. NYSED has provided ongoing guidance and technical assistance to schools and districts with specific inquiries about this regulation through the NYSED Office of Indigenous Education via email at mascotadvisory@nysed.gov. School districts may also obtain technical assistance through their Board of Cooperative Educational Services (BOCES).

**Frequently Asked Questions**

**Q: If my district has any questions regarding this regulation who should I contact?**

**A:** The NYSED Office of Indigenous Education can help answer any questions regarding this regulation and its implementation via email at mascotadvisory@nysed.gov. You can also contact the District Superintendent of your BOCES.

**Q: Does this regulation require us to change the name of our school, school building, school district, or town?**

**A:** No, public schools, school buildings, school districts, or towns named after Indigenous nations, tribes, or people, or derivates of such usage, are outside of the scope of this regulation.

**Q. Do these regulations pertain to the names of public schools, school buildings, or school districts named after Indigenous nations, tribes, or people, or derivates of such?**

**A.** No, this regulation only applies to school team names, mascots, and logos. Anything else is outside the scope of this regulation.

**Q: As a district, how do we know if our team's name, mascot, or logos have a connection with Indigenous nations or peoples in the past?**

**A:** Districts can conduct research using a variety of primary sources including historical photos, yearbooks, or district/local records.

**Q: Can we "appeal" the prohibition on using team names, logos, and mascots in my district?**

**A:** Boards of education are responsible for determining whether their team names, logos, or mascots are prohibited by the regulation. An individual aggrieved by the action or inaction of

5

a school district may commence an appeal to the Commissioner under Education Law § 310 or a petition for removal of school officers under Education Law § 306. More information about that process is on NYSED's Appeals to the Commissioner website.

If a school district does not comply with this regulation the Department may take several actions as prescribed under the education law including, but not limited to, the removal of school officers, or as a last resort, withholding of State Aid, pursuant to Education Law § 306 [2].

**Q: Can my district keep our team's name if it eliminates all associated Indigenous imagery?**

**A:** Those districts that never utilized Indigenous imagery in connection with their team name will not be required to change. However, those districts that currently use, or previously used team names associated with Indigenous imagery or symbols must change their team's name.

Although some imagery and other aspects of the connection between a team's name and Indigenous Nations or individuals may have been changed, removed, or used within a broader context, the connection, connotations, and history of these practices remain associated with the use of team names that have or have had connections to Indigenous nations or peoples.

Continued use of the vestiges of these names and/or images, either explicitly or implicitly, contributes to the continued stereotyping, caricaturing, and denigration of Indigenous peoples. Districts in this situation should take this opportunity to re-brand, as many districts across the state have already done, through collaborative engagement with stakeholders.

**Q: The team logo for my district contains imagery connected to Indigenous peoples, such as feathers and tomahawks, but there is currently no other mention or connection to Indigenous nations or peoples. Do we still need to change our team logo?**

**A:** Yes. Any team name, mascot, or logo that has any connection to Indigenous peoples in the past or present, including logos that incorporate symbols associated with Indigenous peoples such as feathers, historical weapons like tomahawks or spears, or logos utilizing stylization generally attributable to or in association with Indigenous peoples such as feathers or traditional Indigenous clothing are prohibited (8 NYCRR 123.1).

**Q: How should districts with a team name, mascot, or logo that has a connection to Indigenous nations or peoples commit, via resolution, to eliminating the use of all Indigenous names, logos, and mascots by the end of the 2022-2023 academic year as required by the regulation?**

**A:** While each resolution might slightly differ based on the needs of the district, the regulation does not require specific language; boards of education are encouraged to be concise about their intentions consistent with the regulation. The details of the districts' comprehensive plan to replace Indigenous team names, logos, and mascots may be developed

Commissioner's Regulation Part 123 Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools

separately and incorporated by reference (e.g., "In accordance with the district's mascot replacement plan, attached as Exhibit A and incorporated by reference...").

**Q: My district is in the process of changing our team's name, mascot, and logo. Do we need to change plaques on historical trophies in our school trophy case or remove championship banners from decades ago that might contain team names or logos prohibited by this regulation?**

**A:** Legacy or memorial items, such as plaques on trophies, are historical artifacts that do not need to be removed or changed. However, NYSED encourages districts to contextualize these artifacts and, if possible, locate them to areas conducive to conversations that permit contextualization regarding the impact such team names, mascots, or logos have on Indigenous peoples as well as the history and cultures of such peoples and nations.

**Q: How far does a school district's obligation extend in prohibiting its employees "from utilizing or promoting any Indigenous name, logo, or mascot?"**

**A:** The regulation prohibits school district employees from displaying paraphernalia or clothing associated with their own school district's retired Indigenous team name, logo, or mascot. This would encompass retired Indigenous team names, logos, or mascots in school districts throughout New York State. While other Indigenous team names, logos, or mascots (such as professional sports teams) may also be inconsistent with the Dignity for All Students Act, their use is outside the scope of this regulatory provision.

**Q: Our district's team name, mascot, and logo have connections to Indigenous nations and peoples. However, a substantial portion of district residents are opposed to the change. What should we do?**

**A:** This can be challenging for school districts and boards of education. It may be helpful to engage and motivate community groups and staff to see re-branding as an opportunity, explaining why the change is necessary. Schools and districts making these required changes might want to follow the example of other districts across New York that have already engaged in this process—for example, the Brentwood Union Free School District and the Waterloo, Lyme, Watkins Glen, and Candor Central School Districts are a few that have engaged in this process.

Although rebranding might not be easy for communities, the harm that the continued use of team names, mascots, or logos connected to Indigenous peoples has on Indigenous and non-Indigenous peoples, including students, is well established. According to the American Psychological Association,[3]

*Research has shown that the continued use of American Indian mascots, symbols, images, and personalities has a negative effect on not only American Indian students but all students by:*

---

[3] Summary of the APA Resolution Recommending Retirement of American Indian Mascots

Commissioner's Regulation Part 123 Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools

- ***Undermining the educational experiences of members of all communities- especially those who have had little or no contact with Indigenous peoples.*** *The symbols, images, and mascots teach non-Indian children that it is acceptable to participate in culturally abusive behavior and perpetuate inaccurate misconceptions about American Indian culture.*

- ***Establishing an unwelcome and often hostile learning environment for American Indian students that affirms negative images/stereotypes that are promoted in mainstream society.***

*According to Stephanie Fryberg, Ph.D., University of Michigan, this appears to have a negative impact on the self-esteem of American Indian children, "American Indian mascots are harmful not only because they are often negative, but because they remind American Indians of the limited ways in which others see them. This, in turn, restricts the number of ways American Indians can see themselves."*

- ***Undermines the ability of American Indian Nations to portray accurate and respectful images of their culture, spirituality, and traditions***. *Many American Indians report that they find today's typical portrayal of American Indian culture disrespectful and offensive to their spiritual beliefs.*
- ***Presents stereotypical images of American Indians***. *Such mascots are a contemporary example of prejudice by the dominant culture against racial and ethnic minority groups.*
- ***Is a form of discrimination against American Indian Nations that can lead to negative relations between groups.***

**Q: I heard there is an Indigenous Mascot Advisory group. Is this group making the decisions on which team names, mascots, or logos are acceptable or not under this regulation?**

**A:** The regulation places the responsibility of eliminating Indigenous team names, logos, or mascots on local school boards. Therefore, it is the responsibility of each school board to determine the applicability of the regulation and ensure their district's compliance. While NYSED has convened an Indigenous Mascot Advisory group composed of representatives and leaders of Indigenous nations and peoples with relationships and connections to New York State, the purposes of the Advisory Group are to ensure that the voice of Indigenous nations and peoples is at the core of this important work; that NYSED is able to obtain technical assistance regarding this regulation and its implementation from Indigenous nations and peoples; and to provide advice on the potential connection of various names, symbols, and images to and with Indigenous nations and peoples. Questions regarding this regulation can be addressed to the NYSED Office of Indigenous Education at mascotadvisory@nysed.gov.

**Q: What if my district, or a district I know about in New York State is not complying with the requirements of this regulation?**

Commissioner's Regulation Part 123 Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools

**A:** We encourage individuals to contact the NYSED Office of Indigenous Education at mascotadvisory@nysed.gov. If the matter cannot be resolved at the local level, an individual aggrieved by the action or inaction of a school district may commence an appeal to the Commissioner under Education Law § 310 or a petition for removal of school officers under Education Law § 306. More information on that process can be found on NYSED's Appeals to the Commissioner website.

**Q: If my board or district refuses to comply with this regulation, will my district have funding withheld or board members removed?**

**A:** The Department hopes this matter can be managed through local leadership and will work to support district compliance with this regulation. If a school district will not make this necessary change on its own to ensure compliance, the Department may take action as prescribed under the Education Law including, but not limited to, the removal of school officers, or as a last resort, withholding of State Aid, pursuant to Education Law § 306 [2].

**Q: What funding is available for my district to address capital construction costs relating to compliance with this regulation?**

**A:** Districts should remove prohibited team names, mascots, and logos as quickly as possible but by the end of the 2024-2025 academic year. Districts should employ the most economical approach to addressing these requirements, in both time and capital. For example, rather than replacing an entire artificial turf field, the center section of the field containing the prohibited team, logo, or imagery could be replaced. Small sections of terrazzo tiles can be removed and replaced rather than entire floors, and images can be painted over rather than replacing walls.

Building Aid is available for this work and Districts must submit applications for capital construction projects to the Office of Facilities Planning for review, approval, and permitting. For more information on the permit process, please visit NYSED's Facilities Planning website. Please note the permitting process takes several months and thus must be factored into the timeline for the construction work.

The $10,000 requirement for Building Aid does not apply to these projects if it is limited to site work only (i.e., turf field partial replacements, site signage replacements, etc.). If the scope of the project extends beyond the activities necessary to comply with Commissioner's Regulation Part 123, then standard Building Aid rules apply at large. These capital projects are not considered new facilities.

For further guidance and information, the NYSED Facilities and State Aid offices can be reached via email at EMSCFP@nysed.gov.

**Q: My district just completed a new capital project last year that included prohibited images or names. Do we still need to replace these new capital investments?**

Commissioner's Regulation Part 123 Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools

**A:** Yes. However, Districts have the right to request an extension of time as outlined in 8 NYCRR 123.3 (b).

**Q: My district cannot afford the cost of making these changes. What can we do**?

**A:** State building aid is available to defray and subsidize any capital expenses associated with eliminating prohibited team names, mascots, and logos connected to Indigenous nations and peoples. Additional funding can, and should, be sought through the school district budget or capital project processes.

**Q: Many people in our community believe that our use of a team name, mascot, or logo connected to Indigenous nations or peoples "honors" them. How can we retain a connection to Indigenous nations or peoples once our district rebrands?**

**A:** State learning standards that address the history and culture of Indigenous peoples can be found on the Department's Office of Standards and Instruction's website. In addition, New York State has a rich history and connection to Indigenous nations and people. NYSED encourages all districts to connect with local Indigenous nations and peoples in or near their communities to foster authentic conversations with Indigenous nations regarding their history and present-day cultures. In addition, there are numerous cultural institutions near New York schools with a mission highlighting Indigenous cultures and peoples, past and present. More information on those institutions can be obtained from NYSED's Office of Indigenous Education.

**Q: What if my district is unable to fully eliminate team names, mascots, or logos with connections to Indigenous Nations or peoples by the end of the 2024-2025 school year?**

**A:** Upon a showing of good cause, the commissioner may grant an extension of the timelines prescribed in this regulation. The approval or denial of an extension shall be in writing and, if applicable, NYSED shall state the reasons for the denial.

Good faith compliance may include:

- The inability of specific staff members, contractors, or consultants to complete specific work on a timely basis if significant progress (approximately 75%) has been made and is ongoing;
- Replacement costs that could be substantially mitigated if postponed for a brief period; and
- In the case of capital projects needed to comply with this regulation, work toward compliance will have commenced, and a substantial percentage of the work needed to comply (approximately 75%) shall have been completed by the end of the 2024-2025 academic year with an attestation by the district, consultant, or contractor to such effect provided. These capital projects are not considered new facilities.

To request an extension, districts should email mascotadvisory@nysed.gov, copying the district's sole supervisory (BOCES) District Superintendent with:

Commissioner's Regulation Part 123 Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools

- An explanation as to why the extension is needed;
- A timeline of actions the district has taken to date to eliminate all use of prohibited names, logos, or mascots pursuant to this regulation, including specific dates of such actions; and
- A commitment by the president of the board of education as to the date by which the use of prohibited names, logos, or mascots pursuant to this regulation will be eliminated.

# EXHIBIT 2

Decision No. 18,058 | Office of Counsel                    https://www.counsel.nysed.gov/Decisions/volume61/d18058



<u>Home</u>        <u>Appeals</u>        <u>Serving Legal Papers</u>        <u>Charters and Regents</u>

<u>Commissioner's Consents</u>        <u>Guidance Documents</u>        <u>Rules and Regulations</u>

# Decision No. 18,058

> \* Subsequent History: *Matter of Cambridge Central School Dist. et al. v New York State Educ. Dept., et al.;* Supreme Court, Albany County (McGinty, J.) Decision/Order/Judgment dismissing the petition to review June 21, 2022. \*

> Appeal of CORY and SARAH McMILLAN, et al., on behalf of their children, from action of the Board of Education of the Cambridge Central School District regarding a team name, logo, and mascot.

> Decision No. 18,058

> (November 29, 2021)

> Honeywell Law Firm, PLLC, attorneys for respondent, Jeffrey D. Honeywell and Paul M. Aloy, Esqs., of counsel

ROSA., Commissioner.--In 2001, Commissioner of Education Richard P. Mills issued a memorandum describing the State Education Department's position on public schools' use of Native American names, symbols, and mascots.  This memorandum, the product of extensive study, "concluded that the use of Native American symbols or depictions as mascots can become a barrier to building a safe and nurturing school community and improving academic achievement for all students."  Commissioner Mills noted that professional associations, the U.S. Census, the National Association for the Advancement of Colored People, the National Education Association, hundreds of P-20 institutions, and numerous professional sports teams denounced the use of such mascots.  Commissioner Mills recognized that, while a role for local discretion existed, "there is a state interest in providing a safe and supportive learning environment for every child."  He concluded by asking boards of education "to end the use of Native American mascots as soon as practical."

Twenty years later, petitioners[1] challenge the use by the Board of Education of the Cambridge Central School District ("respondent") of the name "Indians" and an accompanying school logo and mascot.[2]  The appeal must be sustained.

Respondent's sports teams are known as the "Indians."  Respondent has adopted a logo that portrays a Native American individual in profile.  Respondent has not explained how or when the name and image came into being, but evidence in the record suggests that the mascot has been used since at least the 1950s.

At a December 10, 2020 board meeting, respondent's then-president announced that the board would consider the appropriateness of its name and logo.  Respondent invited community input and discussed the issue at length over the next six months.

Decision No. 18,058 | Office of Counsel                    https://www.counsel.nysed.gov/Decisions/volume61/d18058

At a June 17, 2021 board meeting, respondent adopted a resolution "retir[ing] the nickname of Cambridge Indians and all Indigenous imagery associated with that nickname effective July 1, 2021." In support of the resolution, respondent indicated that the following institutions and organizations supported the elimination of Native American mascots:

- The National Congress[3] of American Indians;
- The Stockbridge-Munsee Mahican, Haudenosaunee, and St. Regis Mohawk Tribal Council;
- The Woape Foundation;
- The New York State Education Department;
- The National Association for the Advancement of Colored People
- The American Anthropological Association
- The American Psychological Association;
- The American Sociological Association;
- The Native American Education Association; and
- The Society of Indian Psychologists.

Respondent further suggested that its decision was consistent with its policy on Equity, Inclusion, and Diversity ("DEI").

At a board meeting held on July 8, 2021, respondent reversed course, adopting a "compromise" that permitted "the nickname of Indians to remain" and required "a review for potential changes and/or updates to the current imagery associated with it …." Respondent's resolution directed "the [s]uperintendent to create a plan that [would] incorporate enhanced instruction about Native American culture, both past and present, and return to [respondent] with recommendations." This appeal ensued. Petitioners' request for interim relief was granted on August 23, 2021.

Petitioners contend that respondent's July 2021 resolution lacks a rational basis, is unaccompanied by reasonable support or explanation, and does not address the potential harm that Native American mascots pose to students. Petitioners maintain that exposure to the "Indians" name and logo causes psychological harm to their children, and all district students. Petitioners request an order vacating the July 2021 resolution and directing respondent to abide by its June 2021 resolution.

Respondent contends that certain petitioners lack standing and that two petitioners improperly verified the petition. On the merits, respondent argues that it acted within its discretion in maintaining the team name and logo.

First, I will address respondent's procedural contentions. Respondent contends that four of the petitioners lack standing as their children do not currently attend school in the district. Even accepting this allegation as true, however, respondent does not dispute that the other petitioners have standing to pursue this appeal on behalf of their children. Therefore, I decline to dismiss the appeal on this basis.

Respondent also objects to the fact that an affidavit of verification executed by petitioners Alex Dery Snider and David Snider was notarized by a non-New York State notary. However, a petition need only be verified by "at least one of the petitioners" (8 NYCRR 275.5 [a]). Respondent does not object to the affidavits of verification submitted by the other petitioners, which comply with 8 NYCRR 275.6. Therefore, I decline to dismiss the appeal based on this procedural objection.

I must also address two issues concerning the scope of the record. Following submission of their pleadings, petitioners submitted an "addendum" to the petition and two letters dated September 21 and October 15, 2021. Additional affidavits, exhibits, and other supporting papers may only be submitted with the prior permission of the Commissioner (8 NYCRR 276.5). Such submissions should not raise new issues

or introduce new exhibits that are not relevant to the pleadings (*Appeal of Casey-Tomasi*, 57 Ed Dept Rep, Decision No. 17,301; *Appeals of Gonzalez*, 48 *id*. 405, Decision No. 15,898).  Upon review of these documents, I decline to accept them into the record.

Additionally, Mr. John Kane has submitted a proposed *amicus curiae* brief.  Section 275.17 of the Commissioner's regulations permits interested persons to file applications to submit memoranda of law *amicus curiae*.  In considering whether to grant such applications, the Commissioner has historically adopted the standard applied by the New York Court of Appeals and required the interested party to establish at least one of the following criteria:  (1) that the parties are not capable of a full and adequate presentation and that the interested party could remedy this deficiency; (2) that the interested party could identify law or arguments that might otherwise escape the Commissioner's consideration; or (3) that the proposed *amicus curiae* submission would otherwise be of assistance to the Commissioner (*see* 22 NYCRR 500.23 [a] [4]; *Appeal of Touré, et al*., 54 Ed Dept Rep, Decision No. 16,660).

I decline to accept Mr. Kane's submission as petitioners have fully and adequately presented their case. Additionally, Mr. Kane participated in the events described herein.  His submission is in the nature of an affidavit and not a memorandum of law; as such, it should have been submitted with the petition. Therefore, I decline to consider the proposed *amicus* brief.

Turning to the merits, a board of education generally has discretion to determine "the propriety of [a sports] team name," mascot, or logo (*Appeal of Tobin*, 25 Ed Dept Rep 301, Decision No. 11,591).  Such decisions will only be reversed upon a showing that a board abused its discretion (*id*.).  A board may abuse its discretion if a team name, mascot, or logo inhibits the creation of "a safe and supportive environment that promotes achievement of the [learning] standards for all children" (New York State Education Department, "Public School Use of Native American Names, Symbols, and Mascots," Apr. 5, 2001; *see* Education Law §§ 1709, 1805).  A board may also abuse its discretion if it changes its position without explaining "why [it] abandoned all of the benefits it previously asserted would be realized" from a prior course of action (*Appeal of Kaufmann et al*., 57 Ed Dept Rep, Decision No. 17,250; *see also Appeal of Mathis and Dahlia*, 28 *id*. 347, Decision No. 12,132).

In an appeal to the Commissioner, a petitioner has the burden of demonstrating a clear legal right to the relief requested and establishing the facts upon which he or she seeks relief (8 NYCRR 275.10; *Appeal of P.C. and K.C*., 57 Ed Dept Rep, Decision No. 17,337; *Appeal of Aversa*, 48 *id*. 523, Decision No. 15,936; *Appeal of Hansen*, 48 *id*. 354, Decision No. 15,884).

Petitioners have met their burden of proving that respondent acted arbitrarily by reinstating the "Indians" name and imagery in July 2021.  The Commissioner has consistently invalidated actions where boards of education summarily reversed course without sufficiently explaining their reasoning (*Appeal of Kaufmann et al*., 57 Ed Dept Rep, Decision No. 17,250; *Appeal of Mathis and Dahlia*, 28 *id*. 347, Decision No. 12,132). For example, in *Appeal of Mathis and Dahlia*, a board of education resolved to consolidate its three high schools into a single high school.  Twenty months after this resolution, three new members were elected to the board.  In a 4-3 vote, the board changed its resolution and decided to consolidate into two high schools instead of one.  The Commissioner deemed this series of events arbitrary and capricious, concluding that the board's decision was not "the result of … collective judgment and deliberation."

Similarly, in *Appeal of Kaufmann et al*., the Commissioner reversed a board of education's decision regarding the building assignment of its sixth-grade students.  Over the course of 17 months, the board had spent significant time and resources developing a plan to move its sixth-grade students from elementary schools to middle schools.  Following the election of a new board member, the board abandoned the sixth-grade reorganization plan.  The Commissioner held that the board's "unexplained

Decision No. 18,058 | Office of Counsel                    https://www.counsel.nysed.gov/Decisions/volume61/d18058

reversal of a school reorganization which it had been implementing for the prior 17 months" was "arbitrary, capricious, unreasonable and contrary to sound educational policy." The Commissioner also found that the board offered "no explanation as to why [it] abandoned all of the benefits it previously asserted would be realized from the … configuration."

This reasoning applies with equal force to the instant appeal. Respondent spent several months considering the appropriateness of its team name, logo, and mascot. Respondent considered the opinions of the Cambridge community, professional associations, and Native American organizations. These efforts culminated in the June 2021 resolution, which cited the opinions, among others, of Native American tribes, professional and academic associations, the New York State Education Department, and respondent's DEI policy.

The July 2021 resolution, however, offered no meaningful explanation as to why respondent no longer found the information it had previously cited persuasive. It merely indicated that a single association (the Native American Guardian Association) and the "majority of the Cambridge community" supported retention of the name and logo. Respondent did not address or refute the evidence-based findings, including those of the American Psychological Association, that Native American team names and mascots cause psychological harm to students. The July 2021 resolution also failed to explain how the name and logo violated respondent's DEI policy in June 2021 but not a month later.[4] As such, I find respondent's unexplained reversal of its June 2021 resolution to be arbitrary and capricious (*Appeal of Kaufmann et al.*, 57 Ed Dept Rep, Decision No. 17,250; *Appeal of Mathis and Dahlia*, 28 *id.* 347, Decision No. 12,132). A board of education may change its mind on issues, even important ones. But such change must be accompanied by an "explanation as to why the board abandoned all of the benefits it previously asserted would be realized" from a prior proposal (*Appeal of Kaufmann et al.*, 57 Ed Dept Rep, Decision No. 17,250). This respondent has not done.

Even if respondent had not unreasonably changed its position, I would find that it abused its discretion by maintaining its name and logo. Commissioner Mills' position, which continues to represent the view of the State Education Department, has been affirmed by subsequent academic and legal developments. For example, petitioners submit a 2020 literature review on studies of Native American mascots by Laurel R. Davis-Delano, *et al.* In conducting this review, the authors examined "[a]ll academic research that investigated psychosocial effects of Native American mascots." They found that each study "demonstrate[d] either direct negative effects on Native Americans or that these mascots activate[d], reflect[ed], and/or reinforce[d] stereotyping and prejudice among non-Native persons." Those findings remained consistent regardless of "the stated intent of those who support[ed] Native mascots (i.e., to 'honor' Native Americans)."[5]

The authors' findings are corroborated by a 2021 statement by the New York Association of School Psychologists (NYASP). In its "Statement on the Rights and Autonomy of Indigenous Persons," NYASP calls for an immediate end to the use of Indigenous symbols as mascots for schools and school-associated sports teams. NYASP explains that

> research studies have consistently shown that the use of mascots and Indigenous symbols and imagery have a negative impact on not only Indigenous [students], but all students …. Exposure to Indigenous mascots … ha[s] been shown to have many negative effects on Indigenous individuals … [and] indirect [negative] effects on non-Indigenous people who view the mascots.

"Based on the abundance of research, as well as similar position statements of other professional organizations," NYASP "opposes the use of Indigenous images" by educational entities due to their

Decision No. 18,058 | Office of Counsel    https://www.counsel.nysed.gov/Decisions/volume61/d18058

potential to "perpetuat[e] stereotypes and prejudices."  NYASP further opined that the continued use of such "Indigenous symbols, personalities, and stereotypes as mascots" could violate the Dignity for All Students Act ("DASA").

This concern is well-founded.  DASA, enacted in 2012, reflects New York State's commitment to promoting a positive learning environment in schools.  It prohibits "the creation of a hostile environment by conduct or by threats, intimidation or abuse, … that … reasonably causes or would reasonably be expected to cause … emotional harm to a student" (Education Law § 11 [7]; see Appeal of J.S., 58 Ed Dept Rep, Decision No. 17,509 [directing a board of education to review and revise its DASA policy because it omitted the "emotional harm" prong]).  Given the voluminous academic research analyzed within the above sources, it is certainly reasonable to conclude that the use of Native American mascots could violate DASA.

Additionally, the Board of Regents (BOR) has taken affirmative measures, consistent with DASA, to promote positive learning environments in schools.  These are reflected in the BOR's Culturally Responsive-Sustaining Education Framework as well as its DEI policy.  The BOR's DEI policy, for example, urges districts to consider the impact of district and school-wide policies and practices with a view to fostering respect, community-building, and inclusivity.[6]

Respondent's argument that its logo fosters respect for Native Americans is not supported by the evidence in the record.  Petitioners have submitted proof that respondent perpetuates stereotypes by, for example, publishing a "Lil' Indians" newspaper, utilizing an image of "Little Hiawatha" in a district publication,[7] and sanctioning an employee's donning of a Plains Indian headdress.  Respondent's pro forma denial thereof, bereft of any proof or explanation, is unpersuasive.[8]

In sum, petitioners have submitted sufficient evidence that respondent improperly reversed course between June and July 2021 without sufficiently explaining its reasoning (Appeal of Kaufmann et al., 57 Ed Dept Rep, Decision No. 17,250; Appeal of Mathis and Dahlia, 28 id. 347, Decision No. 12,132).  Petitioners have also demonstrated that respondent's use of the Indians team name, mascot, and logo inhibits the creation of "a safe and supportive environment" for all students.  As such, petitioners have met their burden of proving that respondent's continued use of the "Indians" team name, logo and mascot constitutes an abuse of its discretion.

With respect to the appropriate remedy, I agree with petitioners that respondent's June 2021 resolution represents a prudent path forward.  However, given the events described herein, including the granting of petitioners' request for interim relief, it is necessary to alter the date by which respondent originally planned to retire the logo.  Therefore, I will postpone the date by which respondent must finally eliminate the use of its former team name, mascot and logo to July 1, 2022.  Additionally, while not requested by petitioners, I encourage respondent to abide by its proposal, articulated in the July 2021 resolution, to offer "enhanced instruction" concerning Native Americans.  Retiring the mascot is not an end in and of itself; it is a small but important part of increasing the nature and quality of Native American education.[9]

Petitioners' position was best captured by the valedictorian of respondent's Class of 2021.  I conclude with her words:

> If the board formally votes to keep the mascot[,] it signals that the harm and offense many Indigenous people feel from it does not matter—an example that students will see.  If the school is willing to ignore the harm it is causing people, then what is it teaching the students to do?
>
> Vote to remove the mascot.

A-41

The courage to change is a most beautiful thing.

THE APPEAL IS SUSTAINED.

IT IS ORDERED that respondent's July 8, 2021 resolution "CCS NICKNAME & IMAGERY RESOLUTION v.2" is hereby annulled; and

IT IS FURTHER ORDERED that the Board of Education of the Cambridge Central School District eliminate the use of its former team name, mascot and logo in accordance with its resolution dated June 17, 2021, by no later than July 1, 2022.

END OF FILE

---

[1] In addition to those identified in the caption of this decision, the other petitioners are Alex Dery Snider, David Snider, Sara Diane, Jason Nolan, Deborah Jaffe, and Edwin Schiele. They bring this action on behalf of their children.

[2] Any references herein to the "name and logo" are for purposes of brevity and should be read to include the mascot.

[3] Although the Board minutes use the term "Council," according to the record, this is a typographical error and should read "Congress."

[4] That policy provides, in relevant part, that the district "is committed to creating and maintaining a positive and inclusive learning environment where all students, especially those currently and historically marginalized, feel safe, included, welcomed, and accepted, and experience a sense of belonging and academic success."

[5] Laurel R. Davis-Delano, et al., "The Psychosocial Effects of Native American Mascots: A Comprehensive Review of Empirical Research Findings," *Race, Ethnicity and Education*, Vol. 23 No. 5 (2020): 613-633, at 627, 630.

[6] New York State Board of Regents, "Policy on Diversity, Equity and Inclusion," *available at* https://www.regents.nysed.gov/sites/regents/files/521bra7.pdf (last accessed Nov. 29, 2021).

[7] While not explained in the record, I take notice that "Little Hiawatha" is an animated film released by Disney in the 1930s.

Decision No. 18,058 | Office of Counsel          https://www.counsel.nysed.gov/Decisions/volume61/d18058

[8] Additionally, as indicated above, respondent has not explained the circumstances under which the logo and name were originally adopted.

[9] The Board of Regents, at its April 2014 meeting, adopted the New York State K-12 Social Studies Framework as the foundation for Social Studies instruction in New York State.  This framework includes several learning standards concerning Native American education.  (New York State Education Department, "Curriculum and Instruction – Social Studies," available at http://www.nysed.gov/curriculum-instruction/social-studies [last accessed Nov. 29, 2021]).



New York State Education Building
89 Washington Avenue
Albany, NY 12234

**CONTACT US** ☎

**NYSED General Information: (518) 474-3852**
ACCES-VR: 1-800-222-JOBS (5627)
TASC (formerly GED): (518) 474-5906
New York State Archives: (518) 474-6926
New York State Library: (518) 474-5355
New York State Museum: (518) 474-5877
Office of Higher Education: (518) 486-3633
Office of the Professions: (518) 474-3817
P-12 Education: (518) 474-3862

© 2015 - 2024 New York State Education Department

# EXHIBIT 4



**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK / ALBANY, NY 12234

TO:           Presidents of Boards of Education and Superintendents of Public Schools

FROM:      Richard P. Mills

SUBJECT:  Public Schools Use of Native American Names, Symbols, and Mascots

DATE:       April 5, 2001

    Some time ago, I directed Department staff to study the use of Native American mascots by public schools.  I would like to share with you the results of that work.

<u>What I conclude</u>

    Our review confirmed that the use of Native American symbols is part of time-honored traditions in some of our communities, and that there are deeply felt, albeit conflicting, ideas about them.  Some members of these communities believe that the mascots honor or pay tribute to Native Americans and their culture.  However, most Native Americans appear to find the portrayal by others of their treasured cultural and religious symbols disparaging and disrespectful.  Many others who have looked at this issue concur.

    After careful thought and consideration, I have concluded that the use of Native American symbols or depictions as mascots can become a barrier to building a safe and nurturing school community and improving academic achievement for all students.  I ask the superintendents and presidents of school boards to lead their communities to a new understanding of this matter.  I ask boards to end the use of Native American mascots as soon as practical.  Some communities have thought about this and are ready to act.  Others already have acted and I commend them.  Yet, in others, more reflection and listening is needed, and so I ask that these discussion begin now.  I believe that local leaders can find the right way to inquire into this matter and resolve it locally.  Next year I will formally evaluate the progress on this issue.

    Here is my reasoning.

<u>What we found:</u>

    There has already been extensive statewide discussion of this issue.  Some of it is eloquent.  We sought the views of local superintendents.  Many wrote directly and many others expressed their thoughts through District Superintendents.  I have had extended conversations with a few of them.  We contacted representatives of Native American communities.  We also asked the counsel of District Superintendents.  We researched the literature on this subject and read legal documents from other states.  We examined New York law, regulation, and Regents policy.  In addition, many citizens wrote to us.

    The use of Native American names, symbols, and mascots is such a significant issue that it is being looked at in other states, in professional sports, at the collegiate level, as well as at the local level in some New York school districts.  The Society of the Indian Psychologists of the Americas has raised the concern that the use of these mascots and symbols creates an "unwelcome academic environment" for Native American students.  Organizations such as the NAACP, and the NEA have issued statements calling for an end to the use of mascots.  The U.S.

Census 2000 issued a resolution stating that it would not include teams that used these symbols as part of its promotional program. Over the last 30 years, more than 600 colleges, universities and high schools have changed or eliminated their use of Native American mascots. For example, the Los Angeles school board required its junior high and high schools to drop Native American-themed names and mascots, and 20 high schools in Wisconsin followed suit. Collegiate institutions such as Miami University of Ohio, St. John's University, Siena College and Stanford University have changed their school logos. In the professional sports world, objections have also arisen, and it is clear that recent expansion teams in professional baseball, hockey, football and basketball have avoided the use of Indian-themed names or mascots.

In 1999, the United States Department of Justice Civil Rights Division investigated a North Carolina school district to determine if the high school's mascot and nicknames violated Federal Civil Rights Law by creating a racially hostile environment. That investigation was closed after the school district's board of education decided to eliminate the use of Native American religious symbols.

In August 2000, Attorney General Elliot Spitzer reviewed this issue as it related to a New York State school district. The Attorney General raised serious concerns that certain uses of Native American mascots and symbols could violate the Federal Civil Rights Act of 1964. His opinion identified many factors that school districts should consider in examining their use of these symbols and mascots, particularly areas such as stereotypical nicknames, images, gestures and use of historical and religious symbols such as feather headdress, face-paint, or totem poles.

Clearly, many of those who are thinking deeply about this issue are concerned that the use of these symbols should end.

The argument:

Schools must provide a safe and supportive environment that promotes achievement of the standards for all children. The use of Native American mascots by some schools can make that school environment seem less safe and supportive to some children, and may send an inappropriate message to children about what is or is not respectful behavior toward others. For that reason we must question the use of such mascots. If children and parents in the school community are offended or made to feel diminished by the school mascot, what school leader or board would not want to know that and correct the situation? School mascots are intended to make a statement about what the the school values. School leaders and communities may not be aware that the statement heard can be contrary to the one intended.

Here are some thoughts from a student: "Today this school promotes respect, responsibility, compassion, honest, and tolerance. When you use words like these, you need to teach by example. The resigning of this mascot would be a great example of these character education words. I would like to see my brother, sister, and cousins go to a school that shows respect and tolerance for other cultures. I don't want them to feel the confusion that I have felt gong to this school. It has taken me a couple of years to come to understand Native American stereotypes and their effects on me. By keeping [this] mascot the principal lesson the students, staff, and community learn is how to tolerate stereotypes."

Some argue that such mascots honor Native Americans. Most Native American representatives do not share that view.

Some would argue that mascots that are problematic could be made dignified through some state review process. It is difficult to imagine how to craft criteria to make such a judgment process feasible on a statewide basis. Most people would recognize and deplore mocking, distorted representations of minority group members. However, fair-minded people might view these mascots as respectful without realizing that the representation included religious symbols that Native American observers would find distressing when used in that manner.

Some urge keeping the status quo. That is not realistic either. Collegiate sports and newer professional teams have recognized changing public attitudes and decided not to use Native American mascots. The same changes that affected them will eventually overtake schools. It would be better resolve the matter now. The central role of sports in this issue is advantageous. Few areas of American life are as concerned about fairness and respect for individual value and achievement as is the world of sport. We can turn to those values as we think about mascots.

Some call for an immediate and statewide halt to the use of these mascots. That approach is not advisable. People in many communities haven't had an opportunity to talk about this and listen to one another. There are cherished traditions surrounding many of the mascots. There are even significant costs involved: consider mascots on team uniforms and gymnasium floors, to cite obvious examples. In any case, local remedies should be exhausted first. Many communities have engaged the issue and made changes. Many other communities will now do so.

Still others believe this is a local matter. I cannot agree that it is *only* a local matter. There is state interest in providing a safe and supportive learning environment for every child. The use of Native American mascots involves a state responsibility as well.

Here are some questions that might help local communities consider how to approach the issue. I have adapted them from ideas suggested by a New York School Superintendent and they seem like a good place to begin.

- Do Native Americans and non-Native Americans perceive the mascot differently?

- Is there a significant difference between how the mascot may have been intended and how it is interpreted?

- How should an organization respond if its well-intentioned actions unintentionally offend a member of the group's religious or ethnic beliefs?

- Are there other symbols that represent the school's values that could be used in place of the existing mascot?

I call upon school leaders in communities that use Native American symbols, names, or mascots to pose these questions to their communities and lead them in a discussion of the right path to take. It is important that our students learn about the diversity of our communities so that they will understand and respect our difference and draw strength from them in becoming good citizens and productive adults. School administrators, staff, parents and community members play a critical role in modeling behavior that celebrates and honors traditions and beliefs of our fellow citizens. As educators, we have an obligation to inform communities so that they might come to understand the pain, however unintentionally inflicted, these symbols cause.

# EXHIBIT 5

A-48



THE STATE EDUCATION DEPARTMENT / THE UNIVERSITY OF THE STATE OF NEW YORK STATE / ALBANY, NY 12234

James N. Baldwin, Senior Deputy Commissioner for Education Policy
Education Building, Room 2M EB (518) 474-3862
89 Washington Avenue
Albany, NY 12234
jim.baldwin@nysed.gov

To:          All School Districts

From:        James N. Baldwin, Senior Deputy Commissioner

Date:        November 17, 2022

Re:          Use of Native American Mascots

-------------------------------------------------------------------------------------------------------------

The State Education Department (SED) wishes to ensure school districts' knowledge of a recent legal decision and their concomitant need to ensure that district mascots, team names, and logos are non-discriminatory.

SED has consistently opposed the use of Native American mascots. In 2001, former Commissioner of Education Richard P. Mills issued a memorandum "conclud[ing] that the use of Native American symbols or depictions as mascots can become a barrier to building a safe and nurturing school community and improving academic achievement for all students." Commissioner Mills recognized that, while a role for local discretion existed, "there is a state interest in providing a safe and supportive learning environment for every child." He asked boards of education "to end the use of Native American mascots as soon as practical."

Many school districts have heeded Commissioner Mills' directive and retired their mascots. Most recently, the Waterloo and Lyme Central School Districts retired their mascots. SED commends the efforts of these districts.

Other school districts have not complied. Among them, until recently, was the Cambridge Central School District. After extensive study in 2020 and 2021, Cambridge voted to retire its "Indians" team name, logo, and mascot in June 2021. It hastily reversed itself in July 2021 upon the election of a new board member. Community members challenged this action in an appeal to the Commissioner of Education under Education Law § 310.

In *Appeal of McMillan, et al.*,[1] the Commissioner held that: (1) Cambridge "offered no meaningful explanation as to why [it] no longer found the information it had previously cited persuasive"; and (2) Cambridge's retention of the "Indians" logo "inhibit[ed] the creation of a safe and supportive environment for all students." On the latter point, the Commissioner noted that:

---
[1] 61 Ed Dept Rep, Decision No. 18,058, *available at* http://www.counsel.nysed.gov/Decisions/volume61/d18058.

1

A-49

- A 2020 literature review on studies of Native American mascots by Laurel R. Davis-Delano, *et al*. concluded that each study reviewed "demonstrate[d] either direct negative effects on Native Americans or that these mascots activate[d], reflect[ed], and/or reinforce[d] stereotyping and prejudice among non-Native persons."
- The New York Association of School Psychologists (NYASP) concluded that "research studies have consistently shown that the use of mascots and Indigenous symbols and imagery have a negative impact on not only Indigenous [students], but all students …"
- The Dignity for All Students Act prohibits "the creation of a hostile environment ... that ... reasonably causes or would reasonably be expected to cause ... emotional harm to a student," a condition that could be created through the use of Native American mascots.
- The Board of Regents (BOR) has taken affirmative measures, consistent with the Dignity Act, to promote positive learning environments in schools, including its Culturally Responsive-Sustaining Education Framework and policy on Diversity, Equity, and Inclusion.

Cambridge appealed the Commissioner's decision. Supreme Court (Albany County) affirmed the Commissioner's determination in its entirety on June 22, 2022. Crucially, the court held that the Commissioner

> determined correctly that the continued use of the 'Indians' nickname and imagery, given the 20 years that have passed since Commissioner Mills' directive, and given the imperatives of the District's Diversity Policy, was itself an abuse of discretion ….

Thus, the court's decision establishes that public school districts are prohibited from utilizing Native American mascots. Arguments that community members support the use of such imagery or that it is "respectful" to Native Americans are no longer tenable.

Those school districts that continue to utilize Native American team names, logos, and/or imagery without current approval from a recognized tribe must immediately come into compliance. Should they require guidance, districts may reach out to those districts that successfully retired their mascots or their local Board of Cooperative Education Services. The Department is developing regulations that will clarify school districts' obligations in this respect.

Should a district fail to affirmatively commit to replacing its Native American team name, logo, and/or imagery by the end of the 2022-23 school year, it may be in willful violation of the Dignity Act. The penalties for such a violation include the removal of school officers and the withholding of State Aid.[2]

Schools are learning environments; students learn as much through observation of their surroundings as they do from direct instruction. In addition to their legal obligations, boards of education that continue to utilize Native American mascots must reflect upon the message their choices convey to students, parents, and their communities.

---

[2] Education Law § 306.

A-50

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
WANTAGH UNION FREE SCHOOL DISTRICT,
WANTAGH UNION FREE SCHOOL DISTRICT BOARD
OF EDUCATION, WYANDANCH UNION FREE
SCHOOL DISTRICT, WYANDANCH UNION FREE
SCHOOL DISTRICT BOARD OF EDUCATION,
ANTHONY GRECO, *in his capacity as a Wantagh Board of
Education Member and a Resident of the School Community*,
and CHARLIE REED, *in his capacity as a Wyandanch Board
of Education Member and a Resident of the School
Community*.

Index No. 23-cv-7299
(MKB) (LGD)

**AMENDED VERIFIED
COMPLAINT AND
PETITION**

Plaintiffs-Petitioners,

-against-

NEW YORK STATE BOARD OF REGENTS, LESTER W.
YOUNG, JR, in his official capacity as Chancellor of the New
York State Board of Regents, JOSEPHINE VICTORIA
FINN, in her official capacity as Vice Chancellor of the New
York State Board of Regents, ROGER TILLES, in his official
capacity as a member of the New York State Board of
Regents, CHRISTINE D. CEA, in her official capacity as a
member of the New York State Board of Regents, WADE S.
NORWOOD, in his official capacity as a member of the New
York State Board of Regents, KATHLEEN M. CASHIN, in
her official capacity as a member of the New York State
Board of Regents, JAMES E. COTRELL, in his official
capacity as a member of the New York State Board of
Regents, JUDITH CHIN, in her official capacity as a member
of the New York State Board of Regents, CATHERINE
COLLINS, in her official capacity as a member of the New
York State Board of Regents, ELIZABETH S. HAKANSON,
in her official capacity as a member of the New York State
Board of Regents, LUIS O. REYES, in his official capacity
as a member of the New York State Board of Regents,
SUSAN W. MITTLER, in her official capacity as a member
of the New York State Board of Regents, FRANCES G.
WILLS, in her official capacity as a member of the New York

1

State Board of Regents, ARAMINA VEGA FERRER, in her official capacity as a member of the New York State Board of Regents, SHINO TANIKAWA, in her official capacity as a member of the New York State Board of Regents, ROGER P. CATANIA, in his official capacity as a member of the New York State Board of Regents, ADRIAN I. HALE, in his official capacity as a member of the New York State Board of Regents.

Defendants-Respondents.

-------------------------------------------------------------------------x

Plaintiffs-Petitioners WANTAGH UNION FREE SCHOOL DISTRICT, WANTAGH UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION, WYANDANCH UNION FREE SCHOOL DISTRICT, WYANDANCH UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION, ANTHONY GRECO, and CHARLIE REED, as and for their Verified Complaint and Petition, state and allege the following as against Respondent NEW YORK STATE BOARD OF REGENTS and Defendants-Respondents LESTER W. YONG, JR., in his official capacity as Chancellor of the New York State Board of Regents, JOSEPHINE VICTORIA FINN, in her official capacity as Vice Chancellor of the New York State Board of Regents, ROGER TILLES, in his official capacity as a member of the New York State Board of Regents, CHRISTINE D. CEA, in her official capacity as a member of the New York State Board of Regents, WADE S. NORWOOD, in his official capacity as a member of the New York State Board of Regents, KATHLEEN M. CASHIN, in her official capacity as a member of the New York State Board of Regents, JAMES E. COTRELL, in his official capacity as a member of the New York State Board of Regents, JUDITH CHIN, in her official capacity as a member of the New York State Board of Regents, CATHERINE COLLINS, in her official capacity as a member of the New York State Board of Regents, ELIZABETH S. HAKANSON, in her official capacity as a member of the New York State Board of Regents, LUIS O. REYES, in his official capacity as a member of the New

2

York State Board of Regents, SUSAN W. MITTLER, in her official capacity as a member of the
New York State Board of Regents, FRANCES G. WILLS, in her official capacity as a member of
the New York State Board of Regents, ARAMINA VEGA FERRER, in her official capacity as a
member of the New York State Board of Regents, SHINO TANIKAWA, in her official capacity
as a member of the New York State Board of Regents, ROGER P. CATANIA, in his official
capacity as a member of the New York State Board of Regents, ADRIAN I. HALE, in his official
capacity as a member of the New York State Board of Regents:

**PRELIMINARY STATEMENT**

1. This is a hybrid Article 78 proceeding and declaratory judgment action seeking to
annul *Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the
Use of Indigenous Names, Mascots, and Logos by Public Schools* (hereinafter "Part 123") and
enjoin its enforcement.

2. The declaratory judgment action presents a facial and as-applied challenge to the
constitutionality of Part 123 under the First and Fourteenth Amendments to the United States
Constitution on the ground that it is unconstitutionally vague and overbroad. It seeks declaratory
and injunctive relief, declaring Part 123 to be unconstitutional, and enjoining further enforcement
to the extent it is declared unconstitutional.

3. In their Article 78 proceeding, Plaintiff-Petitioners seek a judgment declaring Part
123 is arbitrary and capricious and an abuse of discretion in that it was enacted in violation of law
and outside the scope of Defendants-Respondents' authority.

4. Despite the fact that Part 123 was not lawfully enacted, is arbitrary and capricious,
and raises constitutional issues, Plaintiffs-Petitioners still plan to change their respective mascots
and/or logos to remove any Native American-associated imagery. However, they seek equitable

relief that will allow them to maintain the name "Warriors."


## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 3613. This Court has supplemental jurisdiction over the New York State law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY TRIAL DEMAND

7.      Plaintiffs demand a trial by jury.

## PARTIES

8.      Plaintiff-Petitioner Wantagh Union Free School District ("Wantagh UFSD") is a pre-K-12 public school district located in Wantagh, New York that currently serves approximately 2,832 students in five schools: Wantagh Elementary, Mandalay Elementary, Forest Lake Elementary, Wantagh Middle School, and Wantagh High School. Wantagh UFSD administrative offices are located at 3301 Beltagh Avenue, Wantagh, New York 11793.

9.      Plaintiff-Petitioner Wantagh Union Free School District Board of Education ("Wantagh Board") is the duly elected governing body of Wantagh UFSD. The Wantagh Board is comprised of five residents of the community who serve staggered three-year terms as representatives in all matters concerning the school district.

10.     Plaintiff-Petitioner Wyandanch Union Free School District ("Wyandanch UFSD") is a Pre-K-12 public school district located in Wyandanch, New York that currently serves approximately 2,788 students in four schools: LaFrancis Hardiman School, Martin L. King Jr. Elementary School, Milton L. Olive Middle School, and Wyandanch Memorial High School. The

Wyandanch UFSD's administrative offices are located at 1445 Dr. Martin Luther King Jr. Blvd., Wyandanch, New York 11798.

11.    Plaintiff-Petitioner Wyandanch Union Free School District Board of Education ("Wyandanch Board") is the duly elected governing body of Wyandanch UFSD. The Wyandanch Board is comprised of seven residents of the community who serve staggered two and three-year terms as representatives in all matters concerning the school district.

12.    Plaintiff-Petitioner Anthony Greco is a member of the Wantagh Board of Education and a resident of the Wantagh School District with several relatives who are current District students.

13.    Plaintiff-Petitioner Charlie Reed is a member of the Wyandanch Board of Education and a resident of the Wyandanch School District with relatives who are current District students.

14.    Respondent New York State Board of Regents ("Board of Regents") sets education policy for the State of New York and oversees both the University of the State of New York and New York State Education Department (hereinafter "NYSED"). Plaintiffs-Petitioners pursue only an Article 78 petition as against the Board of Regents.

15.    Plaintiffs-Petitioners pursue an Article 78 petition and plenary action against the remaining Defendants-Respondents.

16.    Defendant-Respondent Lester W. Young, Jr. ("Chancellor Young") is the duly appointed Chancellor of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

17.    Defendant-Respondent Josephine Victoria Finn ("Vice Chancellor Finn") is the

duly appointed Vice Chancellor of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

18.     Defendant-Respondent Roger Tilles is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

19.     Defendant-Respondent Christine D. Cea is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

20.     Defendant-Respondent Wade S. Norwood is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

21.     Defendant-Respondent Kathleen M. Cashin is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

22.     Defendant-Respondent James E. Cotrell is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

23.     Defendant-Respondent Judith Chin is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

24.     Defendant-Respondent Catherine Collins is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

25.     Defendant-Respondent Elizabeth S. Hakanson is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

26.     Defendant-Respondent Luis O. Reyes is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

27.     Defendant-Respondent Susan W. Mittler is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

28.     Defendant-Respondent Frances G. Wills is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including

those complained of herein.

29.     Defendant-Respondent Aramina Vega Ferrer is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

30.     Defendant-Respondent Shino Tanikawa is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

31.     Defendant-Respondent Roger P. Catania is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

32.     Defendant-Respondent Adrian I. Hale is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

## LEGAL FRAMEWORK

33.     For school districts located in the State of New York, the determination as to whether to conduct an interscholastic sports program lies within the authority and discretion of the board of education, as does the manner in which any such program is to be conducted. *See Appeal of Tobin*, 25 Ed. Dept. Rep. 301 (Decision No. 11,591).

34.     Additionally, a board of education has discretion to how to conduct an

interscholastic sports program, which includes determining "the propriety of a sports team name, mascot, or logo. *Id.* Such decisions "will be set aside only upon a showing that the Board has abused its discretion." *Id.*

### FACTS AND PROCEDURAL HISTORY
### UNDERLYING THIS PROCEEDING

**A. The Names of Many Municipalities, Bodies of Water, and Other Cherished Landmarks Throughout the State of New York Derive From Native American Culture**

35.    Long Island's rich history originates from the Native American tribes who once lived in the area. And these historical roots live on in the names of municipalities, school districts, public parks, bodies of water, and various historical landmarks, which are derived from the names of local tribes, famous Native Americans, and Algonquin phrases.

36.    According to reports from early settlers, there were 13 tribes of the Algonquin Family, now known as the "13 Tribes of Long Island," at the time of European settlement. According to early accounts from European settlers, these tribes included the Canarsie, Rockaways, Merricks, Massapequas, Matinecocks, Nissaquogues, Setaukets, Corchaugs, Secatogues, Unkechaugs, Shinnecock, Montaukett, and Manhansets.

37.    Several of these tribe names may look familiar as they inspired the names of municipalities throughout Long Island, including the Rockaways, Merrick, Massapequa, Setauket, Shinnecock, Montauk, Amagansett, and Manhasset.

38.    Other examples of municipal names derived from Native American language and people include Wyandanch, Patchogue, Mattituck, Ronkonkoma, Quogue, Yaphank, Cutchogue, Copiague, Commack, Nyack, Mecox, Noyac, Moriches, Sagaponack, Tuckahoe, Ponquogue, etc.

39.    Even the name Manhattan is of Native American Lenape origin. It comes from the Lenape word "Manhatta," which has been translated to "the place where bows are from" or "hilly

9

island."

40.     These Native American historical roots extend far beyond Long Island. In fact, the names of counties all over the State of New York originate from Native American tribes, people, and phrases. For instance, Allegany County derives its name from a Lenape word. Cayuga County was named after the Cayuga tribe of Native Americans. Other examples of county names derived from Native American tribes or phrases include, but are not limited to, the Counties of Chautauqua, Chemung, Oneida, Onondaga, Oswego, Otsego, Saratoga, Seneca, and Tioga.

41.     There are also various bodies of water named after Native American tribes or phrases including the Ashokan Reservoir, Seneca Lake, Cayuga Lake, and Lake Ronkonkoma.

**B. The Villages of Wantagh and Wyandanch and Their School Districts Were Named After Famous Native American Sachems**

42.     Wantagh is a hamlet of Nassau County located in the Town of Hempstead. The Wantagh UFSD is located in the Incorporated Village of Wantagh.

43.     Wantagh's name and history—like many other municipalities throughout the State of New York, come from Native American roots. In fact, it was named after a real person: Chief Wantagh.

44.     The area now known as Wantagh was occupied by Native American tribes for thousands of years. Before the European settlement of the area, which occurred in the 17th century, it was occupied by the Merokee Native Americans, an Algonquin tribe indigenous to the area.

45.     According to local historical experts, in 1644 a group of Englishman crossed the Long Island Sound from Connecticut to relocate their families to the Hempstead area. Two of these Englishmen, Captain John Seaman and Robert Jackson, settled in the present area of Wantagh and Seaford. They purchased the land (which amounted to 6,000 acres) from the Native Americans who inhabited the area at that time. The first land sale agreement was signed in 1644 by

10

Tackapausha, who was the Chief of the Marsepeque tribe and responsible for that area at the time.

46.     On July 4, 1657, a more formal agreement was signed by the Governor of Manhattan and Chief Wantagh who, at the time, was the Grand Sachem of the Montauks. This agreement was meant to settle any disputes resulting from the original land purchase. From that point onward, early Dutch and English settlers coexisted peacefully with native tribes in the area.

47.     In 1666, the area was named "Jerusalem," a name inspired by Quakers who had settled and farmed the land. It was renamed Ridgewood sometime in the 1880s.

48.     As Ridgewood grew in size, the community applied to have a post office in the area. The U.S. Post office, however, refused to approve the application because the name Ridgewood was already claimed by another community. The application would only be approved after a name change.

49.     After deciding the name "Ridgewood" had to go, members of the Congressional Church hosted a contest in 1891 to rename the village. The Society for Village Improvement proposed several names, but the villagers preferred the name "Wantagh."

50.     The village was officially renamed "Wantagh" to honor the former Grand Sachem who was instrumental in bringing peace to the area 250 years earlier.

51.     And instrumental in this 1891 name change was Thomas Seaman, a descendant of John Seaman who was a signatory to the 1657 Agreement also signed by Chief Wantagh.

52.     The Wantagh UFSD, like the municipality in which it lies, also honors Chief Wantagh in name.

53.     The first schoolhouse in Wantagh dates back to the 1800's, as does the school district's Board of Education. As the population of Wantagh grew over the years, particularly after World War II, so too did the size of its school district. Wantagh Elementary School was built in

11

1950. Wantagh High School first opened its doors to students in September of 1954, and graduated its first senior class in June of 1956. And Wantagh Middle School was completed in 1965.

54.     The "Wantagh Warriors" name and logo, which depicts the profile of a Native American in full headdress, dates back to 1956. Depicted below is the current imagery of the school's logo for Wantagh High School and Wantagh Middle School.[1] As depicted below, this logo is affiliated with the school district's core principles: Vision, Tradition, Pride, and Excellence.[2]



55.     The high school's student-run online news site is named "The Warrior." While this student club bears the same name, its website banner and logo (depicted below) do not include any Native American imagery.



56.     At school sports events and other functions, you can find members of the school community sporting "Warriors" apparel, which can be found in Wantagh High School's Apparel

_____

[1] The current mascots of the district's three elementary schools are Buzz the Bee, Forester the Bear, and Bubbles the Dolphin. These three mascots are not impacted by Part 123.

[2] These images are located on the Wantagh UFSD's website, which can be accessed at https://www.wantaghschools.org/. The images to the left can also be found on the Wantagh Warriors Athletics website, which can be accessed at https://wantaghwarriorathletics.org/.

Store.

57.     Senator Steven Rhoads explained it best in a June 14, 2023 letter to Commissioner Betty Rosa: "The Choice of the Wantagh Warriors name, logo, and mascot is clearly appropriate and consistent with his community's ongoing effort to honor its history and pay tribute to the tribal leader whose contributions made the peaceful development of the area possible." (A copy of Senator Rhoads' June 14, 2013 letter is attached as Exhibit A.)

58.     Wyandanch is a hamlet of Suffolk County located in the Town of Babylon. Wyandanch UFSD is located in the Village of Wyandanch.

59.     As with Wantagh, and many other municipalities throughout the State of New York, Wyandanch's name and history comes from Native American roots. The area now known as Wyandanch was inhabited by the Massapequa Indians until 1706 when Jacob Conklin purchased the land.

60.     The village was named after a real person: Chief (or Sachem) Wyandanch who was a famous sachem in the 17th century.

61.     The first Wyandanch Public School opened in 1937, and additional school facilities were built as a result of the 1950s population boom.

62.     The villages of Wantagh and Wyandanch, and their respective school districts, were named to honor famous sachems.

**C.  Plaintiffs-Petitioners Have Committed to Retiring their Native American Imagery and Only Seek to Maintain the "Warrior" Name Which is A Universal Cultural Symbol, Not Only a Native American One**

63.     As Brian Polite, the Chairman of the Shinnecock Indian Nation, publicly acknowledged, the name Warrior is not exclusive to native culture as there are many cultures who have warriors.

64.     This is true. Various cultures throughout history have honored the great warriors of their time.

65.     The name Warrior dates all the way back to the greatly feared Celtic warriors who lived in Celtic Europe, a culture that is believed to have started to evolve as early as 1200 B.C., which was the Iron Age.

66.     Fast forward through history, and you have the great warriors of Ancient Rome and Greece, such as the Trojan Warriors and Spartan warriors who came from a warrior society in ancient Greece. Ancient Greek warriors, like Achilles, Hercules, Odysseus, and Perseus, are well-known throughout the world, and have inspired countless movies and tv shows, like Xena: The Warrior Princess.

67.     The Warrior name can be found in various other parts of human history, such as medieval knights who served as warriors during the Middle Ages, Scottish Warriors, the Mongol Warriors of East Asia, Viking Warriors (also known as sea warriors), Ottoman Mamluk Warriors, Samurai Warriors (the warriors of premodern Japan), Jewish rebel warriors also referred to as the Maccabees, and the Valkyrie warriors (a figure in Norse Mythology depicted as a warrior woman).

68.     The Warrior name is also used by various schools and institutions of higher education, not only throughout the State of New York, but throughout the Country.

69.     At the collegiate level, several colleges use the Warrior name including Westmont College, Wayne State University, Bacone College, Sterling College, Merrimack College, Lycoming College, Eastern Connecticut State University, East Stroudsburg University of Pennsylvania, and Wisconsin Lutheran College.

70.     With the removal of any Native American imagery and a successful rebrand, the Warriors name would not fall within the definition of "Indigenous name, logo, or mascot" as set

forth in Part 123. (8 NYCRR 123.1.)

71.　　In fact, the NYSED has permitted school districts to continue to use the Warriors name if it was never associated with Native American culture. This is proof that the Warriors name with no Native American imagery is not prohibited by Part 123.

72.　　While the NYSED has attempted to expand this definition through after-the-fact statements to prohibit any name, logo, or mascot that bore any connection to Native American culture at any point in time, Part 123 said no such thing. Defendants-Respondents cannot unilaterally expand the scope of its regulation after its enactment.

**D. New York State's Dignity for All Students Act**

73.　　In September 2010, the New York State Legislature enacted the Dignity for All Students Act (hereinafter "DASA") which took effect in July 2012. New York's Education Law was amended to create a new Article 2 entitled "Dignity for All Students."

74.　　DASA prohibits bullying harassment, discrimination, and cyberbullying against students in school or at school functions based on their actual or perceived membership in a protected class. *See* N.Y. Educ. Law § 12.

75.　　The legislation was designed to prevent incidents of discrimination or harassment, including bullying, taunting, or intimidation, through the institution of preventive, educational measures. *See* N.Y. Educ. Law § 10; *see also* New York Bill Jacket, 2010 A.B. 3661, Ch. 482.

76.　　Prior to the enactment of DASA, New York was one of only eight states without anti-bullying legislation.

77.　　As reflected in the legislative history of the act, the State Legislature felt it important to create state-wide anti-bullying legislation to combat bullying and harassment in schools. The Bill Jacket for DASA provides, "Although school yard bullies have long had a

presence on public school grounds, this bill will help ensure that school administrators and educators have the tools and resources in place to afford all students – and particularly those who are targeted by such bullies – an educational environment in which they can thrive." *See* New York Bill Jacket, 2010 A.B. 3661, Ch. 482.

78.     This sentiment was reiterated in a Senator's July 16, 2010 letter to then-Governor Patterson (which is also part of the Bill Jacket): "[t]he implementation of DASA will provide clear direction to school districts and reduce the incidents of harassment and discrimination which are now an epidemic in our schools." *Id.*

**E. Part 123 of the Regulations of the Commissioner of Education**

79.     This lawsuit challenges the enactment of *Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools*" (hereinafter "Part 123"), 8 NYCRR 123.1 *et seq.*

80.     Part 123 prohibits public schools in the State of New York from utilizing or displaying any Indigenous name, logo, or mascot other than for purposes of classroom instruction. (8 NYCRR 123.2.)

81.     Part 123 defines "*Indigenous name, logo, or mascot*" as "a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures, used to represent a public school, including but not limited to such school sports teams." (8 NYCRR 123.1.) This definition excludes a public school, school building, or school district named after an Indigenous tribe. (*Id.*)

82.     Part 123 provides for certain exceptions to this rule. First, a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation is not

prohibited from choosing to use an Indigenous name, logo, or mascot for a sports team comprised of its tribal members, including an Indigenous name, logo, or mascot for a sports team comprised of its tribal members, including a tribal school or intramural league. (8 NYCRR 123.4(a).)

83.　　Second, Part 123 does not apply where a written agreement exists between a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation and a public school permitting the use of an Indigenous name, mascot, or logo that is culturally affiliated with such tribe. (8 NYCRR 123.4(b).)

84.　　Under this provision of Part 123, the NYSED will only acknowledge written agreements submitted before May 3, 2023, and will therefore reject any written agreements submitted after that date. Part 123 does not provide for any extensions of this deadline.

85.　　Part 123 also requires public schools to prohibit school officers and employees from utilizing or promoting any Indigenous name, logo, or mascot, while on school property or at a school function, except for school officers or employees who are a member of a tribal nation and are utilizing or promoting an Indigenous name logo, or mascot of such tribal nation. (8 NYCRR 123.5.)

86.　　Part 123 required boards of education to commit, via resolution, to eliminating the use of all Indigenous names, logos, and mascots by the end of the 2022-2023 school year. (8 NYCRR 123.3(a).) And it requires those resolutions to identify a plan to eliminate all use of the prohibited name, logo, or mascot by the end of the 2024-2025 school year. (*Id.*) Part 123 allows the commissioner to grant an extension of these timelines "[u]pon a showing of good cause." (8 NYCRR 123.3(b).)

87.　　Because the NYSED will not provide any funding to support its mandate, school districts are also forced to figure out how to fund this large undertaking.

**F. History of Implementation of Part 123 of the Regulations of the Commissioner of Education**

88.    In April of 2001, Richard Mills (the Commissioner of Education at the time) released a memorandum to all public school districts in the State of New York outlining his position on public schools' use of Native American names, symbols, and mascots and asking boards of education to end the use of Native American mascots as soon as possible.

89.    The NYSED did not issue any Commissioner's regulations or mandatory guidelines to this effect after the Commissioner of Education released his April 2001 memorandum.

90.    While a bill seeking to amend the Education Law to prohibit public schools from using a native name, logo, or mascot was presented to the State Assembly during its 2021-2022 Legislative Session, it was referred to the Assembly Committee on Education and remains there for review.[3] A similar bill was introduced in the 2023-2024 session.[4] Simply put, there were three separate bills introduced in two successive Legislative sessions without any successive enactments by either the Assembly or Senate. To this day, the State Legislature has never enacted a law banning Indigenous names, logos, and mascots.

91.    Twenty-one years after the April 2001 memorandum was released, James Baldwin, the Senior Deputy Commissioner for Education Policy at the NYS Education Department, released a memorandum on November 17, 2022 in which he declared that public school districts were prohibited from using Native American mascots and threatened removal of school officers and withholding of State Aid if school districts did not affirmatively commit to replacing its Native American team name, logo, and/or imagery by the end of the 2022-2023 school year.

92.    This November 17, 2022 memorandum referenced regulations that were being

---

[3] *See* Senate Bill No. 1549 and Assembly Bill No. 5443 in the 2021-22 session.
[4] *See* Senate Bill No. 4-52 introduced in the 2023-24 session.

developed by the NYSED, couching them as regulations that would clarify school districts'
obligations.

93.     Mr. Baldwin made this across-the-board directive to all public school districts
before Part 123 was even drafted, much less subjected to a 60-day public comment period or
actually promulgated in accordance with the State Administrative Procedure Act (hereinafter
"SAPA").

94.     The State created a statutory scheme for administrative agencies to promulgate
rules and regulations, and this November 17th memorandum was a blatant departure from those
requirements. Neither Mr. Baldwin, nor the Commissioner of Education herself, has the authority
to adopt an across-the-board directive without first formally adopting a regulation or rule to that
effect.

95.     On December 1, 2022, the Board of Regents indicated they anticipated the proposed
amendment would be presented for permanent adoption at the April 2023 Regents meeting, and
become effective as a permanent rule on May 3, 2023, after publication of the proposed
amendment in the State Registrar and expiration of the 60-day public comment period required
under SAPA.

96.     Accordingly, even prior to the public comment period, the NYSED made it clear it
planned to adopt Part 123 before the public comment period even began. To make matters worse,
the November 17th memorandum made it clear the NYSED planned to adopt Part 123 before it
even finished preparing a draft of it. In other words, the NYSED's compliance with SAPA was
mere window dressing, as the NYSED was just going through the motions before reaching a
conclusion that was already pre-ordained. This is further evidenced in the NYSED's *Assessment
of Public Comment*, which was released in April 20223. There, the NYSED acknowledged it

provided school districts with advance notice of its intentions in Mr. Baldwin's November 7, 2022 memorandum. Again, the NYSED declared its intentions to enact a regulation that was still in the works and had not undergone the requisite "notice-and-comment" requirements of SAPA.

97.     On December 28, 2022, the NYSED released a draft of Part 123, which triggered the beginning of the 60-day public comment period.

98.     After publishing the proposed amendment in the State Register, the NYSED received various comments during the 60-day public comment period; some were supportive of the proposed changes and others were strongly opposed to it.

99.     After the public comment period, the NYSED made two revisions to the proposed amendment, which they characterized as non-substantial.

100.    On April 18, 2023, the Board of Regents voted to adopt Part 123 which took effect on May 3, 2023.

101.    Part 123 set a June 30, 2023 deadline for boards of education to first self-determine if their names, logos, or mascots even fall within the scope of Part 123, and if so, to commit, via resolution to eliminate such names, logos, and mascots by the end of the 2022-2023 school year.

### G.  The Wantagh UFSD's Response to Part 123

102.    Upon reviewing Part 123, the Wantagh Board of Education decided it would retire the district's current imagery but fight to keep the "Warrior" name.

103.    On June 1, 2023, the Wantagh UFSD submitted a plan to NYSED entitled "*Wantagh Union Free School District NYSED Indigenous Mascot Regulation Board of Education Plan*" (hereinafter the "June 1 Wantagh Replacement Plan.") (A copy of this June 1 Wantagh Replacement Plan is attached as Exhibit B.)

104.    In its June 1 Wantagh Replacement Plan, the Wantagh Board of Education

acknowledged the Wantagh USFD's current imagery being used by the school district was implicated by Part 123 and represented it would retire that imagery and rebrand the Warrior name. (Ex. B at p. 2.)

105.    Although the Wantagh Board of Education concluded its current imagery was clearly implicated by Part 123, it took did not reach that conclusion with respect to the "Warrior name." On the contrary, the Wantagh Board of Education, in relying on Part 123's definition for Indigenous name, logo, or mascot, reached the exact opposition conclusion: that it was "equally clear that the Warrior name would not fit into the definition, as it is not a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, customs, symbols, or traditions." (*Id.*)

106.    The June 1 Wantagh Replacement Plan referred to Mr. Polite's public statement that he has no opposition to the Warrior name so long as there is no Native American imagery that goes along with it. (*Id.* at p. 3.)

107.    NYSED Assistant Commissioner David Frank denied the Wantagh Board of Education's request to keep the Warrior name.

108.    On June 14, 2023, Senator Rhoads, a Wantagh resident and representative of the 5th Senatorial District, sent a comprehensive letter to Commissioner Rosa urging the NYSED to reconsider its decision concerning the Wantagh Warriors, and its decision to enact Part 123 in general.

109.    Senator Rhoads opined that the mere enactment of Part 123 was unlawful and an abuse of discretion. He wrote:

> The broad purpose of the Dignity for All Students Act, (DASA), to create an environment "*free from discrimination, intimidation. Taunting harassment. and bullying on school property, a school bus and/or at a school function,*" is certainly a laudable goal. The decision, however, by the Board of Regents and you, as Commissioner, to institute a blanket statewide ban on the use of indigenous names, logos and mascots without an assessment on a case by

case basis whether the use of such items in any way actually promotes a culture of *"discrimination, intimidation. taunting. harassment. and bullying"* is, respectfully, an abuse of discretion and an overbroad interpretation of the statute, unintended by the Legislature.

(Ex. A at p. 1.)

110.　In addition not being an abuse of discretion, Senator Rhoads also criticized the manner in which Part 123 was drafted, calling it "poor policy" His letter June 14 letter continues:

> The State Education Department's state-wide and universal ban on the use of indigenous names, logos and mascots under the pretext of DASA's charge to create an environment *"free from discrimination. intimidation, taunting. harassment and bullying"* while making absolutely no effort to consider whether the use of such name, logo or mascot, given the history and circumstances of its use, actually creates such an environment, is not only poor policy, but creates a dangerous precedent, particularly in an educational setting…
>
> I also urge that the SEO create a mechanism for the individual evaluation of continued use of certain names, logos and mascots based upon community history, purpose and whether its continued use will create an environment which DASA was actually intended to avoid.

(*Id.* at pp. 2-3.)

111.　After receiving this denial, the Wantagh Board of Education revised its Replacement Plan on June 15, 2023 to incorporate the fact that its request to keep the Warrior's name was denied. (A copy of the June 15 Board Replacement Plan is attached as Exhibit C.)

112.　In this June 15 Board Replacement Plan, the Wantagh Board of Education reiterated that it remained committed to retiring the imagery associated with the current district logo but would still like to keep the Warrior name and rebrand it. (Ex. C at p. 2.) The Wantagh Board of Education prepared this plan for the sole purpose of complying with Part 123, which threatened removal of school officers and withholding of State Aid if school districts did not comply with the June 30, 2023 deadline.

113.    In order to comply with the June 30, 2023 deadline imposed by Part 123, the Wantagh Board of Education also passed a resolution with a plan to eliminate the use of prohibited Indigenous names, mascots, and logos by the end of the 2024-2025 school year. The resolution makes clear, however, that the Wantagh Board of Education's compliance shall in no way serve as a waiver or be construed as a waiver of the District's right to, among other things, challenge (a) whether the use of the "Warrior' name does in fact constitute a prohibited "indigenous name, logo or mascot" pursuant to Part 123, and (b) whether Part 123 should be repealed and/or determined to be unenforceable by the Commissioner and/or of any court of competent jurisdiction.

114.    The Wantagh Board of Education also indicated in its resolution that should Part 123 be repealed and/or determined to be unenforceable, it will immediately reinstate the "Warrior" team name and authority its usage in a manner unconnected with any indigenous imagery.

115.    This forced resolution was passed by the Wantagh Board on June 15, 2023. This action now follows.

116.    On June 28, 2023, the Wantagh UFSD surveyed the community to gather feedback about the requirement for school districts to move away from Indigenous mascots. This survey data was collected over a two-week period from June 28 through July 11, 2023. The survey yielded 962 responses, which the Wantagh Board considered when deciding how to move forward.

117.    Of the 962 community members who participated in the survey, 54.8% indicated the district should maintain the current imagery and "Warriors" name, 33.9% indicated the district should remove the imagery and maintain the "Warriors" name, and only 11.3% said the district should remove both and develop a new nickname and imagery. Additionally, 73.7% of the community members who were surveyed indicated the district should file a lawsuit against the State to keep the "Warriors" name. The survey also asked for the community's input on how much

the District should spend on legal fees to pursue the matter. The results were a mix bag in terms of the amount that should be spent, but the majority felt the district should spend some money on legal fees and 30.8% supported the district spending over $100,000 to challenge the regulation. (A copy of the Wantagh UFSD Board of Education Mascot Survey Results, dated July 12, 2023, are attached as Exhibit D.)

### H. The Wyandanch UFSD's Response to Part 123

118.    After Senior Deputy Commissioner Baldwin issued his November 17, 2022 memorandum ordering all school districts to stop using "Indian" mascots and associated Native American imagery—which was five months before Part 123 was even proposed, let alone enacted—the Wyandanch UFSD commenced discussions with Native American tribal leaders from the National, State, and local levels to discuss the possibility of retiring all Native American imagery and only keeping the "Warriors" name. These meetings signified the district's commitment and willingness to work together and be compliant.

119.    The Wyandanch UFSD's conversations with the Shinnecock Indian Nation were ongoing. They began as early as December 2022, and continued in March 2023, and again during the first week of May 2023.

120.    After reaching an agreement with the Shinnecock Indian Nation, the Wyandanch UFSD promptly reached out to the NYSED to procure an exemption to keep the Warriors name, but the NYSED denied the request via email saying, "It is too late" because the deadline to secure an exemption was May 3.

121.    As Newsday reported in a May 11, 2023 online article, Chairman of the Shinnecock Indian Nation, Mr. Polite, stated publicly on May 10, 2023 that he would have been in favor of allowing Wyandanch UFSD to keep its Warriors team name so long as it removes any Native

A-75

American imagery. Mr. Polite also went on record to say that Wyandanch was the only district to reach out to him and that he personally did not see an issue with Wyandanch keeping the Warriors name only. He was further quoted in the Newsday article as giving the following response to Wyandanch's proposed to keep the Warriors name only: "This is kind of a no-brainer. Unless there's Native American imagery that goes along with it, the name Warrior isn't exclusive to native culture. There are many cultures who have warriors, and I don't have any issue with them using it so long as there's no Native American imagery that goes along with that."[5]

122.    In other words, the NYSED is requiring the Wyandanch UFSD to change its Warriors name simply because it qualified for an exemption eight days late.

123.    It is nonsensical that an arbitrary May 3, 2023 deadline is the only distinguishing factor between a permissible use of the Warriors name and an impermissible one—especially when school districts have until the end of the 2024-2025 school year to comply with Part 123.

124.    In order to comply with the June 30, 2023 deadline imposed by Part 123, the Wyandanch District Board of Education passed a resolution with a plan to eliminate the use of prohibited Indigenous names, mascots, and logos by the end of the 2023-2024 school year. The resolution makes clear, however, that the Wyandanch Board of Education reserves its right to (a) challenge Part 123 pursuant to applicable law, and (2) communicate with the NYSED and local politicians to demonstrate the name "Warrior" should not be prohibited when it is disassociated from indigenous imagery.

125.    This forced resolution was passed by the Wyandanch Board of Education on June 21, 2023. This action now follows.

---

[5] This May 11, 2023 Newsday article, entitled "Shinnecock Nation open to Wyandanch keeping Warriors name, but state says it's too late for exemptions," is publicly available at https://www.newsday.com/sports/high-school/native-american-mascot-ban-wyandanch-shinnecock-nation-wk7khjov.

126.    That same day (June 21, 2023), the Wyandanch UFSD released a Rebranding Action Plan outlining a timeline for compliance with Part 123. The Wyandanch Board of Education prepared this plan in accordance with Part 123's June 30, 2023 deadline to do so.

### I. Part 123 Contains Vague Language, Which Makes It Difficult for School Districts to Navigate A Regulation That Is Designed to Be Self-Policing

127.    Part 123 is a self-policing regulation; the NYSED has left it up to boards of education to determine whether their team names, logos, or mascots are prohibited by Part 123—which appears to prohibit any name or item that is, or was at any point in time, loosely tied to indigenous people. In other words, it is up to the school district to decide where the Board of Regents drew its proverbial line.

128.    However, Part 123 fails to include any standards or criteria for school districts to determine the meaning, scope, and application of the regulation and its prohibition against the use of names, logos, and mascots by public schools.

129.    Part 123 does not adequately define what constitutes an Indigenous custom, symbol, or tradition.

130.    Part 123 also fails to describe the difference between a stereotypical aspect of Indigenous culture, as opposed to a representation that is accurate and respectful.

131.    Persons of common intelligence must necessarily guess at the meaning, scope, and application of Part 123.

132.    Additionally, the Board of Regents and NYSED never issued a list of schools that it considered to violate the new regulation. Nor has the State been very forthcoming in responding to inquiries about the scope of the regulation.

133.    There is no evidence the Board of Regents conducted any review, much less an extensive one, of New York public school logos to see if they might refer to a Native American

tribe or individual. Rather, the Board of Regents issued a sweeping regulation prohibiting any non-exempt use of an Indigenous name, logo, or image, without taking their origin into account.

134.    As set forth above, school districts are exempted from Part 123 where an agreement exists between a federally or state-recognized Indian tribe and a public school. (8 NYCRR 123.4(b).)

135.    The exception to Part 123 allowing public schools to use Indigenous names, logos, or imagery that would overwise violate the regulation absent the existence of an agreement between a federally or state-recognized Native American tribe and public school, is also problematic.

136.    It is not appropriate to condition a school district's use of an honorific Native American name or symbol based on a school's ability to locate, negotiate, and contract with a federal or state-recognized tribe that may or may not represent the actual interests of the school's Native American constituents.

137.    For instance, under Part 123 as it was enacted, one school district's use of an Indigenous name, mascot, or logo would not constitute a violation of the regulation if the school district obtained a written agreement with a federally or state-recognized Native American tribe prior to May 3, 2023, while another school district's use of the exact same Indigenous name, mascot, or logo would be deemed a violation if they had no written agreement. It simply makes no sense how one school district's conduct could be characterized as a DASA violation while another school district's same conduct would not.

138.    Additionally, individual Native American tribes and individuals cannot be the sole decision-makers on whether a school district's use of an Indigenous name, logo or mascot is legal or not. They are not elected officials accountable to constituents, and therefore should not be the

sole decision-maker as to whether a school district can continue to use their team name, mascot, or logo.

### J. The NYSED's Treatment of School Districts With a Warriors Name Has Been Both Haphazard and Contradictory

139. Upon information and belief, the NYSED has allowed the Chenango Valley Central School District to keep its "Warriors" nickname because it was not connected with Indigenous Nations or peoples.

140. And yet Petitioners-Plaintiffs are unable to retire their Native American imagery and rebrand the "Warriors" name. As set forth above, warriors (and what they represent) are not specific to Native American culture but have connections to a range of different cultures spanning various time periods throughout history.

141. If the Wyandanch UFSD and Wantagh UFSD retire their Native American imagery and successfully rebrand of the Warriors name, then there is no rational reason why they should not be able to continue to use the Warriors name. Even the Chairman of the Shinnecock Nation himself, someone who has been intimately involved the NYSED's implementation of Part 123, called it a "no-brainer."

142. Upon information and belief, the Salamanca City Central School District has been exempted from Part 123 and allowed to maintain its Warriors name *and logo* which depicts a Native American male after reaching an agreement with the Seneca Nation.

143. Upon information and belief, the Salamanaca City Central School District did not obtain approval from the Seneca Nation until after the May 3, 2023 deadline to do so.

144. The Salamanca Board of Education issued a resolution on April 25, 2023 authorizing its superintendent to seek and approve permission from the Seneca Nation for the school district to continue to use its Native American imagery and identify as The Warriors.

145.    As reflected in the minutes for the Salamanca Board of Education's April 25 meeting, the school district held four community forums to get feedback from students, staff and residents about district's logo and identity. The district superintendent shared the findings of these community forums at the April 25 meeting; he indicated there was a significant amount of support for retaining the district's identity as the Warriors and for the continued use of the logo.

146.    On April 30, 2023, the New York Post reported that the Salamanca Board of Education authorized the superintendent to seek approval from the Seneca and that the Seneca Nation did not immediately issue a decision.[6]

147.    Fortune.com published a similar story, reporting that the Seneca Nation did not immediately issue a decision but Seneca Indian Nation's leader commented the nation would "carefully consider" the request.[7]

148.    On May 17 and May 18, 2023, several news sources reported that the Seneca Indian Nation gave approval on May 17, 2023 to allow the Salamanca city schools to continue to use its "Warriors" name and imagery.

149.    If the Salamanca city schools did not obtain written approval from the Seneca Nation until May 17, as reported, then it could not have complied with the NYSED's May 3, 2023 deadline to obtain an exemption.

150.    And yet it appears the Salamanca city schools exemption will be honored, while the Wyandanch UFSD's exemption request was rejected because it came eight days after the May 3 deadline.

---

[6] This April 30, 2023 New York Post article, entitled "Should school use 'Warrior' nick name? Tribe to have last say," is publicly available at https://nypost.com/2023/04/30/seneca-indian-nation-could-approve-salamanca-warriors-name/.
[7] This April 30, 2023 Fortune article, entitled "AN upstate New York school may keep its Native American logo and "Warriors" nickname—because the local Seneca tribe is proud of it," is publicly available at https://fortune.com/2023/04/30/high-school-native-american-logo-nickname-salamanca-new-york-seneca-tribe/.

151.    Under these circumstances, the NYSED's differential treatment of school districts in enforcing the May 3 deadline would be the epitome of arbitrary and capricious.

152.    Notwithstanding the May 3 deadline, there is no rational basis for allowing one school district to retain its Warriors name and Native American imagery while not permitting another district to use only a rebranded Warriors name.

153.    This differential treatment is particularly egregious with respect to Wyandanch who, like the Salamanca city schools, obtained approval from a federally recognized Long Island tribal nation.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS-RESPONDENTS

### (Violation of State Administrative Procedures Act)

154.    Plaintiffs-Petitioners repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

155.    Part 123 prohibits all public schools in the State of New York from utilizing or displaying an Indigenous name, logo, or mascot, with limited exceptions, and impose harsh penalties for schools that do not comply.

156.    Because Part 123 is a statewide prohibition, it constitutes a "rule" as defined in the SAPA. *See* N.Y. A.P.A. Law § 102(2)(a) (defining a "rule" as a statement of "general applicability that implements or applies law," or a statement of "the procedure or practice requirements of an agency").

157.    Under the SAPA and the New York Constitution, rule-making by an administrative agency must comply with certain procedural requirements, including notice-and-comment requirements. *See* N.Y. A.P.A. Law § 202(1) (outlining rulemaking procedure required by SAPA, which includes notice-and-comment requirements); *see also* N.Y. A.P.A. Law § 102(2)(a)

(defining a "rule" as a statement of "general applicability that implements or applies law," or a statement of "the procedure or practice requirements of an agency").

158.    The notice-and-comment period for Part 123 was merely a pretense as the NYSED had already determined the outcome of the notice-and-comment period before it even began. Even more, the end result appears to have been fixed before Part 123 was even fully drafted.

159.    Defendants-Respondents also violated SAPA by expanding the scope of Part 123 after its enactment. In response to the utter confusion created by Part 123 inherent vagueness, the NYSED release an FAQ guide in May 2023. In that informational packet, the NYSED indicated that it would prohibit any name, logo, or mascot that bore any connection to Native American culture at any point in time, even if not currently. The NYSED advised school districts to consult historical documentation, such as year books, to determine if Part 123 applied to them.

160.    This was an expansion of the definition of "Indigenous name, logo, or mascot" as set forth in Part 123, which says no such thing. (8 NYCRR 123.1.)

161.    Defendants-Respondents cannot unilaterally expand the scope of its regulation after its enactment. In doing so, they have circumvented the requirements of SAPA.

162.    An Article 78 proceeding must be commenced within four months after the determination to be reviewed becomes final and binding upon the petitioner. This date is not necessarily the effective date of a challenged regulation, but rather when the challenged determination inflicts an actual, concrete injury upon the petitioner.

163.    Although Part 123 was enacted on April 17, 2023 and took effect on May 3, 2023, public school districts had until June 30, 2023 to first self-determine if their names, logos, or mascots even fall within the scope of Part 123, and if so, to commit, via resolution to eliminate such names, logos, and mascots by the end of the 2022-2023 school year.

164.   It was not until June 30, 2023, or alternatively the dates on which Plaintiffs-Petitioners passed resolutions in compliance with the June 30 deadline, that the challenged determination inflicted an actual, concrete injury upon Plaintiffs-Petitioners.

165.   Plaintiffs-Petitioners' Article 78 claims are therefore timely.

166.   Accordingly, Plaintiffs-Petitioners are entitled to a judgment pursuant to C.P.L.R. § 3001, declaring that Part 123 is contrary to law and thus null and void; and to a judgment, pursuant to C.P.L.R. § 7803(3), that Part 123 is contrary to law, arbitrary and capricious, and an abuse of discretion, and enjoining Defendants-Respondents form enforcing the New Regulations against them.

### AS AND FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS-RESPONDENTS

#### (Violation of State Administrative Procedures Act)

167.   Plaintiffs-Petitioners repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

168.   Administrative agencies, as creatures of the Legislature within the executive branch, may establish rules and regulations for the administration of statute to give effect to legislative policies, if authorized to do so.

169.   While an administrative agency can adopt rules and regulations for carrying out a law, it cannot create rules that were not contemplated or authorized by the Legislature. Specifically, an administrative agency's rule-making power does not authorize it to extend, limit, or alter the statute.

170.   Nor can an administrative agency exercise its rule-making authority to engage in broad-based public policy determinations.

171.   Defendants-Respondents exceeded the scope of their authority in enacting Part 123

because the regulation attempts to extend the reach of DASA.

172.    As reflected in the legislative history of DASA, and the statute itself, DASA was an anti-bullying legislation created mainly to create a safe school environment for students by preventing incidents of discrimination, harassment, and bullying. To serve this purpose, the Legislature implemented standardized policies for schools to prevent incidents of discrimination, bullying, and harassment from occurring. The statute also standardized the process for investigating complaints of this nature, and provided schools with guidance regarding what action they should take after finding a DASA violation occurred.

173.    In enacting Part 123, the NYSED improperly relies on DASA to create a blanket prohibition on the use of any names, mascots, or logos that are loosely related to Native Americans. What is missing in Part 123, is a determination as to what certain names, mascots, or logos violate DASA.

174.    This type of broad-based public policy determination extends beyond the NYSED's rule-making authority.

175.    Defendants-Respondents also impermissibly infringe upon school districts' authority and discretion in how to conduct an interscholastic sports program, including determining the propriety of a sports team name, mascot, or logo.

176.    While such decisions can only be set aside upon a showing that a board of education abused its discretion, Defendants-Respondents significantly limited this discretionary authority without a providing a showing that the Board of Education has abused its discretion.

177.    Defendants-Respondents rely heavily on the Commissioner's determination in *Appeal of McMillan*, in which the Commissioner analyzed a school district's use of an "Indians" team name. While the Commissioner determined in *Appeal of McMillan* that the respondent school

district abused its discretion by using an "Indians" team name and logo, Respondents-Defendants cannot bootstrap that decision to all team names, mascots, and logos used throughout the State.

178.    Accordingly, Plaintiffs-Petitioners are entitled to a judgment pursuant to C.P.L.R. § 3001, declaring that Part 123 is contrary to law and thus null and void; and to a judgment, pursuant to C.P.L.R. § 7803(3), that Part 123 is contrary to law, arbitrary and capricious, and an abuse of discretion, and enjoining Defendants-Respondents form enforcing the New Regulations against them.

**AS AND FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS-RESPONDENTS**

**(Request for Declaratory Judgment that Part 123 Violates the Separation of Powers Clause of the United States Constitution and New York State Constitution)**

179.    Plaintiffs-Petitioners repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

180.    Commissioner regulations issued by the NYSED, including Part 123, have the force of law comparable to a statute.

181.    The United States Constitution establishes three separate but equal branches of government. The legislative branch makes the law, the executive branch enforces the law, and the judicial branch interprets the law. These separation of powers serve to provide for checks and balances in order to prevent any one branch from having too much power.

182.    The New York State Constitution similarly has a separation of powers clause meant to provide checks and balances at the state level. Article III, Section 13 of the New York State Constitution provides, "The enacting clause of all bills shall be 'The People of the State of New York, represented in Senate and Assembly, do enact as follows,' and no law shall be enacted except by bill."

Case 2:23-cv-07299-NJC-PK Document 42 Filed 09/06/24 Page 35 of 45 PageID #: 450

183. Part 123 was issued by the NYSED, an administrative agency within the executive branch. As an administrative agency, the NYSED can enforce the law, but it cannot create the law itself. That is a non-delegable duty bestowed upon the legislative branch.

184. It follows that an administrative agency, like the NYSED, may adopt rules and regulations for carrying out a law, but cannot create rules that were not contemplated or authorized by the Legislature.

185. As set forth above, Defendants-Respondents exceeded the scope of their authority in enacting Part 123 because the regulation attempts to extend the reach of DASA and constitutes an impermissible broad-based policy determination.

186. In doing so, Defendants-Respondents enacting a regulation that has been given the force of law without proper delegation from the State Legislature.

187. Accordingly, the regulation is inherently unconstitutional as it was promulgated in violation of the separation of powers clause of the U.S. Constitution and NYS Constitution.

188. Plaintiffs-Petitioners have no adequate remedy at law other than to seek declaratory relief.

189. Plaintiffs-Petitioners are therefore entitled to an order invalidating Part 123 and declaring them null and void; a declaratory order; and an order permanently enjoining Part 123.

### AS AND FOR A FOURTH CAUSE OF ACTION THE INDIVIDUALLY-NAMED DEFENDANTS-RESPONDENTS

### (Part 123 Is Impermissibly Vague and Overbroad in Violation of the First and Fourteenth Amendment Due Process Clause of the U.S. Constitution)

190. Plaintiffs-Petitioners repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

191. Part 123 is unconstitutionally vague and overbroad under the First Amendment and

the Due Process Clause of the Fourteenth Amendment.

192.    A regulation can be impermissibly vague for either of two independent reasons.

193.    First, a law violates the Fourteenth Amendment Due Process Clause if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what it prohibits. This is rooted in the well-settled constitutional principle that individuals should receive fair notice or warning when the state has prohibited specific behaviors or acts.

194.    Second, a law is also unconstitutionally vague if it authorizes or even encourages arbitrary and discriminatory enforcement. A law is constitutionally vague where it fails to provide explicit standards for those who apply them, and in doing so authorizes or encourages resolution on an *ad hoc* and subjective basis.

195.    The vagueness doctrine includes a "notice" component in that a statute must include language that conveys a sufficiently definite warning as to the proscribed conduct when measures by common understanding and practices. Where a statute fails to give adequate warning of the boundary between the constitutionally permissible and constitutionally impermissible applications of the statute, it does not satisfy the "notice" component and is therefore impermissibly vague.

196.    Part 123 is unconstitutionally vague in violation of the Fourteenth Amendment Due Process Clause of the United State Constitution to the extent that it fails to give adequate warning of the boundary between the constitutionally permissible and constitutionally impermissible applications of the statute. In other words, Part 123 is impermissibly vague because it fails to provide a reasonable opportunity to know what conduct is prohibited by law, leaving the public uncertain as to the conduct it prohibits.

197.    Part 123 does not adequately define what constitutes an Indigenous "name," "symbol," or "image."

36

198.    Part 123 also fails to describe the difference between a stereotypical aspect of Indigenous culture, as opposed to a representation that is accurate and respectful.

199.    As a result, persons of common intelligence must necessarily guess at the meaning, scope, and application of Part 123.

200.    Part 123 is also unconstitutionally vague because it not only encourages, but authorizes, arbitrary and discriminatory enforcement. For example, the exemption provision of Part 123 is easily susceptible to inconsistent, arbitrary, and capricious enforcement. The exemption provision's very existence would allow one school district to maintain a particular team name, logo, or mascot, while prohibiting another school district from doing the same simply because it could not secure written approval from a federally or state-recognized Indian tribe.

201.    Part 123 not only encourages arbitrary enforcement based on the manner in which it was drafted, but enforcing Part 123 to Plaintiffs' team names would be arbitrary. As discussed in further detail above, Defendants have allowed one school district to maintain the Warriors name and Native American imagery while prohibiting Plaintiffs from using a re-branded Warriors name with no Native American imagery. This is an arbitrary enforcement of Part 123 that contradicts the purported rationale for implementing Part 123 in the first place.

202.    Defendants' enforcement of Part 123 as to the Wyandanch Plaintiffs is even more arbitrary considering Defendants denied their exemption request as untimely while reportedly allowing another school district to obtain an exemption after the requisite deadline to use the same team name.

203.    The application of Part 123 to the Warriors name is also arbitrary in and of itself considering the name is not unique to Native Americans, which is something the Chairman of the Shinnecock Indian Nation publicly acknowledged.

204.   "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Vague statutes are particularly egregious when they "abut upon sensitive areas of basic First Amendment freedoms." *Grayned* v. *City of Rockford*, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)

205.   The First Amendment doctrine of overbreadth provides that a law is unconstitutionally overbroad if it punishes a substantial amount of protected free speech, judged in relation to legitimate sweep. *See Virginia* v. *Hicks*, 539 U.S. 113, 122, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003).

206.   In determining whether a regulation is substantially overbroad, a court may examine possible applications of the regulation in factual contexts other than those of the plaintiff in the instant case. *See NAACP v. Button*, 371 U.S. 415, 432–33, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Overbreadth challenges are based upon the hypothetical application of a regulation to third parties. *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006). The purpose of an overbreadth challenge is to prevent the chilling of constitutionally protected conduct. *Id.* at 499.

207.   Part 123 should be invalidated as substantially overbroad because it reaches a substantial amount of constitutionally protected First Amendment activity through viewpoint and/or content-based restrictions that cannot survive strict scrutiny, as discussed in further detail below. In other words, Part 123 is unconstitutionally overbroad because a substantial number of its applications are unconstitutional, judged in relation to its purported plainly legitimate sweep. Part 123 lacks any tailoring to Defendants' purported goal, which is to prevent DASA violations. Part 123 does not even provide a mechanism to determine whether a DASA violation has occurred, or is likely to occur, in a particular school district so as to warrant a team name, logo, or mascot change. Rather, it creates a sweeping, policy-based determination that strays far beyond the scope

of the enabling statute (DASA) and in doing so creates an unnecessary risk of chilling the speech and expression of school employees, and the school community at large, in violation of the First Amendment.

208.    Defendants' application of Part 123 for Plaintiffs' team names presents one of the many examples of how the regulation is unconstitutionally overbroad and can lead to unwarranted restrictions of constitutionally protected conduct. Plaintiffs have already committed to removing all Native American imagery and only seek to keep a rebranded Warriors name. To prohibit them from doing so restricts constitutionally protected activity without furthering the purported purpose of Part 123.

209.    Plaintiffs are entitled to a final judgment declaring that Part 123 is void for vagueness by failing to provide persons of ordinary intelligence a reasonable opportunity to understand the breadth of the law.


**AS AND FOR A FIFTH CAUSE OF ACTION ASSERTED BY PLAINTIFFS-PETITIONERS ANTHONY GRECO AND CHARLIE REED AGAINST THE INDIVIDUAL DEFENDANTS-RESPONDENTS**

**(Violation of First Amendment Right to Freedom of Speech)**

210.    Plaintiffs-Petitioners repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

211.    The First Amendment of the United States Constitution, through the Fourteenth Amendment, restricts the States from unlawfully compelling speech and impairing the right to free speech. Article 1, Section 8 of the New York State Constitution also protects the right to free speech. The First Amendment generally prevents governments from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed. Such content-based and/or

viewpoint-based regulations are presumptively invalid.

212. Additionally, contend-based restrictions on speech are subject to strict scrutiny standard. Under this exacting standard, governmental regulation of speech is enforceable only if it the least restrictive means for serving a compelling government interest.

213. The protections of the First Amendment are not limited to spoken words, but rather include gestures and other expressive conduct, even if vulgar or offensive to some.

214. To determine whether conduct is expressive and entitled to constitutional protection requires an inquiry into whether the activity is sufficiently imbued with the elements of communication to fall within the scope of the First and Fourteenth Amendments.

215. To be sufficiently imbued with communicative elements, an activity need not necessarily embody a narrow, succinctly articulable message. So long as there is an intent to convey a particularized message along with a great likelihood that the message will be understood by those viewing it, expressive conduct will fall within the scope of the First Amendment.

216. The protection of the First Amendment depends not only on whether the conduct is expressive, but also on the context in which that expression takes place.

217. Part 123 prohibits school officers and employees from utilizing or promoting any Indigenous name, logo, or mascot, while on school property or at a school function. (8 NYCRR 123.5.) Because Part 123 is a content-based regulation, it is subject to strict scrutiny.

218. This enforcement provision of Part 123 unlawfully restricts individuals' free speech in violation of the First Amendment. Specifically, it prohibits District officials and employees, like Plaintiffs-Petitioners Anthony Greco and Charlie Reed, from engaging in expressive conduct through wearing Warriors apparel, regardless of whether they are acting as a citizen and a member of the public.

**Plaintiff-Petitioner Anthony Greco:**

219.    Plaintiff-Petitioner Greco is not only a member of the Wantagh Board of Education. He has been a resident of the school community for 27 years. And in those 27 years, he has watched all six of his children graduate from Wantagh High School.

220.    Plaintiff-Petitioner Greco's wife graduated from Wantagh High School, along with her eight siblings. Four of her siblings still reside in the District, along with their families.

221.    Although his own children have graduated high school, Plaintiff-Petitioner Greco still regularly attends school games and functions to support his nieces, several of whom are still District students who play sports on District teams. He also attends games and functions to support the school community in general.

222.    Plaintiff-Petitioner Greco regularly attends various sports games including football, volleyball, soccer, and lacrosse. He also attends homecoming and all championship games.

223.    School sports are a popular pastime in Wantagh. Much of the community attends school games while sporting their Warriors apparel.

224.    Warriors apparel also correlates with fundraising and awareness efforts. For example, members of the school community, including Plaintiff-Petitioner Greco, will wear specialty Warriors apparel in remembrance of 9/11. In fact, Plaintiff-Petitioner Greco just purchased a new Warriors hat in recognition of 9/11.

225.    Additionally, the Sports Booster Club, a parent-run organization, raises money through selling Warriors apparel to fund school sports teams throughout the year. The proceeds from the Sports Booster club also pay for sports scholarships and end-of-year student awards. Plaintiff-Petitioner Greco regularly attends these events throughout the school year.

226.    As a proud father, uncle, and community member, Plaintiff-Petitioner Greco has

amassed quite the collection of Warriors gear over the years. He wears his Warriors apparel to sports games and other school functions to support not only student athletes, but the school community as a whole.

227.  Plaintiff-Petitioner Greco, along with his wife and relatives, wear their Warriors apparel while attending school games or other functions. When Plaintiff-Petitioner Greco sits in the stands with his wife to watch their family member's sports games, he is acting as a spectator, not a Board of Education Member.  And yet under Part 123, he is prohibited from wearing Warriors apparel while his wife and relatives can.

**Plaintiff-Petitioner Charlie Reed**

228.  Plaintiff-Petitioner Reed has been a Wyandanch resident since 1963, and he has been a Board of Education member for a total of 27 years. When he first moved to the area, the Warriors name was already in existence.

229.  In the years he has lived in the District, Plaintiff-Petitioner Reed has watched all three of his children graduate from Wyandanch Memorial High School.

230.  Although his own children have graduated high school, Plaintiff-Petitioner Reed has two young grandchildren who are students in the District. As they grow older, he will continue participate in school events to support his grandkids, just as his did for his own children.

231.  Plaintiff-Petitioner Reed also attends school games, particularly football and basketball, to support the school community in general. He attends other school events as well, including but not limited to, high school band recitals and theatrical productions, etc.

232.  When Plaintiff-Petitioner Reed sits in the stands to watch sports games, he is acting as a spectator, not a Board of Education Member.  And yet under Part 123, he is prohibited from wearing Warriors apparel while other spectators can.

42

233.    This enforcement provision of Part 123 is unconstitutional because it cannot pass strict scrutiny.

234.    At a minimum, the enforcement provision of Part 123 is not narrowly tailored to serve a compelling interest because it restricts District officials and employees' free speech, like Plaintiff-Petitioner Greco and Charlie Reed, regardless of the context in which they are wearing their Warriors apparel.

235.    This is a content-based regulation that in no way satisfies strict scrutiny. Accordingly, Plaintiffs are entitled to a final judgment declaring that Part 123 violates Plaintiffs-Petitioners Greco and Charlie Reed's First Amendment right to engage in expressive conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs-Petitioners respectfully request that the court enter a judgment:

236.    Declaring that Part 123 conflicts with governing law and is therefore null and void;

237.    Enjoining Defendants-Respondents from enforcing Part 123; and

238.    Awarding Plaintiffs-Petitioners such other and further relief as this Court may deem just, equitable, and proper.

Dated: Carle Place, New York
      January 16, 2024

                                 SOKOLOFF STERN LLP
                                 *Attorneys for Plaintiffs-Petitioners*

                         By: _____
                           Adam I. Kleinberg
                           Chelsea Weisbord
                           179 Westbury Avenue
                           Carle Place, New York 11514
                           (516) 334-4500
                           File No. 230101

A-94

## VERIFICATION

STATE OF NEW YORK     )
                                 ) ss:
COUNTY OF NASSAU     )

      Adam Fisher, being duly sworn, deposes and says that he is the President of the Board of

Education of the Wantagh Union Free School District, which is a plaintiff-petitioner in the within

action; that he has read the foregoing Amended Verified Complaint and Petition, and knows the

contents thereof; and based upon documents maintained within the entity's files, that the same is

true to his own knowledge, except as to the matters there in stated to be alleged upon information

and belief, and as to those matters deponent believes them to be true.

 

Adam Fisher
*(As President and on behalf of the
Wantagh Board of Education)*

Subscribed and sworn to before me
this _12th_ day of January, 2024

NOTARY PUBLIC

JEANINE REALE
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01RE6195844
QUALIFIED IN NASSAU COUNTY
COMMISSION EXPIRES 11/3/24

A-95

## VERIFICATION

STATE OF NEW YORK    )
                                    ) ss:
COUNTY OF SUFFOLK    )

        Arlise Carson, being duly sworn, deposes and says that she is the Interim Superintendent

of Schools of the Wyandanch Union Free School District, plaintiff-petitioner in the within action;

that she has read the foregoing Amended Verified Complaint and Petition, and knows the contents

thereof; and based upon documents maintained within the entity's files, that the same is true to his

own knowledge, except as to the matters there in stated to be alleged upon information and belief,

and as to those matters deponent believes them to be true.

                                    _____
                                      Arlise Carson

Subscribed and sworn to before me
this   16   day of January, 2024


_____
**NOTARY PUBLIC**

KAREN L. PARRISH
Notary Public, State of New York
NO. 01PA5065123
Qualified in Suffolk County
Commission Expires September 3, 20__26

# EXHIBIT E

2023 NY REG TEXT 631927 (NS), 2023 NY REG TEXT 631927 (NS)

2023 NY REG TEXT 631927 (NS)

45 N.Y. Reg. 16 (May 3 2023)

New York Regulation Text - Netscan
8 NYCRR 123.1, 2, 3, 4, 5
Notices of Adoption
May 03, 2023
Effective: May 03, 2023
Education Department
FULL TEXT OF REGULATION(S)

**Indigenous Names, Mascots, and Logos**

To prohibit the use of Indigenous names, mascots, and logos by public schools.
Subchapter E of the Regulations of the Commissioner of Education is amended by adding a new Part 123 to read as follows:

*Part 123*

*Use of Indigenous Names, Logos, or Mascots Prohibited*

8 NYCRR 123.1

*8 NYCRR 123.1 Definitions.*

*As used in this Part, "Indigenous name, logo, or mascot" means a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures, used to represent a public school, including but not limited to such schools sports teams. It does not include a public school, school building, or school district named after an Indigenous tribe.*

8 NYCRR 123.2

*8 NYCRR 123.2 Prohibition.*

*Except as provided in section 123.4 of this Part, no public school in the State of New York may utilize or display an Indigenous name, logo, or mascot other than for purposes of classroom instruction.*

8 NYCRR 123.3

*8 NYCRR 123.3 Timelines.*

*(a) Boards of education must commit, via resolution, to eliminating use of all Indigenous names, logos, and mascots by the end of the 2022-23 school year. Such resolution shall identify a plan to eliminate all use of the prohibited name, logo, or mascot within a reasonable time, which shall be no later than the end of the 2024-2025 school year.*

*(b) Upon a showing of good cause, the commissioner may grant an extension of the timelines prescribed in subdivision (a) of this section.*

A-98

2023 NY REG TEXT 631927 (NS), 2023 NY REG TEXT 631927 (NS)

8 NYCRR 123.4

*8 NYCRR 123.4 Exceptions; Tribal Use or Approval.*

*(a) Tribal Use. Nothing in this section shall be construed to prohibit a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation from choosing to use an Indigenous name, logo, or mascot for a sports team comprised of its tribal members, including an Indigenous name, logo, or mascot for a sports team comprised of its tribal members, including a tribal school or intramural league.*

*(b) Tribal Approval. This Part shall not apply where a written agreement exists prior to the effective date of this part between a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation and a public school permitting the use of an Indigenous name, mascot, or logo that is culturally affiliated with such tribe. A public school shall not offer or accept any money, consideration, or thing of value pursuant to any such agreement. The tribal nation shall have the right and ability to revoke any such agreement at any time. Upon termination of such an agreement, the public school shall have the remainder of the school year in which such agreement is revoked and one additional school year to discontinue its use of an Indigenous name, logo, or mascot.*

8 NYCRR 123.5

*8 NYCRR 123.5 Implementation.*

*Public schools shall prohibit school officers and employees when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot. This provision shall not apply to any school officer or employee who is a member of a tribal nation and is utilizing or promoting an Indigenous name, logo, or mascot of such tribal nation.*

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 NY REG TEXT 631927 (NS), 2023 NY REG TEXT 631927 (NS)

2023 NY REG TEXT 631927 (NS)

45 N.Y. Reg. 16 (May 3 2023)

New York Regulation Text - Netscan
8 NYCRR 123.1, 2, 3, 4, 5
Notices of Adoption
May 03, 2023
Effective: May 03, 2023
Education Department

**Indigenous Names, Mascots, and Logos**

To prohibit the use of Indigenous names, mascots, and logos by public schools.

8 NYCRR 123.1

8 NYCRR 123.1

8 NYCRR 123.2

8 NYCRR 123.2

8 NYCRR 123.3

8 NYCRR 123.3

8 NYCRR 123.4

8 NYCRR 123.4

8 NYCRR 123.5

8 NYCRR 123.5

**Education Department**

**NOTICE OF ADOPTION**

**Indigenous Names, Mascots, and Logos**

**I.D. No.** EDU-52-22-00009-A

**Filing No.** 316

**Filing Date:** 2023-04-18

**Effective Date:** 2023-05-03

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following action:

2023 NY REG TEXT 631927 (NS), 2023 NY REG TEXT 631927 (NS)

*Action taken:* Addition of Part 123 to Title 8 NYCRR.

*Statutory authority:* Education Law, sections 101, 207, 305, 308, 309 and art. 2

*Subject:* Indigenous Names, Mascots, and Logos.

*Purpose:* To prohibit the use of Indigenous names, mascots, and logos by public schools.

*Final rule as compared with last published rule:* Nonsubstantial changes were made in section 123.5.

*Text of rule and any required statements and analyses may be obtained from:* Kirti Goswami, NYS Education Department, Office of Counsel, 89 Washington Avenue, Room 112 EB, Albany, NY 12234, (518) 474-6400, email: legal@nysed.gov

*Revised Regulatory Impact Statement*

Since publication of a Notice of Proposed Rulemaking on December 28, 2022, the Department has made two non-substantial revisions to the proposed amendment. First, the original proposed rule required that public schools prohibit school officers, employees, and all individuals when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot. The Department recognizes that public schools may not be able to successfully enforce this provision as it relates to individuals who are not officers or employees of such public schools. Therefore, the Department proposes to revise this provision to remove the requirement that public schools prohibit "individuals" from utilizing or promoting any Indigenous name, logo, or mascot when located on school property or at a school function.

Second, the Department received a comment suggesting that school districts could not display or use Indigenous team names, logos, or mascots for educational purposes. While the Department does not believe that this use is prohibited by the regulations as written, the Department has made a non-substantial revision to clarify that the regulation does not pertain to display or use of such names, symbols, or images in the context of classroom instruction.

The above changes require that the NEEDS AND BENEFITS and LOCAL GOVERNMENT MANDATES sections of the previously published Regulatory Impact Statement be revised to read as follows:

3. NEEDS AND BENEFITS:

The New York State Education Department (SED) has consistently opposed the use of Indigenous mascots. In 2001, former Commissioner of Education Richard P. Mills issued a memorandum "conclud[ing] that the use of Native American symbols or depictions as mascots can become a barrier to building a safe and nurturing school community and improving academic achievement for all students." Commissioner Mills recognized that, while a role for local discretion existed, "there is a state interest in providing a safe and supportive learning environment for every child." He asked boards of education "to end the use of Native American mascots as soon as practical."

Many school districts have heeded Commissioner Mills' directive. Most recently, the Waterloo and Lyme Central School Districts retired their mascots. SED commends the efforts of these districts and the many others that have or are embarking on this process.

Other school districts have not complied. Among them, until recently, was the Cambridge Central School District. After extensive study in 2020 and 2021, Cambridge voted to retire its "Indians" team name, logo, and mascot in June 2021. It hastily reversed itself in July 2021 upon the election of a new board member. Community members challenged this action in an appeal to the Commissioner of Education under Education Law § 310.

2023 NY REG TEXT 631927 (NS), 2023 NY REG TEXT 631927 (NS)

In Appeal of McMillan, et al.,[1] the Commissioner held that: (1) Cambridge "offered no meaningful explanation as to why [it] no longer found the information it had previously cited persuasive"; and (2) Cambridge's retention of the "Indians" logo "inhibit[ed] the creation of a safe and supportive environment for all students." On the latter point, the Commissioner noted that:

• A 2020 literature review on studies of Native American mascots by Laurel R. Davis-Delano, et al. concluded that each study reviewed "demonstrate[d] either direct negative effects on Native Americans or that these mascots activate[d], reflect[ed], and/ or reinforce[d] stereotyping and prejudice among non-Native persons."

• The New York Association of School Psychologists (NYASP) concluded that "research studies have consistently shown that the use of mascots and Indigenous symbols and imagery have a negative impact on not only Indigenous [students], but all students …"

• The Dignity Act prohibits "the creation of a hostile environment… that… reasonably causes or would reasonably be expected to cause… emotional harm to a student," a condition that could be created through the use of Native American mascots.[2]

• The Board of Regents (BOR) has taken affirmative measures, consistent with the Dignity Act, to promote positive learning environments in schools, including its Culturally Responsive-Sustaining Education Framework and policy on Diversity, Equity, and Inclusion.

Cambridge appealed the Commissioner's decision. Supreme Court (Albany County) affirmed the Commissioner's determination in its entirety on June 22, 2022. Crucially, the court held that the Commissioner:

determined correctly that the continued use of the 'Indians' nickname and imagery, given the 20 years that have passed since Commissioner Mills' directive, and given the imperatives of the District's Diversity Policy, was itself an abuse of discretion ....

Thus, the court's decision establishes that public schools are prohibited from utilizing Indigenous mascots. Arguments that community members support the use of such imagery or that it is "respectful" to Indigenous persons are no longer tenable.

In a memorandum dated November 17, 2022[3], the Department informed the field of the Commissioner's decision in Appeal of McMillan et al. and their concomitant need to eliminate the use of Native American mascots.

The Department now proposes a regulation to clarify public schools' obligations in this respect. In addition to prohibiting the use of Native American or Indigenous names, mascots, or logos by public schools, the regulation:

• defines Indigenous name, mascot, or logo and provides that such definition does not include a public school building, public school, or school district named after an Indigenous tribe;

• provides timelines by which such names, mascots, and/or logos must be eliminated;

• creates certain exceptions; and

• provides that public schools shall prohibit school officers and employees, when located on school property or at a school function, from utilizing or promoting any Indigenous name, logo, or mascot. This provision does not apply to individuals who are members of tribal nations.

5. LOCAL GOVERNMENT MANDATES:

The proposed provides that boards of education must commit, via resolution, to eliminating use of all Indigenous names, logos, and mascots by the end of the 2022-23 school year. Such resolution must identify a plan to eliminate all use of the prohibited name, logo or mascot within a reasonable time, which shall be no later than the end of the 2024-2025 school year, proved that, upon a showing of good cause, the commissioner may extend such timeline. Additionally, public schools must prohibit school officers and employees, when located on school property or at a school function, from utilizing or promoting any Indigenous name, logo, or mascot (this provision does not apply to any individual who is a member of a tribal nation).

[1] 61 Ed Dept Rep, Decision No. 18,058, available at http://www.counsel.nysed.gov/Decisions/volume61/d18058

[2] The Department is the agency tasked by the Legislature to administer the Dignity Act.

[3] http://www.nysed.gov/common/nysed/files/programs/main/indig-enous-native-american-mascot-memo.pdf

***Revised Regulatory Flexibility Analysis***

Since publication of a Notice of Proposed Rulemaking on December 28, 2022, the proposed rule was revised as set forth in the Revised Regulatory Impact Statement submitted herewith. The above changes require that the COMPLIANCE REQUIREMENTS section of the previously published Regulatory Flexibility Analysis be revised to read as follows:

2. COMPLIANCE REQUIREMENTS:

The proposed rule prohibits the use of Indigenous names, mascots, or logos by public schools, and provides timelines by which such names, mascots, and/or logos must be eliminated. Boards of education must commit, via resolution, to eliminating use of all Indigenous names, logos, and mascots by the end of the 2022-23 school year. Such resolution must identify a plan to eliminate all use of the prohibited name, logo or mascot within a reasonable time, which shall be no later than the end of the 2024-2025 school year, proved that, upon a showing of good cause, the commissioner may extend such timeline.

Additionally, public schools must prohibit school officers, employees, and all individuals when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot (this provision does not apply to any individual who is a member of a tribal nation).

***Revised Rural Area Flexibility Analysis***

Since publication of a Notice of Proposed Rulemaking on December 28, 2022, the proposed rule was revised as set forth in the Revised Regulatory Impact Statement submitted herewith. The above changes require that the REPORTING, RECORDKEEPING AND OTHER COMPLIANCE REQUIREMENTS; AND PROFESSIONAL SERVICES REQUIREMENTS section of the previously published Rural Area Flexibility Analysis be revised to read as follows:

2. REPORTING, RECORDKEEPING AND OTHER COMPLIANCE REQUIREMENTS;

AND PROFESSIONAL SERVICES:

The proposed rule prohibits the use of Indigenous names, mascots, or logos by public schools, and provides timelines by which such names, mascots, and/or logos must be eliminated. Boards of education must commit, via resolution, to eliminating use of all Indigenous names, logos, and mascots by the end of the 2022-23 school year. Such resolution must identify a plan to eliminate all use of the prohibited name, logo or mascot within a reasonable time, which shall be no later than the end of the 2024-2025 school year, proved that, upon a showing of good cause, the commissioner may extend such timeline.

A-103

Additionally, public schools must prohibit school officers, employees, and all individuals when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot (this provision does not apply to any individual who is a member of a tribal nation).

***Revised Job Impact Statement***

The proposed amendment is necessary to implement Regents policy and the Dignity for All Students Act by prohibiting the use of Indigenous names, mascots, or logos by public schools.

The proposed amendment will not have a substantial adverse impact on jobs or employment opportunities. Because it is evident from the nature of the proposed amendment that it will have no impact, or a positive impact, on jobs or employment opportunities, no further steps were needed to ascertain that fact and none were taken. Accordingly, a job impact statement is not required and one has not been prepared.

***Initial Review of Rule***

As a rule that requires a RFA, RAFA or JIS, this rule will be initially reviewed in the calendar year 2026, which is no later than the 3rd year after the year in which this rule is being adopted.

***Assessment of Public Comment***

This assessment summarizes the comments received on the proposed rule, published December 28, 2022. Please refer to the full Assessment of Public Comment (APC) for the Department's complete assessment of public comment at: http://www.counsel.nysed.gov/rules/full-text-indices.

1. COMMENT: The Department received comments supporting the proposed regulatory change from organizations and residents of school districts throughout New York State.

DEPARTMENT RESPONSE: The Department appreciates these supportive comments.

2. COMMENT: The Department received comments expressing general opposition to the proposed regulation.

DEPARTMENT RESPONSE: The Department's position is that the creation and maintenance of Indigenous mascots causes harm to all students regardless of their identity or background.

3. COMMENT: Several commenters expressed interest in increasing the amount of Native American history and culture in P-12 curricula.

DEPARTMENT RESPONSE: The comment is outside the scope of the proposed regulation.

4. COMMENT: Several commenters objected to the "costs" that replacement of their team name, mascot, or logo will entail. Others characterized the prohibition as an "unfunded mandate."

DEPARTMENT RESPONSE: The Department believes that the importance of prohibiting offensive or stereotypical imagery outweighs any attendant costs.

5. COMMENT: Several commenters expressed the sentiment that the elimination of their team name, logo, or mascot would "erase the history and general understanding of [Indigenous] culture throughout New York."

A-104

DEPARTMENT RESPONSE: This argument suggests a false dichotomy; namely, that Indigenous communities are entitled to stereotypical representations or no representation. The Department rejects this premise. Indigenous persons deserve representation in curricula and to be depicted accurately and respectfully. With respect to representation in curricula, see the Department's response above concerning curricula.

6. COMMENT: Several commenters expressed opposition to a proposed provision of the regulation requiring that school districts "prohibit school officers, employees, and all individuals when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot." Some commenters argued that this prohibition, as applied to "all individuals," is inconsistent with the First Amendment. Other commenters indicated that this would present practical difficulties in enforcement.

DEPARTMENT RESPONSE: The Department has engaged in a nonsubstantial revision of the regulation to remove "all individuals" from its scope.

7. COMMENT: A public school asks whether it would be prohibited from "display[ing] … photographs, trophies, [or] banners" that feature a retired team name, logo, or mascot. The school district further requests additional time "to fully implement the changes" required of the regulation.

DEPARTMENT RESPONSE: The Department does not recommend the destruction or alteration of historical artifacts such as photographs, trophies, or banners. The intent of this regulation is not to pretend that Indigenous mascots were never used, but to eliminate their use going forward.

With respect to extensions of time, the regulation permits school districts to request an extension of the deadlines identified in the regulation based "[u]pon a showing of good cause" (8 NYCRR 123.3 [b]).

8. COMMENT: A public school district seeks clarification as to why the Department is seeking to change team name, logos, mascots, but not the names of school buildings.

DEPARTMENT RESPONSE: School districts within the United States have historically reduced Native Americans to caricatures in the form of team names, logos, and mascots. To the Department's knowledge, there is no comparable tradition with respect to the legal names of school buildings or districts.

9. COMMENT: A "parental rights group" asserts that the Mahopac Central School District's "Indian mascot is being vilified by those who do not live in our community and or [sic] understand the importance of our history." The commenter alleges that the Department's actions have sown "division" within their school community and suggest that a prohibition on Indigenous mascots is inconsistent with "free speech and expression."

DEPARTMENT RESPONSE: See the Department's response above to the argument that Indigenous mascots "honor" Indigenous persons or communities.

10. COMMENT: A public school administrator asked whether the term "Indians" could be appropriate under any circumstances. The administrator argues that this term is akin to "American," which is utilized by certain schools. The commenter further asks whether the use of a "feather" in a logo would be inappropriate.

DEPARTMENT RESPONSE: The commenter's first question was squarely addressed by the Commissioner of Education in Appeal of McMillan et al. (61 Ed Dept Rep, Decision No. 18,058). In that appeal, the Commissioner found that a school district's "continued use of the 'Indians' team name, logo and mascot constitutes an abuse of its discretion."

2023 NY REG TEXT 631927 (NS), 2023 NY REG TEXT 631927 (NS)

The commenter's equation of "Indian" with "American" is inaccurate. "Indian" is a historical term used to apply to Native American tribes, it does not describe a specific tribe. "Indian nation[s] or tribe[s]," by contrast, are comprised of nine sovereign nations within the State of New York (Indian Law § 2). Thus, the generic term "Indian" is not analogous to the term "American," which refers to citizens of the United States of America—and which includes individuals of Indigenous descent.

The appropriateness of a logo containing a feather must be evaluated in context.

11. COMMENT: A resident of the Glens Falls City School District states that his district will no longer use an arrowhead as its logo. He argues that an arrowhead "isn't offensive to anyone's culture or race or nationality since all our ancestors used it and benefitted from its use."

DEPARTMENT RESPONSE: The Department cannot opine as to the Glens Falls City School District's reasoning for making the decision about which the commenter complains. However, to the extent that Glens Falls may have a history of utilizing stereotypical names and imagery, see the above response regarding the Mahopac Central School District's question about using a feather in a logo. No changes to the proposed rule are necessary.

12. COMMENT: The superintendent of the Mahopac Central School District requests that the Department consider the "[a]llowance of mascot names that exhibit strength such as "Braves" or "Warriors," citing dictionary definitions of these words. She opines that these words "do not refer to Native Americans but certainly describe the strength, courage, and determination of our students."

DEPARTMENT RESPONSE: As with the above comment considering the use of a feather, these issued must be considered in context. The question is not whether the words "braves" or "warriors" are offensive in the abstract, but whether their use is appropriate in school districts that have a history of utilizing stereotypical names and imagery. No changes to the proposed rule are necessary.

13. COMMENT: After expressing support for the proposed regulations, a commenter offers five specific proposals:

1. Give school districts two years to eliminate the use of Indigenous team names, logos, and mascots so that school districts are not "harmed by the upfront cost of removing and enacting new iconography";

2. Revise the definition of "Indigenous name, logo, or mascot" to the following: "any person, animal or object used to represent a school district which names, refers to, represents, or is associated with Native American, including aspects of Native American cultures and specific Native American tribes";

3. Provide additional guidance regarding the definition of federally recognized tribes. In this respect, the commenter notes that school districts have, and continue to attempt to, engage in "tribal shopping" whereby they seek a tribe's approval to use an Indigenous team name, logo, or mascot;

4. Ascertain whether school districts "can tap into cultural funds within NYSED" to defray costs; and

5. Promote additional education about Indigenous peoples in local curricula.

DEPARTMENT RESPONSE:

1. Following adoption of this regulation, school districts will have more than two years to eliminate use of Indigenous team names, logos, and mascots. Additionally, the Department provided advance notice of its intentions in James N. Baldwin's November 17, 2022 memorandum, which provided districts with an additional five months' notice. See also the Department's response above regarding extensions of time.

A-106

2023 NY REG TEXT 631927 (NS), 2023 NY REG TEXT 631927 (NS)

2. While the Department appreciates the suggested changes, Department staff have elected to maintain the original proposed language, as it believes that it is broader and will more accurately capture the team names, logos, and mascots that the Department seeks to prohibit.

3. The Department of the Interior's Bureau of Indian Affairs maintains an electronic database that allows users to search all federally recognized tribes: https://www.bia.gov/service/tribal-leaders-directory/federally-recognized-tribes (last accessed Mar. 18, 2023). With respect to "tribal shopping," the Department did not intend the "tribal approval" provision (8 NYCRR 123.4 [b]) to constitute an invitation for school districts to obtain such agreements.

4. See the Department's response regarding costs.

5. See the Department's response above regarding curricula.

14. COMMENT: Members of the assembly write to express their "severe disappointment" that the regulation affects two school districts within their Assembly district. They argue that the issue should be decided by local school boards. They further assert that the State Education Department "threaten[ed] to remove duly elected school board members and withhold millions of dollars ...." Finally, they characterize the regulation as an "unfunded mandate" and assert that the Department "should pay for its implementation."

DEPARTMENT RESPONSE: While the Department also hoped that this matter could have been handled at the local level, dozens of school districts ignored, or took pro forma steps to implement, Commissioner Mills' 2001 directive. It has become readily apparent that many school boards will not make this necessary change on their own.

While Deputy Commissioner Baldwin informed school districts that their willful maintenance of an Indigenous mascot could result in such consequences, these are set forth in statute (Education Law § 306 [2]).

On the characterization of the regulation as an "unfunded mandate," see the Department's response above concerning costs.

15. COMMENT: The New York State School Boards Association and New York State Association of School Attorneys argue that the prohibition on "all individuals … utilizing or promoting any Indigenous name, logo, or mascot" exceeds the Department's jurisdiction and is inconsistent with the First Amendment. These organizations further argue that the regulation does not contain an exception for displaying or discussing mascots for "educational or historical purpose[s]."

DEPARTMENT RESPONSE: As indicated above, the Department has engaged in a nonsubstantial revision of 8 NYCRR 123.5 to remove the reference to "all individuals."

Additionally, the Department has made a nonsubstantial revision to 8 NYCRR 123.2 to clarify that the regulation does not pertain to display or use of such names, symbols, or images in the context of classroom instruction.

16. COMMENT: A commenter asks who is responsible for "making the final determination on what is or isn't acceptable." The commenter further suggests that "if the group that makes this ultimate decision doesn't include native Americans, it is being just as offending as what this ruling is trying to prohibit." The commenter further suggests the creation of an appeals "process for schools that have their logos challenged or denied by the State."

DEPARTMENT RESPONSE: The Board of Regents, the head of the State Education Department, are responsible for adoption of all regulations proposed by the Department. The Department notes that it has convened an Indigenous Mascot Advisory Group comprised of tribal leaders which advised, and continues to advise, the Department in making determinations.

A-107

**2023 NY REG TEXT 631927 (NS), 2023 NY REG TEXT 631927 (NS)**

With respect to an appeals process, the regulation places the responsibility of eliminating Indigenous team names, logos, or mascots on local school boards. Therefore, it is the responsibility of each school board to determine the applicability of the regulation and ensure their district's compliance therewith.

---

**End of Document**                                                                 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 NY REG TEXT 631927 (NS), 2022 NY REG TEXT 631927 (NS)

2022 NY REG TEXT 631927 (NS)

44 N.Y. Reg. 33 (December 28 2022)

New York Regulation Text - Netscan
8 NYCRR 123.1, 2, 3, 4, 5
Proposed Rulemakings
December 28, 2022
Education Department
FULL TEXT OF REGULATION(S)

**Indigenous Names, Mascots, and Logos**

To prohibit the use of Indigenous names, mascots, and logos by public schools.

Subchapter E of the Regulations of the Commissioner of Education is amended by adding a new Part 123 to read as follows:

*Part 123*

*Use of Indigenous Names, Logos, or Mascots Prohibited*

8 NYCRR 123.1

*8 NYCRR 123.1 Definitions.*

*As used in this Part, "Indigenous name, logo, or mascot" means a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures, used to represent a public school, including but not limited to such schools sports teams. It does not include a public school, school building, or school district named after an Indigenous tribe.*

8 NYCRR 123.2

*8 NYCRR 123.2 Prohibition.*

*Except as provided in section 123.4 of this Part, no public school in the State of New York may utilize or display an Indigenous name, logo, or mascot.*

8 NYCRR 123.3

*8 NYCRR 123.3 Timelines.*

*(a) Boards of education must commit, via resolution, to eliminating use of all Indigenous names, logos, and mascots by the end of the 2022-23 school year. Such resolution shall identify a plan to eliminate all use of the prohibited name, logo, or mascot within a reasonable time, which shall be no later than the end of the 2024-2025 school year.*

*(b) Upon a showing of good cause, the commissioner may grant an extension of the timelines prescribed in subdivision (a) of this section.*

8 NYCRR 123.4

A-109

2022 NY REG TEXT 631927 (NS), 2022 NY REG TEXT 631927 (NS)

*8 NYCRR 123.4 Exceptions; Tribal Use or Approval.*

*(a) Tribal Use. Nothing in this section shall be construed to prohibit a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation from choosing to use an Indigenous name, logo, or mascot for a sports team comprised of its tribal members, including an Indigenous name, logo, or mascot for a sports team comprised of its tribal members, including a tribal school or intramural league.*

*(b) Tribal Approval. This Part shall not apply where a written agreement exists prior to the effective date of this part between a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation and a public school permitting the use of an Indigenous name, mascot, or logo that is culturally affiliated with such tribe. A public school shall not offer or accept any money, consideration, or thing of value pursuant to any such agreement. The tribal nation shall have the right and ability to revoke any such agreement at any time. Upon termination of such an agreement, the public school shall have the remainder of the school year in which such agreement is revoked and one additional school year to discontinue its use of an Indigenous name, logo, or mascot.*

8 NYCRR 123.5

*8 NYCRR 123.5 Implementation.*

*Public schools shall prohibit school officers, employees, and all individuals when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot. This provision shall not apply to any individual who is a member of a tribal nation and is utilizing or promoting an Indigenous name, logo, or mascot of such tribal nation.*

---

**End of Document**                                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

A-110

2022 NY REG TEXT 631927 (NS), 2022 NY REG TEXT 631927 (NS)

2022 NY REG TEXT 631927 (NS)

44 N.Y. Reg. 33 (December 28 2022)

New York Regulation Text - Netscan
8 NYCRR 123.1, 2, 3, 4, 5
Proposed Rulemakings
December 28, 2022
Education Department

**Indigenous Names, Mascots, and Logos**

To prohibit the use of Indigenous names, mascots, and logos by public schools.

8 NYCRR 123.1

8 NYCRR 123.1

8 NYCRR 123.2

8 NYCRR 123.2

8 NYCRR 123.3

8 NYCRR 123.3

8 NYCRR 123.4

8 NYCRR 123.4

8 NYCRR 123.5

8 NYCRR 123.5

**Education Department**

**PROPOSED RULE MAKING**

**NO HEARING(S) SCHEDULED**

**Indigenous Names, Mascots, and Logos**

**I.D. No.** EDU-52-22-00009-P

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following proposed rule:

*Proposed Action:* Addition of Part 123 to Title 8 NYCRR.

*Statutory authority:* Education Law, sections 101, 207, 305, 308, 309, and art. 2

2022 NY REG TEXT 631927 (NS), 2022 NY REG TEXT 631927 (NS)

*Subject:* Indigenous Names, Mascots, and Logos.

*Purpose:* To prohibit the use of Indigenous names, mascots, and logos by public schools.

*Text of proposed rule and any required statements and analyses may be obtained from:* Kirti Goswami, NYS Education Department, Office of Counsel, 89 Washington Avenue, Room 112 EB, Albany, NY 12234, (518) 474-6400, email: legal@nysed.gov

*Data, views or arguments may be submitted to:* Christina Coughlin, Assistant Commissioner, NYS Education Department, 89 Washington Avenue, Room 1078 EBA, Albany, NY 12234, (518) 474-7206, email: REGCOMMENTS@nysed.gov

*Public comment will be received until:* 60 days after publication of this notice.

*This rule was not under consideration at the time this agency submitted its Regulatory Agenda for publication in the Register.*

*Regulatory Impact Statement*

1. STATUTORY AUTHORITY

Article 2 of the Education Law, Dignity for All Students Act (the Dignity Act): Section 10 sets forth the legislative intent of such article which states, in part, that it is the "policy of the state to afford all students in public schools an environment free of discrimination and harassment." Section 11 defines terms, including "harassment" and "bullying" to mean the creation of a hostile environment by conduct…that…reasonably causes or would reasonably be expected to cause…harm to a student." Section 12 provides, in part, that no student shall be subject to harassment or bullying by employees or students on school property or at a school function…" Section 14(3) requires the Commissioner to promulgate regulations to assist school districts in implementing DASA.

Education Law § 101 continues the existence of the Education Department, with the Board of Regents at its head and the Commissioner of Education as the chief administrative officer, and charges the Department with the general management and supervision of public schools and the educational work of the State.

Education Law § 207 grants general rule-making authority to the Board of Regents to carry into effect the laws and policies of the State relating to education.

Education Law § 305(1) empowers the Commissioner of Education to be the chief executive officer of the State system of education and the Board of Regents and authorizes the Commissioner to enforce laws relating to the educational system and to execute educational policies determined by the Board of Regents. Education Law section 305(2) authorizes the Commissioner to have general supervision over all schools subject to the Education Law.

Education Law § 309 provides that the schools of every union free school district and of every city in all their departments are subject to the visitation of the commissioner and charges the commissioner with the general supervision of their board of education and their management and conduct of all departments of instruction.

Education Law § 2854(1)(b) provides that charter schools shall meet the same health and safety, civil rights, and student assessment requirements applicable to other public schools, except as otherwise specifically provided in Article 56 of the Education Law.

2. LEGISLATIVE OBJECTIVES:

2022 NY REG TEXT 631927 (NS), 2022 NY REG TEXT 631927 (NS)

Consistent with the above statutory authority, the proposed rule is necessary to implement Regents policy and the Dignity for All Students Act by prohibiting the use of Indigenous names, mascots, or logos by public schools.

3. NEEDS AND BENEFITS:

The New York State Education Department (SED) has consistently opposed the use of Indigenous mascots. In 2001, former Commissioner of Education Richard P. Mills issued a memorandum "conclud[ing] that the use of Native American symbols or depictions as mascots can become a barrier to building a safe and nurturing school community and improving academic achievement for all students." Commissioner Mills recognized that, while a role for local discretion existed, "there is a state interest in providing a safe and supportive learning environment for every child." He asked boards of education "to end the use of Native American mascots as soon as practical."

Many school districts have heeded Commissioner Mills' directive. Most recently, the Waterloo and Lyme Central School Districts retired their mascots. SED commends the efforts of these districts and the many others that have or are embarking on this process.

Other school districts have not complied. Among them, until recently, was the Cambridge Central School District. After extensive study in 2020 and 2021, Cambridge voted to retire its "Indians" team name, logo, and mascot in June 2021. It hastily reversed itself in July 2021 upon the election of a new board member. Community members challenged this action in an appeal to the Commissioner of Education under Education Law § 310.

In Appeal of McMillan, et al.,[1] the Commissioner held that: (1) Cambridge "offered no meaningful explanation as to why [it] no longer found the information it had previously cited persuasive"; and (2) Cambridge's retention of the "Indians" logo "inhibit[ed] the creation of a safe and supportive environment for all students." On the latter point, the Commissioner noted that:

• A 2020 literature review on studies of Native American mascots by Laurel R. Davis-Delano, et al. concluded that each study reviewed "demonstrate[d] either direct negative effects on Native Americans or that these mascots activate[d], reflect[ed], and/or reinforce[d] stereotyping and prejudice among non-Native persons."

• The New York Association of School Psychologists (NYASP) concluded that "research studies have consistently shown that the use of mascots and Indigenous symbols and imagery have a negative impact on not only Indigenous [students], but all students …"

• The Dignity Act prohibits "the creation of a hostile environment… that… reasonably causes or would reasonably be expected to cause… emotional harm to a student," a condition that could be created through the use of Native American mascots.[2]

• The Board of Regents (BOR) has taken affirmative measures, consistent with the Dignity Act, to promote positive learning environments in schools, including its Culturally Responsive-Sustaining Education Framework and policy on Diversity, Equity, and Inclusion.

Cambridge appealed the Commissioner's decision. Supreme Court (Albany County) affirmed the Commissioner's determination in its entirety on June 22, 2022. Crucially, the court held that the Commissioner:

determined correctly that the continued use of the 'Indians' nickname and imagery, given the 20 years that have passed since Commissioner Mills' directive, and given the imperatives of the District's Diversity Policy, was itself an abuse of discretion ....

Thus, the court's decision establishes that public schools are prohibited from utilizing Indigenous mascots. Arguments that community members support the use of such imagery or that it is "respectful" to Indigenous persons are no longer tenable.

2022 NY REG TEXT 631927 (NS), 2022 NY REG TEXT 631927 (NS)

In a memorandum dated November 17, 2022[3], the Department informed the field of the Commissioner's decision in Appeal of McMillan et al. and their concomitant need to eliminate the use of Native American mascots.

The Department now proposes a regulation to clarify public schools' obligations in this respect. In addition to prohibiting the use of Native American or Indigenous names, mascots, or logos by public schools, the regulation:

• defines Indigenous name, mascot, or logo and provides that such definition does not include a public school building, public school, or school district named after an Indigenous tribe;

• provides timelines by which such names, mascots, and/or logos must be eliminated;

• creates certain exceptions; and

• provides that public schools shall prohibit school officers, employees, and all individuals when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot. This provision does not apply to individuals who are members of tribal nations.

4. COSTS:

(a) Costs to State government: None.

(b) Costs to local government: The proposed rule prohibits the use of Indigenous names, mascots, or logos by public schools (this does not apply to names of public school buildings, public schools, or school districts named after an Indigenous tribe). There will likely be costs to public schools who currently use Indigenous names, mascots, or logos to remove such names, mascots, or logos from being utilized and/or displayed. The Department is unable to estimate the cost to such public school districts to do so, as the degree of utilization and display of Indigenous names, mascots, or logos in public schools varies. However, the Department has calculated the following estimates:

• Synthetic Turf Field: A school logo on a synthetic field is typically an inlay. Therefore, an existing logo can be cut out and replaced without disturbing the rest of the file. On average, for a 1,000 square foot installation (31 feet x 31 feet), the Department estimates a cost of $6.00-$12.00 per square foot.

• Gymnasium Floor: The Department estimates that a gymnasium floor can be re-painted and re-finished for approximately $40,000. The Department has based this estimate off of similar projects that have been completed by school districts within the past year (these projects are typically completed as capital outlay projects).

Additionally, the Department notes that costs to school districts associated with the removal of the use and display of such Indigenous names, mascots, or logos from buildings, signage, gym floors and sports fields can be offset by building aid. Building aid is available for certain approved capital outlays and debt services for school buildings where the construction costs of the project equal or exceed $10,000, excluding incidental costs. Additionally, the Commissioner has the authority to grant an extension of time to eliminate the use of such mascots, which may include projects that present a significant financial hardship.

Most or all of these items (signs, floors, field turf and certainly uniforms) are replaced/repaired on periodic cycles that are far shorter than the 21 years that have passed since Commissioner Mills' directive, so the districts that have failed to change their mascots and logos in the intervening time have foregone opportunities to do so at no greater cost than would have otherwise occurred. The time frames in this regulation allow districts sufficient time to plan and budget for the instances where the renewal cycles are accelerated by the proposed rule.

A-114

(c) Costs to private regulated parties: The proposed rule only applies to public school districts. Therefore, there are no costs imposed on private parties.

(d) Costs to regulating agency for implementation and continued administration of this rule: None.

5. LOCAL GOVERNMENT MANDATES:

The proposed provides that boards of education must commit, via resolution, to eliminating use of all Indigenous names, logos, and mascots by the end of the 2022-23 school year. Such resolution must identify a plan to eliminate all use of the prohibited name, logo or mascot within a reasonable time, which shall be no later than the end of the 2024-2025 school year, proved that, upon a showing of good cause, the commissioner may extend such timeline. Additionally, public schools must prohibit school officers, employees, and all individuals when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot (this provision does not apply to any individual who is a member of a tribal nation).

6. PAPERWORK:

The proposed provides that boards of education must commit, via resolution, to eliminating use of all Indigenous names, logos, and mascots by the end of the 2022-23 school year. The proposed rule does provide an exception for tribal use and tribal approval. Regarding triable approval, the proposed rule provides that the provisions of the proposed rule shall not apply where a written agreement exists prior to the effective date of the proposed rule.

7. DUPLICATION:

The proposed rule does not duplicate existing State or Federal regulations.

8. ALTERNATIVES:

The proposed rule is necessary to implement Regents policy and the Dignity for All Students Act by prohibiting the use of Indigenous names, mascots, or logos by public schools. Consistent with DASA, such prohibition is necessary to ensure that all students in public schools are not subject to a hostile environment or suffer from emotional harm in their school. There are no viable alternatives and none were considered.

9. FEDERAL STANDARDS:

There are no related Federal standards.

10. COMPLIANCE SCHEDULE:

It is anticipated that the proposed rule will be presented for permanent adoption at the April 2023 Board of Regents meeting. If adopted at the April meeting, the proposed rule will take effect on May 3, 2023. The proposed rule requires boards of education to commit, via resolution, to eliminate the use of all Indigenous names, logos, and mascots by the end of the 2022-23 school year (except where such public school meets an exception outlined in the proposed rule). Such resolution must identify a plan to eliminate all use of the prohibited name, logo, or mascot within a reasonable time, which shall be no later than the end of the 2024-2025 school year. However, the proposed rule provides that the Commissioner may grant an extension of such timelines upon good cause shown. Therefore, the Department anticipates that regulated parties will be able to comply with the proposed rule on its effective date and the timelines set forth in such rule.

[1] 61 Ed Dept Rep, Decision No. 18,058, available at http://www.counsel.nysed.gov/Decisions/volume61/d18058.

A-115

2022 NY REG TEXT 631927 (NS), 2022 NY REG TEXT 631927 (NS)

---

[2] The Department is the agency tasked by the Legislature to administer the Dignity Act.

[3] http://www.nysed.gov/common/nysed/files/programs/main/indigenous-native-american-mascot-memo.pdf

***Regulatory Flexibility Analysis***

(a) Small businesses:

The proposed rule is necessary to implement Regents policy and the Dignity for All Students Act by prohibiting the use of Indigenous names, mascots, or logos by public schools.

Because it is evident from the nature of the proposed amendment that it does not affect small businesses, no further measures were needed to ascertain that fact and none were taken. Accordingly, a regulatory flexibility analysis for small businesses is not required and one has not been prepared.

(b) Local governments:

1. EFFECT OF RULE:

The proposed amendment applies to all public schools in the state, which includes each of the 731 public school district and 356 charter schools.

2. COMPLIANCE REQUIREMENTS:

The proposed rule prohibits the use of Indigenous names, mascots, or logos by public schools, and provides timelines by which such names, mascots, and/or logos must be eliminated. Boards of education must commit, via resolution, to eliminating use of all Indigenous names, logos, and mascots by the end of the 2022-23 school year. Such resolution must identify a plan to eliminate all use of the prohibited name, logo or mascot within a reasonable time, which shall be no later than the end of the 2024-2025 school year, proved that, upon a showing of good cause, the commissioner may extend such timeline.

Additionally, public schools must prohibit school officers, employees, and all individuals when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot (this provision does not apply to any individual who is a member of a tribal nation).

3. PROFESSIONAL SERVICES:

The proposed rule does not impose any additional professional services requirements on local governments.

4. COMPLIANCE COSTS:

The proposed rule prohibits the use of Indigenous names, mascots, or logos by public schools (this does not apply to names of public school buildings, public schools, or school districts named after an Indigenous tribe). There will likely be costs to public schools who currently use Indigenous names, mascots, or logos to remove such names, mascots, or logos from being utilized and/or displayed. The Department is unable to estimate the cost to such public school districts to do so, as the degree of utilization and display of Indigenous names, mascots, or logos in public schools varies. However, the Department has calculated the following estimates:

A-116

2022 NY REG TEXT 631927 (NS), 2022 NY REG TEXT 631927 (NS)

• Synthetic Turf Field: A school logo on a synthetic field is typically an inlay. Therefore, an existing logo can be cut out and replaced without disturbing the rest of the file. On average, for a 1,000 square foot installation (31 feet x 31 feet), the Department estimates a cost of $6.00-$12.00 per square foot.

• Gymnasium Floor: The Department estimates that a gymnasium floor can be re-painted and re-finished for approximately $40,000. The Department has based this estimate off of similar projects that have been completed by school districts within the past year (these projects are typically completed as capital outlay projects).

Additionally, the Department notes that costs to school districts associated with the removal of the use and display of such Indigenous names, mascots, or logos from buildings, signage, gym floors and sports fields can be offset by building aid. Building aid is available for certain approved capital outlays and debt services for school buildings where the construction costs of the project equal or exceed $10,000, excluding incidental costs. Additionally, the Commissioner has the authority to grant an extension of time to eliminate the use of such mascots, which may include projects that present a significant financial hardship.

Most or all of these items (signs, floors, field turf and certainly uniforms) are replaced/repaired on periodic cycles that are far shorter than the 21 years that have passed since Commissioner Mills' directive, so the districts that have failed to change their mascots and logos in the intervening time have foregone opportunities to do so at no greater cost than would have otherwise occurred. The time frames in this regulation allow districts sufficient time to plan and budget for the instances where the renewal cycles are accelerated by the proposed rule.

5. ECONOMIC AND TECHNOLOGICAL FEASIBILITY:

The proposed amendment does not impose any new technological requirements on school districts or charter schools. Economic feasibility is addressed in the Costs section above.

6. MINIMIZING ADVERSE IMPACT:

There were no significant alternatives and none were considered. The proposed rule is necessary to implement Regents policy and the Dignity for All Students Act by prohibiting the use of Indigenous names, mascots, or logos by public schools. Consistent with DASA, such prohibition is necessary to ensure that all students in public schools are not subject to a hostile environment or suffer from emotional harm in their school.

Because the statute upon which the proposed amendment is based applies to all public schools in the state, it is not possible to establish differing compliance or reporting requirements or timetables or to exempt schools from coverage by the proposed amendment.

7. LOCAL GOVERNMENT PARTICIPATION:

A copy of the proposed rule has been shared with school districts through the offices of the district superintendents of each supervisory district in the State, from the chief school officers of the five big city school districts and from charter schools for review and comment.

***Rural Area Flexibility Analysis***

1. TYPES AND ESTIMATED NUMBERS OF RURAL AREAS:

The proposed amendment applies to all public schools in the state, including those located in the 44 rural counties with less than 200,000 inhabitants and the 71 towns in urban counties with a population density of 150 per square mile or less.

2022 NY REG TEXT 631927 (NS), 2022 NY REG TEXT 631927 (NS)

2. REPORTING, RECORDKEEPING AND OTHER COMPLIANCE REQUIREMENTS; AND PROFESSIONAL SERVICES:

The proposed rule prohibits the use of Indigenous names, mascots, or logos by public schools, and provides timelines by which such names, mascots, and/or logos must be eliminated. Boards of education must commit, via resolution, to eliminating use of all Indigenous names, logos, and mascots by the end of the 2022-23 school year. Such resolution must identify a plan to eliminate all use of the prohibited name, logo or mascot within a reasonable time, which shall be no later than the end of the 2024-2025 school year, proved that, upon a showing of good cause, the commissioner may extend such timeline.

Additionally, public schools must prohibit school officers, employees, and all individuals when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot (this provision does not apply to any individual who is a member of a tribal nation).

3. COSTS:

The proposed rule prohibits the use of Indigenous names, mascots, or logos by public schools (this does not apply to names of public school buildings, public schools, or school districts named after an Indigenous tribe). There will likely be costs to public schools who currently use Indigenous names, mascots, or logos to remove such names, mascots, or logos from being utilized and/or displayed. The Department is unable to estimate the cost to such public school districts to do so, as the degree of utilization and display of Indigenous names, mascots, or logos in public schools varies. However, the Department has calculated the following estimates:

• Synthetic Turf Field: A school logo on a synthetic field is typically an inlay. Therefore, an existing logo can be cut out and replaced without disturbing the rest of the file. On average, for a 1,000 square foot installation (31 feet x 31 feet), the Department estimates a cost of $6.00-$12.00 per square foot.

• Gymnasium Floor: The Department estimates that a gymnasium floor can be re-painted and re-finished for approximately $40,000. The Department has based this estimate off of similar projects that have been completed by school districts within the past year (these projects are typically completed as capital outlay projects).

Additionally, the Department notes that costs to school districts associated with the removal of the use and display of such Indigenous names, mascots, or logos from buildings, signage, gym floors and sports fields can be offset by building aid. Building aid is available for certain approved capital outlays and debt services for school buildings where the construction costs of the project equal or exceed $10,000, excluding incidental costs. Additionally, the Commissioner has the authority to grant an extension of time to eliminate the use of such mascots, which may include projects that present a significant financial hardship.

Most or all of these items (signs, floors, field turf and certainly uniforms) are replaced/repaired on periodic cycles that are far shorter than the 21 years that have passed since Commissioner Mills' directive, so the districts that have failed to change their mascots and logos in the intervening time have foregone opportunities to do so at no greater cost than would have otherwise occurred. The time frames in this regulation allow districts sufficient time to plan and budget for the instances where the renewal cycles are accelerated by the proposed rule.

4. MINIMIZING ADVERSE IMPACT:

There were no significant alternatives and none were considered. The proposed rule is necessary to implement Regents policy and the Dignity for All Students Act by prohibiting the use of Indigenous names, mascots, or logos by public schools. Consistent with DASA, such prohibition is necessary to ensure that all students in public schools are not subject to a hostile environment or suffer from emotional harm in their school.

A-118

2022 NY REG TEXT 631927 (NS), 2022 NY REG TEXT 631927 (NS)

Because the statute upon which the proposed amendment is based applies to all public schools in the state, it is not possible to establish differing compliance or reporting requirements or timetables or to exempt schools in rural areas from coverage by the proposed amendment.

5. RURAL AREA PARTICIPATION:

A copy of the proposed rule has been shared with school districts through the offices of the district superintendents of each supervisory district in the State, from the chief school officers of the five big city school districts and from charter schools, including those located in rural areas, for review and comment.

***Job Impact Statement***

The proposed amendment is necessary to implement Regents policy and the Dignity for All Students Act by prohibiting the use of Indigenous names, mascots, or logos by public schools.

The proposed amendment will not have a substantial adverse impact on jobs or employment opportunities. Because it is evident from the nature of the proposed amendment that it will have no impact, or a positive impact, on jobs or employment opportunities, no further steps were needed to ascertain that fact and none were taken. Accordingly, a job impact statement is not required and one has not been prepared.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT F

A-120

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

NY Bill Jacket, 2010 A.B. 3661, Ch. 482

Image 1 within document in PDF format.

New York Bill Jacket, 2010 Assembly Bill 3661

2010
Governor of New York
233rd Legislature, 2010 Regular Session

Illegible text characters in the source data are indicated by three asterisks (***).

CHAPTER 482

LAWS OF 2010

SENATE BILL _____ ASSEMBLY BILL 3661-C

_____ _____

**STATE OF NEW YORK**

3661--C

Cal. No. 275

2009-2010 Regular Sessions

**IN ASSEMBLY**

January 28, 2009

Introduced by M. of A. O'DONNELL, GLICK, NOLAN, LIFTON, BENJAMIN, FIELDS, McENENY, CLARK, PAULIN, ROSENTHAL, JOHN, GALEF, HEVESI, ESPAILLAT, ENGLEBRIGHT, KAVANAGH, POWELL, N. RIVERA, LANCMAN, PERALTA, STIRPE, HOYT, DINOWITZ, JAFFEE, SCHIMEL, CAHILL, BRODSKY, TITONE -- Multi-Sponsored by -- M. of A. ALFANO, BARRA, BING, BRENNAN, FARRELL, GIANARIS, GOTTFRIED, JACOBS, JEFFRIES, KELLNER, KOON, LATIMER, LUPARDO, MARKEY, MILLMAN, PEOPLES-STOKES, PERRY, PHEFFER, SWEENEY, WEISENBERG, WRIGHT -- read once and referred to the Committee on Education -- reported and referred to the Committee on Codes -- committee discharged, bill amended, ordered reprinted as amended and recommitted to said committee -- committee discharged, bill amended, ordered reprinted as amended and recommitted to said committee -- reported from committee, advanced to a third reading, amended and ordered reprinted, retaining its place on the order of third reading

S. 1987-B Duane

DATE RECEIVED BY GOVERNOR:

SEP 07 2010

ACTION MUST BE TAKEN BY:

SEP 18 2010

A-121

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

DATE GOVERNOR'S ACTION TAKEN:

SEP 13 2010

SENATE VOTE 58 Y 3 N HOME RULE MESSAGE ___ Y ___ N

DATE 6/22/10

ASSEMBLY VOTE 138 Y 4 N

DATE 5/17/10

**STATE OF NEW YORK**

**EXECUTIVE CHAMBER**

**ALBANY 12224**

APPROVAL # 22

CHAPTER # 482

MEMORANDUM filed with Assembly Bill Number 3661-C, entitled:

  "AN ACT to amend the education law, in relation to enacting the dignity for all students act"

APPROVED

 Although school yard bullies have long had a presence on public school grounds, this bill will help ensure that school administrators and educators have the tools and resources in place to afford all students -- and particularly those who are targeted by such bullies -- an educational environment in which they can thrive. To help provide a safe and civil educational environment, this bill will require school districts to: (a) revise their codes of conduct and adopt policies intended to create a school environment free from harassment and discrimination; (b) adopt guidelines to be used in school training programs to raise awareness and sensitivity of school employees to these issues and to enable them to respond appropriately; and (c) designate at least one staff member in each school to be trained in non-discriminatory instructional and counseling methods and handling human relations.

 The bill explicitly defines "harassment" as creating a hostile environment that unreasonably and substantially interferes with a student's educational performance, opportunities or benefits, or mental, emotional or physical well-being, or conduct, verbal threats, intimidation or abuse that reasonably causes or would reasonably be expected to cause a student to fear for his or her physical safety. The bill will explicitly prohibit harassment and discrimination of students with respect to certain non-exclusive protected classes, including, but not limited to, the student's actual or perceived "race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender or sex." Ending student harassment is an essential element of a quality education, and I believe strongly that the prohibitions set forth in this bill will serve as a significant step towards that goal.

 Although some have raised concerns about the implementation costs to school districts that would be created by this bill, I am confident that these costs will be minimal. First, the State Education Department (SED) will be required to adopt regulations to assist school districts in complying with the new statute, and may promulgate model policies to assist districts to do so.

A-122

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

Second, existing law, including the Safe Schools Against Violence in Education Act (SAVE), already imposes some of the same training and reporting obligations, and this bill wisely enhances and strengthens those existing protocols. As a result, the implementation costs to school districts will be more modest than they would be if this bill created an entirely new system. Third, while the bill provides a new requirement for training of a designated staff member at each school in non-discriminatory instructional and counseling methods and handling human relations, the bill's sponsors have made clear that the bill was not intended to compel each school to hire a new staff person, but would allow an existing staff person to receive such training. The sponsors have also stated that, at least in smaller school districts, schools may "share" a staff member who would be available to perform this function at multiple schools. These acknowledgments make clear that the bill allows for ample tools to mitigate the costs of compliance.

Finally, it should be noted that SED, at the Executive Chamber's request, will be creating a working group to help provide guidance to schools in implementing the bill. This group, which should include SED personnel, advocates, representatives from the school boards association and school administrators, will be available to develop model policies and provide assistance to school districts to further help individual schools adapt to the new, and important requirements that the bill sets forth, and the positive learning environment I am certain it will foster.

The bill is approved.

**A3661-C** O'Donnell (MS) Same as S 1987-B DUANE

| 06/22/10 | A3661-C | Senate Vote | Aye: 58 | Nay: 3 |
| 05/17/10 | A3661-C | Assembly Vote | Yes: 138 | No: 4 |
| 04/07/09 | A3661-B | Assembly Vote | Yes: 131 | No: 5 |

**Floor Votes:**

06/22/10 A3661-C Senate Vote Aye: 58 Nay: 3

| Aye | Adams | Aye | Addabbo | Aye | Alesi | Aye | Aubertine |
| Aye | Bonacic | Aye | Breslin | Nay | DeFrancisco | Aye | Diaz |
| Aye | Dilan | Aye | Duane | Aye | Espada | Aye | Farley |
| Aye | Flanagan | Aye | Foley | Aye | Fuschillo | Aye | Golden |
| Aye | Griffo | Aye | Hannon | Aye | Hassell-Thompson | Aye | Huntley |
| Aye | Johnson C | Aye | Johnson O | Aye | Klein | Aye | Krueger |
| Aye | Kruger | Aye | Lanza | Aye | Larkin | Aye | LaValle |
| Aye | Leibell | Aye | Libous | Aye | Little | Aye | Marcellino |
| Nay | Maziarz | Aye | McDonald | Aye | Montgomery | Exc | Morahan |
| Aye | Nozzolio | Aye | Onorato | Aye | Oppenheimer | Aye | Padavan |
| Aye | Parker | Aye | Peralta | Aye | Perkins | Aye | Ranzenhofer |

A-123

*New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Aye | Robach | Aye | Saland | Aye | Sampson | Aye | Savino |
| Aye | Schneiderman | Aye | Serrano | Aye | Seward | Aye | Skelos |
| Aye | Smith | Aye | Squadron | Aye | Stachowski | Aye | Stavisky |
| Aye | Stewart-Cousins | Aye | Thompson | Aye | Valesky | Nay | Volker |
| Aye | Winner | Aye | Young | | | | |

**<u>Floor Votes:</u>**

05/17/10 A3661-C Assembly Vote Yes: 138 No: 4

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Yes | Abbate | Yes | Alessi | Yes | Alfano | Yes | Amedore |
| Yes | Arroyo | Yes | Aubry | Yes | Bacalles | Yes | Ball |
| Yes | Barclay | Yes | Barra | Yes | Barron | Yes | Benedetto |
| Yes | Benjamin | Yes | Bing | Yes | Boyland | Yes | Boyle |
| Yes | Brennan | Yes | Brodsky | Yes | Brook-Krasny | No | Burling |
| No | Butler | Yes | Cahill | Yes | Calhoun | Yes | Camara |
| Yes | Canestrari | ER | Carrozza | Yes | Castelli | Yes | Castro |
| Yes | Christensen | Yes | Clark | Yes | Colton | Yes | Conte |
| ER | Cook | Yes | Corwin | Yes | Crespo | Yes | Crouch |
| Yes | Cusick | Yes | Cymbrowitz | Yes | DelMonte | Yes | DenDekker |
| Yes | Destito | Yes | Dinowitz | Yes | Duprey | Yes | Englebright |
| Yes | Errigo | Yes | Espaillat | Yes | Farrell | Yes | Fields |
| Yes | Finch | No | Fitzpatrick | Yes | Gabryszak | Yes | Galef |
| Yes | Gantt | Yes | Gianaris | Yes | Gibson | Yes | Giglio |
| Yes | Glick | Yes | Gordon | Yes | Gottfried | Yes | Gunther A |
| Yes | Hawley | Yes | Hayes | Yes | Heastie | Yes | Hevesi |
| ER | Hikind | Yes | Hooper | Yes | Hoyt | Yes | Hyer-Spencer |
| Yes | Jacobs | Yes | Jaffee | Yes | Jeffries | Yes | John |
| Yes | Jordan | Yes | Kavanagh | Yes | Kellner | Yes | Kolb |
| Yes | Koon | Yes | Lancman | ER | Latimer | Yes | Lavine |
| Yes | Lentol | Yes | Lifton | Yes | Lopez P | Yes | Lopez V |

**WESTLAW**   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

A-124

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Yes | Lupardo | Yes | Magee | Yes | Magnarelli | Yes | Maisel |
| Yes | Markey | Yes | Mayersohn | Yes | McDonough | Yes | McEneny |
| Yes | McKevitt | Yes | Meng | Yes | Miller J | Yes | Miller M |
| Yes | Millman | Yes | Molinaro | Yes | Montesano | Yes | Morelle |
| Yes | Murray | Yes | Nolan | Yes | Oaks | Yes | O'Donnell |
| Yes | O'Mara | Yes | Ortiz | Yes | Parment | Yes | Paulin |
| Yes | Peoples-Stokes | Yes | Perry | Yes | Pheffer | Yes | Powell |
| Yes | Pretlow | Yes | Quinn | Yes | Rabbitt | Yes | Raia |
| Yes | Ramos | Yes | Reilich | Yes | Reilly | Yes | Rivera J |
| Yes | Rivera N | Yes | Rivera P | Yes | Robinson | Yes | Rosenthal |
| Yes | Russell | Yes | Saladino | Yes | Sayward | Yes | Scarborough |
| Yes | Schimel | Yes | Schimminger | Yes | Schroeder | Yes | Scozzafava |
| Yes | Skartados | Yes | Spano | Yes | Stirpe | Yes | Sweeney |
| Yes | Tedisco | ER | Thiele | Yes | Titone | Yes | Titus |
| Yes | Tobacco | Yes | Towns | No | Townsend | Yes | Weinstein |
| ER | Weisenberg | Yes | Weprin | ER | Wright | Yes | Zebrowski K |
| Yes | Mr. Speaker | | | | | | |

**Floor Votes:**

04/07/09 A3661-B Assembly Vote Yes: 131 No: 5

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Yes | Abbate | Yes | Alessi | Yes | Alfano | Yes | Amedore |
| Yes | Arroyo | ER | Aubry | Yes | Bacalles | Yes | Ball |
| Yes | Barclay | Yes | Barra | Yes | Barron | Yes | Benedetto |
| Yes | Benjamin | Yes | Bing | Yes | Boyland | Yes | Boyle |
| ER | Bradley | Yes | Brennan | Yes | Brodsky | Yes | Brook-Krasny |
| No | Burling | No | Butler | Yes | Cahill | Yes | Calhoun |
| ER | Camara | Yes | Canestrari | ER | Carrozza | Yes | Castro |
| Yes | Christensen | Yes | Clark | Yes | Colton | Yes | Conte |
| Yes | Cook | Yes | Corwin | Yes | Crouch | Yes | Cusick |
| Yes | Cymbrowitz | Yes | DelMonte | Yes | DenDekker | Yes | Destito |

A-125

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ER | Diaz | Yes | Dinowitz | Yes | Duprey | Yes | Eddington |
| Yes | Englebright | Yes | Errigo | Yes | Espaillat | Yes | Farrell |
| Yes | Fields | Yes | Finch | No | Fitzpatrick | Yes | Gabryszak |
| Yes | Galef | ER | Gantt | Yes | Gianaris | Yes | Giglio |
| Yes | Glick | Yes | Gordon | Yes | Gottfried | Yes | Greene |
| Yes | Gunther A | Yes | Hawley | Yes | Hayes | Yes | Heastie |
| Yes | Hevesi | ER | Hikind | Yes | Hooper | Yes | Hoyt |
| Yes | Hyer-Spencer | ER | Jacobs | Yes | Jaffee | Yes | Jeffries |
| Yes | John | Yes | Jordan | Yes | Kavanagh | Yes | Kellner |
| Yes | Kolb | Yes | Koon | Yes | Lancman | Yes | Latimer |
| Yes | Lavine | Yes | Lentol | Yes | Lifton | Yes | Lopez P |
| Yes | Lopez V | Yes | Lupardo | Yes | Magee | Yes | Magnarelli |
| Yes | Maisel | Yes | Markey | Yes | Mayersohn | Yes | McDonough |
| Yes | McEneny | Yes | McKevitt | Yes | Meng | Yes | Miller |
| Yes | Millman | Yes | Molinaro | Yes | Morelle | ER | Nolan |
| Yes | Oaks | Yes | O'Donnell | Yes | O'Mara | Yes | Ortiz |
| Yes | Parment | Yes | Paulin | Yes | Peoples | Yes | Peralta |
| Yes | Perry | Yes | Pheffer | Yes | Powell | Yes | Pretlow |
| Yes | Quinn | Yes | Rabbitt | Yes | Raia | Yes | Ramos |
| Yes | Reilich | Yes | Reilly | Yes | Rivera J | ER | Rivera N |
| Yes | Rivera P | Yes | Robinson | Yes | Rosenthal | Yes | Russell |
| No | Saladino | Yes | Sayward | Yes | Scarborough | Yes | Schimel |
| Yes | Schimminger | Yes | Schroeder | Yes | Scozzafava | Yes | Seminerio |
| Yes | Skartados | Yes | Spano | Yes | Stirpe | Yes | Sweeney |
| ER | Tedisco | Yes | Thiele | ER | Titone | Yes | Titus |
| Yes | Tobacco | ER | Towns | No | Townsend | Yes | Walker |
| Yes | Weinstein | ER | Weisenberg | Yes | Weprin | Yes | Wright |
| Yes | Zebrowski K | Yes | Mr. Speaker | | | | |

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 131 of 299

A-126

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 8 of 55 PageID #: 573

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

**THE SENATE**

**STATE OF NEW YORK**

**ALBANY**

THOMAS DUANE

SENATOR, 29TH DISTRICT

CHAIR

SENATE COMMITTEE ON HEALTH

COMMITTEES:

CHILDREN & FAMILIES

CODES

CRIME VICTIMS, CRIME & CORRECTION

CULTURAL AFFAIRS, TOURISM,

PARKS & RECREATION

FINANCE

MENTAL HEALTH & DEVELOPEMENTAL DISABILITIES

RULES

SOCIAL SERVICES

PLEASE RESPOND TO

□ 322 EIGHTH AVENUE

SUITE #1700

NEW YORK NEW YORK 10001

PHONE (212) 633-8052

FAX (212) 633-8096

□ ROOM 430

STATE CAPITOL

ALBANY NEW YORK 12247

PHONE (518) 455-2451

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 132 of 299

A-127

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 9 of 55 PageID #: 574

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

FAX (518) 426-6846

▢ E-MAIL

DUANE@SENATE.STATE.NY.US

July 16, 2010
Hon. David A. Paterson
Governor
State of New York
Executive Chamber
Albany, NY 12224

Dear Governor Paterson:

After a decade of struggle, the *Dignity for All Students Act* (S. 1987-B/A.3661-C) (*DASA*) has passed both houses of the Legislature and awaits your approval. No child should be terrified to go to school due to bullying. Unlike other proposed anti-bullying legislation, DASA focuses on the education and prevention of harassment and discrimination *before* it begins rather than punishment after the fact. DASA will improve the quality of life for thousands of New York State's public school students and I urge you to sign the bill into law.

Shockingly, New York is only one of eight states in the nation that does not have an antibullying law. A few New York State school districts, including New York City, have instituted local anti-bullying policies -- but most have not. It is inexcusable that a child living in one school district where such policies have been instituted can thrive in a safe school environment, while another child in an adjoining district that lacks such policies may face unchecked torment and ridicule. DASA would provide a uniform policy for all of New York's public schools.

DASA was carefully drafted to insure that school boards have the greatest input on how best to implement anti-harassment and anti-discrimination policies for their school districts.

Specifically, DASA would:
  • Prohibit harassment and discrimination against public school students by employees while on school property or at school functions;
  • Define "harassment" as the creation of a hostile environment by conduct, verbal threats, intimidation, or abuse that has or would have the effect of unreasonably interfering with educational performance, opportunities, benefits, physical or emotional well being, or cause fear for physical safety;
  • Prohibit discrimination based on, *but not limited to,* an individual's actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender or sex;
  • Require every school board to establish:
    • guidelines for creating a discrimination-free and harassment-free environment
    • guidelines to be used in school training programs to discourage the development of discrimination and harassment
    • nondiscriminatory instructional and counseling methods, and
    • at least one staff person comprehensively trained to handle human relations with regard to race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender identity and expression, and sex;
  • Require that a plain language version of the policies be included in the school district's code of conduct;
  • Require that student disciplinary procedures and the district's code of conduct be changed to address the prohibition against discrimination and harassment;
  • Alter the definition of "tolerance" and "dignity" for the purposes of already required civility, citizenship and character education, to specifically include tolerance, respect for others and awareness and sensitivity to discrimination and harassment;

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

   • Require the State Education Commissioner to develop guidance for local school districts -- including model policies, and, where possible, district services. The Commissioner will also distribute grants, when funds are appropriated, to school districts for implementation;

   • Require the Commissioner to create an annual reporting process to track instances of discrimination and harassment. Such reporting shall be in compliance with existing *Violent and Disruptive Incident Reports* (VADIR) requirements;

   • Establish immunity from civil liability for any good faith and reasonable reporting of suspected harassment;

   • Provide that private and religious institutions are exempt from DASA;

   • Protect the rights of any individual to file suit for violations of the Individuals with Disabilities Act, the Americans with Disabilities Act, the Civil Rights Act and Title VII.

The fiscal impact is minimal. The State Education Department (SED) has assessed that DASA would have a one-time cost of $270,000 to implement across New York State. This is not by accident. The bill was specifically drafted to be integrated with existing SED programs - such as the Safe Schools Against Violence Education Program (Project SAVE) - which focus on school safety and violence prevention. This year DASA was amended to change the effective date from 2011 to 2012 in order for SED and school districts to reasonably phase in the requirements in an efficient and cost effective matter.

It is important to note that schools districts are currently paying a high cost in civil damages for failure to prevent bullying. Even worse, the consequences of school bullying include a steep spike in student absence, school violence, drop outs - and suicide. The implementation of DASA will provide clear direction to school districts and reduce the incidents of harassment and discrimination which are now an epidemic in our schools.

DASA is written to be inclusive of _all_ students. In addition, DASA addresses the needs of certain classes of students who have been historically harassed and discriminated against based on actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender identity and expression, and sex. There must be a serious dialogue in our schools about the harmful and long lasting effects of harassment and bullying based on real or perceived membership in these protected and vulnerable classes - dialogue which will provide comfort and validation to those students who are discriminated against based solely on who they are.

The enactment of DASA will mark this first time transgender protections are enshrined in law under the definition "gender identity and expression." For far too long New York has failed to protect and defend the rights of the transgender community. DASA is solid first step toward full transgender equality.

DASA was one of the first pieces of legislation I introduced when I was elected to the State Senate in 1999. The bill was desperately needed then as it is now. Since that time I have held two separate legislative hearings on DASA. I have heard from students, parents, teachers, administrators and advocates about the widespread and dangerous problem of bullying. The testimony presented to me was powerful and demanded a call to action.

One mother from Ithaca told me of her daughter being ruthlessly bullied and taunted on the school bus. The girl, the only African-American child on the bus, would become physically ill in the mornings before school due to the anxiety and fear of being bullied. She complained to the school district and demanded that the bullying and harassment stop. The school district's solution? It banned the little girl from the bus. Regrettably, the school district decided to punish the victim because it lacked a policy to address this terrible situation. This is just one example of injustice that happens every day in New York.

As Governor, Lieutenant Governor and State Senator, you have been a champion of civil rights and fighting injustice. DASA is historic legislation which will improve the quality of life for New York's children. I urge you to sign the bill into law. If you have any questions or concerns regarding DASA please do not hesitate to contact me.

Thank you for your consideration

Sincerely,

Thomas K. Duane

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

THE ASSEMBLY

STATE OF NEW YORK

ALBANY

DANIEL O'DONNELL

Member of Assembly

69 th Assembly District

CHAIR

Committee on Ethics and Guidance

Codes Subcommittee on Criminal Procedure

COMMITTEES

Codes

Education

Environmental Conservation

Judiciary

Oversight, Analysis and Investigation

Tourism, Parks, Arts and

Sports Development

September 7, 2010
Honorable David Paterson,
Governor of the State of New York
Executive Chamber
State Capitol
Albany, NY 12224

Re: A.3661-C/S.1987-B

Dear Governor Paterson,

As the Assembly sponsor of the Dignity for All Students Act, I am writing to urge you to sign the bill into law, to clarify and elaborate the legislative intent in greater detail than was done in the sponsor's memorandum, especially in relation to the bill's implementation, and to provide documents for your review and inclusion in the bill jacket. There are two implementation issues. First, the Legislature intends Dignity to be primarily a preventive, rather than punitive, measure; it should therefore be implemented accordingly, with the emphasis on proactive techniques such as training and early intervention to prevent discrimination and harassment. Second, the Legislature also intends that the training required by Dignity should be done in a sensible and cost-effective manner, and that the State Education Department and local districts have sufficient flexibility to achieve Dignity's goals in ways that are suited to the wide variety of school districts throughout the state.

The Dignity for All Students Act seeks to ensure that students have access to a school environment free from harassment by instituting preventive, educational measures. Under this legislation, schools retain the authority to utilize an array of disciplinary measures to address harassment and bullying, including conflict resolution, peer-mediation, restorative practices, counseling and parent conferences, as well as suspensions. The Legislature is aware, however, that in recent years, suspension rates have increased in New York City public schools. There is wide agreement among researchers that a school's over-reliance on exclusionary methods of discipline, such as suspension, damages that school's educational mission, and studies show that a child who has been suspended is more likely to fall behind in school, be retained a grade, drop out of high school, commit a crime, and become incarcerated as an adult. See NAACP Legal Defense & Educational Fund, Inc., *Dismantling the School-to-Prison Pipeline,* at 3 (2005); Russell Skiba, et. al, *Are Zero Tolerance Policies Effective in the Schools? An Evidentiary Review and Recommendations,* Adopted by the American Psychological Association Council of Representatives, Aug. 9, 2006. Therefore, it is not intended that this legislation should be implemented in a manner that leads to an over-reliance on student suspensions. Instead, this bill strives to reduce incidents of bullying and harassment by instituting preventive education and data collection, and by providing teachers the tools and support they need to prevent bullying incidents and respond effectively when they occur.

During negotiations that led to the bill's passage, questions were raised about the training requirements in the new Education Law section 13 created by this legislation. With respect to subdivisions one and two of that section, the Legislature intends that the State Education Department (SED), in providing direction to districts under new Education Law section 14, and school districts in creating policies and guidelines under new section 13, have flexibility to determine who must be trained, how often, and the specific content of the training in order to meet the bill's philosophical and practical goals: creating a school environment free of discrimination and harassment. The Legislature further intends that the training that is already required under SAVE (Education Law Article 55, added by Chapter 181 of the Laws of 2000) would be expanded to assist employees improve their ability to recognize the precursors of violence and to intervene appropriately to prevent bullying and the more violent behavior that can result when bullying is left unchecked. With respect to subdivision three's requirement that "at least one staff member at every school be thoroughly trained to handle human relations in the areas of race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender and sex," the Legislature does not intend this language to impose any new hiring requirement; rather, an existing staff member with compatible duties and responsibilities would receive additional training. Depending on the size of the district, this bill text does not necessarily mean that there must be a full-time staffer sited at every school building; rather, the Legislature intends that such a staffer must be available to go to every school as needed and to be readily accessible to staff at every school for consultation and advice as needed, which can be by telephone or any other means of communication that is effective in meeting the legislative goals discussed above. As with subdivisions one and two, it is the legislative intent that SED and school districts have flexibility in implementing this language; for example, a large urban school should have such a staff member on-site full time, while a district spread over a large geographic area with several schools and a smaller student population could well have a single staff member "riding circuit" and serving several schools. The Legislature expects and intends that SED will give guidance to the districts to ensure that this requirement is met in a way that is both cost-effective for school districts and effective in implementing the bill's goals: creating a school environment that is free from discrimination or harassment through proactive measures such as training.

Finally, I am providing copies of the 2010 floor debate in the Assembly on A.3661-C, various support and opposition memoranda, and the sponsor's memorandum. Thank you for the opportunity to comment and provide information about the bill.

Very truly yours,

Daniel O'Donnell

Member of Assembly

cc: Peter Kiernan, Counsel to the Governor

Enclosures:

Record of Proceedings in Assembly, May 17, 2010 (A.3661-C)

Sponsor's Memorandum in Support, A.3661-C

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 136 of 299

A-131

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 13 of 55 PageID #: 578

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

Memoranda in Support (Office of the Mayor of the City of New York, NYC Department of Education, NYSUT, NY Association of School Psychologists, National Alliance on Mental Illness, Gay Men's Health Crisis, New York State Nurses Association)

Memoranda in Opposition (Conservative Party of New York, New Yorkers for Constitutional Freedoms)

**The Assembly**

**State of New York**

**Albany**

**THE HONORABLE SHELDON SILVER, SPEAKER**

**PRESIDING**

**RECORD OF PROCEEDINGS**

**MAY 17, 2010**

THE CLERK: Bill No. 3661-C, Calendar No. 275, O'Donnell, Glick, Nolan, Benjamin, Fields, McEneny, Clark, Paulin, Rosenthal, John, Galef, Hevesi, Espaillat, Englebright, Kavanagh, Powell, N. Rivera, Lancman, Stirpe, Hoyt, Dinowitz, Jaffee, Schimel, Cahill, Brodsky, Titone, Boyland, Skartados, DenDekker, Alessi. An act to amend the Education Law, in relation to enacting the Dignity For All Students Act.

ACTING SPEAKER P. RIVERA: An explanation is requested.

MR. O'DONNELL: This bill is the Dignity For All Students Act. It has passed all eight years that I have been a member of the Assembly and passed for a number of years prior to my arrival here. It is designed to combat harassment in schools and this bill is in a C-print from the bill that we passed last year, which was the B-print.

ACTING SPEAKER P. RIVERA: Mr. Conte.

MR. CONTE: Thank you, Mr. Speaker. Danny, if you would yield for a couple of questions.

MR. O'DONNELL: Sure.

MR. CONTE: You've changed the bill over the last couple of years, as just mentioned, you've gone from a B-print to a C-print, and I think one of the main changes that you've made is that it's dealing with all types of harassment, not just dealing with harassment, dealing with sexual orientation; is that correct?

MR. O'DONNELL: When we went from an A-print to a B-print, we expanded the list of possible areas where children were being harassed. The list was never exclusive, by which I mean the language said, including but not limited to, and then it had a list of things that children might be harassed about. A number of members suggested that we did not include fat kids, and so as a former fat kid, I was more than willing to amend the bill to include weight as one of the things that children might be harassed about at school. The addition of that as one of the included but not limited to categories was done in the B-print. In the C-print we did one, only one change, which was pass -- push back the enactment date. We heard from local school districts that they were concerned that they were not going to have enough time to implement these rules. And so, what we did was we put the implementation date to September 2012 to coincide with the beginning of a new academic year and, therefore, allowed more time for the State DOE to promulgate regulations to assist local school districts on how to work with this problem, but mostly, it gives a school district additional time before they have to be compliant with these rules.

MR. CONTE: Thank you. When I'm looking at the definition of harassment, and the definition of discrimination and harassment prohibited, a lot of them that are there, including persons' actual perceived race, color, national origin, ethnic group, religion,

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 137 of 299

A-132

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 14 of 55 PageID #: 579
New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

religious practice, a lot of those are constitutional rights and just by adding weight, we're not looking at adding weight as a new constitutional right; is that correct?

MR. O'DONNELL: This bill does not amend the Constitution in any way. It amends the Education Law to say that schools should be an environment where discrimination and harassment does not belong, and that if children are getting harassed in school based on their weight or other categories, the school should have policies and ways to protect and implement these rules.

MR. CONTE: Okay. And I'm assuming this is only for public educational facilities?

MR. O'DONNELL: That's correct.

MR. CONTE: So, the private schools are still able to discriminate as much as they would like?

MR. O'DONNELL: If that makes you happy, I guess, the answer is yes.

MR. CONTE: No, I'm just stating what the facts are.

MR. O'DONNELL: Okay.

MR. CONTE: Nowadays, there is a number of harassments that occur that could be on school grounds, but are in the personal property of a particular individual, i.e., a cell phone or a laptop computer and there has been a number of instances throughout the country where harassment has occurred with individuals and students -- between students via the internet and via text messaging, and I was just wondering how you envision the school districts to be able to prohibit this activity and respond to that activity if and when it does occur in the school grounds or in the school environment.

MR. O'DONNELL: It is very difficult to constitutionally distinguish between speech and conduct. So, in this particular case, this bill addresses conduct on school property. It does not -- and therefore, it's the conduct, not the speech, that allows it to be regulated based on the constitutional principles. The conduct that you refer to may or may not be protected, but mostly for purposes of this, is often not on school grounds. So, this does not impose on schools any obligation or liability to address other forms of communication unless those forms of communication lead to actual harassment on school property.

MR. CONTE: Okay. Finally, just one last question. What is the remedy, if you will, for a student who feels that they harassed and the school has this policy in place, but doesn't abide by the policy?

MR. O'DONNELL: This bill does not address any remedy beyond internally to the school. The school has an obligation to have a policy. The school has an obligation to have people on staff who know how to deal with the policy. The school has an obligation to protect all children from that conduct. If, in fact, the school fails, then the school fails. This bill has nothing to do with the remedy outside the school failing. This bill requires the State Education Department to promulgate regulations to assist schools, if they need assisting, on how to make sure that schools remain an environment that are free from harassment and discrimination.

MR. CONTE: And, again, one last question. In terms of reporting this information to the Commissioner of Education, it's my understanding that we're not creating a new mandate upon the school districts to report this, it's just going to be included in another reporting that they already have to do; is that correct?

MR. O'DONNELL: That's correct. I know of the great concern for unfunded mandates, so what's required of schools and under this bill is nothing new. It's adding to what they're already required to do when they report other conduct to the State Education Department.

MR. CONTE: Thank you, Mr. O'Donnell. Thank you, Mr. Speaker

ACTING SPEAKER P. RIVERA: Read the last section.

A-133

THE CLERK: This act shall take effect on the first day of July 2012 next succeeding the date on which it shall have become a law

ACTING SPEAKER P. RIVERA: The Clerk will record the vote.

(The Clerk recorded the vote.)

Mrs. Robinson to explain her vote.

MRS. ROBINSON: Thank you very much, Mr. Speaker. I want to commend the sponsor for this legislation because I look at it as an indicator to some other things that are taking place, and that is children that are committing suicide and not much attention is being given to that. In my district I've attended several meetings where they're talking about bullying. The children are actually participating in role play talking about how it is to be bullied and how to stop bullying. And so, therefore, I think it is most important that we begin to talk about that and it's something that's not being talked about. Several children up in the Schenectady area have committed suicide over the past couple of years. Also, in the Brooklyn community, we have children who are committing suicide. And most recently, there was another young lady that committed suicide because she was so bullied. I think that we have to begin to pay attention to these young people who say that their lives are a living hell because somebody is bullying them for one reason or another.

So, therefore, looking at this in its holistic perspective, I think that we have to pay attention to children being bullied and also look at the side effects of those that children are committing suicide as a result of that. Thank you and I vote in the affirmative.

ACTING SPEAKER P. RIVERA: Mrs. Robinson in the affirmative.

Mr. Hoyt to explain his vote.

MR. HOYT: Mr. Speaker, very briefly. This is a great bill. I commend the sponsor for, once again, leading the charge to enact it, and I call on our colleagues in the Senate to finally vote in the affirmative and send this bill to the Governor so it can be signed into law immediately. I cast my vote in the affirmative.

ACTING SPEAKER P. RIVERA: Mr. Hoyt in the affirmative.

Are there any other votes? The Clerk will announce the results.

(The Clerk announced the results.)

The bill is passed.


**NEW YORK STATE ASSEMBLY**

**MEMORANDUM IN SUPPORT OF LEGISLATION**

**submitted in accordance with Assembly Rule III, Section I (e)**

() Memo on original draft of bill

(X) Memo on amended bill

**BILL NUMBER**:                              Assembly 3661-C

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 139 of 299

A-134

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 16 of 55 PageID #: 581
New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

|  | Senate |
|---|---|
| **SPONSORS**: | Member(s) of Assembly: Daniel O'Donnell |
|  | Senator(s): |
| **TITLE OF BILL**: | AN ACT to amend the education law, in relation to enacting the dignity for all students act. |

**PURPOSE OR GENERAL IDEA OF BILL**:

The purpose of this bill is to afford all students an environment free of any harassment that substantially interferes with their education, regardless of the basis of the harassment, and free of discrimination based on actual or perceived race, color, weight, national origin, ethnic group, religion, disability, sexual orientation, gender, or sex.

**SUMMARY OF SPECIFIC PROVISIONS**:

Section one of the bill establishes its short title, the Dignity for all Students Act.

Section 2 of the bill amends the Education Law by adding a new article 2 entitled "Dignity for all Students." New article 2 sets forth the legislative intent in section 10, and sets forth definitions in section 11. The definition of "harassment" in section 11(7) was carefully drafted to ensure that this legislation protects children against harassment in a manner that is consistent with the First Amendment protections of speech and expression. See Tinker v. Des Moines School District, 393 U.S. 503 (1969) and its progeny. In addition, by moving the list of protected classes to the end of the definition, and by adding the phrase "not limited to" at the beginning of the list, the amendment made in the B-print explicitly establishes, in the bill text itself, that the list is non-exclusive and that the definition is content neutral.

Harassment is defined as "creation of a hostile environment by conduct or by verbal threats, intimidation or abuse that has or would have the effect of unreasonably and substantially interfering with a student's educational performance, opportunities or benefits, or mental, emotional or physical well-being; ...". Education Law §11(7), as proposed in this bill. The definition includes an objective reasonableness standard and, consistent with Tinker and the cases decided after Tinker, it also provides that speech (e.g., the verbal threats included in the definition) becomes harassment only when it does, or foreseeably would, substantially interfere with a student's education. It is also the legislative intent that, consistent with the hostile environment case law developed in the employment context, conduct or verbal behavior must be severe or pervasive in order to substantially interfere with educational performance, opportunities, etc. and to therefore be harassment under this definition. This content-neutral definition is followed by a non-exclusive list of protected classes whose members are often the targets of the type of harassment the bill seeks to prevent. The purpose of listing these protected classes is to provide examples of the types of status-based harassment frequently encountered by students without in any way limiting the application of the definition to individuals in those classes.

Section 12 prohibits harassment, as defined in section 11(7) and discussed above, and it also prohibits discrimination on the basis of actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender, or sex in any activity occurring on school grounds or at a school function. New section 12 includes language intended to make clear that the Dignity for All Students Act does not contravene or override existing provisions of law, including but not limited to the Education Commissioner's regulations, regarding single gender schools and athletic teams.

Sections 13 and 14 of new article 2 respectively provide for the policies and guidelines to be established by school districts, and the State Education Commissioner's responsibilities. This part of the bill requires school districts to develop procedures which create a school environment free of discrimination and harassment and to establish guidelines for training school personnel. School districts must also establish guidelines for developing nondiscriminatory instructional and counseling methods and

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 140 of 299

A-135

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 17 of 55 PageID #: 582
New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

ensuring that staff will be available at every school who have been trained to handle human relations in the areas in which discrimination is prohibited. The Commissioner of Education is to provide advice, which may include model policies, and direct services, to the extent possible, to help districts prevent discrimination and harassment. The commissioner will also provide grants, from funds appropriated for such purpose, to local school districts to assist them in implementing the guidelines provided for by the bill.

Section 15 of new Education Law article 2 requires the commissioner to create a procedure whereby material incidents of discrimination and harassment on school grounds or at school functions are reported to the State Education Department at least annually. The commissioner may use the existing UVIR (uniform violent incident reporting) system for this purpose; however, it is the legislative intent that the UVIR system will be adapted to include information about the specific nature of the incident, i.e., the type or types of bias involved in a reported incident of harassment or discrimination, including the possibility that multiple types of bias could be involved in a single incident, and all of the types of bias involved should be reported.

Section 16 of new Education Law article 2 provides protection for people who report incidents of discrimination or harassment. Section 17 provides for applicability of the new article with respect to certain institutions and other laws, and section 18 provides for severability and construction.

Section 3 of the bill amends section 801-a of the education law by requiring sensitivity to the harassment or discrimination prohibited by section 2 of this bill to be incorporated into the civility and character training currently required by section 801-a of the education law.

Section 4 of the bill amends section 2801 of the education law by adding a new paragraph n. Section 5 of the bill now provides that the bill will take effect on July 1, 2012. This change in the effective date is the only change made in the C-print of the bill.

The A-print added weight to the non-exclusive list of protected classes, whose members are often the targets of the type of harassment the bill seeks to prevent, that is contained in the harassment definition, and also added weight to the same list that appears in other places in the bill. As noted in the Justification section below, the GLSEN study shows that looks/body size was the most frequently reported basis for harassment of students in New York schools. There were no other changes in the A-print.

The B-print revised the harassment definition by moving the non-exclusive list of protected classes from the middle of the definition to the end of the definition, and by adding the phrase "not limited to" at the beginning of the list. This change clarifies the consistently expressed legislative intent that the list is non-exclusive and that the definition is content neutral. The B-print also made a conforming change in proposed new Education Law §10, by removing the list of protected classes and simply stating the broad legislative intent to provide a school environment free of discrimination and harassment. There were no other changes in the B-print.

The C-print changes the effective date to July 1, 2012 to ensure that there is adequate time for both SED and school districts to develop thoughtful and well-designed implementation plans. This time frame also will permit proposed budgets at the state and local levels to include consideration of the implementation plans before the law takes effect. There are no other changes in the C-print.

**JUSTIFICATION**:

In deciding First Amendment cases in school settings, courts have recognized "the special need to maintain a safe, secure and effective learning environment," Harper v. Poway Unified School, 445 F.3d 1166 at 1176 (9 [th] Cir. 2006), citing Tinker v. Des Moines School District, 393 U.S. 503 (1969). Students need such a safe, welcoming and supportive school environment so that they can concentrate on their academic and personal growth, and they should never have to be preoccupied by the threat or actual occurrence of harassment or discrimination at school. The Dignity for All Students Act promotes civility among students and between students and teachers. It will also help create an atmosphere where learning is paramount and distractions to learning are minimized.

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 18 of 55 PageID #: 583

Moreover, the Act provides a response to the large numbers of harassed and stigmatized students skipping school and engaging in high risk behaviors like drug use, alcohol abuse, and perhaps even suicide. No child or teen should ever be pushed to such extremes because of an intolerable environment in his or her school. Scholarly literature and common sense establish that harassment and intimidation interfere with students' ability to learn. By prohibiting harassment in public schools and establishing the basis for proactive measures such as training and model policies, the "Dignity for All Students Act" takes a major step in creating more nurturing environments in all our schools.

A 2008 review of existing literature, that also analyzed 1993-94 data from a large urban school district, noted that bullying victimization is estimated to affect 15-20% of the U.S. student population. The authors defined bullying to include threats, intimidation and other conduct, and concluded it was the most common form of "low level" school violence. Meyer-Adams, N. & Conner, B.T., "School violence: Bullying behavior and the Psychosocial School Environment in Middle Schools," Children & Schools, Vol. 30, No. 4 (October 2008). The negative effects of bullying include increased truancy and dropout rates as well as negative psychosocial effects such as depression, etc. Id. at p. 212. Verbal teasing and intimidation are the most common form of bullying. Dupper, D.R. & Meyer-Adams, N., "Low-level violence: A neglected aspect of school culture," Urban Education, Vol. 37, No. 3 at p. 351 (2002). A 1992 study found that 88% of secondary school students reported having observed bullying and 76.8% stated they had been victims. Id. In addition to the negative effects discussed above, bullying victims' grades may suffer and even "good kids" may be pushed into starting fights. Id. at 352. There is also harm to those who witness peer harassment. Id.

The continuing need for this legislation is apparent from recent data demonstrating the prevalence of bias-based harassment in New York schools. A survey commissioned by the Gay, Lesbian and Straight Education Network (GLSEN) found that more than one-third (39%) of New York students reported that bullying, name-calling, and harassment is a serious problem in school. Students were asked about the frequency of witnessing other students bullied, called names, or harassed in school. From Teasing to Torment: A Report on School Climate in New York (GLSEN 2005), at p. 8. The most commonly reported harassment was based on physical appearance. Sixty-six percent (66%) of students reported that people at school were harassed at least sometimes because of their looks or body size, with 38% reporting that this happened often or very often. Id. This bill therefore now includes weight as one of the examples contained in the non-exclusive list at the end of the harassment definition. Bullying and harassment based on how people expressed their gender, or because of their actual or perceived sexual orientation was also very common. Fifty seven percent of respondents reported that students were bullied or harassed at least sometimes because of the way they expressed their gender, and about a quarter (23%) said these behaviors occurred often or very often. Id. More than five out of ten (52%) reported that students were harassed because they were or were perceived to be lesbian, gay, or bisexual, id., even as only 5% identified as being so. Id. at 2. About a quarter (24%) said these behaviors occurred often or very often. Id. at 8.

**PRIOR LEGISLATIVE HISTORY:**

A.3496-A/S.1571 (passed Assembly 2007 and 2008); A.9491/S.1454 (passed Assembly 2006); A.4963/S.1454 (passed Assembly 2005); A.1118/S.1925 (2003-04) passed Assembly 2003 and 2004; A.2634-A /S.1628-A (2001-02) passed Assembly 2002; A.9244-A/S.5775-A (2000).

**FISCAL IMPLICATIONS:**

Minimal.

**EFFECTIVE DATE:**

This act shall take effect on July 1, 2012.

**NEW YORK STATE ASSEMBLY**

**MEMORANDUM IN SUPPORT OF LEGISLATION**

submitted in accordance with Assembly Rule III, Sec 1(f)

**BILL NUMBER:** A3661C

**SPONSOR:** O'Donnell (MS)

**TITLE OF BILL**: An act to amend the education law, in relation to enacting the dignity for all students act

**PURPOSE OR GENERAL IDEA OF BILL**: The purpose of this bill is to afford all students an environment free of any harassment that substantially interferes with their education, regardless of the basis of the harassment, and free of discrimination based on actual or perceived race, color, weight, national origin, ethnic group, religion, disability, sexual orientation, gender, or sex.

**SUMMARY OF SPECIFIC PROVISIONS**: Section one of the bill establishes its short title, the Dignity for all Students Act. Section 2 of the bill amends the Education Law by adding a new article 2 entitled "Dignity for all Students." New article 2 sets forth the legislative intent in section 10, and sets forth definitions in section 11. The definition of 'harassment' in section 11(7) was carefully drafted to ensure that this legislation protects children against harassment in a manner that is consistent with the First Amendment protections of speech and expression. See Tinker v. Des Moines School District, 393 U.S. 503 (1969) and its progeny. In addition, by moving the list of protected classes to the end of the definition, and by adding the phrase "not limited to" at the beginning of the list, the amendment made in the B-print explicitly establishes, in the bill text itself, that the list is non-exclusive and that the definition is content neutral.

Harassment is defined as "creation of a hostile environment by conduct or by verbal threats, intimidation or abuse that has or would have the effect of unreasonably and substantially interfering with a student's educational performance, opportunities or benefits, or mental, emotional or physical well-being:" Education Law §11(7), as proposed in this bill. The definition includes an objective reasonableness standard and, consistent with Tinker and the cases decided after Tinker, it also provides that speech (e.g., the verbal threats included in the definition) becomes harassment only when it does, or foreseeably would, substantially interfere with a students education. it is also the legislative intent that, consistent with the hostile environment case law developed in the employment context, conduct or verbal behavior must be severe or pervasive in order to substantially interfere with educational performance, opportunities, etc. and to therefore be harassment under this definition. This content-neutral definition is followed by a nonexclusive list of protected classes whose members are often the targets of the type of harassment the bill seeks to prevent. The purpose of listing these protected classes is to provide examples of the types of status-based harassment frequently encountered by students without in any way limiting the application of the definition-to individuals in those classes.

Section 12 prohibits harassment, as defined in section 11(7) and discussed above, and it also prohibits discrimination on the basis of actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender, or sex in any activity occurring on school grounds or at a school function. New section 12 includes language intended to make clear that the Dignity for All Students Act does not contravene or override existing provisions of law, including but not limited to the Education Commissioner's regulations, regarding single gender schools and athletic teams. Sections 13 and 14 of new article 2 respectively provide for the policies and guidelines to be established by school districts, and the State Education Commissioners responsibilities. This part of the bill requires school districts to develop procedures which create a school environment free of discrimination and harassment and to establish guidelines for training school personnel. School districts must also establish guidelines for developing nondiscriminatory instructional and counseling methods and ensuring that staff will be available at every school who have been trained to handle human relations in the areas in which discrimination is prohibited. The Commissioner of Education is to provide advice, which may include model policies, and direct services, to the extent possible, to help districts prevent discrimination and harassment. The commissioner will also provide grants, from funds appropriated for such purpose, to local school districts to assist them in implementing the guidelines provided for by the bill.

Section 15 of new Education Law article 2 requires the commissioner to create a procedure whereby material incidents of discrimination and harassment on school grounds or at school functions are reported to the State Education Department at least annually. The commissioner may use the existing UVIR (uniform violent incident reporting) system for this purpose; however,

it is the legislative intent that the UVIR system will be adapted to include information about the specific nature of the incident, i.e., the type or types of bias involved in a reported incident of harassment or discrimination, including the possibility that multiple types of bias could be involved in a single incident, and all of the types of bias involved should be reported.

Section 16 of new Education Law article 2 provides protection for people who report incidents of discrimination or harassment. Section 17 provides for applicability of the new article with respect to certain institutions and other laws, and section 18 provides for severability and construction.

Section 3 of the bill amends section 801-a of the education law by requiring sensitivity to the harassment or discrimination prohibited by section 2 of this bill to be incorporated into the civility and character training currently required by section 801-a of the education law.

Section 4 of the bill amends section 2801 of the education law by adding a new paragraph n. Section 5 of the bill now provides that the bill will take effect on July 1, 2012. This change in the effective date is the only change made in the C-print of the bill.

The A-print added weight to the non-exclusive list of protected classes, whose members are often the targets of the type of harassment the bill seeks to prevent, that is contained in the harassment definition, and also added weight to the same list that appears in other places in the bill. As noted in the Justification section below, the GLSEN study shows that looks/body size was the most frequently reported basis for harassment of students in New York schools. There were no other changes in the A-print

The B-print revised the harassment definition by moving the non-exclusive list of protected classes from the middle of the definition to the end of the definition, and by adding the phrase "not limited to" at the beginning of the list. This change clarifies the consistently expressed legislative intent that the list is non-exclusive and that the definition is content neutral. The B-print also made a conforming change in proposed new Education Law §10, by removing the list of protected classes and simply stating the broad legislative intent to provide a school environment free of discrimination and harassment. There were no other changes in the B-print.

The C-print changes the effective date to July 1, 2012 to ensure that there is adequate time for both SEA and school districts to develop thoughtful and well-designed implementation plans. This time frame also will permit proposed budgets at the state and local levels to include consideration of the implementation plans before the law takes effect. There are no other changes in the C-print.

**JUSTIFICATION**: In deciding First Amendment cases in school settings, courts have recognized "the special need to maintain a safe, secure and effective learning environment," Harper v. Poway Unified School, 445 F.3d 1166 at 1176 (9th Cir. 2006), citing Tinker v. Des Moines School District, 393 U.S. 503 (1969). Students need such a safe, welcoming and supportive school environment so that they can concentrate on their academic and personal growth, and they should never have to be preoccupied by the threat or actual occurrence of harassment or discrimination at school. The Dignity for All Students Act promotes civility among students and between students and teachers. It will also help create an atmosphere where learning is paramount and distractions to learning are minimized:

Moreover, the Act provides a response to the large numbers of harassed and stigmatized students skipping school and engaging in high risk behaviors like drug use, alcohol abuse, and perhaps even suicide. No child or teen should ever be pushed to such extremes because of an intolerable environment in his or her school. Scholarly literature and common sense establish that harassment and intimidation interfere with students' ability to learn. By prohibiting harassment in public schools and establishing the basis for proactive measures such as training and model policies, the "Dignity for All Students Act" takes a major step in creating more nurturing environments in all our schools.

A 2008 review of existing literature, that also analyzed 1993-94 data from a large urban school district, noted that bullying victimization is estimated to affect 15-20% of the U.S. student population. The authors defined bullying to include threats, intimidation and other conduct, and concluded it was the most common form of "low level" school violence. Meyer-Adams, N. & Conner, B.T., "School violence: Bullying behavior and the Psychosocial School Environment in Middle Schools," Children & Schools, Vol. 30, No. 4 (October 2008), The negative effects of bullying include increased truancy and dropout rates as well as

A-139

negative psychosocial effects such as depression, etc. Id. at p. 212, Verbal teasing and intimidation are the most common form of bullying. Dupper, D.R. & Meyer-Adams, N., "Low-level violence: A neglected aspect of school culture," Urban Education, Vol. 37, No. 3 at p. 351 (2002). A 1992 study found that 88% of secondary school students reported having observed bullying and 76.8% stated they had been victims. id. In addition to the negative effects discussed above, bullying victims' grades may suffer and even "good kids" may be pushed into starting fights. Id. at 352. There is also harm to those who witness peer harassment. id.

The continuing need for this legislation is apparent from recent data demonstrating the prevalence of bias-based harassment in New York schools. A survey commissioned by the Gay, Lesbian and Straight Education Network (GLSEN) found that more than one-third (39%) of New York students reported that bullying, name-calling, and harassment is a serious problem in school. Students were asked about the frequency of witnessing other students bullied, called names, or harassed in school. From Teasing to Torment: A Report on School Climate in New York (GLSEN 2005), at p. B. The most commonly reported harassment was based on physical appearance. Sixty-six percent (66%) of students reported that people at school were harassed at least sometimes because of their looks or body size, with 38% reporting that this happened often or very often. id. This bill therefore now includes weight as one of the examples contained in the non-exclusive list at the end of the harassment definition. Bullying and harassment based on how people expressed their gender, or because of their actual or perceived sexual orientation was also very common. Fifty seven percent of respondents reported that students were bullied or harassed at least sometimes because of the way they expressed their gender, and about a quarter (23%) said these behaviors occurred often or very often. Id. More than five out of ten (52%) reported that students were harassed because they were or were perceived to be lesbian, gay, or bisexual, id., even as only 5% identified as being so. Id. at 2. About a quarter (24%) said these behaviors occurred often or very often. Id. at 8.

**PRIOR LEGISLATIVE HISTORY**: A.3496-A/S.1571 (passed Assembly 2007 and 2008); A.9491/S.1454 (passed Assembly 2006); A.4963/S.1454 (passed Assembly 2005); A.1118/S.1925 (2003-04) passed Assembly 2003 and 2004; A.2634-A /S.1628-A (2001-02) passed Assembly 2002; A.9244- A/S.5775-A (2000).

**FISCAL IMPLICATIONS**: Minimal.

**EFFECTIVE DATE**: This act shall take effect on July 1, 2012.

STATE OF NEW YORK

**DEPARTMENT OF STATE**

ONE COMMERCE PLAZA

99 WASHINGTON AVENUE

ALBANY, NY 12231-0001

DAVID A. PATERSON

GOVERNOR

LORRAINE A. CORTÉS-VÁZQUEZ

SECRETARY OF STATE

**MEMORANDUM**

To:                         Honorable Peter J. Kiernan, Esq.

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

|  | Counsel to the Governor |
|---|---|
| From: | Matthew W. Tebo, Esq. |
|  | Legislative Counsel |
| Date: | July 8, 2010 |
| Subject: | A.3661-C (M. of A. O'Donnell) |
|  | Recommendation: <u>No comment</u> |

The Department of State has no comment on the above referenced bill.

If you have any questions or comments regarding our position on the bill, or if we can otherwise assist you, please feel free to contact me at (518) 474-6740.

MWT/mel

THE STATE EDUCATION DEPARTMENT / THE UNIVERSITY OF THE STATE OF NEW YORK /ALBANY, NY 12234

Acting Counsel and Deputy Commissioner for Legal Affairs

Tel. 518-474-6400

Fax 518-474-1940

July 9, 2010

| TO: | Counsel to the Governor |
|---|---|
| FROM: | Erin M. O'Grady-Parent |
| SUBJECT: | A.3661-C |
| RECOMMENDATION: | Approval |

REASON FOR RECOMMENDATION:

This bill would add a new Article 2 to the Education Law (§§10-18) to enact the Dignity for All Students Act to provide enhanced protection of public school students from harassment and discrimination. The bill would prohibit harassment or discrimination of students by school employees or other students and would require school districts to revise their codes of conduct, adopt policies intended to create a school environment free from harassment and discrimination and guidelines to be used in school training programs to raise awareness and sensitivity of school employees to these and enable them to respond

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 146 of 299

A-141

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 23 of 55 PageID #: 588

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

appropriately, and designate at least one staff member in each school to be trained in nondiscriminatory instructional and counseling methods and handling human relations. The bill defines "harassment" as the "creation of a hostile environment by conduct or by verbal threats, intimidation or abuse that has or would have the effect of unreasonably and substantially interfering with a student's educational performance, opportunities or benefits, or mental, emotional or physical well-being; or conduct, verbal threats, intimidation or abuse that reasonably causes or would reasonably be expected to cause a student to fear for his or her physical safety." This definition would cover bullying that occurs on school property or at a school function. The definition also provides that the proscribed conduct, verbal threats, intimidation or abuse includes, but is not limited to, a person's actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender or sex. The bill would also prohibit discrimination against students in such protected classes.

The State Education Department (SED) would be required to adopt regulations to assist school districts in complying with the new statute, provide direction to school districts on compliance, which may include development of model policies and, to the extent possible, direct services and provide grants to districts from funds appropriated for such purpose. The bill would also require SED to collect annual reports of material incidents of discrimination and harassment on school grounds or school functions, which may be done through the existing uniform violent incident reporting system (VADIR). The bill would also clarify that instruction in civility, citizenship and character education must include awareness and sensitivity to discrimination or harassment and civility in relations with persons in the protected classes identified in new Article 2. The bill would take effect July 1, 2012.

SED recommends approval of this bill, as an important step in addressing the growing problem of bullying and harassment of students in public schools. Students cannot be expected to learn if they are subjected to harassment for any cause, whether that is their actual or perceived race, ethnicity, weight, religion, disability, sexual orientation, gender, sex or other characteristic. This bill appropriately focuses on classes of students who have historically been the victims of harassment, but does so without being exclusive. It is the creation of a hostile environment by conduct or by verbal threats, intimidation or abuse that unreasonably and substantially interferes with a student's educational performance or mental, emotional or physical well being or causes or is reasonably causes the student to fear for his or her physical safety that is prohibited under this bill.

The bill supports and enhances SED's efforts to address school violence and school climate under prior law, including the Safe Schools Against Violence in Education Act (SAVE), by increasing awareness, strengthening the training for and requiring the reporting of incidents of bias-based discrimination and harassment in New York State schools. Many school districts have already taken steps to address bullying, harassment and discrimination in their current Board of Education policies, as well as in their codes of conduct. This bill would establish uniform definitions and require that all school districts address the problem of discrimination and harassment.

However, districts will need to amend their policies and codes of conduct to further reflect the intent, purpose and requirements of this bill. In addition, SED would need to supplement its existing School Violence Prevention Education professional development program to support the bill's intent to reduce bias-based harassment of all protected classes. There will be some costs associated with these efforts, but because this bill has a delayed effective date, school districts will be able to come into compliance gradually through their normal process of annual review of their codes of conduct and related board policies and incorporate any training elements relating to harassment and discrimination as they develop their professional development programs prior to July 1, 2012.

STATE OF NEW YORK

OFFICE OF MENTAL HEALTH

COUNSEL

JOHN V. TAURIELLO                                   44 Holland Avenue

Deputy Commissioner and Counsel                      Albany, New York 12229

A-142

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

July 20, 2010
Honorable Peter J. Kiernan
Counsel to the Governor
Executive Chamber
State Capitol Building
Albany, NY 12224

Re: A.3661-C

Dear Mr. Kiernan:

 The Office of Mental Health (OMH) has no objection to the above-referenced legislation, which is before the Governor for Executive action.

 This legislation creates a new Article Two in the Education Law entitled, the "Dignity for All Students Act." The intent of the legislation is to "foster civility in public schools and to prevent and prohibit conduct which is inconsistent with a school's educational mission." The legislation requires school districts to develop policies and training programs concerning discrimination and harassment on the basis of "based upon a person's actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender or sex." Under this bill, the State Education Department (SED) is charged with developing model policies, providing grants and promulgating regulations "to assist school districts in developing measured, balanced, and age-appropriate responses to violations of this policy, with remedies and procedures focusing on intervention and education."

 As a point of information and in the context of the legislation, New York State has been responding to rising concerns about school violence, including bullying with various initiatives, resources and programs. To that end and as an example of the state's response, OMH in collaboration with other state agencies produced a booklet several years ago for schools as a training document for school districts to identify "needs and the measures that are currently employed to prevent violence and to promote a safe and positive learning environment."

Thank you for an opportunity to comment on this legislation.
 Sincerely,
 John V. Tauriello
 Deputy Commissioner and Counsel

**NEW YORK STATE**

**DIVISION OF HUMAN RIGHTS**

**ONE FORDHAM PLAZA, FOURTH FLOOR**

**BRONX, NEW YORK 10458**

**(718) 741-8398**

**Fax: (718) 741-8102**

**www.dhr.state.ny.us**

|  |  |
|---|---|
| **DAVID A. PATERSON** | **GALEN D. KIRKLAND** |
| **GOVERNOR** | **COMMISSIONER** |

| To: | Peter J. Kiernan |
| | Counsel to the Governor |
| From: | Sharon A. Clarke |
| | Associate Counsel |
| Re: | 3661 C |
| Date: | July 22, 2010 |

Thank you for the opportunity to comment on the abovereferenced legislation, which is an act to amend the education law, in relation to the dignity for all students act. While this bill does not amend the Human Rights Law, the Division supports the goal of the bill, which affords all students an environment free from harassment and discrimination in any activity occurring on school grounds or at school functions.

The Memorandum in Support indicates "The Dignity for All Students Act promotes civility among students and between students and teachers. It will also help create an atmosphere where learning is paramount and distractions to learning are minimized."

It further propounds that "The continuing need for this legislation is apparent from recent data demonstrating the prevalence of bias-based harassment in New York schools. A survey commissioned by the Gay, Lesbian and Straight Education Network (GLSEN) found that more than one-third (39%) of New York students reported that bullying, name-calling, and harassment is a serious problem in school. Students were asked about the frequency of witnessing other students bullied, called names, or harassed in school. From Teasing to Torment: A Report on School Climate in New York (GLSEN2005), at p. B. The most commonly reported harassment was based on physical appearance. Sixty-six percent (66%) of students reported that people at school were harassed at least sometimes because of their looks or body size, with 38% reporting that this happened often or very often. id. Bullying and harassment based on how people expressed their gender, or because of their actual or perceived sexual orientation was also very common. Fifty seven percent of respondents reported that students were bullied or harassed at least sometimes because of the way they expressed their gender, and about a quarter (23%) said these behaviors occurred often or very often. Id. More than five out of ten (52%) reported that students were harassed because they were or were perceived to be lesbian, gay, or bisexual, id., even as only 5% identified as being so. Id.at 2. About a quarter (24%) said these behaviors occurred often or very often. Id.at 8.

This bill addresses a myriad of harassment and discrimination issues that arise within a school context and its goals comports with the goals of the HRL.

**NEW YORK STATE**

**SCHOOL BOARDS**

**ASSOCIATION**

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

**NO OBJECTION**

**24 Century Hill Drive, Latham, New York 12110-2125 • (518) 783-0200 • FAX (518) 783-0211**

Date: June 15, 2010

S. 1987-B by Senator Duane

The New York State School Boards Association, on behalf of its 5000 locally elected school officials, removes its objection to this legislation. The intent of the legislation is laudable and there can be little question that all students should be afforded the most secure and welcoming environment possible in which to learn. We remain concerned that this legislation creates legal, financial and programmatic consequences for all New York state school districts. We remain concerned that the legislation fails to establish an objective standard by which to measure the severity and number of hostile acts within the school environment. We also continue to be concerned that it impedes the local school districts' ability to determine its own community priorities, make determinations about needed curricula, allocate resources according to local need and devote administrative effort toward the most productive, locally derived educational goals.

However, NYSSBA recognizes that the safety of students and a secure and supportive learning environment are the goal of this legislation and we believe that the intrusion on local authority and the financial implications of the legislation are de minimis in nature, with the resulting improvement in the protection of students justifying these impositions.

While NYSSBA's sample code of conduct includes language prohibiting bullying and harassment and includes language that is all-inclusive, this legislation identifies a group that has been historically and statistically vulnerable to acts of bullying and harassment. The training called for in this legislation would be provided with minimal financial impact, allowing existing staff to receive this training within the context of professional development that is already provided. Similarly, the addition of this topic into existing curriculum is less intrusive and costly than a requirement calling for providing the information separate and distinct from related topics.

To call for even slight increases in local costs in a time when the state is providing diminished resources to schools is unfortunate. However, the problem is of sufficient severity to warrant such individualized legislative attention and while school districts would obviously prefer that the state recognize the cost implications to local taxpayers inherent in this universal approach, NYSSBA appreciates the effort to provide time for districts to adapt and to meet the new requirements within the context of existing staffing and programs.

**Please direct questions to David A. Little, Esq., Dir. of Govt. Relations, (518) 783-3734.**

**NEW YORK STATE**

**SCHOOL BOARDS**

**ASSOCIATION**

**NO OBJECTION**

**24 Century Hill Drive, Latham, New York 12110-2125 • (518) 783-0200 • FAX (518) 783-0211**

Date: June 15, 2010

S. 1987-B by Senator Duane

The New York State School Boards Association, on behalf of its 5000 locally elected school officials, removes its objection to this legislation. The intent of the legislation is laudable and there can be little question that all students should be afforded the most secure and welcoming environment possible in which to learn. We remain concerned that this legislation creates legal,

A-145

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

financial and programmatic consequences for all New York state school districts. We remain concerned that the legislation fails to establish an objective standard by which to measure the severity and number of hostile acts within the school environment. We also continue to be concerned that it impedes the local school districts' ability to determine its own community priorities, make determinations about needed curricula, allocate resources according to local need and devote administrative effort toward the most productive, locally derived educational goals.

However, NYSSBA recognizes that the safety of students and a secure and supportive learning environment are the goal of this legislation and we believe that the intrusion on local authority and the financial implications of the legislation are de minimis in nature, with the resulting improvement in the protection of students justifying these impositions.

While NYSSBA's sample code of conduct includes language prohibiting bullying and harassment and includes language that is all-inclusive, this legislation identifies a group that has been historically and statistically vulnerable to acts of bullying and harassment. The training called for in this legislation would be provided with minimal financial impact, allowing existing staff to receive this training within the context of professional development that is already provided. Similarly, the addition of this topic into existing curriculum is less intrusive and costly than a requirement calling for providing the information separate and distinct from related topics.

To call for even slight increases in local costs in a time when the state is providing diminished resources to schools is unfortunate. However, the problem is of sufficient severity to warrant such individualized legislative attention and while school districts would obviously prefer that the state recognize the cost implications to local taxpayers inherent in this universal approach, NYSSBA appreciates the effort to provide time for districts to adapt and to meet the new requirements within the context of existing staffing and programs.

**Please direct questions to David A. Little, Esq., Dir. of Govt. Relations, (518) 783-3734.**

**Robin Forshaw**

| | |
|---|---|
| **From:** | Jeff Pearlman |
| **Sent:** | Tuesday, June 15, 2010 9:31 PM |
| **To:** | Robin Forshaw; Mark Leinung; Duffy Palmer |
| **Cc:** | Howie Katz |
| **Subject:** | NYS School Boards Memo Removing Opposition to Dignity Bill |
| **Attachments:** | nyssba dignity.doc |

FYI

——— Original Message ———

From: groberts@senate.state.ny.us [mailto:groberts@senate.state.ny.us]

Sent: Tuesday, June 15, 2010 8:20 PM

To: Jeff Pearlman

Subject: Fw: how about with the memo

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 151 of 299

A-146

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 28 of 55 PageID #: 593

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

FYI

New NYSSBA memo

———— Original Message ————

From: Julie Marlette

Sent: 06/15/2010 04:59 PM EDT

To: Greg Roberts; grainger.ka@gmail.com

Cc: Nora Niedzielski-Eichner

Subject: how about with the memo

(See attached file: nyssba dignity.doc)

**ASSOCIATION OF TOWNS OF THE STATE OF NEW YORK**

**G. JEFFREY HABER**

**EXECUTIVE DIRECTOR**

*Serving Towns Since 1933*

> 150 State Street Albany New York 12207 • Phone: (518) 465-7933 • Fax: (518) 465-0724

July 20, 2010
Honorable Peter Kiernan
Counsel to the Governor
Executive Chamber
State Capitol
Albany, New York 12224

**No Recommendation**

Dear Sir

This is in response to your request for comments and recommendations regarding the following bills:

A.699-a Introduced by M. of A. Hoyt (MS)

AN ACT to direct the law revision commission to make recommendations to the legislature concerning proposed revisions to the general city law, the town law, the county law, the village law, the general municipal law, the local finance law and any related statutes

S.6120 Introduced by Senator Dilan

AN ACT to amend the vehicle and traffic law, in relation to requiring access aisles of handicapped parking spaces to be marked with "No Parking Anytime" signs

S.7241 Introduced by Senator Stewart-Cousins

AN ACT to amend the town law, in relation to conditional approval of a final plat

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

A.8498 Introduced by M. of A. Gottfried

AN ACT to amend the public health law, in relation to birth certificates for children born in foreign countries; and registration for the adoption information registry; and repealing certain provisions of such law relating thereto

A.520 Introduced by M. of A. Destito (MS)

AN ACT to amend the executive law, in relation to requiring counties to maintain a registry of people of all ages with disabilities for evacuation and sheltering during disasters

A 915-A Introduced by M. of A. DelMonte

AN ACT to amend the agriculture and markets law, in relation to the administration of property tax assessments for certain orchards and vineyards

S. 5440-C Introduced by Senator Valesky

AN ACT to amend the alcoholic beverage control law, in relation to allowing a licensed winery or farm winery to sell wine for consumption upon the premises of a food festival

A.10551 Introduced by M. of A. Jeffries (MS)

AN ACT to amend the public service law, in relation to the notice requirements pertaining to residential utility service to residential health care facilities, adult care facilities and assisted living residences

S.7801-A Introduced by Senator Stachowski

AN ACT to amend the general municipal law, in relation to increasing the cap on the total raffle prize amount permissible for a license period

A. 9550-A Introduced by M. of A. Gottfried (MS)

AN ACT to amend the public health law, in relation to admissions to adult care facilities

A.356 Introduced by M. of A. Magnarelli (MS)

AN ACT to amend the public authorities law, in relation to creating the technology employment community hub (TECH) centers program

S.8357 Introduced by Senator Smith

AN ACT to amend the transportation law, in relation to the state high speed rail planning board, and providing for the repeal of such provisions upon expiration thereof

A 3661-C Introduced by M. of A O'Donnell (MS)

AN ACT to amend the education law, in relation to enacting the dignity for all students act

S. 7198-B Introduced by Senator Valesky

AN ACT to amend the highway law, in relation to designating a portion of the state highway system as the "Harriet Tubman Memorial Highway"

S.5114-A Introduced by Senator Foley

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

AN ACT to amend chapter 606 of the laws of 2006 amending the volunteer firefighters' benefit law relating to creating a presumption relating to certain lung disabilities incurred by volunteer firefighters, in relation to the effectiveness of such chapter

S.4812-A Introduced by Senator Craig Johnson

AN ACT to amend the public officers law, in relation to prohibiting certain agencies from charging for the process of a FOIL request made by state and local agencies or the state legislature

A 11098 Introduced by M. of A Magnarelli (MS)\

AN ACT to amend the executive law, in relation to enacting the "Veterans Mental Health and Chemical Dependency Act"

S.5868 Introduced by Senator Little

AN ACT to amend the real property tax law, in relation to providing a tax exemption on real property owned by members of volunteer fire companies or voluntary ambulance services in a certain county

S.5533-A Introduced by Senator Savino

AN ACT to amend the retirement and social security law, in relation to bringing certain provisions of such law into accordance with the requirements of the federal older workers' benefit protection act (OWBPA)

A.4395 Introduced by M. of A Canestrari (MS)

AN ACT to amend the civil service law, in relation to including state university of New York police officers in provisions permitting transfer of police officers

S. 7086-C Introduced by Senator Leibell

AN ACT in relation to authorizing the town of Lewisboro in the county of Westchester, to discontinue the use of certain park land

S.8140-A Introduced by Senator Aubertine

AN ACT in relation to authorizing the village of Heuvelton, county of St. Lawrence to transfer ownership of certain parklands to the Heuvelton central school district

A. 9096 Introduced by M. of A Crouch

AN ACT to amend the executive law, in relation to designating the Bushkill stream as an inland waterway

A 11064 Introduced by M. of A Benedetto

AN ACT to amend chapter 618 of the laws of 1998, amending the general municipal law and the education law relating to disposal of surplus computer equipment by political subdivisions, in relation to extending the expiration of such chapter

The Association of Towns offers no recommendation on these bills.

Respectfully submitted,

*/s/ G. Jeffrey Haber*

G. Jeffrey Haber

Executive Director

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 154 of 299

A-149

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 31 of 55 PageID #: 596
New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

**New York State Conference of Mayors and Municipal Officials**

119 Washington Avenue, Albany, New York 12210 (518) 463-1185

Toll free number for NYCOM members 1-800-446-9266

Fax #(518) 463-1190

July 19, 2010
Hon. Peter Kiernan
Counsel to the Governor
State Capitol - Room 225
Albany, NY 12224

**Re: A. 3661-C**

Dear Mr. Kiernan:

In response to your recent inquiry, the Conference of Mayors has reviewed the above-referenced bill and takes no position as to whether or not the Governor should sign the bill into law.
Sincerely,
Peter A. Baynes
Executive Director

## LEGISLATIVE MEMORANDUM

### SUPPORTS

NYSUT represents more than 600,000 professionals in education and health care. Affiliated with AFT • NEA • AFL-CIO.

| | |
|---|---|
| **Richard C. Iannuzzi,** *President* | NYSUT |
| **Andrew Pallotta,** *Executive Vice President* | 800 Troy-Schenectady Road |
| **Maria Neira,** *Vice President* | Latham, N.Y. 12110-2455 |
| **Kathleen M. Donahue,** *Vice President* | (518) 213-6000, (800) 342-9810 |
| **Lee Cutler,** *Secretary-Treasurer* | |
| | **Stephen K. Allinger,** *Director of Legislation* |

| S-1987-A | Duane | Education Committee |
|---|---|---|
| A-3661-B | O'Donnell | On Calendar #275 |

**SUMMARY OF PROVISIONS:**

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 32 of 55 PageID #: 597

This legislation amends the education law to enact the Dignity for All Students Act (herein "DASA") which would codify, in law, the state's intent to provide all students in public schools an environment free of discrimination and harassment based on, but not limited to, one's actual or perceived race, color, national origin, ethnicity, sexual orientation, religious practice, disability, weight, gender or sex.

The provisions of DASA, include:

§ 12. Requiring school districts to adopt an age-appropriate version of the anti-harassment policy. The bill also requires the Commissioner of Education to provide direction to school districts on preventing discrimination and harassment, which may include the development of model policies. The Commissioner is also to adopt regulations to assist school districts. The State Education Department regularly develops regulations and provides assistance to school districts on a regular basis. The cost of such development is minimal;

§ 13. School districts are required to identify one person per school building who has received training to handle human relations in the areas of race, color, weight, national origin, sexual orientation, gender and sex. There are opportunities throughout the year to provide such training within the framework of the existing school calendar such as teacher conference days and superintendent days, for such training;

§ 15. The Commissioner is required to report material incidents of discrimination and harassment at least on an annual basis. The Act provides that the Commissioner may use the existing Violent Incident Reporting System;

§ 16. Immunity from any civil liability for any person reporting, in good faith, such harassment or discrimination; and

§ 3. Amending the 2000 SAVE legislation to require that the existing instruction in tolerance, respect and dignity include awareness and sensitivity to discrimination or harassment on the basis of one's actual or perceived race, color, national origin, ethnicity, sexual orientation, religious practice, disability, weight, gender or sex.

**(OVER)**

**STATEMENT OF SUPPORT:**

The Dignity for All Students Act is an important piece of legislation because it, respectfully, recognizes our nation's collective diversity and stresses the acceptance of such diversity within our educational system. The basic tenants of this legislation promote the education and tolerance of one's characteristics within the school environment and seek the elimination of negative behaviors that work against the appreciation for one's identity. To achieve this end, the Dignity for All Students Act:
  • Establishes anti-harassment and discrimination policies;
  • Creates school training programs to erase harassment and discriminatory behavior within the school environment;
  • Elevates school staff sensitivity towards differences among each other and the student body;
  • Develops non-discriminatory instruction and counseling methods; and
  • Provides civil liability protection to those who, acting in good faith, report such incidents of discrimination and harassment

New York state public schools are a microcosm of the diversity that exists within our society. In the education environment this diversity should be openly acknowledged and celebrated at the elementary and secondary level. However, quite often, fear and lack of understanding of another's background can result in some harmful behaviors that range from derogatory verbal assaults to vandalism to both mental and physical abuse towards another individual or group. Such behaviors are pejorative to the educational process for all involved in the school setting and create an environment of intimidation and fear within the school climate.

The existence and consequences of harassment and discrimination in schools are well documented. One result from a report, entitled "From Teasing to Torment: A Report on School Climate in New York (GLSEN, 2005) shows that the most frequent type of harassment in the school system is that which focuses on ones' physical appearance. The disturbing consequences that

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 156 of 299

A-151

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 33 of 55 PageID #: 598

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

harassing behavior in school can produces for its intended target range from ostracism, chronic truancy, substance abuse and dependency, violent retaliation, and suicide.

A student should never have to be concerned about threats, harassment, or discrimination from either fellow students or school employees when in the learning environment. All students need a safe school environment in which they can concentrate on individual and academic growth and in which they feel appreciated and valued. It is therefore incumbent upon the state to insure that each school district adopts and implements a policy of tolerance for the diversity in their schools and takes concrete measures to educate both their students and employees that discrimination and harassment of any kind will not be condoned. DASA seeks to create a school environment where freedom from harassment and discrimination allows for an unfettered pursuit of academic success and exploration while also provide the means for people to learn about differences within our society.

While DASA address all forms of discriminatory behavior, it is important to note that currently, 38 states in the U.S. have laws that prohibit harassment and bullying in the school setting and 13 of those states specifically list sexual orientation and/or gender identity. Absent from this is list is New York State. Even recently, the US Congress voted to include gender or gender-identity, or sexual orientation as a federally protected class against hate crimes.

NYSUT has a long history of advocating for basic human and civil rights for all people and has also condemned discriminatory policies, laws and actions by individuals and institutions both at home and abroad. We have developed courses and seminars to train our members on the issues of tolerance, diversity and harassment (i.e. cultural proficiency, multicultural children's literature, cyber bullying, disability awareness...etc.). However, more must be done in this area and we strongly believe that enactment of DASA must occur now.

**NYSUT AND ITS AFFILIATE, THE UNITED FEDERATION OF TEACHERS, STRONGLY URGE THE ENACTMENT OF THIS LEGISLATION**

14837

JG/JP

Full Assy.

2/8/10

**MEMORANDUM OF SUPPORT**

**A3661-B**                                    **S1987-A**

**By Assemblymember O'Donnell**               **By Senator Duane**

**Assembly Calendar # 275**

 **AN ACT to amend the education law, in relation to enacting the dignity for all students act**

The New York State Nurses Association supports the above-referenced bill to promote a harassment and discrimination free learning environment in all public schools. This legislation would prohibit discrimination or harassment by school employees or students against any student based on their actual or perceived race, color, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender or sex.

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 157 of 299

A-152

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 34 of 55 PageID #: 599
New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

All children deserve a safe and supportive environment to foster their academic and personal growth. Enacting the "Dignity for All Students Act" would support school districts' efforts to eliminate bias on school property and at school sponsored events. Furthermore, this bill would help ensure that discrimination and harassment are not tolerated in New York's public school system. It is essential that students are able to learn without fear of verbal or physical intimidation and that they are not distracted or discouraged by derogatory actions or remarks.

Additionally, NYSNA supports educating and training school personnel to recognize and respond to incidents of discrimination or harassment. Establishing policies and procedures that ensure the physical and mental wellbeing of New York students is essential to creating a strong academic environment and producing well rounded productive individuals.

NYSNA urges the New York State Legislature to enact this bill.

January 11, 2010

**New York State**

260 Washington Avenue • Albany • New York 12210 • Info@naminys.org

518.462.2000 • 1.800.950.3228 • Fax 518.462.3811 • www.naminys.org

**Memorandum of Support**

S.1987-A (Duane)/ A.3661-B(O'Donnell)

*Enacts the Dignity for All Students Act; authorizes the commissioner of education to establish policies and procedures affording all students in public schools an environment free of harassment and discrimination: requires reporting harassment and discrimination to such commission; make exemptions.*

The National Alliance on Mental Illness of New York State (NAMI-NYS) strongly supports S.1987-A/A.3661-B, which would enact the *Dignity for All Students Act* and establish policies affording students to be free of "bullying."

The importance of this legislation should not be underestimated. A recent longterm study of 6,437 12-year-olds and their parents indicates that being bullied in childhood doubles a young person's likelihood of having psychotic symptoms in early adolescence.

"Chronic or severe peer victimization has non-trivial, adverse, long-term consequences," the authors write in the May 2009 issue of Archives of General Psychiatry. "Reduction of peer victimization and the resulting stress caused to victims could be a worthwhile target for prevention and early intervention efforts for common mental health problems and psychosis." Young children who have had psychosis-like symptoms or experiences are more likely to develop schizophrenia and similar types of mental illness as young adults, the researchers said.

Another study (Pediatrics, 2007) indicated that boys who bully and victims of bullies may have a higher risk of mental health disorders as young men. This study was based on 2,540 boys with comparisons at age 8 and later at 18 to 23 years of age.

We thank the sponsors of this important legislation and urge its passage.

*The National Alliance on Mental Illness of New York State (NAMI-NYS) is a grassroots organization of 26 years, providing education. support and advocacy. Through our 56 local affiliates, NAMI-NYS represents thousands of families across New York State. Most of our members either have a mental illness or have a loved one with a mental Illness.*

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 158 of 299

A-153

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 35 of 55 PageID #: 600
New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

**CONSERVATIVE PARTY of NEW YORK STATE**

**486 78th Street, Ft. Hamilton Station, NY 11209**

**(718) 921-2158 Voice * (718) 921-5268 Fax**

*2009 Legislative Memo...*

*In Opposition to "Dignity for all Students" Act*

A. 3661-O'Donnell (in codes committee)

**Purpose:** The stated purpose of this bill is to foster civility in public schools and an environment for all students, administrators and staff that is conducive to learning by being free of discrimination and free of harassment, bullying, taunting or intimidation -- including when such behaviors or acts are based on actual or *perceived* race, color, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender or sex. Additionally, the bill provides for districts to be offered guidance by the Commissioner of Education on measures to combat harassment and discrimination -- measures that focus on intervention and education.

**Party Position:** On July 24, 2000, former Governor Pataki signed into law historic legislation to make schools safe. At the time former Assemblyman Sanders stated: *"Schools must be safe havens where children and teachers alike can be focused on learning without the ominous sense of and real threat of danger. This important legislation addresses school violence comprehensively by considering prevention, safety protocols, and punishment. It gives parents, teachers and principals key roles in establishing vitally needed intervention programs at every school."*

The *Project Save* legislation was the result of a fact-finding conducted by former Lt. Governor Mary O. Donohue's Task force, which held several statewide public hearings and one-on-one sessions with high school and middle school students at more than 75 schools. One of the components of the bill is *"Character Education which requires the Board of Regents to include a civility, citizenship and character education component in the K-12 course of instruction concerning the principles of honesty, tolerance, personal responsibility, respect for others, observance of laws and rules, courtesy, dignity and other positive traits."*

The stated objectives of the proposed bill by Assemblyman O'Donnell and Senator Duane are included in *Project Save*, All students are protected in *Project Save*, this bill seeks to create a special class of students, and we urge all Members of the Legislature to reject creating special rights for a special class of students. We also believe learning is paramount and that distractions to learning should be addressed equally - when one group is given more protection than another - the problem is exacerbated.

Dignity for All Students Act

New York Association of School Psychologists

Response to the Dignity for All Students Act: A.3661B (O'Donnell) / S.1987A (Duane)

The American public school system was founded with the idea that by educating students of diverse backgrounds together, they would naturally learn to accept and respect each others' differences (Fagan & Sachs Wise, 2007). Unfortunately, legislative interventions have had to occur to protect those who differ in one way or another from what is considered to be the acceptable norm (i.e., Brown v. the Board of Education, 1954; Civil Rights Act, 1964; Elementary and Secondary Education Act, 1965; Education for All Handicapped Children Act, 1975). The Dignity for All Students Act is another legislative intervention aimed

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 159 of 299

A-154

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 36 of 55 PageID #: 601
New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

at creating learning environments that are free from discrimination and/or harassment and are conducive to learning. The results of a national survey conducted by the Gay, Lesbian, and Straight Education Network (GLSEN, 2005) demonstrate the need for A.3661B (O'Donnell) / S.1987A (Duane) as they indicate that "two-thirds of the students surveyed reported that they have been verbally or physically harassed or assaulted at school during the past year because of their appearance or their actual or perceived race/ethnicity, disability, gender, sexual orientation, gender expression, or religion and half of the teachers surveyed described bullying and harassment of all kinds as a serious problem in their schools." (p. iii)

The New York Association of School Psychologists (NYASP), through its members, is committed to sensitivity and diversity through best practices in school psychology, when working with children, their families, and the school community. If enacted, the Dignity for All Students Act will require that public school districts establish policies and procedures that will lead to discrimination and harassment free schools. School psychologists, already employed within the public schools are in a unique position to assist administrators with this endeavor as they are already trained in the application of nondiscriminatory psychological services (i.e., counseling, assessment, consultation).

New York Association of School Psychologists, Inc.

P.O. Box 178 Hornell, NY 14843

www.nyasp.org E-mail president@nyasp.org

Albany Contact:

Pamela Madeiros

Greenberg Traurig, LLC

54 State Street, Albany, New York 12207

P: 518-689-1412 / Fax: 518-689-1499

madeirosp@gtlaw.com

NYASP supports A.3661B (O'Donnell) / S.1987A (Duane) because it will serve as a foundation for the necessary policies at the district level that will yield a healthy school climate. NYASP and its members are aware that the "school climate is the heart and soul of a school. It can foster resilience or become a risk factor" (Freiburg & Stein, 1999, p. 11).

All students enrolled in the public schools are expected to demonstrate adequate yearly progress which involves academic achievement at or above their respective age-or grade- level standards. To achieve this goal, students must be available to learn, which involves the physical and emotional presence of the student at school. This is not possible if the student perceives his school as a hostile environment where students are subject to low-level violence that has been shown to have "profound and lasting effects on students' mental health and school performance" (Meyer-Adams & Conner, 2008). Such behaviors are outlined in A.3661B (O'Donnell) / S.1987A (Duane) and include: "incidents of discrimination and harassment including bullying, taunting or intimidation that are based on actual or perceived race, color, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender or sex" (§10).

NYASP proposes that school psychologists address low-level violence by assisting in the creation of district policies that help create a school climate and culture of Dignity for All Students that is (adapted from Dupper & Meyer-Adams, 2002):
   • Characterized by warmth, tolerance, positive responses to diversity, sensitivity to others' views, cooperative interactions among students, teachers and school staff, and an environment that expects and reinforces appropriate behavior (pp. 360-361).

References

A-155

Dupper, D.R, & Meyer-Adams, N. (2002). Low-level violence: A neglected aspect of school Culture. *Urban Education, 37(3),* 350-364.

Fagan, T.K. & Sachs Wise, P. (2007). *School psychology: Past, present, and future* (3 [rd] Ed.). MD: NASP

Freiberg, H. J., & Stein, T.A.. (1999). Measuring, improving and sustaining healthy learning environments. In H.J. Freidberg (Eds.). *School climate: Measuring, improving and sustaining healthy learning environments* (pp. 11-29). London: Falmer

Meyer-Adams, N. & Conner, B.T. (2008). School violence: Bullying behaviors and the psychosocial school environment in middle schools. *Children & schools. 30(4),* 211-221.

*1,211,685v2 3-18-09067362010200*

**ON SENATE**

**COMMITTEE AGENDA**

**THE CITY OF NEW YORK**

**OFFICE OF THE MAYOR**

| | |
|---|---|
| **MICAH C. LASHER** | **City Hall** |
| **Director** | **New York, New York 10007** |
| **State Legislative Affairs** | **(212) 788-8820** |
| | **119 Washington Avenue** |
| | **Albany, New York 12210** |
| | **(518) 447-5200** |

**MEMORANDUM IN SUPPORT**

| | |
|---|---|
| **LEGISLATIVE** | S1987-B -- by Senator Duane -- Education Committee |
| **REFERENCE** | A3661-C -- by M. of A. O'Donnell -- Passed |

**TITLE AN ACT** to amend the education law, in relation to enacting the dignity for all students act

**SUMMARY OF PROVISIONS**

Adds a new article 2 to the Education Law entitled the "Dignity for all Students." The new article defines harassment and states that in order to constitute harassment the proscribed conduct, verbal threats, intimidation or abuse must be such that it "has or would have the effect of unreasonably and substantially interfering with a student's educational performance, opportunities or benefits, or mental, emotional or physical well-being...."

The new article also prohibits discrimination and harassment against students, administrators and staff in public schools on the basis of actual or perceived race, national origin, ethnic group, religion, mental or physical disability, sexual orientation, gender, or sex in any activity occurring on school grounds and any activity conducted by the educational institution or its agents. It also requires the State Education Department and school districts to develop and implement policies and procedures which create a school environment free of discrimination and harassment and to establish guidelines for training school personnel.

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 161 of 299

A-156

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 38 of 55 PageID #: 603
New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

**REASONS FOR SUPPORT**

The New York City public school system has the most ethnically diverse student population in the nation, and the City's Department of Education has focused on improving the safety and learning environment for all students and school staff.

The New York City Department of Education has longstanding policies prohibiting harassment and discrimination on the basis of race, ethnicity, religion, national origin, gender and sexual orientation. For example, in 1985, the then-Board of Education adopted a policy directing the Chancellor to take steps to eliminate practices which "foster attitudes and/or actions leading to discrimination against students, parents or school personnel on the basis of race, color, religion, national origin, gender, age, sexual orientation and/or handicapping condition." In 1993, the Board adopted a "Policy Against Bias and Discrimination in All Facilities and at All Levels of the New York City Board of Education," affirming its policy against harassment, discrimination, and bigotry.

The Chancellor's Regulations and the Discipline Code recognize "gender identity" as a protected group and define "bullying." Continuing efforts to protect students from harassment include: online reporting of Code violations through the On-line Occurrence Reporting System (OORS), broad dissemination of the Discipline Code to students and parents in eight languages and Braille, and ongoing professional development to help school professionals prevent bullying and harassment.

These ongoing efforts have produced significant results. Since this administration took office, major crime in schools is down by more than a third, while violent crime has decreased some 31%. In the past year alone, major school crime declined 10%, with some of the biggest reductions coming within "Impact Schools."

The goals and objectives of the proposed legislation reflect the values of the New York City Department of Education. As such, the Mayor supports this legislation, which would require anti-harassment and anti-discrimination policies in schools throughout the entire State and also address the growing problem of cyber harassment.

Accordingly, the Mayor urges the earliest possible favorable consideration of this proposal by the Legislature.

 Respectfully submitted,

SW: 05/18/10

 MICHA C. LASHER

 Director

**NYC**

**Department of Education**

OFFICE OF PUBLIC AFFAIRS

Lenny H. Speiller, Executive Director

Joel I. Klein

Chancellor

May 17, 2010

**MEMORANDUM IN SUPPORT**

| | |
|---|---|
| **LEGISLATIVE** | **S. 1987 by Member of Senate Duane** |
| **REFERENCE** | **A. 3661 by Member of Assembly O'Donnell** |

A-157

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

| | |
|---|---|
| **TITLE:** | **AN ACT** to amend the education law, in relation to enacting the "Dignity for All Students Act." |

## OVERVIEW

The New York City Department of Education **SUPPORTS S.1987/A. 3661**, which would enact the "Dignity For All Students Act."

The proposed legislation includes definitions and prohibitions key to establishing a school environment in which all students and staff feel safe from discriminatory behaviors and intimidation. These include:

   1. "Harassment" defined as verbal, physical or other conduct which has the effect of substantially interfering with a student's educational performance or creating an intimidating or hostile environment.

   2. "Gender" is defined as actual or perceived sex and includes a person's gender identity or expression;

   3. Harassment by school staff or students on the basis of "actual or perceived race, national origin, ethnic group, religion, disability, sexual orientation, gender, or sex" in any school program or activity during school hours is expressly prohibited; and

   4. Discrimination by school staff or students on the basis of these categories in any school program or activity during school hours is prohibited.

The proposed legislation would direct the Commissioner of Education to establish the appropriate policies and procedures to implement the Act, including procedures to address and remedy complaints and grievances. Finally, the legislation provides statutory protection to any person who reports on any actions or behavior that violates the Act.

## REASONS FOR SUPPORT

The New York City public school system has the most ethnically diverse student population in the nation. Recognizing its large and diverse student population, the New York City Department of Education has long standing policies prohibiting harassment and discrimination on the basis of race, ethnicity, religion, national origin, gender and sexual orientation. For example, in 1985, the Board adopted a policy directing the chancellor to take steps to eliminate practices which "foster attitudes and/or actions leading to discrimination against students, parents or school personnel on the basis of race, color, religion, national origin, gender, age, sexual orientation and/or handicapping condition." In 1993, the Board adopted a "Policy Against Bias and Discrimination in All Facilities and at All Levels of the New York City Board of Education", affirming its policy against harassment, discrimination, and bigotry. Most recently, the Department has initiated the following measures to support efforts to eliminate harassment and discrimination in our system.

   • "Gender identity" is now a protected group in both the Discipline Code and Chancellor's Regulation A-832, most recently updated in September 2008.

   • "Bullying" is now clearly defined in the Code as a Level 4 infraction, serious enough that the minimum response is a principal suspension.

   • The On-line Occurrence Reporting System (OORS) is now aligned to the Code, so that bias incidents in schools can be more accurately captured.

   • The Code has been translated into 8 languages including Braille and is posted on the DOE website.

   • Professional development, notably our Respect for All (RFA) training, continues to be provided to teachers, counselors and other staff and new lessons are being developed for students.

The goals and objectives of the proposed legislation reflect the same values promoted by the New York City Department of Education. Accordingly, the Department urges the Legislature to approve *Dignity for All Students Act.*

The New York City Department of Education

urges the Legislature to APPROVE the

"Dignity for All Students Act" **A. 3661/S. 1987**

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 163 of 299

A-158

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 40 of 55 PageID #: 605

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

**GMHC**

**Memorandum of Support**

**A. 3661-B (O'Donnell) / S. 1987-A (Duane)**

**Assembly Calendar #284**

April 6, 2009

Gay Men's Health Crisis (GMHC), the nation's oldest HIV/AIDS service organization, submits this memorandum in support of this legislation. The proposed legislation authorizes the commissioner of education to establish policies and procedures affording all students in public schools an environment free of harassment and discrimination based on actual or perceived race, national origin, ethnic group, religion, disability, sexual orientation, gender or sex.

Founded in 1981, GMHC now serves one in every five persons diagnosed with AIDS in New York City. Last year, GMHC served more than 15,000 men, women and children and their families. Our clients reflect the diversity of the expanding epidemic: 67% are people of color, 65% are lesbian, gay, bisexual, 23% are women, and more than half reside outside of Manhattan.

GMHC supports the rights of students to learn in an environment that is free from harassment. Schools should be conducive to learning, so that students may develop to their fullest potential, free from fear of violence and discrimination. Bias harassment affects all students negatively; and lesbian, gay, bisexual and transgender (LGBT) students and students with disabilities can often face particularly devastating harassment in schools.

According to the Dignity for All Students Coalition, of which GMHC is a member, 97% of high school students report regularly hearing homophobic remarks *(Massachusetts Governor's Commission on Gay and Lesbian Youth)*. What is even more troubling is the lack of adult intervention in 2/3 of the cases when a student is verbally or physically harassed, and that 1/3 of the time, harassing comments are coming from school staff *(Gay Lesbian Straight Education Network)*. Furthermore, when students feel unsafe and victimized, they leave school. More than 22% of gay and lesbian youth report skipping school because they fear for their safety on school grounds *(Empire State Pride Agenda)* as opposed to only 4.2% of the general student population.

Unfortunately, students are not currently protected by New York State law. There is no explicit prohibition on harassment in a primary or secondary education setting. While local protections do exist in localities like New York City, Buffalo, Albany and Rochester, there is no comprehensive statewide law which provides for protection from harassment in schools. The proposed legislation would require schools to: provide policies to make schools free from harassment and discrimination; inform students and parents of these policies; develop guidelines for training programs for school employees, and for incorporation into the education curricula; provide trained staff for counseling; protect those who report incidents; and report incidents to the State Education Department.

For these reasons, GMHC strongly supports the proposed legislation and urges its passage.

**New Yorkers for Constitutional Freedoms**

P.O. Box 107

Spencerport, NY

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 164 of 299

A-159

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 41 of 55 PageID #: 606
New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

14559-0107

585-225-2340

Fax 585-225-2810

E-mail: family@nyfrf.org

## OPPOSE

### Education in Alternative Lifestyles

**A3661-B (O'Donnell)**                                           **S1987-A (Duane)**

The purpose of the proposed bill, known as the Dignity for All Students Act, claims "to afford all students an environment free of any harassment that substantially interferes with their education". **The sponsor's intent, however, is to advance acceptance of a lifestyle choice objectionable to the majority of families in New York State.**

**New Yorkers for Constitutional Freedoms (NYCF) recognizes the intrinsic value of every human being as created in the image of God.** NYCF is opposed to bullying and mistreatment of any kind, but NYCF opposes the bill for the following reasons.

  • **The penalties for violations of the bill are vague and undetermined.** It would fall upon the Commissioner of Education to develop regulations pertaining to "responses to violations of this policy, with remedies and procedures focusing on intervention and education." The bill would be passed before the penalties for violation are determined.

  • **The bill raises constitutional concerns.** It would likely lead to public school faculty, administration, staff, and students being punished for "intimidation" when they exercise their First Amendment right to speak in opposition to homosexual or transgender behavior. The courts have consistently found that a student's guaranteed right of free speech does not end at the classroom door. This bill will only lead to confusion in the classroom and the courtroom as the district attempts to follow State Education Department's guidelines "focusing on intervention", not specific action.

  • **Children attend school to be educated in academics, not indoctrinated in controversial ideology.** According to the bill, "'tolerance,' 'respect for others' and 'dignity' shall include awareness and sensitivity to discrimination or harassment and civility in the relations of ... sexual orientations, genders and sexes." Sexual orientation is defined as "actual or perceived heterosexuality, homosexuality or bisexuality." Gender is defined as "actual or perceived sex and shall include a person's gender identity or expression."

  • **There is a fiscal impact.** In this time of fiscal difficulty, the prudence of spending every tax dollar should be weighed in light of its expected and measurable results. There will be anticipated costs for the development of new regulations and the required additional training by school personnel in each district. Bullying cannot be stopped by a New York State Legislative action. The state should not be expending additional dollars in a fruitless effort.

### The Christian Voice In Albany

### NEW YORK

### CITY BAR

Contact: Maria Cilenti - Director of Legislative Affairs - mcilenti @nycbar.org - (212) 382-6655

June 29, 2010
The Honorable David A. Paterson
New York State Governor
Executive Chamber
State Capitol

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

Albany, NY 12224

**Re: A.3661-C/S.1987-B, the Dignity for All Students Act**

Dear Governor Paterson:

We are writing on behalf of the Lesbian, Gay, Bisexual and Transgender Rights Committee, Sex and Law Committee and Council on Children to urge you to sign A.3661-C/S.1987-B into law once it is delivered to your office by the Assembly.

The Dignity for All Students Act ("DASA") would amend the New York Education Law to require the Commissioner of Education to establish policies and procedures to afford all students in public schools an environment free of harassment and discrimination. Acts of harassment and discrimination are defined under this bill as being based on, *but not limited to*, actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender (including gender identity and expression) and sex. The prohibited conduct must create a hostile environment that would or could unreasonably and substantially interfere with a student's educational performance, opportunities or benefits, or mental, emotional or physical wellbeing or would reasonably be expected to cause a student to fear for his or her physical safety.

Student harassment and bullying are a growing epidemic in our schools. Pervasive harassment and bullying make schools hostile places, undermining students' ability to flourish. Prevention mechanisms need to be put in place to combat this issue and DASA provides those mechanisms. This legislation includes anti-harassment training programs for students, teachers and administrators and assistance to students who face harassment and bullying. In addition, it implements reporting mechanisms to elucidate the scope of the problem.

During the Senate debate, a few legislators raised two concerns: (i) the bill's inclusion of a list of protected classes under the definition of harassment, and (ii) the fiscal impact of enacting such legislation. However, as accurately explained in the sponsor's memo, "[t]he purpose of listing these protected classes is to provide examples of the types of status-based harassment frequently encountered by students without in any way limiting the application of the definition to individuals in those classes." The text of DASA is also written so that the definition of harassment remains all-inclusive. The prohibited conduct may be based on one of the classes listed, but very well may be based on some other characteristic of the student, which would still fall within the ambit of the bill so long as the conduct rises to the level of harassment or discrimination as defined in the bill.

The language, structure and timing of the legislation provide a reasonable approach to the fiscal implementation of DASA. The most recent amendment to the bill changes the effective date to July 1, 2012, permitting proposed budgets at the state and local levels to include consideration of the implementation plans before the law takes effect. Also, as many of the provisions in DASA correlate to the programs already required of school districts by the Safe Schools Against Violence in Education ("SAVE") legislation, the overall cost of enacting the legislation will be lower since the basic framework is already in place.

This legislation has passed in the Assembly every year since 2002, most recently passing by a vote of 138 to 4 on May 17, 2010. The Senate passed DASA for the first time on June 22 by a vast majority of 58 to 3. We urge you to sign this important bill into law and give children a school environment free of bullying where they can learn and thrive.

Thank you for your consideration.

Sincerely,

***                                                    ***

Carmelyn P. Malalis                                    Rachel L. Braunstein

*Chair, Lesbian, Gay, Bisexual & Transgender Rights*   *Chair, Sex & Law Committee*
*Committee*

***                                                    ***

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 166 of 299

A-161

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 43 of 55 PageID #: 608
New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

Karen Freedman                                      Stephanie Gendell

*Chair, Council on Children*                        *Vice-Chair, Council on Children*

Cc: Hon. Thomas K. Duane

Hon. Daniel J. O'Donnell

**CFE**

**Campaign for Fiscal Equity, Inc.**

**110 William Street, Suite 2602, New York, NY 10038**

**Tel (212) 867-8455 Fax (212) 867-8460**

**www.cfequity.org**

**July 9, 2010**

**To: Legislative Secretary**

**From: Geri Palast, Executive Director, Campaign for Fiscal Equity (CFE)**

**Re: Recommend Adoption of A 3661 C**

**CFE wholeheartedly endorses the Dignity for All Students Act. The provisions of this bill are consistent with ensuring the every student is provided with the proper protections and conditions for acquiring the sound basic education guaranteed by the state constitution.**

**UFT**

July 13, 2010
Hon. David A. Paterson
c/o Peter Kiernan
State Capitol
Albany, NY 12224

**Re:** Support of the "Dignity for All Students Act" (S1987B/A3661).

Dear Governor Paterson:

Committed to ensuring that all students have a safe environment in which to learn, free from harassment and discrimination, the United Federation of Teachers strongly supports the 'Dignity for All Students Act' (DASA) (S1987B/A3661).

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

This legislation is intended to provide all students with a safe school environment conducive to learning by putting an end to harassment and discrimination including but not limited to discrimination based on race, color, weight, national origin, ethnic group, religion, disability, sexual orientation, gender, or sex.

No child should be afraid to go to school simply because of who they are. There is no place for bullying and discrimination in New York's classrooms. Punishing students after the fact does little to address the root cause of the problem. DASA is unique in that it seeks to prevent bullying, harassment and discrimination through education and awareness before it occurs.

DASA addresses these issues and establishes a safer, more constructive school environment, by prohibiting harassment or discrimination against students by employees or students while on school property or on school grounds.

Every child is entitled to attend school in an environment free of harassment and discrimination As teachers we know a safe and supportive school environment is vital for students to achieve their full potential. However, far too many students do not have such an environment.

The Dignity for All Students Act will ensure that all students attend schools that are free of harassment and discrimination, We strongly encourage you to sign this important legislation into law.

> Sincerely,
> Michael Mulgrew
> United Federation of Teachers

**HESC**

**We Help People Pay For College**

 July 23, 2010
The Honorable Peter J. Kiernan
Counsel to the Governor
Executive Chamber
State Capitol
Albany, New York 12224

 Re: A.3661-C/S.1987-B

 Recommendation: None

Dear Mr. Kiernan:

 The New York State Higher Education Services Corporation (HESC) has reviewed the above-referenced bill, which will soon be before the Governor for executive action. The bill would amend the Education Law to enact the "Dignity For All Students Act."

 In particular, the bill would authorize the Commissioner of the New York State Education Department to establish policies and procedures affording all students in public elementary and secondary schools an environment free of harassment and discrimination.

 Because the bill does not affect post-secondary financial aid issues, we have no recommendation.

 Thank you for the opportunity to comment.

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 168 of 299

A-163

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 45 of 55 PageID #: 610
New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

Very truly yours,
*/s/ George M. Kazanjian*
George M. Kazanjian
Senior Attorney
Office of Counsel
(518) 473-1581

September 8, 2010
Governor David A. Paterson
State Capitol
Albany, NY 12224

Dear Governor Paterson:

Thank you for signing the Dignity for All Students Act, a critical bill that took way too long to pass. As you know, Dignity recognizes that students who are bullied can't concentrate on learning, may drop out of school and sometimes take their own lives. This important legislation will prohibit and combat bullying and discrimination in public schools, including bias harassment based on traits like race, ethnicity, religion, disability, sexual orientation, and gender identity/expression, with teacher training, education for students and reporting of bias incidents to the State Education Department

I am also very pleased that with Dignity, New York now has a statewide law that for the first time includes explicit protections for transgender New Yorkers.

With your signature, we can all be confident that the state's public schools will be much safer places to learn and grow.

Gay & Lesbian Youth Services (GLYS) of Western New York, the only organization in the eight (8) counties of WNY dedicated to providing safe space, opportunities, support and much for gay, lesbian, bi trans and questioning (GLBTQ) youth. As the Executive Director of GLYS, I know the horrific impact of heterosexist/homophobic bullying on students ~ gay and straight I look forward to a future when, thanks to DASA, our GLBTQ youth ~ ALL of our youth ~ can learn in safety and fulfill their promise.

Thank you for your leadership.
    Sincerely,
    (Miss) Marvin L. Henchbarger
    Executive Director
Hon. David Paterson
Governor, New York State
State Capitol
Albany, New York 12224

Dear Governor Paterson:

I strongly urge you immediately to halt issuing all permits for gas drilling by hydraulic fracturing. It is the only fiscally responsible and safe action to take.

The New York City Department of Environmental Protection has stated that the "inherent environmental impacts and risks of gas drilling could result in the need to construct a filtration plant at a minimum cost of **$10 billion**, which would translate into a **30 percent increase** in water rates." With the state already struggling to close a $9 billion budget gap this year and $15 billion

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 169 of 299

A-164

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 46 of 55 PageID #: 611

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

next year, how could it be in the best interests of your constituents to saddle them with more costs, all while polluting our water and endangering food supplies both upstate and downstate?

Whatever the currently perceived economic benefits of drilling, whether to the state or to individual landowners, they will be wiped out by the taxes necessary to fund filtration systems and other safety measures.

Please heed the NYC DEP's report, which has called not only for a ban on hydraulic fracturing, but also for the State Department of Environmental Conservation to rescind the September 2009 draft environmental impact statement because it does not adequately address the risks of drilling in the New York City watershed.

Now is the time for you to take a leadership role on this issue: please ban all gas drilling in New York State that uses hydraulic fracturing.

Sincerely,

Name Lisa Nieves Date 7/14/10

Address 4013 Joann Terrace, North Port, FL 34286

Phone 941-650-8701 Email lisanieves1@yahoo.com

Copies to Lieutenant Governor Ravitch, Commissioner Grannis, Senator Schneiderman, Senator Perkins, Senator Smith, Speaker Silver and Assembly Member O'Donnell

**Three Parks Independent Democrats**

Cathedral Station P.O. Box 1316, New York, N.Y. 10025, 212-866-6378

www.ThreeParksDems.org, ThreeParksDems@aol.com

SAMPLE OF

CORRESPONDENCE

ONLY

Jul 17, 2010
Governor David Paterson
State Capitol
Executive Chambers
Albany, NY 12224

Dear Governor Paterson,

New York is one of only eight states without a law protecting students from severe or pervasive bullying and harassment in schools. New York is failing its kids. The New York State Senate must immediately pass the Dignity for All Students Act (S. 1987).

Far too often, adults dismiss bullying as an unavoidable "fact of life" or a "rite of passage." This attitude ignores the destructive toll that persistent bullying and harassment inflicts on children.

With the suicides, depression, academic failure, emotional stress, violence and alcohol and drug abuse that come from constant bullying, New York students cannot wait another year to pass the dignity bill.

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 47 of 55 PageID #: 612

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

More than 100 civil rights and youth service organizations from across New York State support this critical bill. Your vote is crucial to passing this necessary and proactive legislation. The time has come. Pass the Dignity for All Students Act today!

Sincerely,

Ms. karen woodfield

85 Waite Rd

Old Chatham, NY 12136-2914

Jun 17, 2010
Governor David Paterson
State Capitol
Executive Chambers
Albany, NY 12224

Dear Governor Paterson,

New York is one of only eight states without a law protecting students from severe or pervasive bullying and harassment in schools. New York is failing its kids. The New York State Senate must immediately pass the Dignity for All Students Act (S. 1987).

Far too often, adults dismiss bullying as an unavoidable "fact of life" or a "rite of passage." This attitude ignores the destructive toll that persistent bullying and harassment inflicts on children.

With the suicides, depression, academic failure, emotional stress, violence and alcohol and drug abuse that come from constant bullying, New York students cannot wait another year to pass the dignity bill.

More than 100 civil rights and youth service organizations from across New York State support this critical bill. Your vote is crucial to passing this necessary and proactive legislation. The time has come. Pass the Dignity for All Students Act today!

Sincerely,

Ms. martine peters

749 Taylor Rd

Honeoye Falls, NY 14472-9727

Jun 18, 2010
Governor David Paterson
State Capitol
Executive Chambers
Albany, NY 12224

Dear Governor Paterson,

New York is one of only eight states without a law protecting students from severe or pervasive buliying and harassment in schools. New York is failing its kids. The New York State Senate must immediately pass the Dignity for All Students Act (S. 1987).

A-166

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

Far too often, adults dismiss bullying as an unavoidable "fact of life" or a "rite of passage." This attitude ignores the destructive toll that persistent bullying and harassment inflicts on children.

With the suicides, depression, academic failure, emotional stress, violence and alcohol and drug abuse that come from constant bullying, New York students cannot wait another year to pass the dignity bill.

More than 100 civil rights and youth service organizations from across New York State support this critical bill. Your vote is crucial to passing this necessary and proactive legislation. The time has come. Pass the Dignity for All Students Act today!

Sincerely,

Mr. Robert G. ALBERN

33 Hudson St

PO Box 366

Kinderhook, NY 12106-0366

(518) 758-2400

Jun 18, 2010
Governor David Paterson
State Capitol
Executive Chambers
Albany, NY 12224

Dear Governor Paterson,

New York is one of only eight states without a law protecting students from severe or pervasive bullying and harassment in schools. New York is failing its kids. The New York State Senate must immediately pass the Dignity for All Students Act (S. 1987).

Far too often, adults dismiss bullying as an unavoidable "fact of life" or a "rite of passage." This attitude ignores the destructive toll that persistent bullying and harassment inflicts on children.

With the suicides, depression, academic failure, emotional stress, violence and alcohol and drug abuse that come from constant bullying, New York students cannot wait another year to pass the dignity bill.

More than 100 civil rights and youth service organizations from across New York State support this critical bill. Your vote is crucial to passing this necessary and proactive legislation. The time has come. Pass the Dignity for All Students Act today!

Sincerely,

Mr. Robert G. ALBERN

33 Hudson St

PO Box 366

Kinderhook, NY 12106-0366

(518) 758-2400

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

Jun 18, 2010
Governor David Paterson
State Capitol
Executive Chambers
Albany, NY 12224

Dear Governor Paterson,

New York is one of only eight states without a law protecting students from severe or pervasive bullying and harassment in schools. New York is failing its kids. The New York State Senate must immediately pass the Dignity for All Students Act (S. 1987).

Far too often, adults dismiss bullying as an unavoidable "fact of life" or a "rite of passage." This attitude ignores the destructive toll that persistent bullying and harassment inflicts on children.

How many times do students pushed to the brink by bullying have to plan to do a "Columbine" masscre before we fulfill our responsiblity as adults and pass a law protecting our children from bullying and harassment?

With the suicides, depression, academic failure, emotional stress, violence and alcohol and drug abuse that come from constant bullying, New York students cannot wait another year to pass the dignity bill.

More than 100 civil rights and youth service organizations from across New York State support this critical bill. Your vote is crucial to passing this necessary and proactive legislation. The time has come. Pass the Dignity for All Students Act today!

Sincerely,

Ms. Andi Weiss Bartczak

142 Bruynswick Rd

New Paltz, NY 12561-4130

Jun 17, 2010
Governor David Paterson
State Capitol
Executive Chambers
Albany, NY 12224

Dear Governor Paterson,

New York is one of only eight states without a law protecting students from severe or pervasive bullying and harassment in schools. New York is failing its kids. The New York State Senate must immediately pass the Dignity for All Students Act (S. 1987).

Far too often, adults dismiss bullying as an unavoidable "fact of life" or a "rite of passage." This attitude ignores the destructive toll that persistent bullying and harassment inflicts on children.

When I was in elementary school, the faculty did nothing to prevent or correct the caucasian students from harassing myself and other children from my reservation. In fact, the school faculty seemed to encourage it, segregating us in group activities, imposing rules on us, specifically, as if we were somehow unable to compose ourselves as the others would. Almost everyone I know who shared this educational environment, now has a severe disconnection from American society at large. The way were treated as school children directly caused the overwhelming majority of Native people like myself to not just feel, but know that we do not belong, that we are not welcome beyond the borders of our reservations. Consequently, very few of us go on to

Case: 25-1136, 08/11/2025, DktEntry: 19.1, Page 173 of 299

A-168

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 50 of 55 PageID #: 615

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

any form of success. I realize that there are a myriad of other factors, but perhaps had our education been a more welcoming endeavour, things might be very different for more of us today.

With the suicides, depression, academic failure, emotional stress, violence and alcohol and drug abuse that come from constant bullying, New York students cannot wait another year to pass the dignity bill.

More than 100 civil rights and youth service organizations from across New York State support this critical bill. Your vote is crucial to passing this necessary and proactive legislation. The time has come. Pass the Dignity for All Students Act today!

Sincerely,

Mr. Jason Rehm

5202 Green Rd

Lewiston, NY 14092-9735

Jun 17, 2010
Governor David Paterson
State Capitol
Executive Chambers
Albany, NY 12224

Dear Governor Paterson,

New York is one of only eight states without a law protecting students from severe or pervasive bullying and harassment in schools. New York is failing its kids. The New York State Senate must immediately pass the Dignity for All Students Act (S. 1987).

Far too often, adults dismiss bullying as an unavoidable "fact of life" or a "rite of passage." This attitude ignores the destructive toll that persistent bullying and harassment inflicts on children.

With the suicides, depression, academic failure, emotional stress, violence and alcohol and drug abuse that come from constant bullying, New York students cannot wait another year to pass the dignity bill.

More than 100 civil rights and youth service organizations from across New York State support this critical bill. Your vote is crucial to passing this necessary and proactive legislation. The time has come. Pass the Dignity for All Students Act today!

Sincerely,

Ms. Carolyn Hoffman

5 Rockledge Rd

White Plains, NY 10603-2520

Jun 17, 2010
Governor David Paterson
State Capitol
Executive Chambers
Albany, NY 12224

Dear Governor Paterson,

New York is one of only eight states without a law protecting students from severe or pervasive bullying and harassment in schools. New York is failing its kids. The New York State Senate must immediately pass the Dignity for All Students Act (S. 1987).

Far too often, adults dismiss bullying as an unavoidable "fact of life" or a "rite of passage." This attitude ignores the destructive toll that persistent bullying and harassment inflicts on children.

It is not the children who share the resentment of their parents and peers; it is the adults and others who teach them to hate and despise other human beings.

With the suicides, depression, academic failure, emotional stress, violence and alcohol and drug abuse that come from constant bullying, New York students cannot wait another year to pass the dignity bill.

More than 100 civil rights and youth service organizations from across New York State support this critical bill. Your vote is crucial to passing this necessary and proactive legislation. The time has come. Pass the Dignity for All Students Act today!

Sincerely,

Miss Andrea Ivey

1305 Amsterdam Ave Apt 17C

New York, NY 10027-4257


**STATE OF NEW YORK**

3661--C

Cal. No. 275


2009-2010 Regular Sessions

**IN ASSEMBLY**

January 28, 2009

EXPLANATION--Matter in **italics** (underscored) is new; matter in brackets [--] is old law to be omitted.

 Introduced by M. of A. O'DONNELL, GLICK, NOLAN, LIFTON, BENJAMIN, FIELDS, McENENY, CLARK, PAULIN, ROSENTHAL, JOHN, GALEF, HEVESI, ESPAILLAT, ENGLEBRIGHT, KAVANAGH, POWELL, N. RIVERA, LANCMAN, PERALTA, STIRPE, HOYT, DINOWITZ, JAFFEE, SCHIMEL, CAHILL, BRODSKY, TITONE -- Multi-Sponsored by -- M. of A. ALFANO, BARRA, BING, BRENNAN, FARRELL, GIANARIS, GOTTFRIED, JACOBS, JEFFRIES, KELLNER, KOON, LATIMER, LUPARDO, MARKEY, MILLMAN, PEOPLES-STOKES, PERRY, PHEFFER, SWEENEY, WEISENBERG, WRIGHT -- read once and referred to the Committee on Education -- reported and referred to the Committee on Codes -- committee discharged, bill amended, ordered reprinted as amended and recommitted to said committee -- committee discharged, bill amended, ordered reprinted as amended and recommitted to said committee -- reported from committee, advanced to a third reading, amended and ordered reprinted, retaining its place on the order of third reading

 AN ACT to amend the education law, in relation to enacting the dignity for all students act

Case 2:23-cv-07299-MKB-LGD   Document 41-6   Filed 09/06/24   Page 52 of 55 PageID #: 617

**The People of the State of New York, represented in Senate and Assembly, do enact as follows:**

Section 1. Short title. This act shall be known and may be cited as the "dignity for all students act".

§ 2. The education law is amended by adding a new article 2 to read as follows:

**ARTICLE 2**

**DIGNITY FOR ALL STUDENTS**

Section 10. Legislative intent.
    **11. Definitions.**
    **12. Discrimination and harassment prohibited.**
    **13. Policies and guidelines.**
    **14. Commissioner's responsibilities.**
    **15. Reporting by commissioner.**
    **16. Protection of people who report discrimination or harassment.**
    **17. Application.**
    **18. Severability and construction.**

  **§ 10.** **Legislative intent. The legislature finds that students' ability to learn and to meet high academic standards, and a school's ability to educate its students, are compromised by incidents of discrimination or harassment including bullying, taunting or intimidation. It is hereby declared to be the policy of the state to afford all students in public schools an environment free of discrimination and harassment. The purpose of this article is to foster civility in public schools and to prevent and prohibit conduct which is inconsistent with a school's educational mission.**

  **§ 11.** **Definitions. For the purposes of this article, the following terms shall have the following meanings:**

  **1. "School property" shall mean in or within any building, structure, athletic playing field, playground, parking lot, or land contained within the real property boundary line of a public elementary or secondary school; or in or on a school bus, as defined in section one hundred forty-two of the vehicle and traffic law.**

  **2. "School function" shall mean a school-sponsored extra-curricular event or activity.**

  **3. "Disability" shall mean disability as defined in subdivision twenty-one of section two hundred ninety-two of the executive law.**

  **4. "Employee" shall mean employee as defined in subdivision three of section eleven hundred twenty-five of this title.**

  **5. "Sexual orientation" shall mean actual or perceived heterosexuality, homosexuality or bisexuality.**

  **6. "Gender" shall mean actual or perceived sex and shall include a person's gender identity or expression.**

  **7. "Harassment" shall mean the creation of a hostile environment by conduct or by verbal threats, intimidation or abuse that has or would have the effect of unreasonably and substantially interfering with a student's educational performance, opportunities or benefits, or mental, emotional or physical well-being; or conduct, verbal threats, intimidation or abuse that reasonably causes or would reasonably be expected to cause a student to fear for his or her physical safety; such conduct, verbal threats, intimidation or abuse includes but is not limited to conduct, verbal threats, intimidation or abuse based on a person's actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender or sex.**

  **§ 12. Discrimination and harassment prohibited. 1. No student shall be subjected to harassment by employees or students on school property or at a school function; nor shall any student be subjected to discrimination based on a**

person's actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender, or sex by school employees or students on school property or at a school function. Nothing in this subdivision shall be construed to prohibit a denial of admission into, or exclusion from, a course of instruction based on a person's gender that would be permissible under section thirty-two hundred one-a or paragraph (a) of subdivision two of section twenty-eight hundred fifty-four of this chapter and title IX of the Education Amendments of 1972 (20 U.S.C. section 1681, et. seq.), or to prohibit, as discrimination based on disability, actions that would be permissible under section 504 of the Rehabilitation Act of 1973.

2. An age-appropriate version of the policy outlined in subdivision one of this section, written in plain-language, shall be included in the code of conduct adopted by boards of education and the trustees or sole trustee pursuant to section twenty-eight hundred one of this chapter and a summary of such policy shall be included in any summaries required by such section twenty-eight hundred one.

§ 13. Policies and guidelines. The board of education and the trustees or sole trustee of every school district shall create policies and guidelines that shall include, but not be limited to:

1. Policies intended to create a school environment that is free from discrimination or harassment;

2. Guidelines to be used in school training programs to discourage the development of discrimination or harassment and that are designed:

a. to raise the awareness and sensitivity of school employees to potential discrimination or harassment, and

b. to enable employees to prevent and respond to discrimination or harassment; and

3. Guidelines relating to the development of nondiscriminatory instructional and counseling methods, and requiring that at least one staff member at every school be thoroughly trained to handle human relations in the areas of race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender, and sex.

§ 14. Commissioner's responsibilities. The commissioner shall:

1. Provide direction, which may include development of model policies and, to the extent possible, direct services, to school districts related to preventing discrimination and harassment and to fostering an environment in every school where all children can learn free of manifestations of bias;

2. Provide grants, from funds appropriated for such purpose, to local school districts to assist them in implementing the guidelines set forth in this section; and

3. Promulgate regulations to assist school districts in implementing this article including, but not limited to, regulations to assist school districts in developing measured, balanced, and age-appropriate responses to violations of this policy, with remedies and procedures focusing on intervention and education.

§ 15. Reporting by commissioner. The commissioner shall create a procedure under which material incidents of discrimination and harassment on school grounds or at a school function are reported to the department at least on an annual basis. Such procedure shall provide that such reports shall, wherever possible, also delineate the specific nature of such incidents of discrimination or harassment, provided that the commissioner may comply with the requirements of this section through use of the existing uniform violent incident reporting system. In addition the department may conduct research or undertake studies to determine compliance throughout the state with the provisions of this article.

§ 16. Protection of people who report discrimination or harassment. Any person having reasonable cause to suspect that a student has been subjected to discrimination or harassment by an employee or student, on school grounds or at a school function, who, acting reasonably and in good faith, either reports such information to school officials, to the commissioner, or to law enforcement authorities or otherwise initiates, testifies, participates or assists in any formal or

**informal proceedings under this article, shall have immunity from any civil liability that may arise from the making of such report or from initiating, testifying, participating or assisting in such formal or informal proceedings, and no school district or employee shall take, request or cause a retaliatory action against any such person who, acting reasonably and in good faith, either makes such a report or initiates, testifies, participates or assists in such formal or informal proceedings.**

**§ 17. Application. Nothing in this article shall:**

**1. Apply to private, religious or denominational educational institutions; or**

**2. Preclude or limit any right or cause of action provided under any local, state or federal ordinance, law or regulation including but not limited to any remedies or rights available under the Individuals With Disabilities Education Act, Title VII of the Civil Rights Law of 1964, section 504 of the Rehabilitation Act of 1973 or the Americans with Disabilities Act of 1990.**

**§ 18. Severability and construction. The provisions of this article shall be severable, and if any court of competent jurisdiction declares any phrase, clause, sentence or provision of this article to be invalid, or its applicability to any government agency, person or circumstance is declared invalid, the remainder of this article and its relevant applicability shall not be affected. The provisions of this article shall be liberally construed to give effect to the purposes thereof.**

§ 3. Section 801-a of the education law, as added by chapter 181 of the laws of 2000, is amended to read as follows:

§ 801-a. Instruction in civility, citizenship and character education. The regents shall ensure that the course of instruction in grades kindergarten through twelve includes a component on civility, citizenship and character education. Such component shall instruct students on the principles of honesty, tolerance, personal responsibility, respect for others, observance of laws and rules, courtesy, dignity and other traits which will enhance the quality of their experiences in, and contributions to, the community. The regents shall determine how to incorporate such component in existing curricula and the commissioner shall promulgate any regulations needed to carry out such determination of the regents. **For the purposes of this section, "tolerance," "respect for others" and "dignity" shall include awareness and sensitivity to discrimination or harassment and civility in the relations of people of different races, weights, national origins, ethnic groups, religions, religious practices, mental or physical abilities, sexual orientations, genders, and sexes.**

§ 4. Paragraphs l and m of subdivision 2 of section 2801 of the education law, as added by chapter 181 of the laws of 2000, are amended and a new paragraph n is added to read as follows:

1. a minimum suspension period, for students who repeatedly are substantially disruptive of the educational process or substantially interfere with the teacher's authority over the classroom, provided that the suspending authority may reduce such period on a case by case basis to be consistent with any other state and federal law. For purposes of this section, the definition of "repeatedly are substantially disruptive" shall be determined in accordance with the regulations of the commissioner; [and ]

m. a minimum suspension period for acts that would qualify the pupil to be defined as a violent pupil pursuant to paragraph a of subdivision two-a of section thirty-two hundred fourteen of this chapter, provided that the suspending authority may reduce such period on a case by case basis to be consistent with any other state and federal law[.  ]**; and**

**n. provisions to comply with article two of this chapter.**

§ 5. This act shall take effect July 1, 2012, except that any rules or regulations necessary for the timely implementation of this act on its effective date shall be promulgated on or before such date.

A-173

New York Bill Jacket, 2010 A.B. 3661, Ch. 482, New York Bill Jacket, 2010 A.B. 3661,...

NY Bill Jacket, 2010 A.B. 3661, Ch. 482

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

A-174

# EXHIBIT G

A-175

# STATE OF NEW YORK

---

1549--E

2021-2022 Regular Sessions

# IN SENATE

January 13, 2021

---

Introduced by Sen. BIAGGI -- read twice and ordered printed, and when printed to be committed to the Committee on Education -- committee discharged, bill amended, ordered reprinted as amended and recommitted to said committee -- committee discharged, bill amended, ordered reprinted as amended and recommitted to said committee -- committee discharged, bill amended, ordered reprinted as amended and recommitted to said committee -- recommitted to the Committee on Education in accordance with Senate Rule 6, sec. 8 -- committee discharged, bill amended, ordered reprinted as amended and recommitted to said committee -- committee discharged, bill amended, ordered reprinted as amended and recommitted to said committee

AN ACT to amend the education law, in relation to native names, logos, or mascots

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

1  Section 1. The education law is amended by adding a new section 319 to
2  read as follows:
3  *§ 319. Native mascots, names or logos. 1. As used in this section,*
4  *"native name, logo, or mascot" shall mean any person, animal or object*
5  *used to represent a school district which names, refers to, represents,*
6  *or is associated with Native Americans, including aspects of Native*
7  *American cultures and specific Native American tribes.*
8  *2. No public school shall use a native name, logo, or mascot.*
9  *3. Notwithstanding this section, a public school may continue to use*
10  *uniforms or other materials bearing a native name, logo, or mascot that*
11  *were purchased on or before the effective date of this section until*
12  *September first, two thousand twenty-four if all of the following*
13  *requirements are met:*
14  *(a) The school selects a new school or athletic team name, logo, or*
15  *mascot;*

EXPLANATION--Matter in *italics* (underscored) is new; matter in brackets [-] is old law to be omitted.

LBD02998-18-2

Case 2:23-cv-07299-MKB-LGD   Document 41-7   Filed 09/06/24   Page 3 of 5 PageID #: 623

S. 1549--E                        2

1    (b) The school refrains from purchasing, acquiring, or using resources
2   for the purpose of distribution or sale to pupils or  school  employees,
3   any  uniform that includes or bears their prohibited team name, logo, or
4   mascot;
5    (c) The school refrains from purchasing, acquiring, or using resources
6   for  the  purpose of distribution or sale to pupils or school employees,
7   any yearbook, newspaper, program, or other  tangible  material  that
8   includes  or bears the prohibited school or athletic team name, logo, or
9   mascot in its logos or titles;
10    (d) The school refrains from purchasing  or  constructing  a  marquee,
11   sign,  or  other  new  or replacement fixture that includes or bears the
12   prohibited school or athletic team name, logo, or mascot. This paragraph
13   applies to facilities that bear the prohibited school or  athletic  team
14   name, logo, or mascot, in which case the school shall remove the prohib-
15   ited  name,  logo  or  mascot no later than the next time the associated
16   part of the facility is replaced in the normal course of maintenance.
17    4. Nothing in this section shall be construed to prohibit a  federally
18   recognized tribal nation or state recognized tribal nation from choosing
19   to use a native name, logo, or mascot for a sports team comprised of its
20   tribal members, including a tribal school or intramural league.
21    5.  This  section  shall not apply where an agreement exists between a
22   federally recognized tribal nation within the state of New York or a New
23   York state recognized tribal nation and a public school. Such  agreement
24   must  be  provided  in writing to the department within five days of the
25   effective date of this section.  A public school  shall  not  offer  or
26   accept  any  money, consideration or thing of value pursuant to any such
27   agreement.  The tribal nation shall have the right and ability to revoke
28   any such agreement at any time at its discretion. If  an  agreement  is
29   entered  into  pursuant  to this subdivision by either party, the public
30   school shall have one year from the date of termination  to  discontinue
31   its use of its native name, logo, or mascot.
32    § 2. This act shall take effect immediately.

A-177

# STATE OF NEW YORK

---

5443--E

2021-2022 Regular Sessions

# IN ASSEMBLY

February 16, 2021

———————

Introduced by M. of A. BICHOTTE HERMELYN, CARROLL -- read once and referred to the Committee on Education -- committee discharged, bill amended, ordered reprinted as amended and recommitted to said committee -- again reported from said committee with amendments, ordered reprinted as amended and recommitted to said committee -- again reported from said committee with amendments, ordered reprinted as amended and recommitted to said committee -- recommitted to the Committee on Education in accordance with Assembly Rule 3, sec. 2 -- committee discharged, bill amended, ordered reprinted as amended and recommitted to said committee -- again reported from said committee with amendments, ordered reprinted as amended and recommitted to said committee

AN ACT to amend the education law, in relation to native names, logos, or mascots

  The People of the State of New York, represented in Senate and Assembly, do enact as follows:

1    Section 1. The education law is amended by adding a new section 319 to
2  read as follows:
3    § 319. Native mascots, names or logos. 1. As used in this section,
4  "native name, logo, or mascot" shall mean any person, animal or object
5  used to represent a school district which names, refers to, represents,
6  or is associated with Native Americans, including aspects of Native
7  American cultures and specific Native American tribes.
8    2. No public school shall use a native name, logo, or mascot.
9    3. Notwithstanding this section, a public school may continue to use
10 uniforms or other materials bearing a native name, logo, or mascot that
11 were purchased on or before the effective date of this section until
12 September first, two thousand twenty-four if all of the following
13 requirements are met:
14   (a) The school selects a new school or athletic team name, logo, or
15 mascot;

  EXPLANATION--Matter in *italics* (underscored) is new; matter in brackets
         [-] is old law to be omitted.

LBD02998-19-2

A. 5443--E                           2

1    (b) The school refrains from purchasing, acquiring, or using resources
2    for the purpose of distribution or sale to pupils or school employees,
3    any uniform that includes or bears their prohibited team name, logo, or
4    mascot;
5    (c) The school refrains from purchasing, acquiring, or using resources
6    for the purpose of distribution or sale to pupils or school employees,
7    any yearbook, newspaper, program, or other tangible material that
8    includes or bears the prohibited school or athletic team name, logo, or
9    mascot in its logos or titles;
10   (d) The school refrains from purchasing or constructing a marquee,
11   sign, or other new or replacement fixture that includes or bears the
12   prohibited school or athletic team name, logo, or mascot. This paragraph
13   applies to facilities that bear the prohibited school or athletic team
14   name, logo, or mascot, in which case the school shall remove the prohib-
15   ited name, logo or mascot no later than the next time the associated
16   part of the facility is replaced in the normal course of maintenance.
17   4. Nothing in this section shall be construed to prohibit a  federally
18   recognized tribal nation or state recognized tribal nation from choosing
19   to use a native name, logo, or mascot for a sports team comprised of its
20   tribal members, including a tribal school or intramural league.
21   5. This section shall not apply where an agreement exists between a
22   federally recognized tribal nation within the state of New York or a New
23   York state recognized tribal nation and a public school. Such  agreement
24   must be provided  in writing to the department within five days of the
25   effective date of this section.  A public school  shall  not  offer  or
26   accept  any  money, consideration or thing of value pursuant to any such
27   agreement.  The tribal nation shall have the right and ability to revoke
28   any such agreement at any time at its discretion.  If an agreement  is
29   entered  into  pursuant  to this subdivision by either party, the public
30   school shall have one year from the date of termination  to  discontinue
31   its use of its native name, logo, or mascot.
32   § 2. This act shall take effect immediately.

# EXHIBIT H

A-180

# STATE OF NEW YORK

4052

2023-2024 Regular Sessions

# IN SENATE

February 2, 2023

Introduced by Sen. FERNANDEZ -- read twice and ordered printed, and when printed to be committed to the Committee on Education

AN ACT to amend the education law, in relation to native names, logos, or mascots

   The People of the State of New York, represented in Senate and Assembly, do enact as follows:

1    Section 1. The education law is amended by adding a new section 319 to
2  read as follows:
3    § 319. Native mascots, names or logos. 1. As used in this section,
4  "native name, logo, or mascot" shall mean any person, animal or object
5  used to represent a school district which names, refers to, represents,
6  or is associated with Native Americans, including aspects of Native
7  American cultures and specific Native American tribes.
8    2. No public school shall use a native name, logo, or mascot.
9    3. Notwithstanding this section, a public school may continue to use
10 uniforms or other materials bearing a native name, logo, or mascot that
11 were purchased on or before the effective date of this section until
12 September first, two thousand twenty-six if all of the following
13 requirements are met:
14   (a) The school selects a new school or athletic team name, logo, or
15 mascot;
16   (b) The school refrains from purchasing, acquiring, or using resources
17 for the purpose of distribution or sale to pupils or school employees,
18 any uniform that includes or bears their prohibited team name, logo, or
19 mascot;
20   (c) The school refrains from purchasing, acquiring, or using resources
21 for the purpose of distribution or sale to pupils or school employees,
22 any yearbook, newspaper, program, or other tangible material that
23 includes or bears the prohibited school or athletic team name, logo, or
24 mascot in its logos or titles;

EXPLANATION--Matter in *italics* (underscored) is new; matter in brackets
[-] is old law to be omitted.

LBD08343-01-3

S. 4052                                    2

1   (d)  The  school  refrains  from purchasing or constructing a marquee,
2   sign, or other new or replacement fixture that  includes  or  bears  the
3   prohibited school or athletic team name, logo, or mascot. This paragraph
4   applies  to  facilities that bear the prohibited school or athletic team
5   name, logo, or mascot, in which case the school shall remove the prohib-
6   ited  name,  logo  or  mascot no later than the next time the associated
7   part of the facility is replaced in the normal course of maintenance.
8   4. Nothing in this section shall be construed to prohibit a  federally
9   recognized tribal nation or state recognized tribal nation from choosing
10  to use a native name, logo, or mascot for a sports team comprised of its
11  tribal members, including a tribal school or intramural league.
12  5.  This  section  shall not apply where an agreement exists between a
13  federally recognized tribal nation within the state of New York or a New
14  York state recognized tribal nation and a public school. Such  agreement
15  must  be  provided  in writing to the department within five days of the
16  effective date of this section.  A public school  shall  not  offer  or
17  accept  any  money, consideration or thing of value pursuant to any such
18  agreement.  The tribal nation shall have the right and ability to revoke
19  any such agreement at any time at its discretion. If  an  agreement  is
20  entered  into  pursuant  to this subdivision by either party, the public
21  school shall have one year from the date of termination  to  discontinue
22  its use of its native name, logo, or mascot.
23   § 2. This act shall take effect immediately.

A-182

# EXHIBIT J

**Wantagh Union Free School District**

**NYSED Indigenous Mascot Regulation**

**Board of Education Plan**

**June 1, 2023**

Case 2:23-cv-07299-MKB-LGD   Document 41-10   Filed 09/06/24   Page 3 of 7 PageID #: 633

<u>NYSED Part 123 of the Regulations</u>

On Tuesday, April 18, 2023, the New York State enacted a new part 123 of the regulations regarding the prohibition of the use of indigenous names, mascots and logos by public schools. The regulation took effect on Wednesday, May 3, 2023. It states that, "no public school in the State of New York may utilize or display an Indigenous name, logo, or mascot other than for purposes of classroom instruction." (Appendix C contains the full regulation as written)

<u>Wantagh UFSD Plan</u>

As a result of this new regulation, the Wantagh School District is one of the approximately 60 school districts in New York State that is impacted. The current imagery of the school's logo for Wantagh High School and Wantagh Middle School is depicted below and the schools' current nickname is the "Warriors".



The current mascots of the district's three elementary schools are as follows and would not be impacted:

Wantagh Elementary School – Buzz the Bee

Forest Lake Elementary School – Forester the Bear

Mandalay Elementary School – Bubbles the Dolphin

The Wantagh School District will retire the current imagery being used by the district and rebrand the Warrior name. It is clear that the regulation calls for the retirement of the district's current imagery. However, the Warrior name is not an indigenous name, and can successfully be rebranded. The definition for Indigenous name, logo, or mascot included in the new regulation is as follows:

> *"Indigenous name, logo, or mascot" means a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures, used to represent a public school, including but not limited to such schools sports teams. It does not include a public school, school building, or school district named after an Indigenous tribe.*

Upon review of the definition provided in the regulation it is clear that the current imagery being used by the Wantagh School District is impacted by the regulation. It is also equally clear that the Warrior name would not fit into this definition, as it is not a name, symbol or image that depicts or refers to Indigenous persons, tribes, nations, customs, symbols, or traditions.

A-185

Brian Polite, Chairman of the Shinnecock Indian Nation, stated, "Unless there's Native American imagery that goes along with it, the name Warrior isn't exclusive to native culture…There are many cultures who have warriors, and I don't have an issue with them using [it] as long as there's no Native American imagery that goes along with that."

To Mr. Polite's point, NYSED has indicated that the Chenango Valley School District outside of Binghamton may keep their existing name and logo that is illustrated below. Chenango Valley using the same name, Warriors, that Wantagh UFSD has in place, however, it has different imagery. As a result, it would stand to reason that the Wantagh School District would be able to successfully rebrand using the current Warriors name.



This rebranding process will take place with community input and student involvement. A school community survey will take place to examine various rebranding concepts. A committee will be formed and will be largely student driven to develop concepts for new imagery. These ideas for new imagery will then be shared with the Board of Education and a decision will ultimately be made on which concept to pursue. The district will then consult with professional graphic artists to develop the new imagery. A timeline for this process is contained in Appendix A.

The current imagery appears in many places across the middle school and high school. This includes the gymnasium floor on all three gymnasiums at the secondary complex, the athletic fields on the main turf field, the windscreens throughout the district, the main signs for both the middle school and high school, the athletic scoreboards, wall padding in the gymnasiums, weight rooms and wrestling room, floor mats throughout the district, bleachers in the main gymnasium at Wantagh High School, uniforms for interscholastic sports teams for grades 7-12, updating images on the district website, business cards, letterhead, and imagery on the district phones. This is not an all-inclusive list, as we continue to discover other areas of our facilities on which the logo appears. Appendix B is attached with anticipated costs and a potential timeline for replacement. The district will develop a plan to fund these projects through the budget, capital reserve fund and other revenues, as NYSED is not providing any funding to support this mandate.

<u>Items for Consideration</u>

The district turf field is only three years old. A request would be made to NYSED to replace the existing logo when the natural life of the field has come to an end, and it is slated for replacement in approximately seven years. The main high school gymnasium and scoreboard are slated for replacement this summer and can be accomplished right away. The other two gymnasiums could be completed in summer 2024 and summer 2025.

The Wantagh UFSD is submitting this plan to <u>mascotadvisory@nysed.gov</u> for feedback, as there does not appear to be another vehicle for feedback from NYSED at this time.

A-186

Appendix A

<u>Wantagh School District Rebranding Timeline</u>

June 2, 2023 –           District Plan Submitted to NYSED for Feedback

June 15, 2023 –           Wantagh Board of Education Resolution Submitted for Approval

July 5, 2023 –           Wantagh Board of Education Appoints Mascot Committee

September 2023 –           Mascot Committee Meets to Discuss Rebranding

October 2023 –           Community Rebranding Survey Released

November 2023 –           Mascot Committee Meets to Discuss Rebranding

December 2023 –           Mascot Committee Meets to Discuss Rebranding

January 2024 –           Mascot Committee Presents to the Board of Education

February 2024 –           New Imagery Adopted

March 2023 –           Rebranding Budget Submitted to the Board of Education for consideration for the 2024-25 school year capital projects

Appendix B

Estimated District Costs and Timeline for Replacement

| Item | Estimated Cost | Imagery or Nickname | Timeline for Replacement |
|---|---|---|---|
| Gymnasium Floors | | | |
| WHS North Gym | $30,000 | Imagery | Summer 2024 |
| WHS Main Gym | $30,000 | Imagery | Summer 2023 |
| WMS Gym | $30,000 | Imagery | Summer 2025 |
| | | | |
| WHS Scorers Table | $2,000 | Imagery | Summer 2024 |
| | | | |
| WHS Athletic Chairs for Competition | $11,000 | Imagery | Summer 2025 |
| | | | |
| WHS Turf Field Logo Replacement at Midfield | $45,000 | Imagery | TBD |
| | | | |
| Exterior Signs | | | |
| WHS | $5,000.00 | Imagery | Summer 2024 |
| WMS | $5,000.00 | Imagery | Summer 2025 |
| | | | |
| | | | |
| WHS Weight Room Wallpads | $2,117 | Imagery and Nickname | Summer 2024 |
| | | | |
| WHS Gymnasium Wallpads | $3,434 | Imagery and Nickname | Summer 2024 |
| | | | |
| WMS Wrestling Room Wallpads | $7,783 | Imagery and Nickname | Summer 2024 |
| | | | |
| WHS Windscreens | $70,000 | Imagery and Nickname | Summer 2024 |
| | | | |
| WHS Scoreboard | $90,000 | Imagery and Nickname | Summer 2023 |
| | | | |
| | | | |
| Athletic Uniforms Grades 7-12 | $250,000 | Imagery and Nickname | Ongoing |
| | | | |
| WHS Turf Field End Zone Nickname Replacement | $65,000 | Nickname | TBD |
| | | | |
| WHS Bleacher Seats | $6,100 | Nickname | TBD |
| | | | |
| Total | $652,434 | | |

**Appendix C**

<u>AMENDMENT TO THE REGULATIONS OF THE COMMISSIONER OF EDUCATION</u>

Pursuant to Article 2 and sections 101, 207, 305, 308, 309, and 2854 of the Education Law. Subchapter E of the Regulations of the Commissioner of Education is amended by adding a new Part 123 to read as follows:

Part 123 Use of Indigenous Names, Logos, or Mascots Prohibited

§123.1 Definitions. As used in this Part, "Indigenous name, logo, or mascot" means a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures, used to represent a public school, including but not limited to such schools sports teams. It does not include a public school, school building, or school district named after an Indigenous tribe.

§123.2 Prohibition. Except as provided in section 123.4 of this Part, no public school in the State of New York may utilize or display an Indigenous name, logo, or mascot other than for purposes of classroom instruction.

§123.3 Timelines. (a) Boards of education must commit, via resolution, to eliminating the use of all Indigenous names, logos, and mascots by the end of the 2022-23 school year. Such resolution shall identify a plan to eliminate all use of the prohibited name, logo, or mascot within a reasonable time, which shall be no later than the end of the 2024-2025 school year. (b) Upon a showing of good cause, the commissioner may grant an extension of the timelines prescribed in subdivision (a) of this section.

§123.4 Exceptions; Tribal Use or Approval.

(a) Tribal Use. Nothing in this section shall be construed to prohibit a federally recognized tribal nation within the State of New York or a New York State-recognized tribal nation from choosing to use an Indigenous name, logo, or mascot for a sports team comprised of its tribal members, including an Indigenous name, logo, or mascot for a sports team comprised of its tribal members, including a tribal school or intramural league.

 (b) Tribal Approval. This Part shall not apply where a written agreement exists prior to the effective date of this part between a federally recognized tribal nation within the State of New York or a New York State-recognized tribal nation and a public school permitting the use of an Indigenous name, mascot, or logo that is culturally affiliated with such tribe. A public school shall not offer or accept any money, consideration, or thing of value pursuant to any such agreement. The tribal nation shall have the right and ability to revoke any such agreement at any time. Upon termination of such an agreement, the public school shall have the remainder of the school year in which such agreement is revoked and one additional school year to discontinue its use of an Indigenous name, logo, or mascot. §

123.5 Implementation. 8 Public schools shall prohibit school officers and employees when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot. This provision shall not apply to any school officer or employee who is a member of a tribal nation and is utilizing or promoting an Indigenous name, logo, or mascot of such tribal nation.

A-189

# EXHIBIT K

**RANKING MINORITY MEMBER**
ETHICS AND INTERNAL
GOVERNANCE

LOCAL GOVERNMENT

**COMMITTEE MEMBER**
CITIES I

HEALTH

JUDICIARY

LABOR

**THE SENATE
STATE OF NEW YORK**



**SENATOR
STEVEN D. RHOADS**
5ᵀᴴ DISTRICT

**Albany Office:**
513 Legislative Office Bldg.
Albany, NY 12247
Phone: (518) 455-3161
Fax: (518) 426-6963

**District Office:**
4236 Merrick Rd., 1st Fl.
Massapequa, NY 11758
Phone: (516) 882-0630
Fax: (516) 882-0636

June 14, 2023

Dr. Betty A. Rosa, Commissioner
New York State Education Department
89 Washington Avenue
Albany, New York 11234

      Re:     Part 123 of the Regulations of the Commissioner
                Prohibition of the use of Indigenous Names, Logos and Mascots

Dear Commissioner Rosa,

      I have requested a meeting with you to discuss the State Education Department's recent regulation prohibiting the use of indigenous names, logos and mascots in public schools across the State of New York.  While awaiting the scheduling of this meeting, I wish to raise some concerns which I hope to discuss.

      The broad purpose of the Dignity for All Students Act, (DASA), to create an environment "*free from discrimination, intimidation, taunting, harassment, and bullying on school property, a school bus and/or at a school function*", is certainly a laudable goal.  The decision, however, by the Board of Regents and you, as Commissioner, to institute a blanket statewide ban on the use of indigenous names, logos and mascots without an assessment on a case by case basis whether the use of such items in any way actually promotes a culture of "*discrimination, intimidation, taunting, harassment, and bullying*" is, respectfully, an abuse of discretion and an overbroad interpretation of the statute, unintended by the Legislature.

      Here on Long Island, where much of the land was originally occupied by indigenous tribes which continue to be an important part of our history and legacy, the heavy-handed and arbitrary universal application of this Regulation results in the devaluing of that history.  It is unimaginable to me that a department of State government charged with the responsibility of teaching our young would not only allow, but mandate that team names, logos and mascots reflecting and paying tribute to that history be "cancelled".

      I respectfully draw your attention to the Wantagh School District which is within the 5ᵗʰ Senatorial District.  Since 1956, Wantagh has used the name "Wantagh Warriors" with the logo

of the profile of an Indian head in full headdress.  It is my understanding that the School District's petition to keep the "Warriors" name has been denied by your office.

What your Department fails to consider is why that name was chosen.  Wantagh is not simply the name of a community.  Wantagh was a person.  Chief Wantagh was the Sachem of the Meroke also known as Merikoke Tribe which occupied southern Nassau County including present-day Wantagh at the time of the arrival of the first European settlers.  Wantagh was also Grand Sachem of the larger Montaukett Indian Tribe from 1651-1658, who's certification as a tribe was erroneously revoked by a 1910 State Supreme Court decision.  As a point of reference, just last month, both the State Senate and State Assembly again unanimously passed legislation attempting to correct this error and restore State recognition of the Montaukett Indian Tribe, which is awaiting the signature of the Governor.

Apart from his role as Sachem of the Meroke tribe, Chief Wantagh's direct ties to the community which now bears his name go back to 1657 when, as Grand Sachem of the Montaukett or (Mantoake) Tribe, Wantagh settled disputes resulting from the 1643 purchase of the lands comprising the modern-day Town of Hempstead, including the area known as modern-day Wantagh.  A copy of the original July 4, 1657 Agreement between the Governor of Manhattan and local tribes bearing the mark of Wantagh as Grand Sachem of the Mantoake, is annexed hereto for your review.  It should be noted, that the Agreement is also signed by Takapasha, who was the Sachem of the Marsapege (Massapequa) Indian Tribe.  From the time of the execution of this agreement settling land disputes, there was a lasting peace between the native tribes and early Dutch and English settlers which inhabited the area.

At the time of the execution of this Agreement, Wantagh was known as Jerusalem which encompassed much of present day north Wantagh and south Levittown.  When the South Shore Railroad (now part of the Long Island Rail Road), came to South Jerusalem in 1867, the railroad station was named Ridgewood, and that name was adopted by the community.  However, in 1891,when the United States Postal Service would not grant Ridgewood a post office due to its conflict in name with Ridgewood, Queens, Thomas Seaman, a descendant of the original Seaman and Jackson families that settled the area of present day Wantagh and Seaford in the 1640's and of John Seaman who himself was a signatory to the 1657 Agreement, led the effort to rename the community in honor of the former Grand Sachem who helped bring peace to the area nearly 250 years before.  A photograph of the historical marker outside of the former Thomas Seaman home built in 1860 and reflecting the town's naming, is also attached for your review.

I have also included copies of two portraits of former Grand Sachem Wantagh, the second created from 1870's photographs of decedents of Wantagh, which are on display at the Wantagh Preservation Society, along with the September 1966 Department of Curriculum Development textbook added to the 7th Grade curriculum by the Wantagh Union Free School District at that time to educate students in local community history including the role of Chief Wantagh.  The choice of the Wantagh Warriors name, logo and mascot is clearly appropriate and consistent with this community's ongoing effort to honor its history and pay tribute to the tribal leader whose contributions made the peaceful development of the area possible.

The State Education Department's state-wide and universal ban on the use of indigenous

names, logos and mascots under the pretext of DASA's charge to create an environment "*free from discrimination, intimidation, taunting, harassment and bullying*" while making absolutely no effort to consider whether the use of such name, logo or mascot, given the history and circumstances of its use, actually creates such an environment, is not only poor policy, but creates a dangerous precedent, particularly in an educational setting. As in the case of Wantagh and other Long Island communities, the arbitrary application of this ban is a potential disservice to students, communities and to the legacy of indigenous peoples who are a rich part of our history which the SED is poised to erase. I would hope that this is not your intent, nor the intent of the Board of Regents.

For that reason, as a member of the New York State Senate and as a concerned resident, I urge you to reconsider your decision concerning the Wantagh Warriors. I also urge that the SED create a mechanism for the individual evaluation of continued use of certain names, logos and mascots based upon community history, purpose and whether its continued use will create an environment which DASA was actually intended to avoid.

I look forward to our meeting and to your prompt response to these concerns. Thank you for your courtesy in this regard.

Very truly yours,

Steven D. Rhoads
Senator – 5th District

cc:     Board of Regents
        New York State Department of Education

        Hon. Senator Shelley B. Mayer
        Chairperson – Education Committee
        New York State Senate

Case 2:23-cv-07299-MKB-LGD   Document 41-11   Filed 09/06/24   Page 5 of 9 PageID #: 642

July the 4th 1657 Stilo novo

Know all men, by these presents, that we the
Indians of Marsapege, Mericoke and Rockaway whose names
be hereunder written for ourselves and all the rest of the Indians
that do claim any right or interest in the purchase that
Hempstead bought in the year 1643, and within the bounds
and limits of the whole tract of land, concluded upon with
the Governor of Manhatans, as it is in this paper specified,
do by these presents, ratify and confirm to them and
their heirs for ever, freely, firmly, quietly and peaceably
for them and their heirs and successors for ever, to enjoy
without any molestation or trouble from us or any that
shall pretend any claim or title unto it. The Montauke
Sacham being present at the confirmation, In witness
hereof whose names be hereunder written have hereunto
subscribed in the presents of us

Richard Gildersleve      The mark of Takapasha the
John Seaman         }    Sachem of Marsapege
John Hicks          }    & The mark of Wantagh the
                         Montouke Sachem

The mark of D Chegonoe, The mark of M Pumeye,
The mark of C Mangoaup, The mark of F Weechabee
The mark of V Pumasackromen The mark of V Cocohay
    Vera Copia Concordans Cum Originali's &c____
        by me John James &c.

A-194

Case 2:23-cv-07299-MKB-LGD   Document 41-11   Filed 09/06/24   Page 6 of 9 PageID #: 643



Case 2:23-cv-07299-MKB-LGD   Document 41-11   Filed 09/06/24   Page 7 of 9 PageID #: 644



A-196



Case 2:23-cv-07299-MKB-LGD   Document 41-11   Filed 09/06/24   Page 9 of 9 PageID #: 646



Case 2:23-cv-07299-MKB-LGD   Document 41-12   Filed 09/06/24   Page 1 of 2 PageID #: 647

# EXHIBIT L

A-199

### WANTAGH UNION FREE SCHOOL DISTRICT
### TO BE ADOPTED ON JUNE 15, 2023

**WHEREAS,** Part 123 of the Regulations of the Commissioner of Education relating to prohibition of the use of Indigenous names, mascots, and logos by public schools was recently adopted and became effective as a permanent rule on May 3, 2023; and

**WHEREAS,** Part 123.3 requires boards of education to commit, via resolution, to eliminating the use of prohibited Indigenous names, mascots, and logos by the end of the 2022-2023 school year;

**WHEREAS,** such resolution must identify a plan to eliminate such prohibited use by no later than the end of the 2024-2025 school year;

**WHEREAS,** the Board of Education of the Wantagh Union Free School District wishes to comply with the Regulation by passing this Resolution before the June 30, 2023 deadline; and

**NOW, THEREFORE, BE IT RESOLVED** that the Board of Education shall eliminate the use of all prohibited "indigenous names, logos, or mascots" including but not limited to use of the "Warrior" team name in accordance with Part 123 of the Regulations of the Commissioner of Education on or before June 30, 2025, in accordance with the attached plan; and

**BE IT FURTHER RESOLVED,** that the Board of Education's commitment to eliminate the use of the "Warrior" team name, as outlined above, shall in no way serve as a waiver or be construed as a waiver of the District's right to, among other things, challenge whether the use of the "Warrior" team name does in fact constitute a prohibited "indigenous name, logo, or mascot" pursuant to Part 123 of the Regulations of the Commissioner of Education; and

**BE IT FURTHER RESOLVED,** that should Part 123 of the Regulations of the Commissioner of Education be repealed and/or determined to be unenforceable by the Commissioner of Education and/or any court of competent jurisdiction, the Board of Education will immediately reinstate the "Warrior" team name and authorize its usage in a manner unconnected with any indigenous imagery.

A-200

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

MASSAPEQUA UNION FREE SCHOOL
DISTRICT, MASSAPEQUA UNION FREE
SCHOOL DISTRICT BOARD OF EDUCATION,
and JEANINE CARAMORE, in her capacity as a
Board of Education Member and a Resident/Parent
of the School Community,

                          Plaintiffs,

                v.

NEW YORK STATE BOARD OF REGENTS,
LESTER W. YOUNG, JR., in his official capacity
as Chancellor of the New York State Board of
Regents, JOSEPHINE VICTORIA FINN, in her
official capacity as Vice Chancellor of the New
York State Board of Regents, ROGER TILLES, in
his official capacity as a member of the New York
State Board of Regents, CHRISTINE D. CEA, in
her official capacity as a member of the New York
State Board of Regents, WADE S. NORWOOD, in
his official capacity as a member of the New York
State Board of Regents, KATHLEEN M. CASHIN,
in her official capacity as a member of the New
York State Board of Regents, JAMES E.
COTRELL, in his official capacity as a member of
the New York State Board of Regents, JUDITH
CHIN, in her official capacity as a member of the
New York State Board of Regents, CATHERINE
COLLINS, in her official capacity as a member of
the New York State Board of Regents,
ELIZABETH S. HAKANSON, in her official
capacity as a member of the New York State Board
of Regents, LUIS O. REYES, in his official
capacity as a member of the New York State Board
of Regents, SUSAN W. MITTLER, in her official
capacity as a member of the New York State Board
of Regents, FRANCES G. WILLS, in her official
capacity as a member of the New York State Board
of Regents, ARAMINA VEGA FERRER, in her
official capacity as a member of the New York
State Board of Regents, SHINO TANIKAWA, in

**MEMORANDUM & ORDER**
23-CV-7052 (MKB)

A-201

her official capacity as a member of the New York
State Board of Regents, ROGER P. CATANIA,
in his official capacity as a member of the New
York State Board of Regents, ADRIAN I. HALE, in
his official capacity as a member of the New York
State Board of Regents,

Defendants.

---------------------------------------------------------------

WANTAGH UNION FREE SCHOOL DISTRICT,
WANTAGH UNION FREE SCHOOL DISTRICT
BOARD OF EDUCATION, ANTHONY GRECO,
in his capacity as a Board of Education Member and
a Resident of the School Community,
WYANDANCH UNION FREE SCHOOL
DISTRICT, WYANDANCH UNION FREE
SCHOOL DISTRICT BOARD OF EDUCATION,
and CHARLIE REED, in his capacity as a Board of
Education Member and a Resident of the School
Community,

Plaintiffs,

v.

NEW YORK STATE BOARD OF REGENTS,
LESTER W. YOUNG, JR., in his official capacity
as Chancellor of the New York State Board of
Regents, JOSEPHINE VICTORIA FINN, in her
official capacity as Vice Chancellor of the New
York State Board of Regents, ROGER TILLES, in
his official capacity as a member of the New York
State Board of Regents, CHRISTINE D. CEA, in
her official capacity as a member of the New York
State Board of Regents, WADE S. NORWOOD, in
his official capacity as a member of the New York
State Board of Regents, KATHLEEN M. CASHIN,
in her official capacity as a member of the New
York State Board of Regents, JAMES E.
COTRELL, in his official capacity as a member of
the New York State Board of Regents, JUDITH
CHIN, in her official capacity as a member of the
New York State Board of Regents, CATHERINE

23-CV-7299 (MKB)

2

COLLINS, in her official capacity as a member of
the New York State Board of Regents,
ELIZABETH S. HAKANSON, in her official
capacity as a member of the New York State Board
of Regents, LUIS O. REYES, in his official
capacity as a member of the New York State Board
of Regents, SUSAN W. MITTLER, in her official
capacity as a member of the New York State Board
of Regents, FRANCES G. WILLS, in her official
capacity as a member of the New York State Board
of Regents, ARAMINA VEGA FERRER, in her
official capacity as a member of the New York
State Board of Regents, SHINO TANIKAWA, in
her official capacity as a member of the New York
State Board of Regents, ROGER P. CATANIA,
in his official capacity as a member of the New
York State Board of Regents, ADRIAN I. HALE, in
his official capacity as a member of the New York
State Board of Regents,

Defendants.

---------------------------------------------------------------

CONNETQUOT CENTRAL SCHOOL DISTRICT,
CONNETQUOT CENTRAL SCHOOL DISTRICT
BOARD OF EDUCATION, and JACLYN
NAPOLITANO-FURNO, in her capacity as a
Board of Education Member and a Resident/Parent
of the School Community,

Plaintiffs,

v.

NEW YORK STATE BOARD OF REGENTS,
LESTER W. YOUNG, JR., in his official capacity
as Chancellor of the New York State Board of
Regents, JOSEPHINE VICTORIA FINN, in her
official capacity as Vice Chancellor of the New
York State Board of Regents, ROGER TILLES, in
his official capacity as a member of the New York
State Board of Regents, CHRISTINE D. CEA, in
her official capacity as a member of the New York
State Board of Regents, WADE S. NORWOOD, in
his official capacity as a member of the New York

23-CV-7696 (MKB)

3

State Board of Regents, KATHLEEN M. CASHIN, in her official capacity as a member of the New York State Board of Regents, JAMES E. COTRELL, in his official capacity as a member of the New York State Board of Regents, JUDITH CHIN, in her official capacity as a member of the New York State Board of Regents, CATHERINE COLLINS, in her official capacity as a member of the New York State Board of Regents, ELIZABETH S. HAKANSON, in her official capacity as a member of the New York State Board of Regents, LUIS O. REYES, in his official capacity as a member of the New York State Board of Regents, SUSAN W. MITTLER, in her official capacity as a member of the New York State Board of Regents, FRANCES G. WILLS, in her official capacity as a member of the New York State Board of Regents, ARAMINA VEGA FERRER, in her official capacity as a member of the New York State Board of Regents, SHINO TANIKAWA, in her official capacity as a member of the New York State Board of Regents, ROGER P. CATANIA, in his official capacity as a member of the New York State Board of Regents, ADRIAN I. HALE, in his official capacity as a member of the New York State Board of Regents,

Defendants.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

I.   Background .................................................................................... 8
  a.   Factual background ...................................................................... 8
    i.    Part 123 ............................................................................ 9
    ii.   Additional guidance ........................................................... 10
    iii.  Actions taken by each school after Part 123 ............................... 11
  b.   Procedural history and oral rulings by the Court ............................ 12
II.  Discussion ................................................................................... 13
  a.   Standards of review .................................................................. 13
    i.    12(b)(1) ............................................................................ 13
    ii.   12(b)(6) ............................................................................ 14

4

b.   Defendants' motion to dismiss ................................................................. 15

i.   School District Plaintiffs' and School Board Plaintiffs' capacity to challenge Part 123 as impermissibly vague and overbroad .......................................... 15

1.   Fourteenth Amendment capacity to sue ........................................... 22

2.   First Amendment capacity to sue ..................................................... 25

ii.   Individual Board Member Plaintiffs' Fourteenth Amendment-based vagueness claims and First Amendment-based overbreadth claims .......................................... 29

1.   Individual Board Member Plaintiffs' Fourteenth Amendment-based as-applied vagueness challenge .......................................................................... 29

A.   Level of scrutiny ......................................................................... 34

B.   Adequate notice ........................................................................... 35

C.   Arbitrary and discriminatory enforcement ................................. 38

2.   Individual Board Member Plaintiffs' Fourteenth Amendment-based facial vagueness challenge .......................................................................... 42

3.   Individual Board Member Plaintiffs' First Amendment-based facial overbreadth challenge to Part 123 .......................................................................... 44

iii.   Individual Board Member Plaintiffs' First Amendment free speech claims ........... 52

1.   Indigenous names, logos, and mascots as government speech ................................. 52

2.   Individual Board Member Plaintiffs' conduct as government speech .................... 58

iv.   Constitutional separation of powers claims ..................................... 71

c.   Preliminary injunction ............................................................................ 78

i.   Likelihood of success or sufficiently serious questions going to the merits ................ 80

ii.   Irreparable harm ...................................................................................... 82

iii.   Balance of harms ...................................................................................... 85

iv.   Public interest ........................................................................................ 87

III.   Conclusion ..................................................................................................... 88

Plaintiffs Massapequa Union Free School District ("Massapequa UFSD"), the

Massapequa UFSD Board of Education ("Massapequa Board"), and Jeanine Caramore,

commenced this action on September 22, 2023, and filed an Amended Complaint on January 16,

2024 against Defendants the New York State Board of Regents and Chancellor Lester W. Young,

Jr., Vice Chancellor Josephine Victoria Finn, and members of the Board of Regents Roger Tilles,

Christine D. Cea, Wade S. Norwood, Kathleen M. Cashin, James E. Cotrell, Judith Chin,

Catherine Collins, Elizabeth S. Hakanson, Luis O. Reyes, Susan W. Mittler, Frances G. Wills, Aramina Vega Ferrer, Shino Tanikawa, Roger P. Catania, and Adrian I. Hale (collectively, the "Individual Defendants") (the "Massapequa Matter''). (Complaint ("Compl."), Docket Entry No. 2; Amended Complaint ("Am. Compl."), Docket Entry No. 24.)

Plaintiffs Wantagh Union Free School District ("Wantagh UFSD"), the Wantagh UFSD Board of Education ("Wantagh Board"), Anthony Greco, the Wyandanch Union Free School District ("Wyandanch UFSD"), the Wyandanch UFSD Board of Education ("Wyandanch Board"), and Charlie Reed commenced this action on September 29, 2023, and filed an Amended Complaint on January 16, 2024 against the New York State Board of Regents and Individual Defendants (the "Wantagh/Wyandanch Matter"). (23-CV-7299 Compl., Docket Entry No. 1; 23-CV-7299 Am. Compl., Docket Entry No. 24.)

Plaintiffs Connetquot Central School District ("Connetquot CSD"), the Connetquot CSD Board of Education ("Connetquot Board"), and Jaclyn Napolitano-Furno commenced this action on October 16, 2023, and filed an Amended Complaint on January 16, 2024 against the New York State Board of Regents and Individual Defendants (the "Connetquot Matter").[1] (23-CV-7696 Compl., Docket Entry No. 1; 23-CV-7696 Am. Compl., Docket Entry No. 20.)

Plaintiffs Massapequa UFSD, Wantagh UFSD, Wyandanch UFSD, and Connetquot CSD (collectively, the "School District Plaintiffs"), Plaintiffs Massapequa Board, Wantagh Board,

---

[1]    Plaintiffs Amityville Union Free School District ("Amityville UFSD"), Amityville UFSD Board of Education ("Amityville Board"), and Jeannette Santos (collectively, "Amityville Plaintiffs") commenced an action on October 26, 2023, and amended their Complaint on January 16, 2024 against Defendants the New York State Board of Regents and Individual Defendants (the "Amityville Matter"). (23-CV-8011 Compl., Docket Entry No. 1; 23-CV-8011 Am. Compl., Docket Entry No. 20.) On October 14, 2024, Amityville Plaintiffs filed a notice of discontinuance, (23-CV-8011 Notice of Voluntary Dismissal, Docket Entry No. 42), and, on October 15, 2024, the Court granted the notice of discontinuance and terminated the Amityville Matter, (23-CV-8011 Order dated Oct. 15, 2024).

A-206

Wyandanch Board, and Connetquot Board (collectively, the "School Board Plaintiffs"), and Plaintiffs Caramore, Greco, Reed, and Napolitano-Furno (collectively, the "Individual Board Member Plaintiffs") challenge Part 123 of Title 8 of the Regulations of the Commissioner of Education in the Official Compilation of Codes, Rules and Regulations of the State of New York.[2] N.Y. Comp. Codes R. & Regs., tit. 8 ("8 NYCRR"), §§ 123.1–123.5 ("Part 123"). In the Amended Complaint, Plaintiffs allege (1) pursuant to Article 78 of the New York Civil Practice Law and Rules ("CPLR"), Part 123 should be nullified because its adoption did not adhere to the rulemaking requirements set forth in the State Administrative Procedure Act ("SAPA"); (2) pursuant to Article 78 of the CPLR, Part 123 should be nullified because in passing Part 123, the New York State Education Department ("SED") exceeded its rulemaking authority in violation of SAPA; (3) Part 123 violates the separation of powers doctrines of the United States and New York State Constitutions; (4) Part 123 is impermissibly vague and overbroad under the First and Fourteenth Amendments; and (5) Part 123.5 impermissibly restricts Individual Board Member Plaintiffs' speech in violation of the First Amendment and Article I, Section 8, of the New York State Constitution by prohibiting them from displaying, on school grounds or at school functions, a prohibited Indigenous team name, logo, and mascots.

Defendants separately move to dismiss Plaintiffs' claims, and Plaintiffs move for a preliminary injunction.[3] For the reasons set forth below, the Court grants Defendants' motion to dismiss the Amended Complaint and denies Plaintiffs' motion for a preliminary injunction.

---

[2] Except as to Individual Board Member Plaintiffs' First Amendment free speech claims, the Court interprets Plaintiffs' Amended Complaint as a challenge to Part 123 in full.

[3] Although the parties filed individual motion papers in each matter, because the briefings are similar, the Court cites to the motion papers filed in the Massapequa Matter (23-CV-7052) unless otherwise indicated. (Defs.' Mot. to Dismiss ("Defs.' Mot."), Docket Entry No. 40; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 40-1; Background &

## I.    Background

### a.    Factual background

In April of 2001, then-SED Commissioner Richard Mills released a memorandum to all public school districts in the State of New York that discussed a study conducted by the SED regarding the impact of New York public schools' use of Native American names, symbols, and mascots, and requested that boards of education in New York end the use of Native American mascots as soon as possible and agree to discuss the matter if they were not ready to act immediately.[4]  (Am. Compl. ¶ 73; 2001 Mills Memo 2.)

In 2010, the New York State Legislature enacted the Dignity for All Students Act ("DASA").  N.Y. Educ. L. §§ 10–18. (Am. Compl. ¶ 58.)  "DASA prohibits bullying[,] harassment, discrimination, and cyberbullying against students in school or at school functions based on their actual or perceived membership in a protected class."  (Id. ¶ 59.)

_____

Frequently Asked Questions Regarding Part 123 of the Reguls. of the Comm'r of Educ. Relating to Prohibiting the Use of Indigenous Names, Mascots, & Logos by Pub. Schs. (May 2023) ("FAQ Guidance"), annexed to Defs.' Mem. as Ex. 1, Docket Entry No. 40-3; Mem. from Richard P. Mills to Presidents of Bds. of Educ. & Superintendents of Schs. (Apr. 5, 2001) ("2001 Mills Memo"), annexed to Defs.' Mem. as Ex. 4, Docket Entry No. 40-6; Pls.' Opp'n to Defs.' Mot. ("Pls.' Opp'n"), Docket Entry No. 41-13; Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 42; Defs.' Suppl. Mem. in Supp. of Defs.' Mot. ("Defs.' Suppl. Mem."), Docket Entry No. 52; Pls.' Suppl. Mem. in Opp'n to Defs.' Mot. ("Pls.' Suppl. Mem."), Docket Entry No. 54; Defs.' Suppl. Reply in Supp. of Defs.' Mot. ("Defs.' Suppl. Reply"), Docket Entry No. 56.)  Similarly, although the parties filed individual motion papers in each matter, because the preliminary injunction briefings are similar, the Court cites to the motion papers filed in the Massapequa Matter (23-CV-7052) unless otherwise indicated.  (Letter Mot. for Prelim. Inj. & Summ. J. ("Pls.' Conf. Mem."), Docket Entry No. 43; Defs.' Mem. in Opp'n to Pls.' Mot. ("Defs.' Conf. Mem."), Docket Entry No. 45; Pls.' Suppl. Mem. in Supp. of Pls.' Mot. ("Pls.' Inj. Mem."), Docket Entry No. 53; Defs.' Suppl. Mem. in Opp'n to Pls.' Mot., ("Defs.' Inj. Mem."), Docket Entry No. 55; Pls.' Suppl. Mem. in Reply to Defs.' Suppl. Inj. Mem. ("Pls.' Inj. Mem. Reply"), Docket Entry No. 58.)

[4]  The Court assumes the truth of the factual allegations in the Amended Complaints for the purpose of deciding Defendants' motion to dismiss and Plaintiffs' motion for a preliminary injunction.

On November 17, 2022, SED Senior Deputy Commissioner for Education Policy, James Baldwin, released a memorandum referencing the development of regulations that would clarify a new policy prohibiting public school districts from using Indigenous team names, imagery, and mascots.  (*See id.* ¶¶ 76–77.)  Two weeks later, on December 1, 2022, the Board of Regents announced that the proposed regulation would be presented for permanent adoption at the April of 2023 Regents meeting and become effective after publication of the proposed amendment and the subsequent sixty-day mandatory public comment period.  (*Id.* ¶ 80.)  On December 28, 2022, the SED released a draft of the regulation, Part 123, which triggered the SAPA-mandated sixty-day public comment period.  (*Id.* ¶¶ 80, 82.)  On April 18, 2023, the Board of Regents voted to adopt Part 123, and Part 123 became effective on May 3, 2023.  (*Id.* ¶ 85.)

### i.    Part 123

Part 123 provides that "no public school in the State of New York may utilize or display an Indigenous name, logo, or mascot other than for purposes of classroom instruction."  8 NYCRR § 123.2.  Part 123 defines "Indigenous name, logo, or mascot" as "a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures, used to represent a public school, including but not limited to such schools['] sports teams."  *Id.* § 123.1.  The regulation "does not [apply to] a public school, school building, or school district named after an Indigenous tribe."  *Id.*

Part 123 required boards of education in New York to "commit, via resolution, to eliminating use of all Indigenous names, logos, and mascots by the end of the 2022–[20]23 school year."  *Id.* § 123.3(a).  These resolutions were required to "identify a plan to eliminate all use of the prohibited name, logo, or mascot within a reasonable time" which could be "no later

9

than the end of the 2024–2025 school year." *Id.* The deadline for these resolutions was June 30, 2023. (Am. Compl. ¶ 86.) Part 123 further requires public schools to "prohibit school officers and employees when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot." 8 NYCRR § 123.5.

Part 123 permits several exceptions. First, it allows New York public schools to utilize an Indigenous name, logo, or mascot if "a written agreement exist[ed] prior to the effective date of [Part 123] between a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation and a public school permitting the use of an Indigenous name, mascot, or logo that is culturally affiliated with such tribe." *Id.* § 123.4(b). Second, it allows recognized tribal nations to "choos[e] to use an Indigenous name, logo, or mascot for a sports team comprised of its tribal members, including . . . a tribal school or intramural league." *Id.* § 123.4(a). Third, it allows "any school officer or employee who is a member of a tribal nation" to "utiliz[e] or promot[e] an Indigenous name, logo, or mascot of such tribal nation." *Id.* § 123.5.

### ii.  Additional guidance

In May of 2023, SED issued further guidance in the form of a frequently asked questions document.[5] (FAQ Guidance 3; 23-CV-7696 Am. Compl. ¶ 130; 23-CV-7299 Am. Compl. ¶

---

[5]  Defendants provided the FAQ Guidance as an exhibit to their motion. On a motion to dismiss, "the district court is normally required to look only to the allegations on the face of the complaint" but "may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)); *see Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230–31 (2d Cir. 2016) (holding that courts may consider on a motion to dismiss "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" and other documents "integral" to the complaint (first quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); and then quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111

159.)  *See also https://www.nysed.gov/sites/default/files/programs/indigenous-education/indigenous-mascot-regulation-background-and-faq.pdf*.  The FAQ Guidance clarified that districts that never used Indigenous imagery in connection with their team name, logo, or mascot would not be required to change it, but that districts that have at any time associated with Indigenous imagery would have to implement changes under Part 123.  (FAQ Guidance 6; 23-CV-7696 Am. Compl. ¶ 130; 23-CV-7299 Am. Compl. ¶ 159.)  The FAQ Guidance also provided an email address through which questions could be sent to the SED Office of Indigenous Education.  (FAQ Guidance 4.)

### iii.  Actions taken by each school after Part 123

The Massapequa, Wantagh, and Wyandanch Boards of Education each passed resolutions in accordance with Part 123 to eliminate their use of Indigenous names, mascots, or logos by the end of the 2024–2025 school year.  (Am. Compl. ¶¶ 87–88; 23-CV-7299 Am. Compl. ¶¶ 102–05, 124–25.)  The Connetquot School District did not pass a resolution pledging to eliminate their use of Indigenous names, mascots, and logos in adherence with Part 123, but did issue a resolution setting forth what actions the Board of Education would take if the district were ultimately required to comply with the regulation.  (23-CV-7696 Am. Compl. ¶¶ 109–12.)

---

(2d Cir. 2010))); *see also, e.g.*, *Glob. Network Commc'ns., Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (finding reversible error where the district court considered defendant's submission of a trial transcript in an unrelated proceeding and relied on it to "make a finding of fact that *controverted* the plaintiff's own factual assertions set out in its complaint").  The FAQ Guidance is referenced in Amended Complaint for the Connetquot and Wantagh/Wyandanch Matters, (23-CV-7696 Am. Compl. ¶ 130; 23-CV-7299 Am. Compl. ¶ 159), and Plaintiffs cite to the document in its opposition, (*see* Pls.' Opp'n 6).  The Court therefore considers the FAQ Guidance as integral to the Amended Complaints.

### b.   Procedural history and oral rulings by the Court

On September 6, 2024, Defendants moved to dismiss all actions for failure to state a claim, lack of capacity, and lack of jurisdiction.  (Defs.' Mot 2.)  On September 13, 2024, Plaintiffs sought a pre-motion conference to move for summary judgment and a preliminary injunction, (Pls.' Conf. Mem. 1), which Defendants opposed, (Defs.' Conf. Mem. 1–3).

On October 22, 2024, the Court heard oral arguments from the parties regarding Defendants' motion to dismiss and Plaintiffs' proposed motions for summary judgment and a preliminary injunction.  (Min. Order dated Oct. 22, 2024.)  During the conference, the Court also partially ruled on Defendants' motion to dismiss.  For the reasons discussed on the record, the Court declined to exercise supplemental jurisdiction over Plaintiffs' claims under Article 78 of the CPLR that (1) Part 123 should be nullified because its adoption did not adhere to the rulemaking requirements set forth in SAPA, and  (2) in passing Part 123, the SED exceeded its rulemaking authority in violation of SAPA, and dismissed both claims without prejudice.[6]  (*Id.*)

The Court reserved decision on Plaintiffs' claims that (1) Part 123 is impermissibly vague and overbroad under the First and Fourteenth Amendments; (2) Part 123.5 impermissibly restricts Individual Board Member Plaintiffs' speech in violation of the First Amendment and Article I, Section 8, of the New York State Constitution because it prohibits them from displaying, on school grounds or at school functions, a prohibited Indigenous team name, logo, and mascots;[7] and (3) Part 123 violates the separation of powers doctrines of the United States

---

[6]  As discussed on the record, the Court determined that the Article 78 proceedings were time-barred.  (Tr. of Mot. Hr'g ("Hr'g Tr.") 28:14–29:12.)  However, at Plaintiffs' request, the Court declined to exercise supplemental jurisdiction over Plaintiffs' claims.  (Min. Order dated Oct. 22, 2024; Hr'g Tr. 29:13–30:12.)

[7]  The Court also found that there was no basis for Plaintiffs to move for summary judgment because the legal issues Plaintiffs sought to present on summary judgment were the

and New York State Constitutions.  (*Id.*)  The Court directed the parties to file briefing on any additional legal arguments regarding Plaintiffs' motion for preliminary injunction.  (*Id.*)

On November 5, 2024, Plaintiffs filed a supplemental memorandum in support of their motion for preliminary injunction.  (Pls.' Inj. Mem.)  On November 19, 2024, Defendants filed a supplemental memorandum in opposition to Plaintiffs' motion for preliminary injunction, (Defs.' Inj. Mem.), and on December 6, 2024, Plaintiffs filed a reply to Defendants' supplemental memorandum in opposition to Plaintiffs' motion for preliminary injunction, (Pls.' Inj. Mem. Reply).

## II.  Discussion

### a.  Standards of review

#### i.  12(b)(1)

A district court may dismiss an action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure when the court "lacks the statutory or constitutional power to adjudicate it."  *Huntress v. United States*, 810 F. App'x 74, 75 (2d Cir. 2020) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)); *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (quoting *Makarova*, 201 F.3d at 113); *Shabaj v. Holder*, 718 F.3d 48, 50 (2d Cir. 2013) (per curiam) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)). "'[C]ourt[s] must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff,' but 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting

_____

same legal issues presented in the motions to dismiss, (Hr'g Tr. 30:22–31:24, 62:6–9), and therefore denied Plaintiffs' request to move for summary judgment, (Min. Order dated Oct. 22, 2024; Hr'g Tr. 61:12–13).

it.'" *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted) (first quoting *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006); and then quoting *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003)), *aff'd*, 561 U.S. 247 (2010). Ultimately, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (quoting *Makarova*, 201 F.3d at 113); *see also Suarez v. Mosaic Sales Sols. US Operating Co.*, 720 F. App'x 52, 53 (2d Cir. 2018) ("[T]he party asserting subject matter jurisdiction must demonstrate its existence by a preponderance of the evidence." (citing *Morrison*, 547 F.3d at 170)); *Clayton v. United States*, No. 18-CV-5867, 2020 WL 1545542, at *3 (E.D.N.Y. Mar. 31, 2020) (quoting *Tandon*, 752 F.3d at 243); *Fed. Deposit Ins. Corp. v. Bank of N.Y. Mellon*, 369 F. Supp. 3d 547, 552 (S.D.N.Y. 2019) (quoting *Tandon*, 752 F.3d at 243).

### ii. 12(b)(6)

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court "must construe [the Complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff['s] favor." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021) (citing *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019)); *see also Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009)); *see also Roe v. St. John's Univ.*, 91 F.4th 643, 651 (2d Cir. 2024) (quoting *Matson*, 631 F.3d at 63); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *Roe*, 91 F.4th at 651 ("Although all factual allegations contained in the complaint are assumed to be true, this rule does not extend 'to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" (quoting *Iqbal*, 556 U.S. at 678)).

### b.  Defendants' motion to dismiss

Defendants move to dismiss Plaintiffs' remaining claims: (1) Part 123 is impermissibly vague and overbroad under the First and Fourteenth Amendments; (2) Part 123 impermissibly restricts Individual Board Member Plaintiffs' speech in violation of the First Amendment and Article I, Section 8, of the New York State Constitution by prohibiting them from displaying, on school grounds or at school functions, a prohibited Indigenous team name, logo, and mascots; and (3) Part 123 violates the separation of powers doctrines of the United States and New York State Constitutions. Before addressing each claim, the Court first addresses Defendants' argument that School District Plaintiffs and School Board Plaintiffs lack capacity to sue.

### i.  School District Plaintiffs' and School Board Plaintiffs' capacity to challenge Part 123 as impermissibly vague and overbroad

Defendants argue that School District Plaintiffs and School Board Plaintiffs lack capacity to sue New York state officials for violations of the First Amendment or Fourteenth Amendment because they are municipal entities. (Defs.' Mem. 17–18, 24–25.) First, Defendants argue that none of the first three exceptions to New York's capacity-to-sue rule — express statutory authority, proprietary interest, and interference with a municipality's home rule powers — apply.

(*Id.* at 18.)  Defendants argue these exceptions are inapplicable because "Plaintiffs assert no statutory right to sue," "do not have a proprietary interest in a specific fund of monies," and "assert [no] claim that Part 123 violates the home rule provision of the New York Constitution." (*Id.*)  Second, Defendants contend that the fourth exception — the constitutional proscription exception — is inapplicable because "complying with Part 123 would not force Plaintiffs to violate any constitutional proscriptions."  (*Id.*)  In support, Defendants argue that the constitutional proscription exception to the capacity-to-sue rule is inapplicable because "the [S]chool [D]istrict Plaintiffs and [S]chool [B]oard Plaintiffs do not allege that [sections] 123.1 through 123.4 offend the First Amendment," rather, the First Amendment "claim is asserted only by the [I]ndividual [Board Member] Plaintiffs, in their personal capacity."  (Defs.' Reply 10–11.) Defendants also argue that, "even if school districts' compliance with [section] 123.5 could force them to violate the First Amendment rights of school officials and employees," School District Plaintiffs and School Board Plaintiffs would still lack capacity to sue because they do not allege that the provisions they challenge force them to violate the First Amendment.  (*Id.*)  Third, Defendants argue that School District Plaintiffs and School Board Plaintiffs lack capacity to bring a Fourteenth Amendment-based vagueness claim because "municipalities and municipal officials are not 'persons' within the meaning" of the Fourteenth Amendment.[8]  (Defs.' Mem. 24–25.)

---

[8]  Defendants do not challenge Individual Board Member Plaintiffs' personal capacity to sue under the separation of power doctrines of the United States or New York State Constitutions, the First Amendment, or the Fourteenth Amendment.  (*See generally* Defs.' Mem. 16–29; Hr'g Tr. 20:24–21:8.)  The Court therefore does not address their personal capacity to sue in this Memorandum and Order, and Individual Board Member Plaintiffs' arguments made in their personal capacity are addressed on the merits.  In addition, although Defendants make no argument as to Individual Board Member Plaintiffs' capacity to sue in their official capacity, the Court finds that, as municipal officials, Individual Board Member Plaintiffs "lack capacity to

Plaintiffs acknowledge that municipal entities "generally lack capacity to attack actions by the State and its Legislature on constitutional grounds," (Pls.' Opp'n 21–23), but argue that the fourth exception to the capacity-to-sue rule — the constitutional proscription exception — applies to their claims for violations of the First and Fourteenth Amendments, (*id.* at 22).[9]  In support, Plaintiffs argue that while municipal entities "may not assert a *substantive* claim for protection of their rights under the Fourteenth Amendment," municipal entities "can [still] challenge a state regulation under the Fourteenth Amendment."  (*Id.* at 22–23.)  Plaintiffs further argue that complying with Part 123 "would result in a violation of school officials and employees' First Amendment rights" or require them to "face draconian penalties" such as "the withholding of State Aid and/or removal of school officers."[10]  (*Id.* at 22.)

---

mount constitutional challenges to acts of the State and State legislation" in their official capacity.  *See In re World Trade Ctr. Lower Manhattan Disaster Site Litig. ("In re World Trade Ctr. I")*, 846 F.3d 58, 63 (2d Cir. 2017) ("[M]unicipalities and . . . their officers lack capacity to mount constitutional challenges to acts of the State and State legislation." (quoting *City of New York v. State of New York*, 86 N.Y.2d 286, 291 (1995)); *Blakeman v. James*, No. 24-CV-1655, 2024 WL 3201671, at *12 (E.D.N.Y. Apr. 4, 2024) ("Municipal officials . . . suffer the same lack of capacity to sue the State with the municipal corporate bodies they represent." (quoting City of New York, 86 N.Y.2d at 291)).

[9]  School District Plaintiffs and School Board Plaintiffs only rely on the fourth exception — the constitutional proscription exception — to New York's capacity-to-sue rule, and the Court therefore only addresses this exception.

[10]  Defendants further contend that School District Plaintiffs and School Board Plaintiffs lack capacity to sue New York state officials for violations of a separation of powers doctrine under the United States Constitution.  (Defs.' Opp'n 16–18.)  Plaintiffs fail to make any argument in support of School District Plaintiffs' and School Board Plaintiffs' capacity to sue under the United States Constitution separation of powers doctrine.  Plaintiffs also cite no cases where the federal separation of powers doctrine has been used to support municipal capacity to sue, and the Court is not aware of any.  The Court therefore does not address this unsupported claim as asserted by the School District Plaintiffs, School Board Plaintiffs, and Individual Board Member Plaintiffs in their official capacity.  The Court does address the separation of powers claim brought under the United States Constitution by Individual Board Member Plaintiffs in their personal capacity.  (*See infra* n.27.)

Legal capacity is governed by Federal Rule of Civil Procedure 17(b).  *See La Russo v. St. George's Univ. Sch. of Med.*, 747 F.3d 90, 95 (2d Cir. 2014).  "Rule 17(b) of the Federal Rules of Civil Procedure provides . . . that state law governs whether a party has capacity to be sued."[11]  *Id.*  "Rule 17(b) [of the Federal Rules of Civil Procedure] provides rules for determining the capacity to sue or be sued of 'an individual,' 'a corporation,' and 'all other parties.'"  *Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 97 (2d Cir. 2021) (quoting Fed. R. Civ. P. 17); *La Russo*, 747 F.3d 90, 95 (2d Cir. 2014) ("Capacity to sue or be sued is determined as follows: . . . (3) for all other parties [other than an individual or corporation], by the law of the state where the court is located . . . ." (quoting Fed. R. Civ. P.

---

[11]  Rule 17(b) does not expressly address municipalities/local governments, but the Court of Appeals for the Tenth Circuit, Eleventh Circuit, and district courts in the Second Circuit have interpreted Rule 17(b)(3) to include government agencies and municipalities.  *See Turner v. Homestead Police Dep't*, 828 F. App'x 541, 544 (11th Cir. 2020) ("As to the police department, its ability to sue or be sued is 'determined by the law of the state in which the district court is held.'" (quoting *Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir. 1992))); *Dean*, 951 F.2d at 1214 (quoting Fed. R. Civ. P. 17(b)(3)); *Brodzki v. Topeka Police Dep't*, 437 F. App'x 641, 643 (10th Cir. 2011) (determining that, under Rule 17(b), Kansas state law governed a party's capacity to sue or be sued in federal court, including parties such as "subdivisions, agencies, or departments of governmental entities" (citations omitted); *Town of Babylon v. James*, 707 F. Supp. 3d 213, 221 (E.D.N.Y. 2023) (explaining that under Rule 17(b) "the capacity of a governmental entity to sue or be sued is a question of state law" (quoting *Orraca v. City of New York*, 897 F. Supp. 148, 152 (S.D.N.Y. 1995)); *Callahan v. City of New Haven Dep't of Hum. Res.*, No. 18-CV-488, 2019 WL 1052181, at *1 (D. Conn. Mar. 5, 2019) (finding that a municipality has capacity to sue or be sued after determining that Rule 17(b)(3) applies); *Yonkers Comm'n on Hum. Rts. v. City of Yonkers*, 654 F. Supp. 544, 551 (S.D.N.Y. 1987) ("The capacity of the Commission to sue or be sued must be determined by the law of the State of New York, in accordance with Rule 17(b) . . . ."); *see also Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 393 (4th Cir. 2014) (explaining that "the law of the state in which the district court sits determines an entity's capacity to be sued," including entities such as the city state's attorney's office (citing Fed. R. Civ. P. 17(b))); *SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28, 38 (1st Cir. 2008) (analyzing a town conservation commission's capacity to be sued under 17(b)(3)); *Streit v. Cnty. of Los Angeles*, 236 F.3d 552, 565 (9th Cir. 2001) ("Under Rule 17(b) of the Federal Rules of Civil Procedure, the Police Department's capacity to be sued in federal court is to be determined by the law of California." (quoting *Shaw v. Cal. Dep't of Alcoholic Beverage Control*, 788 F.2d 600, 604 (9th Cir. 2001)).

17(b))); *see also Town of Babylon v. James*, 707 F. Supp. 3d 213, 221 (E.D.N.Y. 2023) ("Legal

capacity is governed by Federal Rule of Civil Procedure 17(b)." (quoting *Centro De La*

*Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 954 F. Supp. 2d 127, 136

(E.D.N.Y. 2013), *aff'd*, 868 F.3d 104 (2d Cir. 2017))); *Blakeman v. James*, No. 24-CV-1655,

2024 WL 3201671, at *11 (E.D.N.Y. Apr. 4, 2024).  Under Rule 17(b), state law governs

whether municipal entities have capacity to sue.  *See La Russo*, 747 F.3d at 95 ("[S]tate law

governs whether a party [other than an individual or corporation] has capacity to be sued.");

*Town of Babylon*, 707 F. Supp. 3d at 221 (explaining that under Rule 17(b) "the capacity of a

governmental entity to sue or be sued is a question of state law" (quoting *Orraca v. City of New*

*York*, 897 F. Supp. 148, 152 (S.D.N.Y. 1995))); *see, e.g., Hartke ex rel. Est. of Hartke v.*

*Bonhams & Butterfields Auctioneers Corp.,* No. 24-258, 2024 WL 4380315, at *1–2 (2d Cir.

Oct. 3, 2024) (applying New York state law to affirm a judgment that the plaintiff lacked

capacity to sue on behalf of her uncle's estate); *In re World Trade Ctr. Lower Manhattan*

*Disaster Site Litig.* ("*In re World Trade Ctr. I*"), 846 F.3d 58, 60 (2d Cir. 2017) (applying New

York law "to determine whether . . . a public benefit corporation[] has the capacity to challenge a

New York State claim-revival statute as unconstitutional under the New York State

[C]onstitution"); *Blakeman*, 2024 WL 3201671, at *1, *12 (applying New York law to determine

whether a municipality and municipal executive "lack[ed] the capacity to sue [the New York

State d]efendants for the equal protection claim pled in the [c]omplaint" under the U.S.

Constitution); *see also Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 393 (4th Cir. 2014)

(determining that, under Rule 17(b), Maryland state law governed a party's capacity to sue the

state's attorney's office); *Brodzki v. Topeka Police Dep't*, 437 F. App'x 641, 643 (10th Cir.

2011) (determining that, under Rule 17(b), Kansas state law governed a party's capacity to sue or

be sued in federal court, including parties such as "subdivisions, agencies, or departments of

governmental entities" (citations omitted)); *Dean v. Barber*, 951 F.2d 1210, 1214–15 (11th Cir.

1992) (determining that, under Rule 17(b), Alabama state law governed a party's capacity to sue

a county sheriff department).

    New York law provides that "municipalities and other local governmental corporate

entities and their officers lack capacity to mount constitutional challenges to acts of the State and

State legislation." *City of New York v. State of New York*, 86 N.Y.2d 286, 289 (1995).  *See In re*

*World Trade Ctr. Lower Manhattan Disaster Site Litig.* ("*In re World Trade Ctr. II*"), 892 F.3d

108, 110–11 (2d Cir. 2018) (explaining that a "public benefit corporation is treated like any other

state entity and is subject to the 'general rule' that 'state entities lack capacity to challenge the

constitutionality of a state statute'" (quoting *In re World Trade Ctr. Lower Manhattan Disaster*

*Site Litig.* ("*In re World Trade Ctr. III*")*, 30 N.Y.3d 377, 383, 387 (2017))); *see also Aguayo v.*

*Richardson*, 473 F.2d 1090, 1101 (2d Cir. 1973) ("The City lacks standing to assert

constitutional claims against the State."); *Blakeman*, 2024 WL 3201671, at *11 ("Capacity to sue

is a threshold matter allied with, but conceptually distinct from, the question of standing"

(quoting *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 403 F. Supp. 3d 257, 267

(S.D.N.Y. 2019))).  Municipal entities are "purely creatures or agents of the State" and "cannot

have the right to contest the actions of their principal or creator affecting them in their

governmental capacity or as representatives of their inhabitants." *Town of Babylon*, 707 F. Supp.

3d at 222 (quoting *City of New York*, 86 N.Y.2d at 289–90); *see also Slattery v. Hochul*, 61 F.4th

278, 287 n.1 (2d Cir. 2023) ("The Supreme Court has held that the Fourteenth Amendment

incorporates the protections of the First Amendment against state governments."); *City of New*

*York v. Richardson*, 473 F.2d 923, 929 (2d Cir. 1973) ("[A] municipal corporation, created by a

state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator." (quoting *Williams v. Mayor & City Council of Balt.*, 289 U.S. 36, 40 (1933))); *City of New Rochelle v. Town of Mamaroneck*, 111 F. Supp. 2d 353, 364 (S.D.N.Y. 2000) ("It has long been the case that a municipality may not invoke the protections of the Fourteenth Amendment against its own state." (citing *City of Newark v. New Jersey*, 262 U.S. 192, 196 (1923)). "This rule 'flows' from the recognition that 'municipal corporate bodies — counties, towns[,] and school districts — are merely subdivisions of the State, created by the State for the convenient carrying out of the State's governmental powers and responsibilities as its agents.'" *Blakeman*, 2024 WL 3201671, at *12 (quoting *City of New York*, 86 N.Y.2d at 289); *In re World Trade Ctr. I*, 846 F.3d at 63 ("This rule is also a 'necessary outgrowth of the separation of powers doctrine'" and similarly "expresses the extreme reluctance of courts to intrude in the political relationships between the Legislature, the State and its governmental subdivisions." (citing *City of New York*, 86 N.Y.2d at 296)). Municipal officials, like the municipal entities they represent, lack of capacity to sue the State. *In re World Trade Ctr. I*, 846 F.3d at 63 (explaining that "[municipal] officers lack capacity to mount constitutional challenges to acts of the State and State legislation." (citing *City of New York*, 86 N.Y.2d at 289)); *Merola v. Cuomo*, 427 F. Supp. 3d 286, 291 (N.D.N.Y. 2019) ("[M]unicipalities, and, by extension, their officers, lack capacity to sue because they 'are merely subdivisions of the State, created by the State for the convenient carrying out of the State's governmental powers and responsibilities as its agents.'" (quoting *City of New York*, 86 N.Y.2d at 290)); *Blakeman*, 2024 WL 3201671, at *12 ("Municipal officials . . . suffer the same lack of capacity to sue the State with the municipal corporate bodies they represent." (quoting *City of New York*, 86 N.Y.2d at 291)); *City of New York*, 86 N.Y.2d at 291 ("Municipal officials and

members of municipal administrative or legislative boards suffer the same lack of capacity to sue

the State with the municipal corporate bodies they represent." (citing *Williams*, 289 U.S. at 40)).

The New York Court of Appeals has recognized four "narrow" exceptions to the general

rule that municipalities and municipal officials lack capacity to mount constitutional challenges

to State action and legislation:

> (1) where a public corporation has express statutory authorization to
> bring suit; (2) where the legislation adversely affects a public
> corporation's proprietary interest in a specific fund of moneys; (3)
> where the statute impinges upon 'Home Rule' powers of a public
> corporation constitutionally guaranteed under article IX of the New
> York State Constitution; and (4) where the public corporation
> asserts that, if it is obliged to comply with the statute, that very
> compliance will force the corporation to violate a constitutional
> proscription.

*In re World Trade Ctr. I*, 846 F.3d at 63–64 (citing *City of New York*, 86 N.Y.2d at 291–92);

*Town of Babylon*, 707 F. Supp. 3d at 222 (quoting *In re World Trade Ctr. I*, 846 F.3d at 63); *see*

*also In re World Trade Ctr. III*, 30 N.Y.3d at 387 (emphasizing "that the exceptions we have

recognized to date are narrow.").

### 1.  Fourteenth Amendment capacity to sue

Plaintiffs' arguments in support of School District Plaintiffs' and School Board Plaintiffs'

capacity to sue under the Fourteenth Amendment, (Pls.' Opp'n 21–23), are meritless.[12]

The law is well-established that municipal entities lack capacity to sue their State creators

under the Fourteenth Amendment.  *See City of Newark*, 262 U.S. at 196 ("The city cannot invoke

the protection of the Fourteenth Amendment against the state."); *Richardson*, 473 F.2d at 929

(holding that "[p]olitical subdivisions of a state may not challenge the validity of a state statute

---

[12]  The Court first addresses the capacity of School District Plaintiffs and School Board Plaintiffs to sue under the Fourteenth Amendment and subsequently addresses their capacity to sue under the First Amendment.

under the Fourteenth Amendment"); *City of New Rochelle*, 111 F. Supp. 2d at 364 (explaining that "[i]t has long been the case that a municipality may not invoke the protections of the Fourteenth Amendment against its own state" (citing *City of Newark*, 262 U.S. at 196)); *Town of Babylon*, 707 F. Supp. 3d at 218, 227 (finding the municipal "[p]laintiffs lack capacity under New York state law to bring this action, and this court thus lacks jurisdiction to hear any dispute" where the plaintiffs challenged a New York mental hygiene for, *inter alia*, substantive due process and equal protection violations); *Blakeman*, 2024 WL 3201671, at *1, *12 (finding that Nassau County and the Nassau County Executive, as municipal entities, lack capacity to sue New York state for a Fourteenth Amendment violation); *see also City of New York*, 86 N.Y.2d at 289 ("Despite their contrary claims, the traditional principle throughout the United States has been that municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation."); *Cmty. Bd. 7 of Borough of Manhattan v. Schaffer*, 84 N.Y.2d 148, 155–56 (1994) ("Being artificial creatures of statute, [governmental] entities have neither an inherent nor a common-law right to sue"); *Vill. of Arlington Heights v. Reg'l Transp. Auth.*, 653 F.2d 1149, 1152 (7th Cir. 1981) (explaining that the Supreme Court has held that cities cannot invoke Fourteenth Amendment protections against the State and "[t]that principle is well established in the federal courts" (first citing *City of Newark*, 262 U.S. at 196; and then quoting *Richardson*, 473 F.2d at 929)).

Plaintiffs' reliance on *City of New Rochelle* to support their claim that municipal entities may bring constitutional challenges under the Fourteenth Amendment is misplaced.  Plaintiffs assert that while "municipal entities may not assert a *substantive* claim for protection of their rights under the Fourteenth Amendment," they "can challenge a state regulation under the Fourteenth Amendment" and contend that *City of New Rochelle* disposed of the city's Fourteenth

Amendment-based vagueness claim on the merits. (Pls.' Opp'n 23.) In *City of New Rochelle*, the court determined that the city, as a municipal entity, lacked standing to challenge another town's ordinance on the basis that the ordinance violated the city's rights to due process and equal protection under the Fifth Amendment and Fourteenth Amendment. *See City of New Rochelle*, 111 F. Supp. 2d at 364. Like the city in *City of New Rochelle*, School District Plaintiffs and School Board Plaintiffs are municipal entities challenging the constitutionality of state action under the Fourteenth Amendment. *See City of New Rochelle*, 111 F. Supp. 2d at 363–64 (explaining that as "a municipal corporation organized under the laws of New York state, . . . [plaintiff] cannot maintain a claim" under the due process and equal protection clauses of the Fifth and Fourteenth Amendments). Plaintiffs contend that *City of New Rochelle* permits municipal entities to assert a constitutional challenge, but neither *City of New Rochelle* nor any of the other cases cited by Plaintiffs state that a municipal plaintiff may assert a claim against the State under the Fourteenth Amendment. *See City of New Rochelle*, 111 F. Supp. 2d at 364 ("[W]hile municipalities or other state political subdivisions may challenge the constitutionality of state legislation on certain grounds and in certain circumstances [such as under the Supremacy Clause], these do not include challenges brought under the Due Process or Equal Protection Clauses of the Fourteenth Amendment." (citations omitted)); *see also Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 459 (1982) (addressing the limited issue of "whether an elected local school board may use the Fourteenth Amendment to *defend* its program of busing for integration from attack by the State" — not whether the school board had standing or capacity to sue the State); *Town of Babylon*, 707 F. Supp. 3d at 221, 227–30 (finding that the municipal plaintiffs lacked standing and capacity to sue New York State under the Fourteenth Amendment and finding it "unnecessary to conduct any further analysis of the question posed by the non-

controlling decision in *City of New Rochelle*" because "its analysis [was] inapplicable to the instant case").  Moreover, neither School Districts Plaintiffs nor School Board Plaintiffs are "persons" under the Fourteenth Amendment.  *See County of Chautauqua v. Shah*, 6 N.Y.S.3d 334, 337 (N.Y. App. Div. 2015) ("conclud[ing] that '[m]unicipalities cannot challenge state action on federal constitutional grounds because they are not "persons" within the meaning of the Due Process Clause'" (second alteration in original) (quoting *City of E. St. Louis v. Circuit Ct. for Twentieth Jud. Circuit, St. Clair County, Ill.*, 986 F.2d 1142, 1144 (7th Cir. 1993))), *aff'd sub nom. County of Chemung v. Shah*, 28 N.Y.3d 244 (2016); *Livnat v. Palestinian Auth.*, 851 F.3d 45, 48 (D.C. Cir. 2017) ("Constitutional limits on the personal jurisdiction of the courts do not protect entities that are not covered by the Due Process Clause, and the language of the Clause speaks only of 'persons.'" (citing U.S. Const. amend. V)); *Vill. of Arlington Heights*, 653 F.2d at 1152 ("Municipal governmental entities have never been held to be 'persons' within the meaning of the [Fourteenth] amendment, which was intended to guard the liberty and property of natural persons and corporations." (quoting *People v. Valentine*, 50 Ill. App. 3d 447, 452 (Ill. App. Ct. 1977)).  Thus, School District Plaintiffs and School Board Plaintiffs lack capacity to sue under the Fourteenth Amendment and cannot bring a Fourteenth Amendment-based as-applied or facial vagueness claim.

### 2.   First Amendment capacity to sue

The Court finds that School District Plaintiffs and School Board Plaintiffs also lack capacity to sue for violations of the First Amendment because they have not alleged that, if obliged to comply with Part 123, they would violate the constitutional rights of school officials

and employees.  Although the First Amendment contains a constitutional proscription,[13] the only

First Amendment-based claim of School District Plaintiffs and School Board Plaintiffs

challenges Part 123 for being impermissibly broad — not for requiring them to violate a

constitutional proscription.[14]  (Am. Compl. ¶¶ 134–49 (alleging that Part 123 "creates an

unnecessary risk of chilling the speech and expression of school employees, and the school

community at large, in violation of the First Amendment" overbreadth doctrine)); *In re World

Trade Ctr. I*, 846 F.3d at 63–64 ("[W]here the public corporation asserts that, if it is obliged to

comply with the statute, that very compliance will force the corporation to violate a

constitutional proscription" (citing *City of New York*, 86 N.Y.2d at 292)); *Town of Babylon*, 707

F. Supp. 3d at 222 (noting that the fourth exception to New York's capacity-to-sue rule requires

that a public corporation assert that "compliance will force the corporation to violate a

constitutional proscription" (quoting *In re World Trade Ctr. I*, 846 F.3d at 63)); *Blakeman*, 2024

WL 3201671, at *12 (explaining that "the capacity-to-sue rule has been applied to bar . . . public

entities from challenging a wide variety of state actions" including, *inter alia*, "special

---

[13]  *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the Freedom of Speech"); *Merola v. Cuomo*, 427 F. Supp. 3d 286, 292 (N.D.N.Y. 2019) (explaining that there was "[n]o proscription evident" in the Supremacy Clause "unlike, for example, the First Amendment[]").

[14]  Defendants argue that the constitutional proscription exception to the capacity-to-sue rule is inapplicable because "the [S]chool [D]istrict Plaintiffs and [S]chool [B]oard Plaintiffs do not allege that [sections] 123.1 through 123.4 offend the First Amendment," rather, the First Amendment "claim is asserted only by the [I]ndividual [Board Member] Plaintiffs, in their personal capacity."  (Defs.' Reply 10–11.)  However, the Court notes that Plaintiffs do not specify which section numbers of Part 123 they are challenging on overbreadth grounds.  (*See generally* Am. Compl. ¶¶ 134–49.)

26

exemptions from local real estate tax assessments" and "laws mandating that counties make

certain expenditures" (quoting *In re World Trade Ctr. III.*, 30 N.Y.3d at 387)).[15]

School District Plaintiffs and School Board Plaintiffs rely on *Herzog v. Board of

Education of Lawrence Union Free School District* and *New York State Coalition of Public

Employers v. New York State Department of Labor* to argue that they have capacity to sue for

constitutional violations of state statutes under the constitutional proscription exception.  (Pls.'

---

[15]  The Court notes that, although School District Plaintiffs and School Board Plaintiffs
contend they can challenge the constitutionality of Part 123 under the First Amendment-based
overbreadth doctrine, (Pls.' Opp'n 23–27), several courts have expressed doubt that the First
Amendment provides protections to government entities.  *See McCutcheon v. Fed. Election
Comm'n*, 572 U.S. 185, 206 (2014) ("The whole point of the First Amendment is to afford
individuals protection against [laws that restrict free speech].  The First Amendment does not
protect the government . . . '"  (citations omitted)); *Columbia Broad. Sys., Inc. v. Democratic
Nat'l Comm.*, 412 U.S. 94, 139 (1973) (Stewart, J., concurring) ("The First Amendment protects
the press from governmental interference; it confers no analogous protection on the
government."); *see also Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 701 F. Supp. 2d 568,
599–602 (S.D.N.Y. 2010) (noting that "some courts have expressed doubt that the First
Amendment's protections apply at all to government actors," but finding that "government actors
are afforded some measure of protection under . . . the First Amendment to petition when they
lawfully do so"); *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 430 F. Supp. 2d 222,
264 n.34 (S.D.N.Y. 2006) ("[T]he Court notes that public libraries, as government entities, hold a
somewhat different position vis-a-vis the First Amendment than do NGOs.  Indeed, there is a
significant question as to whether a government entity may invoke the protections of the First
Amendment at all."  (citation omitted)), *aff'd*, 651 F.3d 218 (2d Cir. 2011), *aff'd sub nom.
Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 133 (2013); *Libin v. Town of
Greenwich*, 625 F. Supp. 393, 396 (D. Conn. 1985) ("Although there is little law on the subject,
it must be obvious that a state actor does not have a First Amendment right of free expression . .
." (citing Mark G. Yudoff, *When Government Speaks: Politics, Law, and Government Expression
in America* 42–50 (1983))); *Nat'l Foreign Trade Council v. Natsios,* 181 F.3d 38, 61 (1st Cir.
1999) (explaining that "the First Circuit has expressed doubt [that local governments have First
Amendment rights], holding that a legal services office of a state university lacks such rights, and
saying that 'a state entity[] itself has no First Amendment rights'" (quoting *Student Gov't Ass'n v.
Bd. of Trustees,* 868 F.2d 473, 481 (1st Cir. 1989) (alteration in original))), *aff'd sub nom. Crosby
v. Nat'l Foreign Trade Council,* 530 U.S. 363 (2000); *Warner Cable Commc'ns, Inc. v. City of
Niceville,* 911 F.2d 634, 638 (11th Cir. 1990) (finding that a government "speaker is not itself
protected by the [F]irst [A]mendment"); *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033,
1038 (5th Cir. 1982) (noting that the plaintiffs' argument that the First Amendment does not
confer any rights on governments "may be essentially correct").

Opp'n 22 (first citing *Herzog v. Bd. of Educ. of Lawrence Union Free Sch. Dist.*, 652 N.Y.S.2d 473 (1996); and then citing *New York State Coal. of Pub. Emps. v. New York State Dep't of Lab.*, 441 N.Y.S.2d 878 (N.Y. Sup. Ct. 1981), *modified*, 456 N.Y.S.2d 465 (N.Y. App. Div. 1982), *aff'd*, 60 N.Y.2d 789, (1983)).  However, these cases are distinguishable as neither involved a First Amendment-based overbreadth challenge to a state statute.  *Herzog*, 652 N.Y.S.2d at 477–78 (finding that, while the respondent school district had capacity to challenge the constitutionality of a retirement law on the grounds that it violated a constitutional proscription against making a gift, the retirement law was constitutional); *New York State Coal. of Pub. Emps*, 441 N.Y.S.2d at 880 (finding that school districts had standing to challenge a statute because section 27-a of the Labor Law "specifically authorizes persons adversely affected to commence an [a]rticle 78 proceeding," the school districts were "entities directly affected by the promulgation of the standards," and because the challenge involved "neither the validity of the statute, nor a limitation on municipal powers").[16]  Accordingly, School District Plaintiffs and School Board Plaintiffs lack capacity to sue for First Amendment violations and therefore cannot bring a First Amendment-based overbreadth claim.

---

[16]  School District Plaintiffs and School Board Plaintiffs argue that they have capacity to sue because all Plaintiffs "have plausibly alleged the enforcement of Part 123 would result in a violation of school officials and employees' First Amendment rights."  (Pls.' Opp'n 22.) However, as discussed *infra*, (*see infra* sections II.b.ii–iii), Individual Board Member Plaintiffs have failed to state a First Amendment-based overbreadth challenge to Part 123 or a First Amendment free speech challenge.

### ii. Individual Board Member Plaintiffs' Fourteenth Amendment-based vagueness claims and First Amendment-based overbreadth claims

Defendants argue that the Court should grant their motion to dismiss Individual Board Member Plaintiffs'[17] facial and as-applied vagueness and overbreadth challenges for failing to state a claim under the Fourteenth and First Amendments. (Defs.' Mem. 25–29; Defs.' Reply 18–22; Defs.' Suppl. Reply 4–5.) The Court addresses each of these arguments below.[18]

### 1. Individual Board Member Plaintiffs' Fourteenth Amendment-based as-applied vagueness challenge

Defendants argue that Individual Board Member Plaintiffs fail to state a plausible as-applied vagueness challenge. (Defs.' Mem. 26–27; Defs.' Reply 19.) As a threshold matter, Defendants argue that the vagueness doctrine is ordinarily applied to criminal legislation and a "less exacting vagueness scrutiny" is merited in civil cases. (Defs.' Mem. at 26 (quoting *Arriga v Mukasey*, 521 F.3d 219, 223 (2d Cir. 2008)).) Defendants contend that Part 123 "is subject to an even less exacting standard" because the "parties 'have the ability to clarify the meaning of the regulation by [their] own inquiry'" through the "FAQ Guidance" and accompanying email

---

[17] Because the Court finds that Individual Board Member Plaintiffs lack capacity to sue in their official capacity, (*see supra* n.8), the Court only addresses the merits of Individual Board Member Plaintiffs' First and Fourteenth Amendment claims in their personal capacity.

[18] Before addressing Individual Board Member Plaintiffs' facial vagueness challenge, the Court first addresses Individual Board Member Plaintiffs' as-applied vagueness challenge. *See Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006) (explaining that "[b]ecause the permissibility of a facial challenge sometimes depends upon whether the challenged regulation was constitutional as applied to the plaintiff, '[a] court should . . . examine the complainant's conduct before analyzing other hypothetical applications of the law.'" (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982))); *Hoffman Estates*, 455 U.S. at 497 (explaining that "the [plaintiff] must demonstrate that the law is impermissibly vague in all of its applications" to succeed on a facial vagueness); *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018) (explaining that, to succeed on a facial challenge, "the challenger must establish that no set of circumstances exists under which the [a]ct would be valid.'" (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987))). The Court addresses Individual Board Member Plaintiffs' Fourteenth Amendment-based vagueness challenges before their First Amendment-based overbreadth challenge.

address.  (*Id.* at 27–28 (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455

U.S. 489, 498 (1982)); FAQ Guidance 5–11.)  In addition, Defendants contend that, even under a

stricter vagueness standard, Part 123 adequately notifies a person of reasonable intelligence that

any symbol depicting "actual or stereotypical aspects of Indigenous cultures" is prohibited.

(Defs.' Mem. 27.)  Defendants also argue that "no regulation is obligated, under any standard, to

provide certainty to persons or entities to whom the regulation is aimed."  (Defs.' Reply 19

(quoting *Williams v. Korines*, 966 F.3d 133, 140 (2d Cir. 2020)).)  In support of their challenge to

Individual Board Member Plaintiffs' as-applied claims, Defendants first argue that Part 123

"contain[s] adequate definitions" to "notify a person of reasonable intelligence" as to what

constitutes a prohibited use of an Indigenous name, symbol, or image, even under a stricter

vagueness standard.  (Defs.' Mem. 26–27 (citing *VIP of Berlin*, 593 F.3d at 186); Defs.' Reply

19–20.)  Second, Defendants argue that Part 123 is not enforced arbitrarily because Part 123's

provision permitting schools "to continue use of an Indigenous name or image where the district

already, at the time of the promulgation of Part 123, had an agreement with a tribe" merely

"declines to interfere with . . . agreements" between a tribe and school district that existed prior

to the promulgation of Part 123.  (Defs.' Reply 20–21.)  As to each team name, Defendants argue

that Individual Board Member Plaintiffs fail to demonstrate an as-applied challenge because,

Plaintiffs in the Massapequa Matter are "well aware that the Chiefs name and imagery are

unambiguously prohibited by Part 123."  (*Id.* at 21.)  Defendants argue Plaintiffs in the

Wantagh/Wyandanch and Connetquot Matters merely disagree with the prohibition against

continued use of names such as "Thunderbirds" and "Warriors."  (*Id.*)

　　　Individual Board Member Plaintiffs argue that Part 123's definitions and exceptions

provisions are unconstitutionally vague as-applied to Plaintiffs.  (Am. Compl. ¶¶ 141–44.)  In

support, Plaintiffs argue that Part 123 fails to provide adequate notice because the regulation "does not adequately define what constitutes an Indigenous 'name,' 'symbol,' or 'image'" and does not distinguish between different depictions of Indigenous culture.  (*Id.* ¶ 141–42; Pls.' Opp'n 27–33.)  Plaintiffs also argue that Part 123 fails to account for uses of Indigenous imagery that are in honor of Indigenous persons, as opposed to those that are derogatory.  (Am. Compl. ¶ 142; Pls.' Opp'n 27–33.)  Further, Plaintiffs contend that Part 123 leads to arbitrary enforcement because it "would allow one school district to maintain a particular team name, logo, or mascot, while prohibiting another school district from doing the same simply because it could not secure written approval from a federally or state-recognized Indian tribe."  (Am. Compl. ¶ 144; Pls.' Opp'n 27–33.)

Plaintiffs in the Massapequa Matter argue that "the Massapequa Chiefs name and logo present a prime example of how Part 123's lack of narrow tailoring to Defendants' purported goal results in an unconstitutionally overbroad regulation that if enforced will burden a substantial amount of protected First Amendment activity."  (Pls.' Opp'n 33.)  Plaintiffs argue that "Defendants' ability to enforce Part 123 against the Massapequa Plaintiffs (or any school district for that matter) depends on its ability to prove the use of the Chiefs name and logo somehow constitutes an abuse of discretion by creating an unsafe learning environment for Massapequa students," but argue that their name and logo has "never prompted a single DASA complaint."  (*Id.*)  Plaintiffs also note the Massapequa community's "strong ties to Native American culture."  (*Id.*)

Plaintiffs in the Wantagh/Wyandanch Matter argue that "Part 123's application to the Warriors name also reveals the regulations' inherent vagueness and overbreadth" because the prohibition against the Warriors name is only covered by the FAQ Guidance's clarification about

historical uses of Native imagery — not Part 123 itself — and applies even though Wantagh and Wyandanch only recently "committed to retiring any Native American imagery" associated with their schools. (*Id.* at 32–33.) In support, Plaintiffs argue that "[e]ven the Chairman of the Shinnecock Nation . . . publicly commented that the name 'Warrior' is not exclusive to native culture and that he would be in favor of school districts keeping their Warriors team name." (*Id.* at 33.) Plaintiffs also argue the fact that the Wantagh/Wyandanch Plaintiffs would be prohibited from using the Warriors name, while SED allows other school districts to maintain their Warriors name and logo, illustrates the regulation's arbitrary and discriminatory enforcement. (*Id.* at 30.)

Plaintiffs in the Connetquot Matter argue that "it is wholly unclear how the Connetquot CSD's Thunderbird name, mascot, and/or logo could possibly violate DASA," because "[w]hile thunderbirds are part of Native American folklore, the belief in bird-like and other mythological creatures, including thunderbirds specifically, traces to various other cultures and is not unique to the Americas" and because the mascot "is more akin to an eagle or other real-life bird, than a mythological literary creature." (*Id.* at 31.) Plaintiffs contend that the U.S. Air Force selected the name "Thunderbirds" for its Air Demonstration Squadron in honor of the "power, protection, and strength" that the mythological creature represents, and that the Connetquot student body's "selection of the name Thunderbird cannot constitute a DASA violation." (*Id.* at 32.) Plaintiffs also contend that the "'T-Bird' nickname . . . bears no connection to a Native American name, symbol, or image" and is more commonly associated with "a classic Ford vehicle or John Travolta's character . . . from the movie classic *Grease*." (*Id.* at 31.)

"A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory

enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)); *see Brokamp v. James*, 66 F.4th 374, 403 (2d Cir. 2023) ("A statute is unconstitutionally vague in violation of the Due Process clause if it (1) 'fails to provide a person of ordinary intelligence fair notice of what is prohibited,' or (2) 'is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18 (2010))); *Kissel v. Seagull*, 552 F. Supp. 3d 277, 285–86 (D. Conn. 2021) (quoting *Hill*, 530 U.S. at 732) (same); *Muchmore's Cafe, LLC v. City of New York*, No. 14-CV-5668, 2016 WL 11469539, at *17 (E.D.N.Y. Sept. 29, 2016) (quoting *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006)) (same); *see also Farrell*, 449 F.3d at 485 ("[A]ll vagueness challenges — whether facial or as-applied — require us to answer two separate questions: whether the statute gives adequate notice, and whether it creates a threat of arbitrary enforcement.").  "In reviewing a statute's language for vagueness, 'we are relegated . . . to the words of the ordinance itself, to the interpretations the court below has given to analogous statutes, and perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it.'" *VIP of Berlin*, 593 F.3d at 186 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)); *see also Keepers, Inc. v. City of Milford*, 944 F. Supp. 2d 129, 150–51 (D. Conn. 2013) (same), *vacated in part and remanded on other grounds*, 807 F.3d 24 (2d Cir. 2015).

"When a statute 'is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts.'" *VIP of Berlin*, 593 F.3d at 186 (quoting *Farrell*, 449 F.3d at 485) (alteration in original).  However, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Id.* at 187 (quoting *Grayned*, 408 U.S. at 110); *see also Cunney v. Bd. of Trs. of*

*Grand View*, 660 F.3d 612, 621 (2d Cir. 2011) (quoting *Grayned*, 408 U.S. at 110) (same); *Farrell*, 449 F.3d at 485 ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts.") (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974))). "Rather, regulations may embody 'flexibility and reasonable depth,' . . . and 'satisfy due process as long as a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, has fair warning of what the regulations require.'" *Cunney*, 660 F.3d at 621 (first quoting *Grayned*, 408 U.S. at 110; and then quoting *Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 156 (2d Cir. 1999)).

## A. Level of scrutiny

As a threshold matter, Plaintiffs and Defendants dispute which level of scrutiny the Court should apply to determine whether Part 123 is unconstitutionally vague as-applied or facially. (Defs.' Mem. 26 n.10; Pls.' Opp'n 27–28.) Defendants argue that a more stringent vagueness standard is inapplicable because School District Plaintiffs and School Board "Plaintiffs do not allege that First Amendment rights are implicated by the provisions Plaintiffs challenge on vagueness grounds," and because "[t]he First Amendment claim, [which] . . . is only asserted by the [Individual] [B]oard [M]ember Plaintiffs in their personal capacity . . . challenges only [section] 123.5." (Defs.' Reply 18.) Plaintiffs argue that "because Part 123 implicates First Amendment rights, the [vagueness] doctrine demands a greater degree of specificity." (Pls.' Opp'n 28 (alteration in original).) Because Individual Board Member Plaintiffs have alleged that Part 123's implementation provision raises First Amendment concerns, (Am. Compl. ¶¶ 157– 71), the Court finds that the appropriate test is whether Part 123 "reaches a substantial amount of

constitutionally protected conduct." *Dorman v. Satti*, 862 F.2d 432, 436 (2d Cir. 1988) (quoting *Hoffman Estates*, 455 U.S. at 494); *see also Farrell*, 449 F.3d at 496 ("Facial vagueness challenges may go forward only if the challenged regulation 'reaches a substantial amount of constitutionally protected conduct.'" (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983))).

### B.  Adequate notice

Defendants argue that Part 123 "contain[s] adequate definitions" to "notify a person of reasonable intelligence" as to what constitutes a prohibited use of an Indigenous name, symbol, or image.  (Defs.' Mem. 26–27.)

Plaintiffs argue that Part 123 fails to provide adequate notice because the regulation "does not adequately define what constitutes an Indigenous 'name,' 'symbol,' or 'image'" and "fail[s] to . . . differen[tiate] between a stereotypical aspect of Indigenous culture, as opposed to a representation that is accurate and respectful."  (Am. Compl. ¶¶ 141–42; Pls.' Opp'n 27–33.)

A statute provides adequate notice when its "language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Cunney*, 660 F.3d at 621 (quoting *Rubin v. Garvin,* 544 F.3d 461, 467 (2d Cir. 2008) (internal quotation marks omitted)); *VIP of Berlin,* 593 F.3d at 187 ("Animating this first vagueness ground is the constitutional principle that individuals should receive fair notice or warning when the state has prohibited specific behavior or acts." (quoting *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007))).  A statute will "satisfy due process as long as a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, has fair warning of what the regulations require."  *Cunney,* 660 F.3d at 621 (quoting *Rock of Ages,* 170 F.3d at 156); *see Grayned,* 408 U.S. at 110 (explaining

that an ordinance "marked by 'flexibility and reasonable breadth'" is constitutional so long as "it is clear what the ordinance as a whole prohibits").

In reviewing the regulation's definitions, Part 123 does not specifically define "name, symbol, or image." 8 NYCRR § 123.1. However, the regulation defines "Indigenous name, logo, or mascot" as "a name, symbol or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs symbols, or traditions . . . used to represent a public school." 8 NYCRR § 123.1. An "Indigenous name, logo, or mascot" includes both "actual or stereotypical aspects of Indigenous cultures, used to represent a public school." *Id.*

Neither Plaintiffs nor Defendants cite to decisions from any court interpreting the definition of "Indigenous name, logo, or mascot," or defining an Indigenous "name, symbol or image," nor is the Court aware of any. However, the Second Circuit has upheld laws with less precise definitions in the First Amendment context. *See VIP of Berlin,* 593 F.3d at 182–83, 187; *Farrell*, 449 F.3d at 490–93 (finding that, while the term "pornography" may be "inherently vague," the publication the defendant possessed "fit[] within any reasonable understanding of the term" and "that the no-pornography condition [of defendant's parole] was not vague" in relation to a special condition prohibiting an individual from possessing "pornographic materials"). For example, in *VIP of Berlin*, the "sexually oriented business" ordinance provided that "adult-oriented stores" were subject to a zoning ordinance and defined "adult-oriented store" as any store having "a 'substantial or significant portion' of its stock in trade in adult merchandise." *VIP of Berlin,* 593 F.3d at 182–83, 187. The Second Circuit concluded that the "plain meaning and stated purpose" of the ordinance provided adequate notice to the plaintiff, whose proposed stock consisted of approximately twelve percent of adult items, that the business qualified as an adult-oriented store because it had a "substantial or significant portion of its stock" in adult

merchandise. *Id.* at 187, 189, 190–91 (explaining that a "substantial or significant portion of its stock" only required "'part' of [a business's] stock in trade [to be] devoted to adult merchandise" and that the merchandise "is of 'considerable quantity' and 'of a noticeably or measurably large amount'" (citations omitted)). Like *VIP of Berlin*'s definition of "adult-oriented stores," a reasonable person would have notice that the definition of an Indigenous name, logo, or mascot includes any Indigenous name, symbol, and imagery that "depicts or refers to Indigenous persons," regardless of the intention behind such a reference. *Id.* at 182–83, 187; 8 NYCRR § 123.1.

Accordingly, Plaintiffs have not plausibly alleged that they had insufficient notice that these names, symbols, and images were covered by Part 123. In the Massapequa Matter, Plaintiffs acknowledge the Massapequa Chiefs name and logo reference and "depict[] Sachem Tackapausha himself." (Am. Compl. ¶ 47.) Similarly, in the Wantagh/Wyandanch Matter, Plaintiffs were equally on notice of the pre-existing history tying the Warriors' name to actual or stereotypical aspects of Indigenous peoples. (Pls.' Opp'n 32–33; 23-CV-7299 Am. Compl. ¶¶ 54, 63 (explaining that "the name Warrior is not exclusive to native culture," but noting that "[t]he 'Wantagh Warriors' name and logo, . . . depicts the profile of a Native American in full headdress").) In the Connetquot Matter, the "Thunderbirds" name is covered by Part 123 because, as Plaintiffs acknowledge, "thunderbirds are part of Native American folklore." (Pls.' Opp'n 31; 23-CV-7696 Am. Compl. ¶¶ 70–81 (explaining that the student body chose the name "Thunderbirds" in order "to select a name that honored the Indian culture of the area").) Part 123's prohibition on any references to "Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures" covers

the names, symbols, and images that Plaintiffs acknowledge have ties to Indigenous persons.  8 NYCRR § 123.1.

### C.   Arbitrary and discriminatory enforcement

Defendants argue that the FAQ Guidance "demonstrates the absence of opportunities for arbitrary enforcement" and "clearly answers" Plaintiffs' core question of whether public schools must retire names such as "Warriors" and "Thunderbirds."  (Defs.' Mem. 28.)

Plaintiffs argue that Part 123 leads to arbitrary enforcement because it "would allow one school district to maintain a particular team name, logo, or mascot, while prohibiting another school district from doing the same simply because it could not secure written approval from a federally or state-recognized Indian tribe."  (Am. Compl. ¶ 144; Pls.' Opp'n 27–33.)  In support, Plaintiffs argue that the fact that the Wantagh/Wyandanch Plaintiffs would be prohibited from using the Warriors name, while Part 123 "allow[s] other schools, like Chenango Valley Central School District to[] continue to use the Warriors name," (Pls.' Opp'n 32),  and "allow[s] the Salamanca City Central School District to maintain its Warriors name *and logo* depicting a Native American male" illustrates the regulation's arbitrariness, (*id.* at 30).  Plaintiffs argue that "Part 123's inherent vagueness is exacerbated by the fact that Part 123 is a self-policing regulation" and that the FAQ Guidance creates "blatant inconsistenc[ies]" that in turn create "incurable void-for-vagueness concerns."  (*Id.* at 28–29.)  Plaintiffs contend that, "[d]espite being a self-policing regulation," Part 123 contains no "standards or criteria for school districts to determine the meaning, scope and application of the regulation and its prohibition[s]."  (*Id.* at 28.)  Plaintiffs also contend that the FAQ Guidance's prohibition on "any name, logo, or mascot that bore any connection to Native American culture at any point in time" is an "impermissible

expansion of the definition of 'Indigenous name, logo, or mascot' as set forth in Part 123" and is inconsistent with the regulation itself. (*Id.* at 29.)

A statute provides explicit standards when "either: (1) the 'statute as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement;' or (2) 'even in the absence of such standards, the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute.'" *VIP of Berlin*, 593 F.3d at 191 (quoting *Farrell*, 449 F.3d at 494); *Cunney*, 660 F.3d at 622 (explaining that determining whether an ordinance provides explicit standards involved a two-part inquiry into whether (1) the ordinance provides sufficiently clear enforcement standards, and (2) the conduct falls within the core of the of the ordinance's prohibition (quoting *Farrell*, 449 F.3d at 494)). A statute authorizes or encourages discriminatory enforcement when it fails to "provide explicit standards for those who apply" the statute. *Cunney,* 660 F.3d at 621 (citing *Grayned*, 408 U.S. at 108–09); *Thibodeau*, 486 F.3d at 66 (explaining that the vagueness "doctrine does not require 'meticulous specificity' from every statute" because "language is necessarily marked by a degree of imprecision" (first quoting *Grayned*, 408 U.S. at 110, and then quoting *Farrell*, 449 F.3d at 485)).

Part 123 provides the following exceptions for schools and their employees:

> (a) Tribal Use. Nothing in this section shall be construed to prohibit a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation from choosing to use an Indigenous name, logo, or mascot for a sports team comprised of its tribal members, including an Indigenous name, logo, or mascot for a sports team comprised of its tribal members, including a tribal school or intramural league.

> (b) Tribal Approval. This Part shall not apply where a written agreement exists prior to the effective date of this part between a

> federally recognized tribal nation within the State of New York or a
> New York State recognized tribal nation and a public school
> permitting the use of an Indigenous name, mascot, or logo that is
> culturally affiliated with such tribe.  A public school shall not offer
> or accept any money, consideration, or thing of value pursuant to
> any such agreement.  The tribal nation shall have the right and ability
> to revoke any such agreement at any time.  Upon termination of such
> an agreement, the public school shall have the remainder of the
> school year in which such agreement is revoked and one additional
> school year to discontinue its use of an Indigenous name, logo, or
> mascot.

8 NYCRR § 123.4.

The Court finds that these challenged provisions are not arbitrary or discriminatory as-

applied to Individual Board Member Plaintiffs because the definitions provide sufficiently clear

standards to determine whether a specific schools name, logo, or mascot is prohibited by Part

123.  The court in *VIP of Berlin* similarly found that enforcement of the adult-oriented business

provision was not arbitrary or discriminatory "[f]or the same reasons that it gave [the business]

adequate notice," namely that "[t]he plain meaning of the ordinance . . . is not vague" and

therefore "does not encourage or authorize arbitrary enforcement."  *VIP of Berlin*, 593 F.3d at

191–93 (explaining that "twelve percent of its stock in trade . . . falls 'within any reasonable

understanding of the [ordinance's language]'" that applied zoning restrictions to businesses that

had a substantial portion of adult merchandise as its stock in trade (quoting *Farrell*, 449 F.3d at

490)); *see also Farrell*, 449 F.3d at 476, 483 (finding that a special condition prohibiting an

individual from possessing "pornographic materials" had "provided adequate standards for the

parole officers to determine whether" a parolee could possess a certain publication); *Dickerson v.

Napolitano*, 604 F.3d 732, 746–49 (2d Cir. 2010) (finding that the defendants' misuse of fake

police badges struck at the "core concern" of New York City statute criminalizing possession

without authority of "insignia or emblem in any way resembling that worn by members of the

40

police force," and therefore enforcement of the statute was not arbitrary and capricious "despite the unfortunate breadth of the statute" and challenges in interpreting the literal meaning of the statute).  Like the "substantial or significant" language in *VIP of Berlin*, Part 123's definition of prohibited Indigenous cultural reference provides clear standards through which schools can determine whether their names, logos, and mascots are prohibited Indigenous cultural references.  Moreover, neither the "Tribal Use" nor the "Tribal Approval" exceptions lead to arbitrary or discriminatory enforcement.  *See United States v. Farhane*, 634 F.3d 127, 142 (2d Cir. 2011) (finding that "the statutory exemption of 'medicine' from the definition of 'material support'" that can be provided to a terrorist did not render the statute unconstitutionally vague); *Rubin*, 544 F.3d at 465, 470 (providing that Medicaid charging regulations that had "unwritten exceptions" in practice for "ongoing contracts or for discounted rates for prompt billing" was not void-for-vagueness as applied to the petitioner because "exceptions do not render the regulation vague as applied"); *see also J & J Sports Prods., Inc. v. Patin*, 358 F. Supp. 3d 318, 323 (S.D.N.Y. 2019) (finding that a statute defining "cable system" which included "stated exceptions" was "neither so vague that people of ordinary intelligence would not understand them, nor encourage arbitrary and discriminatory enforcement"); *Maages Auditorium v. Prince George's Cnty., Maryland*, 681 F. App'x 256, 263–64 (4th Cir. 2017) (finding that a zoning code's "special exception" provision, which allowed adult entertainment businesses to remain in non-conforming locations, was not unconstitutionally vague because "the terms challenged here all have readily ascertainable meanings based on context and dictionary definitions, which sufficiently guide zoning officials in the exercise of their authority").  Further, although Individual Board Member Plaintiffs argue that Part 123's FAQ Guidance "raises incurable void-for-vagueness concerns" by expanding the definitions of what the regulation prohibits, (Pls.' Opp'n 29), the additional guidance actually

remedies their void-for-vagueness concerns because the FAQ Guidance answers questions regarding how to determine whether a school's team name, logo, or mascot has been associated with Indigenous peoples and where to submit further inquiries. *See Hoffman Estates*, 455 U.S. at 498 (recognizing that economic regulation may be subject to a lower standard where parties "have the ability to clarify the meaning of the regulation by [their] own inquiry, or by resort to an administrative process"); (FAQ Guidance 5–11). Accordingly, the Court finds that Part 123 is constitutional as-applied to Individual Board Member Plaintiffs. The Court therefore grants Defendants' motion and dismisses Individual Board Member Plaintiffs' as-applied vagueness claims.

## 2. Individual Board Member Plaintiffs' Fourteenth Amendment-based facial vagueness challenge

Because Individual Board Member Plaintiffs have failed to state a plausible as-applied vagueness claim to Part 123, (*see supra* section II.b.ii.1), the Court grants Defendants' motion to dismiss their facial vagueness claim.

"When considering a facial challenge to the . . . vagueness of a statute as measured against the [F]irst [A]mendment, 'a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.'" *Dorman*, 862 F.2d at 436 (quoting *Hoffman Estates*, 455 U.S. at 494); *see also Farrell*, 449 F.3d at 496 ("Facial vagueness challenges may go forward only if the challenged regulation 'reaches a substantial amount of constitutionally protected conduct.'") (quoting *Kolender*, 461 U.S. at 358 n.8 (1983)); *Helms Realty Corp. v. City of New York*, 320 F. Supp. 3d 526, 533 (S.D.N.Y. 2018) (finding that "[w]hether [the plaintiff] can mount a facial challenge to [the challenged law] depends . . . on whether it reaches constitutionally protected speech, which in turn requires a [c]ourt to examine the (ambiguous and unambiguous) scope of the statute").

To decide whether a statute reaches a substantial amount of constitutionally protected conduct, the Court "must first determine whether the [ordinance at issue] will have a substantial chilling effect on protected conduct." *Farrell*, 449 F.3d at 497 (citing *United States v. Loy*, 237 F.3d 251, 259 (3d Cir. 2001)). "In determining whether a regulation reaches substantial protected conduct, [a court] must consider everything that falls within the ambiguous scope of the" challenged regulation. *Id.* (citing *Hoffman Estates*, 455 U.S. at 494 n.6); *see also Helms Realty Corp.*, 320 F. Supp. 3d at 533 (same (quoting *Farrell*, 449 F.3d at 497)). "Because the permissibility of a facial challenge sometimes depends upon whether the challenged regulation was constitutional as applied to the plaintiff, '[a] court should . . . examine the complainant's conduct before analyzing other hypothetical applications of the law.'" *Farrell*, 449 F.3d at 485 (quoting *Hoffman Estates*, 455 U.S. at 495). This is because, to succeed on a facial vagueness challenge, "the [plaintiff] must demonstrate that the law is impermissibly vague in all of its applications." *See Hoffman Estates*, 455 U.S. at 497; *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."); *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018) ("A facial challenge is 'the most difficult challenge to mount successfully' because, as a general matter 'the challenger must establish that no set of circumstances exists under which the Act would be valid.'" (quoting *Salerno*, 481 U.S. at 745)).

Individual Board Member Plaintiffs have failed to state a facial vagueness claim. As discussed *supra*, (*see supra* section II.b.ii.1), Part 123 is constitutional as-applied to Individual Board Member Plaintiffs. Thus, Individual Board Member Plaintiffs have not "establish[ed] that no set of circumstances exists under which" the regulation would be valid. *Copeland*, 893 F.3d

at 110 (quoting *Salerno*, 481 U.S. at 745); *see also Holder*, 561 U.S. at 20 ("[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." (quoting *Hoffman Estates,* 455 U.S. at 495)); *Diaz v. Paterson*, 547 F.3d 88, 101 (2d Cir. 2008) ("Because plaintiffs have failed to plead facts establishing that Article 65 is unconstitutional as applied to them, they necessarily fail to state a facial challenge, which requires them to 'establish that no set of circumstances exists under which the [statute] would be valid.'" (alteration in original) (quoting *Cranley v. Nat'l Life Ins. Co. of Vt.,* 318 F.3d 105, 110 (2d Cir. 2003))).

Accordingly, the Court finds that Individual Board Member Plaintiffs have not plausibly alleged that Part 123 is facially vague and grants Defendants' motion to dismiss their facial vagueness claims.

### 3.  Individual Board Member Plaintiffs' First Amendment-based facial overbreadth challenge to Part 123

Defendants contend that Individual Board Member "Plaintiffs' overbreadth claim fails on all fronts." (Defs.' Mem. 29.)  In support, Defendants argue that the regulation's prohibition on school district employees displaying Indigenous names or imagery while on school property or at school functions (1) is narrow, and (2) does not implicate the First Amendment.  (*Id.*) Defendants emphasize that the FAQ Guidance "removes any doubt that Section 123.5 is limited to its narrow confines."  (*Id.*)

Plaintiffs contend that Part 123 as a whole is facially overbroad "because a substantial number of its applications are unconstitutional, judged in relation to its purported legitimate sweep."  (Pls.' Opp'n 25.)  Plaintiffs argue that the regulation "lacks any tailoring to Defendants' purported goal, which is to prevent DASA violations," and "creates a sweeping policy-based determination that strays far beyond the scope of the allegedly enabling statute of DASA."  (*Id.*

at 26.)  In support, Plaintiffs emphasize that Part 123 "purports to end discrimination and harassment in school districts it has not even demonstrated existed in the first place."  (*Id.*)  Plaintiffs argue that Part 123's broad sweep "creates an unnecessary risk of chilling the speech and expression of school employees, and the school community at large, in violation of the First Amendment."  (*Id.*)

"A law is unconstitutionally overbroad if it punishes a substantial amount of protected free speech, judged in relation to its plainly legitimate sweep."  *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 127 n.8 (2d Cir. 2014) (quoting *Farhane*, 634 F.3d at 136); *United States v. Thompson*, 896 F.3d 155, 163 (2d Cir. 2018) ("[T]o be struck as overbroad, the statute must be overbroad 'not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.'" (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008))), *cert. denied,* 139 S. Ct. 2715 (2019); *Adams v. Zenas Zelotes*, 606 F.3d 34, 38 (2d Cir. 2010); *see also Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984) ("There are two quite different ways in which a statute or ordinance may be considered invalid 'on its face' — either because it is unconstitutional in every conceivable application, or because it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally 'overbroad.'"); *Sorrell*, 758 F.3d at 127 (describing the two "different ways in which a statute may be considered invalid 'on its face'" (quoting *Taxpayers for Vincent*, 466 U.S. at 796)); *see also United States v. Smith*, 945 F.3d 729, 736 (2d Cir. 2019) ("Overbreadth challenges are a form of First Amendment challenge and an exception to the general rule against third-party standing . . . . Thus, '[a]ll overbreadth challenges are facial challenges'") (citing *Farrell*, 449 F.3d at 498); *Farrell*, 449 F.3d at 498 ("All overbreadth challenges are facial challenges, because an overbreadth challenge by its

nature assumes that the measure is constitutional as applied to the party before the court.").[19]

The Supreme Court has described an overbreadth challenge as "limited" and has noted that its

force weakens as the regulated behavior at issue "moves from 'pure speech' toward conduct and

that conduct — even if expressive — falls within the scope of otherwise valid criminal laws."

*Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973); *Farhane*, 634 F.3d at 136–37 (noting that

"invalidat[ing] *all* enforcement of a challenged law . . . is 'strong medicine'" (quoting *Williams*,

553 U.S. at 292)); *see also Gospel Missions of Am. v. City of Los Angeles*, 419 F.3d 1042, 1050

(9th Cir. 2005) ("[T]he overbreadth doctrine's concern with 'chilling' protected speech

attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from

'pure speech' toward conduct." (alteration in original) (quoting *Virginia v. Hicks*, 539 U.S. 113,

124 (2003))); *United States v. Richards*, No. 13-CR-818, 2014 WL 3765712, at *3 (S.D.N.Y.

July 29, 2014) (quoting *Broadrick*, 413 U.S. at 615).

    "[T]he first step in overbreadth analysis is to construe the challenged statute; it is

impossible to determine whether a statute reaches too far without first knowing what the statute

covers." *United States v. Stevens*, 559 U.S. 460, 474 (2010) (quoting *Williams*, 553 U.S. at 293).

---

    [19] Plaintiffs contend — and Defendants do not disagree — that the overbreadth doctrine is an exception to the rule against third-party standing. (Defs.' Mem. 29; Pls.' Opp'n 24–25.) Because Defendants have not challenged Plaintiffs' third-party standing, the Court considers the claims of hypothetical third parties in its evaluation of Individual Board Member Plaintiffs' overbreadth challenge. However, because School District Plaintiffs, School Board Plaintiffs, and Individual Board Member Plaintiffs suing in their official capacity lack capacity to assert a First Amendment violation, the Court does not address their overbreadth claims. *See Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 382 (2d Cir. 2021) ("Capacity to sue addresses only whether a person or company that possesses an enforceable right may act as a litigant." (citing *Horowitz v. 148 S. Emerson Assocs. LLC*, 888 F.3d 13, 19 n.4 (2d Cir. 2018))); *Town of Babylon*, 707 F. Supp. 3d at 221 (explaining that "[c]apacity, unlike standing, is ordinarily not a jurisdictional issue . . . a party must maintain its capacity to sue throughout litigation, and lack of capacity is grounds for dismissal." (quoting *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 403 F. Supp. 3d 257, 267 (S.D.N.Y. 2019) (internal quotation marks and citations omitted))).

The second step is to determine whether the statute, as construed by the court, "prohibits a substantial amount of protected speech." *Williams*, 553 U.S. at 292; *see also Adams*, 606 F.3d at 38 (noting that determining whether the statute as construed "reach[es] 'a substantial amount of protected expressive activity'" is the "second step in an overbreadth analysis" (quoting *Williams*, 553 U.S. at 297)). "[I]n considering facial challenges we must 'vigorously enforce[] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.'" *Adams*, 606 F.3d at 38 (quoting *Williams*, 553 U.S. at 292).

"The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech." *Virginia v. Black*, 538 U.S. 343, 358 (2003) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)); *see Radwan v. Manuel*, 55 F.4th 101, 115 (2d Cir. 2022) ("The protections of the First Amendment are not limited to spoken words, but rather include gestures and other expressive conduct, even if vulgar or offensive to some."). "To determine whether conduct is expressive and entitled to constitutional protection requires an inquiry into whether activity is 'sufficiently imbued with the elements of communication to fall within the scope of the First . . . Amendment[].'" *Muchmore's Cafe, LLC*, 2016 WL 11469539, at *11 (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (holding that burning a flag in protest is expressive conduct protected under the First Amendment)). To determine "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," a court must analyze "whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Id.* (alterations in original) (quoting *Johnson*, 491 U.S. at 404). "[A]n activity need not necessarily embody 'a narrow, succinctly articulable message,' . . . but the reviewing court must

find, at the very least, an intent to convey 'a particularized message' along with a great

likelihood that the message will be understood by those viewing it." *Zalewska v. County of*

*Sullivan*, 316 F.3d 314, 319 (2d Cir. 2003) (citation omitted) (first quoting *Hurley v. Irish Am.*

*Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995); and then quoting *Johnson*, 491

U.S. at 404).

However, that "something is in some way communicative does not automatically afford it

constitutional protection.  For purposes of the First Amendment, the Supreme Court has

repeatedly rejected the view that 'an apparently limitless variety of conduct can be labeled

speech whenever the person engaging in the conduct intends . . . to express an idea.'"

*Muchmore's Cafe, LLC*, 2016 WL 11469539, at *11 (quoting *Zalewska*, 316 F.3d at 319); *see*

*also Stevens*, 559 U.S. at 468 (stating that the First Amendment "permit[s] restrictions" on some

types of speech, including obscenity, defamation, fraud, incitement, and "speech integral to

criminal conduct").  "Therefore, a court determining whether 'an activity [i]s sufficiently imbued

with elements of communication to fall within the scope of the First . . . Amendment[],' must

examine the 'nature' of the activity 'combined with the factual context and environment in which

it was undertaken.'"  *Muchmore's Cafe, LLC*, 2016 WL 11469539, at *11 (alterations in

original) (quoting *Spence v. Washington*, 418 U.S. 405, 409–10 (1974)); *see also Lebowitz v.*

*City of New York*, 606 F. App'x 17, 17 (2d Cir. 2015) ("We agree with the [Occupy Wall Street]

plaintiffs that their act of lying down in Zuccotti Park under the circumstances presented likely

demonstrated '[a]n intent to convey a particularized message . . . [and] the likelihood was great

that the message would be understood by those who viewed it,' such that they engaged in

protected expressive conduct." (second alteration in original) (quoting *Johnson*, 491 U.S. at

404)); *Zalewska*, 316 F.3d at 320 ("The Supreme Court has been careful to distinguish between

communicative activity with a clear contextual message, such as the wearing of a black armband in protest during the Vietnam War, compared with other types of activity, like choosing what to wear in the ordinary course of employment." (citing *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 507–08 (1969))).

In construing whether First Amendment protected activity is covered by Part 123, "[t]he language of the [l]aw itself is . . . the proper starting point." *Muchmore's Cafe, LLC*, 2016 WL 11468539, at *8; *see also New York v. Mountain Tobacco Co.*, 942 F.3d 536, 546 (2d Cir. 2019) ("The plain meaning [of a statute] is best discerned by 'looking to the statutory scheme as a whole and placing the particular provision within the context of that statute.'" (quoting *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003))); *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 155 (2d Cir. 2013) (stating that statutory analysis begins with a "review [of] the statutory text, considering . . . the placement and purpose of those words in the statutory scheme") (quoting *United States v. Aguilar*, 585 F.3d 652, 657 (2d Cir. 2009)), *cert. dismissed*, 569 U.S. 1040 (2013).

Part 123 prohibits the use of Indigenous names, logos, or mascots. 8 NYCRR §§ 123.1–123.5. The regulation states that "no public school in the State of New York may utilize or display an Indigenous name, logo, or mascot other than for purposes of classroom instruction." 8 NYCRR § 123.2. Part 123 defines "Indigenous name, logo, or mascot" as:

> [A] name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures, used to represent a public school, including but not limited to such schools sports teams. It does not include a public school, school building, or school district named after an Indigenous tribe.

*Id.* § 123.1. The language of Part 123 appears to directly implicate expressive activity in the form of using an Indigenous name, logo, or mascot in schools or at school functions. *Id.* The

regulation does not expressly distinguish between uses that honor Indigenous cultures and uses that are derogatory, but the regulation does permit public schools to continue using an Indigenous name, logo, or mascot with permission from a recognized tribe. *See, e.g.*, *id.* § 123.4(b) (permitting the use of Indigenous imagery "where a written agreement exists prior to the effective date of this part between a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation and a public school"). Although the regulation prohibits school officers and employees from "utilizing or promoting any Indigenous name, logo, or mascot" while "on school property or at school function[,]" it contains no similar prohibition for members of the public. *See id.* § 123.5. The language of "utilizing or promoting" suggests that public school officers and employees are prohibited from wearing team apparel when it displays an Indigenous name, logo, or mascot.

Neither Plaintiffs nor Defendants cite any decisions of other courts that have examined Part 123 or a similar regulation in an effort to determine its scope and sweep, and the Court is not aware of any. The regulation of a public school's use of Indigenous names, logos, and mascots is an emerging issue in the First Amendment context. In one case involving the use of Indigenous symbols for a university sports team, the court found that the action implicated First Amendment rights. *See Crue v. Aiken*, 204 F. Supp. 2d 1130, 1134 (C.D. Ill. 2002), *aff'd*, 370 F.3d 668 (7th Cir. 2004). In *Crue*, the University of Illinois implemented a preclearance directive which required "all faculty, staff and students at the University" to obtain the university's permission before contacting prospective student athletes. *Id*. The plaintiffs sought to inform prospective students regarding the "concerns of Native Americans with respect to the Chief Illiniwek [mascot] controversy," and challenged the university's "preclearance directive" on overbreadth grounds. *Id*. at 1134–35. The court found that the preclearance directive

implicated the faculty and students' rights under the First Amendment to engage in expressive speech. *Id.* at 1142–46.

Similar to the preclearance directive in *Crue* that prohibited communications from all students, faculty, and employees, Part 123.5 prohibits all "school officers and employees" from using any Indigenous name, logo, mascot.[20]  However, Individual Board Member Plaintiffs only make a bare assertion that Part 123.5 "reaches a substantial amount of constitutionally protected First Amendment activity through viewpoint and/or content-based restrictions" that subsequently chills free speech.  (Am. Compl. ¶¶ 148, 158.)  Although Plaintiffs assert the regulation implicates Individual Board Member Plaintiffs' "expressive conduct through wearing [team] apparel" in violation of the First Amendment, (*id.* ¶ 158), as discussed *infra*, (*see infra* section II.b.iii.2.), Individual Board Member Plaintiffs have failed to plead sufficient facts to support their claim that the conduct of such school officials and employees is on a matter of public concern and therefore within the scope of the First Amendment's protection.  *See Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 200, 207–08 (2d Cir. 2004) (finding no First Amendment implications where the "element [of a uniform] has no independent or incremental expressive value" in a case where Ku Klux Klan members challenged New York's anti-mask law); *Zalewska*, 316 F.3d at 319–20 (holding that a female employee's choice to wear a skirt, while expressive, "d[id] not constitute the type of expressive conduct which would allow her to invoke the First Amendment" because "no particularized communication can be divined simply from a woman wearing a skirt").  Because Plaintiffs have not sufficiently alleged that such conduct of school officials and employees implicates protected speech, the Court does not reach

---

[20]  Individual Board Member Plaintiffs make no argument as to the First Amendment implications of Part 123.1–4.  (Am. Compl. ¶¶ 150–171.)

51

the question of whether Part 123 is a substantial burden on free speech. The Court therefore grants Defendants' motion to dismiss the overbreadth claim for failure to state a claim and grants Individual Board Member Plaintiffs leave to amend their Complaints to allege sufficient facts supporting their overbreadth claim.

### iii. Individual Board Member Plaintiffs' First Amendment free speech claims

Defendants argue that the Court should grant their motion to dismiss Individual Board Member Plaintiffs' free speech claims for failing to state a claim under the First Amendment because they are barred by the government speech doctrine. (Defs.' Mem. 30–36.) First, Defendants argue that the Indigenous team names, logos, and mascots themselves are government speech because such symbols (1) "have a long history of communicating government messages to students as well as the public at large," (2) "are perceived as closely identified with the schools they represent," and (3) school districts' choices in team names, logos, and mascots are subject to the "final approval authority" of New York State. (*Id.* at 31–32.) Second, Defendants argue that Individual Board Member Plaintiffs' conduct of wearing team apparel on school grounds and at school functions is government speech because (1) they are speaking as government employees, and (2) they are not speaking on a matter of public concern. (*Id.* at 33–36.) The Court addresses each argument below.

#### 1. Indigenous names, logos, and mascots as government speech

Defendants argue the Indigenous team names, logos, and mascots "are quintessential government speech, and 'therefore [are] not subject to scrutiny under the Free Speech Clause.'" (Defs.' Mem. 30 (first citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 464 (2009); and then citing *Bank v. N.Y. State Dep't of Ag. & Markets*, No. 21-CV-642, 2022 WL 293812, at *5 n.2 (N.D.N.Y. Feb.1, 2022)); Defs.' Reply 22–30.) In support, Defendants argue, first, that

52

"school team names, logos, and mascots have a long history of communicating government messages to students as well as the public at large." (Defs.' Mem. 31; Defs.' Suppl. Reply 1.) Second, Defendants argue that the "school team names, logos, and mascots are perceived as closely identified with the schools they represent." (Defs.' Mem. 31; Defs.' Suppl. Reply 1.) Defendants argue that Massapequa Plaintiffs' allegations that "you will see most people [at school events] are sporting 'Chiefs' apparel" and "the phrase 'Once a Chief, always a Chief' can be heard throughout the schools and community at large" show that the team names, logos, and mascots "convey[] some message on the school's behalf." (Defs.' Mem. 31 (brackets omitted) (citing *Pleasant Grove*, 555 U.S. at 471); Defs.' Suppl. Reply 1–2.) Third, Defendants argue that "the choice of team names and imagery is nevertheless government speech because it is effectively controlled by school districts, subject to the 'final approval authority' of the State." (Defs.' Mem. 32 (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213 (2015)).) Lastly, Defendants argue that Plaintiffs "sidestep Defendants' demonstration that the school sports teams names and imagery at issue are government speech" by merely asserting that this doctrine is the inappropriate lens for analyzing Individual Board Member Plaintiffs' free speech claims. (Defs.' Suppl. Reply 1.)

Individual Board Member Plaintiffs argue that "the 'government speech doctrine' is not the appropriate lens through which to analyze the free speech claims." (Pls.' Suppl. Mem. 1; Pls.' Opp'n 41–44.) In support, Plaintiffs argue that "Defendants cite factually distinguishable law, all of which applied the government speech doctrine to things like monuments, posters, and license plates." (Pls.' Opp'n 43.) Plaintiffs contend that "[w]hile a team logo may constitute government speech when affixed on a school district website, in an official letterhead, or a gymnasium wall," a school community member's expressive clothing worn "off-the-clock"

constitutes activity protected by the First Amendment.  (*Id.* at 43; Pls.' Suppl. Mem. 1.) Plaintiffs also argue that "unlike posters, banners, and bulletin boards, . . . clothing has long served as a canvas for an individual's First Amendment-protected express activity."  (Pls.' Opp'n 44.)

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'"  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. I); *Raymond v. City of New York*, 715 F. Supp. 3d 402, 408 (E.D.N.Y. 2024) (quoting *Reed*, 576 U.S. at 163) (same).  However, when a government "'engag[es] in [its] own expressive conduct, then the Free Speech Clause has no application' because, while the First Amendment 'restricts government regulation of *private* speech,' it does not restrict the *government's* speech."  *Women for Am. First v. Adams*, No. 21-485, 2022 WL 1714896, at *2 (2d Cir. May 27, 2022) (emphasis and alterations in original) (quoting *Pleasant Grove*, 555 U.S. at 467); *see also Walker*, 576 U.S. at 207 ("[G]overnment statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules").  "Thus, when the government speaks for itself, 'it is not barred by the Free Speech Clause from determining the content of what it says,' and 'is entitled to favor certain views over others.'"  *Women for Am. First*, 2022 WL 1714896, at *2 (first quoting *Walker*, 576 U.S. at 207; then quoting *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 34 (2d Cir. 2018)); *Raymond*, 715 F. Supp. 3d at 409 (quoting *Women for Am. First*, 2022 WL 1714896, at *2) (same).

> To determine whether contested speech is government or private, the Supreme Court has identified three primary factors: (1) whether the medium has historically been used to "communicate messages from the States"; (2) whether the medium is "often closely identified in the public mind with the State," *i.e.*, whether it is reasonably interpreted as "conveying some message on the [government's]

behalf"; and (3) whether the government maintains direct, editorial control over the message's content.

*Women for Am. First*, 2022 WL 1714896, at *2 (quoting *Walker*, 576 U.S. at 210–13, 219); *Raymond*, 715 F. Supp. 3d at 409 (same); *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528 (2022) (explaining a school coach engaged in private speech, not government speech, when he uttered prayers without his players at midfield); *Shurtleff v. City of Bos.*, 596 U.S. 243, 252 (2022) (explaining that "[t]he boundary between government speech and private expression can blur when . . . a government invites the people to participate in a program" and the court must "conduct a holistic inquiry to determine whether the government intends to speak for itself" in such situations). The Supreme Court exercises "great caution before extending . . . government-speech precedents," because of the risk that "private speech could be passed off as government speech" and "silence[d] or muffle[d]" by "simply affixing a government seal of approval." *Matal v. Tam*, 582 U.S. 218, 219, 237–38 (2017) (finding that registered trademarks are not government speech); *Wandering Dago*, 879 F.3d at 35 (quoting *Matal*, 582 U.S. at 219).

The Court finds that a school district's team names, logos, and mascots when worn on school team apparel is not government speech because, even assuming school team apparel has a history of communicating messages from the states, the display of team names, logos, and mascots on apparel is not "closely identified in the public mind" with New York State. *See Walker*, 579 U.S. at 209–13 (finding that Texas license plate designs are closely associated with Texas because "[e]ach Texas license plate is a government article serving the governmental purposes of vehicle registration and identification"); *Matal*, 582 U.S. at 238 (explaining that "*Walker* . . . likely marks the outer bounds of the government-speech doctrine"); *New Hope Fam. Servs. v. Poole*, 966 F.3d 145, 171 (2d Cir. 2020) (explaining that "the mere fact that government authorizes, approves, or licenses certain conduct does not transform the speech engaged in

A-255

therein to government speech."); *Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1074–76 (11th Cir. 2015) (finding that banners advertising a private business on school grounds are government speech in part because the "banners are hung on school fences, and government property is 'often closely identified in the public mind with the government unit that owns the land.'" (quoting *Pleasant Grove*, 555 U.S. at 472)).  Although Defendants argue that the team names, logos, and mascots themselves are government speech, (Defs.' Mem. 31–32), Plaintiffs have only alleged that Part 123 implicates their ability to wear these symbols on the "medium" of school team apparel.  (Am. Compl. ¶ 171; 23-CV-7696 Am. Compl. ¶ 193; 23-CV-7229 Am. Compl. ¶¶ 218, 227.)  Unlike in *Walker* where the license plates functioned as "essentially, government IDs," apparel with a school's team name, logo, or mascot is merely worn as a source of school pride and to support the school community — not as a method of government identification.  (Am. Compl. ¶¶ 161, 166); *see Walker*, 579 U.S. at 212 (finding that license plates are closely associated with Texas because "every Texas license plate is issued by the state," the state name appears "in large letters at the top of every plate," Texas vehicle owners are required to display Texas license plates, Texas "owns the designs on its license plates," and Texas determines how drivers can dispose of unused plates).  Further, unlike the license plates in *Walker* that included the state name on the license plate, the logos, team names, and mascots displayed on the school team apparel do not reference "New York."  (Am. Compl. ¶ 47; 23-CV-7696 Am. Compl. ¶¶ 73–76; 23-CV-7299 Am. Compl. ¶¶ 54–55); *see Walker*, 579 U.S. at 212 (explaining that the "governmental nature of the plates is clear from their faces" because "the [s]tate places the name 'TEXAS' in large letters at the top of every [license] plate").  Accordingly, these symbols on team apparel do not allow the public to "appreciate the identity of the speaker" as New York State.  *Pleasant Grove*, 555 U.S. at 471.

In addition, New York maintains minimal control over usage of the school team apparel with team names, logos, and mascots.  *Appeal of McMillan*, 61 Ed. Dept. Rep., Decision No. 18,058 (citing *Appeal of Tobin*, 25 Ed. Dept. Rep. 301, Decision No. 11,591) (discussing how "a board of education generally has discretion to determine 'the propriety of [a sports] team name,'" and "may abuse its discretion if a team name mascot, or logo inhibits the creation of 'a safe and supportive [learning] environment'"); *Walker*, 579 U.S. at 209–13 (finding that Texas's prohibition against the display of the confederate flag on specialty license plates is government speech in part because "Texas maintains direct control over the messages conveyed on its specialty plates" by exercising "final approval authority").  Unlike in *Walker*, where Texas "actively exercised" its authority to have "sole control over the design, typeface, color, and alphanumeric pattern for all license plates," New York only reviews a board of education's choices in team name for an abuse of discretion.  *Walker*, 579 U.S. at 209–13; *Appeal of Tobin*, 25 Ed. Dept. Rep. 301, Decision No. 11,591 ("Such decisions [regarding sports team names, mascots and logos] will only be reversed upon a showing that a board abused its discretion."); *see also Cambridge Christian Sch. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F. 4th 1266, 1292–93 (11th Cir. 2024) (finding that a school athletic association's denial of a school's request to present a prayer over the announcement system fell outside of the First Amendment because announcements over the public announcement system, including those by private parties, are perceived to be government speech); *Cajune v. Indep. Sch. Dist*. *194*, 105 F.4th 1070, 1082 (8th Cir. 2024) (holding that Black Lives Matter posters placed in public schools were not government speech because the school district relinquished control by allowing "private persons, including 'staff and families' in the District" to place posters on school walls); *Shurtleff*, 596 U.S. at 256–57 (finding that a city's flag-raising program was not government speech where the

city did not exercise sufficient control over the program because "[t]he city's practice was to approve flag raisings, without exception" and "ha[d] no record of [previously] denying a request"). Further, in at least one instance, the team apparel bearing the school team name, logo, and mascot is not exclusively provided by New York State or its public schools. (Am. Compl. ¶ 54 ("At any school or community function, you will see most people are sporting 'Chiefs' apparel, which is not only sold in the Massapequa High School Chiefs Apparel Store, but in other privately-owned businesses around town.").) Because school team apparel is not closely associated with the state and there is no indication that the apparel is distributed subject to a "final approval authority," the school districts' team names, logos, and mascots are not government speech when displayed on school team apparel.

### 2. Individual Board Member Plaintiffs' conduct as government speech

Defendants argue, in the alternative, that Individual Board Member Plaintiffs' expressive conduct in wearing team apparel is government speech and that the "First Amendment is inapplicable to 8 NYCRR § 123.5 for the separate and independent reason that any speech related to such symbols is public employee speech." (Defs.' Mem. 33.) First, Defendants argue that Plaintiffs speak as government employees — not private citizens. (*Id.* at 33–34; Defs.' Suppl. Mem. 2.) Defendants contend that, within the "spatial confines" of school grounds and functions, any speech related to the Indigenous names, mascots, and logos, including display of such symbols to "support" the school community, "is inextricably intertwined with their official position as board members." (Defs.' Mem. 34; *see also* Defs.' Suppl. Reply 3.) In support, Defendants emphasize Individual Board Member Plaintiffs' "high level of authority and responsibility" and argue that Part 123 "expressly requires school boards to devise their school districts' plans to eliminate the use of Indigenous names and imagery." (Defs.' Mem. 34–35; *see*

*also* Defs.' Suppl. Mem. 3.)  Second, Defendants argue that Individual Board Member Plaintiffs'

Indigenous team apparel is not speech on a matter of public concern.  (*Id.* at 35.)  In support,

Defendants argue that Plaintiffs "do not allege any broader public statement associated with their

expressive conduct," (*id.* at 36), and any "proposed protest concerning the propriety of their

districts' Indigenous team names and logos would necessarily be 'part-and-parcel' of their

responsibility as board members to choose their districts' team names and logos," (Defs.' Suppl.

Mem. 2).  Defendants argue that "Plaintiffs can assert no First Amendment based claim,

retaliation or otherwise, without first satisfying the strictures of *Garcetti* [*v. Ceballos*, 547 U.S.

410 (2006)]."  (Defs.' Suppl. Reply 2.)  Third, Defendants argue that "[e]ven if the [Individual]

Board Member Plaintiffs had alleged a desire to act as private citizens on a matter of public

concern," Part 123 would pass the *Pickering*/*NTEU*[21] balancing test because "the State's policy

of ensuring a discrimination- and harassment-free learning environment for all students by

prohibiting the use of Indigenous names, mascots, and logos" outweighs Individual Board

Member Plaintiffs' interest in expressing support for their schools.  (Defs.' Mem. at 37–38; *see*

*also* Defs.' Suppl. Reply 3–4.)  Finally, Defendants argue that "Plaintiffs' belated attempt to

revise their claims should be rejected because 'Plaintiff[s] may not amend [their] [Amended]

[C]omplaint[s] through [their] opposition to a motion to dismiss and the Court is constrained in

---

[21] *United States v. Nat'l Treasury Emps. Union* ("*NTEU*"), 513 U.S. 454, 468 (1995) (explaining that where a ban "chills potential speech before it happens" that "Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." (first citing *Near v. Minnesota ex rel Olson*, 283 U.S. 697 (1931), and then quoting *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 571 (1968))); *Pickering*, 391 U.S. at 568 (explaining that "[t]he problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

determining whether a claim's plausibility by what is contained on the face of the complaint.'" (Defs.' Suppl. Mem. 2 (first, second, and fifth alteration in original) (citing *Lyman v. NYS OASAS*, 928 F. Supp. 2d 509, 527 n.5 (N.D.N.Y. 2013)).)

Plaintiffs argue, first, that they are "not expressing government speech" because they are "engaging in associational activities and viewpoint expression as individuals, parents and members of the school community." (Pls.' Suppl. Mem. 1; *see also* Pls.' Opp'n 42–43 (first citing *Latino Officers Ass'n, N.Y., Inc. v. City of New York*, 196 F.3d 458, 468–69 (2d Cir. 1999); then citing *Kennedy*, 597 U.S. at 528–29).) Plaintiffs also argue that the government speech doctrine is inapplicable to Individual Board Member Plaintiffs because they are volunteer board of education members — not employees. (Pls.' Suppl. Mem. 2–3.) Second, Plaintiffs argue that they are engaged in a matter of public concern because "Individual [Board Member] Plaintiffs wear their team apparel to demonstrate pride in and approval of their respective team names." (Pls.' Opp'n 47.) Third, Plaintiffs argue that, as a prior restraint, Part 123.5 is subject to the more rigorous *NTEU* balancing test, not *Pickering*. (Pls.' Suppl. Mem. 2 (citing *Latino Officers Ass'n, N.Y., Inc.*, 196 F.3d at 464).) In support, Plaintiffs argue that Part 123 is unconstitutional under the *NTEU* balancing test because "Defendants have provided no examples of DASA violations relating to the Massapequa Chiefs, the Wantagh Warriors, the Wyandanch Warriors, . . . or the Connetquot Thunderbirds." (Pls.' Opp'n 48–49.) Finally, Plaintiffs argue that they are not required to "recite every basis for which [P]laintiffs engaged in activity protected by the First Amendment" and that their "[p]leadings must be construed so as to do justice," such as protesting the regulations at issue, in their initial pleadings. (Pls.' Suppl. Mem. 1 n.1 (first citing Fed. R. Civ. P. 8(a); and then quoting Fed. R. Civ. P. 8(e)).)

As the Supreme Court has made clear, public employees do not surrender their First

Amendment rights to comment on matters of public interest because of their employment.  *See Garcetti*, 547 U.S. at 417 ("[P]ublic employees do not surrender all their First Amendment rights by reason of their employment.  Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." (citations omitted)); *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will County*, 391 U.S. 563, 568 (1968) (noting that the Supreme Court has "unequivocally rejected" the notion that "teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work"); *see also Wrobel v. County of Erie*, 692 F.3d 22, 27 (2d Cir. 2012) ("Public employees do not surrender their First Amendment rights to comment on matters of public interest by virtue of their acceptance of government employment." (citations omitted)).

The Supreme Court has instructed courts to conduct a two-step inquiry into whether a public employee's speech is entitled to protection:

> The first [step] requires determining whether the employee spoke as a citizen on a matter of public concern.  If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.  If the answer is yes, then the possibility of a First Amendment claim arises.  The question [then] becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Lane v. Franks*, 573 U.S. 228, 237 (2014) (quoting *Garcetti*, 547 U.S. at 418); *Piscottano v. Murphy*, 511 F.3d 247, 270 (2d Cir. 2007) ("If the answer [to the first question] is yes, then the possibility of a First Amendment claim arises." (quoting *Garcetti*, 547 U.S. at 418)).[22]  Thus, the

---

[22]  Individual Board Member Plaintiffs' free speech claims under Article 1, Section 8 of

First Amendment protects a public employee for the employee's speech only if the employee speaks "[1] as a citizen [2] on a matter of public concern." *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013) (alterations in original) (quoting *Garcetti*, 547 U.S. at 418); *Specht v. City of New York*, 15 F.4th 594, 600 ("The speech of a public employee is protected by the First Amendment when the employee speaks as a citizen on a matter of public concern, rather than pursuant to his employment responsibilities."); *Montero v. City of Yonkers*, 890 F.3d 386, 395 (2d Cir. 2018) (same); *see also Eyshinskiy v. Kendall*, 692 F. App'x 677, 678 (2d Cir. 2017) ("The first inquiry encompasses two separate questions: '(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke as a citizen rather than solely as an employee. If the answer to either question is no, that is the end of the matter.'" (quoting *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015))); *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 129–30 (2d Cir. 2013) ("[T]he plaintiff must show that . . . the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest . . . ."); *Best Payphones Inc. v. Dobrin*, 410 F. Supp. 3d 457, 474 (E.D.N.Y. 2019) (same). When an employee has spoken on a matter of public concern, "a court must balance 'the employee's interest in expressing herself' against 'any injury the speech could cause

---

the New York State Constitution are subject to the same analysis as their First Amendment claims. *See Martinez v. Sanders*, 307 F. App'x 467, 468 & n.2 (2d Cir. 2008) (noting that the plaintiff's "freedom of speech, political freedom and affiliation, and freedom of association" claims under Article 1 § 8 of the New York State Constitution were "subject to the same standards as the First Amendment claims" (citations omitted)); *Carter v. Inc. Vill. of Ocean Beach*, 693 F. Supp. 2d 203, 212 (E.D.N.Y. 2010), *aff'd*, 415 F. App'x 290 (2d Cir. 2011) ("[F]ree speech claims under Article 1, Section 8 of the New York State Constitution are subject to the same analysis as free speech claims under the First Amendment[.]" (citations omitted)); *Hous. Works, Inc. v. Turner*, 179 F. Supp. 2d 177, 199 n.25 (S.D.N.Y. 2001) ("Free speech claims under the First Amendment and the New York State Constitution are subject to the same standards[.]"). Because the Court dismisses Individual Board Member Plaintiffs' federal free speech claims, the Court similarly grants Defendants' motion to dismiss Individual Board Member Plaintiffs' state free speech claims.

to the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Locurto v. Giuliani*, 447 F.3d 159, 172 (2d Cir. 2006) (citation and internal quotation marks omitted); *see Garcetti*, 547 U.S. at 418 (explaining that the court must consider "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public"); *Piscottano*, 511 F.3d at 270 (explaining how courts must consider whether the government "employer has shown that the employee's interest in expressing himself on that matter is outweighed by injury that the speech could cause to the employer's operations" (citations omitted)). The Second Circuit has held that the "public concern" requirement applies to associational conduct in addition to speech. *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004).

A matter of public concern is "is a question of law to be determined based on 'the content, form, and context of a given statement, as revealed by the whole record,'" including "whether the speech . . . had a broader public purpose," and "whether the speech can 'be fairly considered as relating to any matter of political, social, or other concern to the community'" *See Heim v. Daniel*, 81 F.4th 212, 228 (2d Cir. 2023) (first quoting *Connick*, 461 U.S. at 147–48 & n.7; then quoting *Singer*, 711 F.3d at 339; and then quoting *Lane*, 573 U.S. at 241); *Spencer*, 540 F. App'x at 70 ("A matter of public concern is one that relates to any matter of political, social, or other concern to the community." (alteration and internal quotation marks omitted) (quoting *Singer*, 711 F.3d at 339)); *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004) ("[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication"). To determine whether speech is a matter of public concern, the Court must take into consideration the "content, form, and context" of the speech. *See Singer*, 711 F.3d at 339 ("Whether an

employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983))); *Spencer*, 540 F. App'x at 70 (same); *see also Adams*, 536 F. App'x at 145 ("Whether speech is a matter of public concern is . . . determined by the 'content, form and context of a given statement, as revealed by the whole record.'" (quoting *Connick*, 461 U.S. at 147–48 & n.7)); *Wells v. Saratoga Hosp.*, No. 24-CV-260, 2025 WL 391180, at *7 (N.D.N.Y. Feb. 4, 2025) ("Whether speech is on a matter of public concern is a question of law to be determined based on the content, form, and context of a given statement, as revealed by the whole record" (internal quotation marks omitted) (quoting *Heim*, 81 F.4th at 228)).

The court must also examine whether the speech addresses a personal grievance or has a public purpose. *Spencer*, 540 F. App'x at 70 ("Among the relevant considerations is whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." (quoting *Singer*, 711 F.3d at 339)); *see also Heim,* 81 F.4th at 228 (explaining that courts "look[] to, among other things, 'whether the speech . . . had a broader public purpose" in determining whether speech addresses matter of public concern (quoting *Singer*, 711 F.3d at 339)); *MacFall v. City of Rochester*, 495 F. App'x 158, 160–61 (2d Cir. 2012) (stating that speech is not protected if it is "merely 'calculated to redress personal grievances'" (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008))); *Wells*, 2025 WL 391180, at *7 ("[W]hen assessing whether speech was a matter of public concern, courts consider 'whether the employee's speech was calculated to redress personal grievances or whether it had a broader public purpose.'" (quoting *Ruotolo*, 514 F.3d at 189)). Although the court can consider the employee's motive, any such motive is not dispositive of the issue. *Spencer*, 540 F. App'x at 70 ("The employee's motive for speaking 'surely may be one factor' in determining whether the

speech was on a matter of public concern, but motive 'is not, standing alone, dispositive or conclusive.'" (quoting *Sousa v. Roque*, 578 F.3d 164, 175 (2d Cir. 2009))). "The fact that a statement was made to the employer in private is not determinative of whether its subject was a matter of public concern." *Jackler v. Byrne*, 658 F.3d 225, 235–36 (2d Cir. 2011) (citations omitted).

When an employee speaks as a citizen on a matter of public concern, the Court must "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. In situations involving prior restraints on such speech, "the Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government.'" *NTEU*, 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571); *Latino Officers Ass'n, N.Y., Inc.*, 196 F.3d at 463 (explaining that "the government's burden of justification is 'greater' with respect to . . . *ex ante* restrictions"); *Harman v. City of New York*, 140 F.3d 111, 118 (2d Cir. 1998) ("The burden is particularly heavy where, as here, the issue is not an isolated disciplinary action taken in response to one employee's speech, but is, instead, a blanket policy designed to restrict expression by a large number of potential speakers"). The burden is on the government to "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 475 (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622,

664 (1994)); *Latino Officers Ass'n, N.Y., Inc.*, 196 F.3d at 463 (explaining that "the government

'must do more than simply posit the existence of the disease sought to be cured'").[23]

While the Court finds that Individual Board Member Plaintiffs spoke as citizens when

wearing school apparel at school-affiliated events, Individual Board Member Plaintiffs have

failed to allege that they were speaking on a matter of public concern when doing so.

Accordingly, Individual Board Member Plaintiffs' speech does not garner First Amendment

protections.[24]

---

[23] Plaintiffs argue that the Court must apply the *NTEU* balancing test regardless of whether the government employees have spoken as citizens on public concern. (Pls.' Suppl. Mem. 2.) In support, Plaintiffs primarily rely on the government speech analysis in *Latino Officers Ass'n.* (*Id.*)  See *Latino Officers Ass'n, N.Y., Inc. v. City of New York*, 196 F.3d 458, 463, 465 (2d Cir. 1999) (holding that "the District Court properly subjected the defendants to the 'greater' burden of justification set forth in *NTEU*" when government employees challenged an New York Police Department "parade policy restrain[ing] speech 'before it occurs'" (citation omitted)). However, in applying the *NTEU* standard, the Second Circuit in *Latino Officers Ass'n,* examined whether the government employees had spoken on a matter of public concern. *See Latino Officers Ass'n, N.Y., Inc.* 196 F.3d at 466 (discussing how plaintiffs' interest in communicating ethnic pride as members of the NYPD is not necessarily a matter only of private concern when applying the heightened *NTEU* standard); *Harman v. City of New York*, 140 F.3d 111, 118 (2d Cir. 1998) (discussing how the plaintiffs each had an interest "in being able to comment on matters of public concern" where the plaintiffs challenged a "prospective regulation" that operated as "a blanket policy designed to restrict expression by a large number of potential speakers"). Thus, contrary to Plaintiffs' argument, the Court finds it is appropriate to first examine whether the government employees have spoken as citizens on a matter of public concern.

[24] Although Plaintiffs contend that the government speech doctrine is inapplicable because they are volunteer board members, as opposed to employees, (Pls.' Suppl. Mem. 2), courts in the Second Circuit have applied the government speech doctrine to volunteers. *See Langton v. Town of Chester*, 168 F. Supp. 3d 597, 604 (S.D.N.Y. 2016) ("The Second Circuit has employed the public employee First Amendment claim analysis specifically with respect to volunteers." (first citing *Gorman–Bakos v. Cornell Co-op Extension of Schenectady Cnty.,* 252 F.3d 545, 549, 551–57 (2d Cir. 2001); and then citing *Monz v. Rocky Point Fire Dist.,* 519 F. App'x 724, 726–27 (2d Cir. 2013))); *see also Gorman–Bakos v. Cornell Co-op Extension of Schenectady Cnty.,* 252 F.3d 545, 549, 551–57 (2d Cir. 2001) (applying a First Amendment retaliation claim analysis to a case involving volunteer leaders for a youth program); *Monz,* 519 F. App'x at 726-27 (applying *Garcetti* to a volunteer firefighter's First Amendment claims);

### A.  Plaintiffs plausibly spoke as citizens

The wearing of team apparel while attending school games and functions is not part of each Individual Board Member Plaintiff's "employment responsibilities," as a school board member.  N.Y. Educ. L. § 1709 (describing how the powers and duties of a board of education member include, *inter alia*, "establish[ing] such rules and regulations concerning the order and discipline of the schools" and "prescrib[ing] the text-books to be used"); *Lane*, 573 U.S. at 237–40 ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes . . . . The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." (quoting *Garcetti*, 547 U.S. at 421)).  There is no indication that wearing team apparel is "part-and-parcel" of Individual Board Member Plaintiffs' ability to exercise their "official duties" as school board members.  *Montero*, 890 F.3d at 396 (quoting *Weintraub v. N.Y.C. Bd. of Educ. of City School Dist.*, 593 F.3d 196, 203 (2d Cir. 2010)); *United Veterans Mem'l and Patriotic Ass'n of the City of New Rochelle v. City of New Rochelle*, 72 F. Supp. 3d 468, 478 (S.D.N.Y. 2014) (finding that a veterans' association's display of a historical flag on a city flagpole was government speech that was excluded from First Amendment protections), *aff'd*, 615 F. App'x. 693 (2d Cir. 2015); *see also Kennedy*, 597 U.S. at 512–14, 529 (finding that a high school football coach "offer[ing] a quiet prayer of thanks" at

---

*Morton v. County of Erie*, 335 F. Supp. 3d 449, 452 (W.D.N.Y. 2018) (noting that the court previously dismissed a former elected legislator's First Amendment retaliation claim), *aff'd*, 796 F. App'x 40 (2d Cir. 2019); *Joinnides v. Floral Park-Bellerose Union Free Sch. Dist.*, No. 12-CV-5682, 2016 WL 3841096, at *15 (E.D.N.Y. July 13, 2016) (noting that "courts in th[e] [Second] Circuit have considered civic volunteers to be public employees in the context of First Amendment retaliation claims" and therefore finding framework applicable to plaintiff's conduct while serving on the school board's budget advisory committee).  The Court therefore applies a First Amendment claims analysis to Individual Board Member Plaintiffs' First Amendment free speech claims.

midfield after games was private speech because "he was not engaged in speech 'ordinarily within the scope' of his duties as a coach").  Rather than acting as representatives of the school, Individual Board Member Plaintiffs allege that they wear the school apparel in their roles as a "member of the school community, parent, and/or relative."  (Pls.' Opp'n 42–46; Am. Compl. ¶ 171.)  Plaintiffs therefore plausibly speak as citizens for purposes of First Amendment protection when they wear team apparel to school games and functions.

### B.  Matter of public concern

Each Plaintiff alleges that they wear their school team apparel at school functions to support their school community.  (Am. Compl. ¶ 166; 23-CV-7299 Am. Compl. ¶¶ 226, 230–32; 23-CV-7696 Am. Compl. ¶ 193.)  However, wearing team apparel to support a community does not convey a sufficiently particularized message to constitute a matter of public concern.  *See Roe*, 543 U.S. at 84 (finding that "there is no difficulty in concluding that [plaintiff's] expression does not qualify as a matter of public concern under any view of the public concern test" where the police officer made and sold sexually explicit videos and that because "[h]e fails the threshold test [then] *Pickering* balancing does not come into play"); *Church of Am. Knights of the Ku Klux Klan*, 356 F.3d at 200, 207–08 (holding that when "a statute banning conduct imposes a burden on the wearing of an element of an expressive uniform, which element has no independent or incremental expressive value, the First Amendment is not implicated" in a case where Ku Klux Klan members challenged New York's anti-mask law); *Zalewska,* 316 F.3d at 319–20 (holding that a female employee's choice to wear a skirt, while expressive, "did not constitute the type of expressive conduct which would allow her to invoke the First Amendment" because the message she "intend[ed] to convey [was] not a specific, particularized message, but rather a broad statement of cultural values" and because "the ordinary viewer would glean no

particularized message from [her] wearing of a skirt rather than pants as part of her uniform").

Accordingly, Plaintiffs' allegations contain no indication that their association with the

Indigenous team names, logos, and mascots are "relat[ed] to any matter of political, social, or

other concern to the community."[25]  *Piscottano*, 511 F.3d at 253, 270, 274–76 (finding that "the

nature and character of the Outlaws [criminal organization] is a topic of public concern" and that

plaintiffs, who were correctional officers, engaging "in expressive conduct approving of the

Outlaws," such as wearing Outlaw colors and denying Outlaws chapters have engaged in

criminal activity, merit First Amendment protections (citing *Connick*, 461 U.S. at 146)); *see also*

*Latino Officers Ass'n, N.Y., Inc.,* 196 F.3d at 466, 468–69 (finding that "plaintiffs' interest in

communicating ethnic pride as members of the NYPD is not necessarily a matter only of private

---

[25]  In their opposition, Plaintiffs argue that "wear[ing] Chiefs, Warriors, or Thunderbirds apparel to school events" is now a "political protest due to Part 123."  (Pls.' Opp'n 34.)  The Second Circuit has recognized that protests by government employees may constitute matters of public concern.  *See, e.g.*, *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 207 (2d Cir. 2004) (holding that the "New York Police Department's parade policy likely ran afoul of the First Amendment by preventing the plaintiffs . . . from marching in parades while wearing their police uniforms to protest discrimination and misconduct within the police force"); *Zalewska v. County of Sullivan*, 316 F.3d 314, 320 (2d Cir. 2003) ("The Supreme Court has been careful to distinguish between communicative activity with a clear contextual message, such as the wearing of a black armband in protest during the Vietnam War, compared with other types of activity, like choosing what to wear in the ordinary course of employment.") (citing *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 507–08 (1969)).  However, Individual Board Member Plaintiffs cannot amend their Complaint through their motion papers.  *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (rejecting claim raised for the first time in plaintiff's brief in opposition to the defendant's motion to dismiss); *D'Alessandro v. City of New York*, 713 F. App'x 1, 10 n.12 (2d Cir. 2017) (explaining that a court will "test the sufficiency of *a complaint* in response to a Rule 12(b)(6) motion to dismiss" and that a plaintiff is "not entitled to amend its complaint through statements made in motion papers." (first citing *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847 F.3d 92, 94 (2d Cir. 2017); then quoting *Wright*, 152 F.3d at 178); *Haczynska v. Mount Sinai Health Sys., Inc.,* 738 F. Supp. 3d 300, 317 n.11 (E.D.N.Y. 2024) (explaining that "[i]t is axiomatic that the [c]omplaint cannot be amended by the briefs in opposition to a motion to dismiss." (alteration in original) (collecting cases)); *Trooper 1 v. N.Y. State Police*, No. 22-CV-893, 2024 WL 3401196, at *5 (E.D.N.Y. July 12, 2024) (declining to address a hostile work environment argument because it was an "argument advanced only in [plaintiff's] opposition brief").

concern" where the police department "authorize[d] other groups such as the Hispanic Society to march in uniform," but sought to prohibit members of the New York Police Department's Latino Officers Association from doing the same); *Rys v. Grimm*, No. 19-CV-1251, 2021 WL 827671, at *7 (N.D.N.Y. Mar. 4, 2021) (noting that the plaintiff failed to allege "anything indicating that her 'association with an "openly gay" student' was intended to convey a public message or 'advance a political or social point of view beyond the employment context' that would make it a public concern"); *Medici v. City of Chicago*, 144 F. Supp. 3d 984, 978–88 (N.D. Ill. 2015) (finding constitutional a policy requiring on-duty police officers to cover up tattoos and explaining that "[p]laintiffs' tattoos are a form of personal expression, and not a form of speech on matters of public concern" because "[w]hen an individual decides to place a symbol, a set of words, or a design on his or her body, he or she is engaging in a form of personal expression, rather than a form of commentary on the interests of the public.").

Since Plaintiffs have not spoken on a matter of public concern and therefore their conduct is not protected by the First Amendment, the Court does not reach the merits of their free speech claims or whether Part 123.5 constitutes a content- or viewpoint-based prior restraint on free speech. The Court grants Defendants' motion to dismiss Individual Board Member Plaintiffs First Amendment free speech claims and grants them leave to amend to allege specific facts supporting their claims.[26]

---

[26] The Court notes that, as alleged, Individual Board Member Plaintiffs have only challenged Part 123.5 as violating the First Amendment. (Am. Compl. ¶¶ 150–71.) Accordingly, even if Individual Board Member Plaintiffs amend their Complaint to state a plausible First Amendment challenge to Part 123.5, a finding that Part 123.5 is unconstitutional would not affect Part 123.3, which requires schools to eliminate prohibited Indigenous names, logos, and mascots no later than the end of the 2024–2025 school year. 8 NYCRR § 123.3.

### iv.  Constitutional separation of powers claims

Plaintiffs attempt to allege a separation of powers claim under the New York State Constitution,[27] (Am. Compl. ¶¶ 126–31), but for the reasons explained below, the Court declines to exercise supplemental jurisdiction over the claim.

Defendants argue that the Court should decline to exercise supplemental jurisdiction over Plaintiffs' New York Constitution separation of powers claim pursuant to 28 U.S.C. § 1367(c)(1), and if the Court does exercise supplemental jurisdiction, the Court should nevertheless find that Plaintiffs have failed to state a valid claim.[28]  (Defs.' Mem. 16, 18–19.)  In

---

[27]  Plaintiffs also allege a separation of powers claim under the United States Constitution.  (Am. Compl. ¶¶ 125–31.)  Although Individual Board Member Plaintiffs have capacity to bring such a claim in their personal capacity, (*see supra* n.10), Plaintiffs have not made any arguments to support this claim, and in any event, cannot state such a claim.  (Pls.' Opp'n 1, 49–59.)  "[T]he separation-of-powers principles that the Constitution imposes upon the Federal Government do not apply against the states."  *Stop the Beach Renourishment, Inc. v. Fla. Dept. of Envt. Prot.*, 560 U.S. 702, 719 (2010)); *see also Consolidated Edison Co. of N.Y., Inc. v. Pataki*, 292 F.3d 338, 343, 346 n.4 (2d Cir. 2002) (noting that "the federal Constitution does not impose any particular separation of powers requirement on state governments . . . . "); *Friedman v. Beame*, 558 F.2d 1107, 1111 n.8 (2d Cir. 1977) (noting as dicta that "[t]he check on the authority of the executive branch of the federal government, flowing from the 'delegation' doctrine, derives from the separation of powers and is not enforceable against the states" (citations omitted)); *Gray v. Nordstrom*, No. 18-CV-1402, 2019 WL 2193463, at *5 (D. Conn. May 21, 2019) ("[T]he separation of powers doctrine, as embodied in the federal Constitution, is not binding on state or municipal governments." (citation omitted)); *De La Garza v. Lantz*, No. 08-CV-15, 2010 WL 2825818, at *2 (D. Conn. July 15, 2010) (noting that, "as the Supreme Court has explained, the separation-of-powers principles that the Constitution imposes upon the Federal Government do not apply against the States" (internal quotation marks and citations omitted)).  Because Plaintiffs cannot assert a valid separation of powers challenge to Part 123 pursuant to the United States Constitution, the Court grants Defendants' motion to dismiss Individual Board Member Plaintiffs' federal separation of powers claim.

[28]  Defendants argue that if the Court exercises supplemental jurisdiction over this claim, it should find that Plaintiffs "fail to state a claim that Part 123 is an unconstitutional usurpation of the Legislature's non-delegable legislative powers."  (Defs.' Mem. 20.)  In support, Defendants argue that: (1) the New York Legislature "expressly delegated broad authority to both SED and its Commissioner to implement rules and regulations to advance state policy goals for

support of their argument that the Court should decline to exercise supplemental jurisdiction, Defendants argue that Part 123 is a developing state legal issue ill-suited for relief in federal courts.  (*Id.* at 19 (citing *Donohue v. Mangano*, 886 F. Supp. 2d 126, 148 (E.D.N.Y. 2012); *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 307–08 (2d Cir. 2003); *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001); *Seabrook v. Jacobson*, 153 F.3d 70, 72 (2d Cir. 1998)).) Defendants argue that Part 123's validity under the New York Constitution is "purely a matter of state law" and the regulation "involves matters of state governance" including "state oversight of its public school districts and efforts to further a state policy of ensuring safe and discrimination-free learning environment."  (*Id.* (citing *K.W. ex rel. Brown v. City of New York*, 275 F.R.D. 393, 400 (E.D.N.Y. 2011)).)

   Plaintiffs argue that the Court should exercise jurisdiction over this claim because "[their] federal and state law claims are based on the same set of events and derive from a common nucleus of operative fact."  (Pls.' Opp'n 52.)  Plaintiffs contend that the exception for declining to extend supplemental jurisdiction over novel or complex issues outlined in "28 U.S.C. [§] 1367(c)(1) does not apply."  (*Id.*)  In support, Plaintiffs argue that, "[w]hile Part 123 itself may be novel, Plaintiffs' challenges of Part 123 do not turn on novel or unresolved

—————————

learning environments within New York public schools," (*id.* at 21); (2) Part 123 falls within the scope of DASA, (*id.* at 22–23); (3) the Legislature's efforts to codify an Indigenous mascot ban do not constitute sufficient "vigorous debate" to limit SED's rulemaking authority, (*id.* at 23); and (4) SED's use of special expertise in enacting Part 123 weighs strongly in their favor, (*id.* at 23–24).  *See Boreali v. Axelrod*, 71 N.Y.2d 1 (1987) (providing the framework for evaluating whether an act of administrative rulemaking has exceeded its regulatory authority).  Plaintiffs argue that Defendants "exceeded their rule-making authority" in enacting Part 123, by making impermissible value judgments, exceeding the reach of DASA as an enabling statute after unsuccessful attempts by the Legislature to reach meaningful agreement on the issue, and relying on an "Indigenous Advisory Group" rather than the SED's own expertise.  (Pls.' Opp'n 57–59.) Because the Court declines to exercise supplemental jurisdiction over this claim, the Court does not decide whether Plaintiffs have stated a claim.

questions of state law" because "[t]he 'separation of powers' [doctrine] is a well-settled

doctrine," as are "Article 78 challenges," and "the requirements of SAPA." (*Id.* at 52–53.)

Plaintiffs also argue that the cases relied on by Defendants, *Donahue* and *K.W. ex rel. Brown*, are

factually distinguishable. (*Id.* at 53–54 (citing *Donohue*, 886 F.Supp. 2d at 133, 148; *K.W. ex

rel. Brown*, 275 F.R.D. at 400).)

"It is a principle of first importance that the federal courts are tribunals of limited subject

matter jurisdiction." *Wright v. Musanti*, 887 F.3d 577, 583 (2d Cir. 2018) (citation omitted).

"Under 28 U.S.C. § 1367(a), district courts 'shall have supplemental jurisdiction over all other

claims that are so related to claims in the action within such original jurisdiction that they form

part of the same case or controversy.'" *Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d

321, 332 (2d Cir. 2011) (quoting 28 U.S.C. § 1367(a)).  "[A] district court cannot exercise

supplemental jurisdiction unless there is first a proper basis for original federal jurisdiction."

*Cangemi v. United States*, 13 F.4th 115, 134 (2d Cir. 2021) (internal quotation marks omitted)

(quoting *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 399 (2d Cir. 2017)); *see also Montefiore

Med. Ctr.*, 642 F.3d at 332 ("In order to exercise supplemental jurisdiction, a federal court must

first have before it a claim sufficient to confer subject matter jurisdiction." (citing *United Mine

Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).  Both the claim conferring subject matter

jurisdiction and the supplemental claim "must stem from the same 'common nucleus of operative

fact'; in other words, they must be such that the plaintiff 'would ordinarily be expected to try

them all in one judicial proceeding.'" *Id.* (quoting *Gibbs*, 383 U.S. at 725); *see also Treglia v.

Town of Manlius*, 313 F.3d 713, 723 (2d Cir. 2002) (stating that supplemental jurisdiction is

proper where a state law "claim arises out of approximately the same set of events as [the]

federal . . . claim").  However, a district court may decline to exercise supplemental jurisdiction

over a claim for a number of reasons, including: "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."  28 U.S.C. § 1367(c).

A district court may decline to exercise supplemental jurisdiction over a claim if "the claim raises a novel or complex issue of [s]tate law."  28 U.S.C. § 1367(c)(1).  "Where a pendent state claim turns on novel or unresolved questions of state law, especially where those questions concern the state's interest in the administration of its government, principles of federalism and comity may dictate that these questions be left for decision by the state courts."  *Valencia*, 316 F.3d at 306 (finding that the district court had abused its discretion by exercising supplemental jurisdiction over state law claims because, at the time of the dismissal of federal claims, no judicial opinions had been issued on the "novel and complex issues of state law" involving the city's ability to create a "special relationship" with the plaintiff by failing to enforce local laws (citing *Seabrook*, 153 F.3d at 72)); *Norton v. Town of Brookhaven,* No. 22-1015, 2023 WL 3477123, at *4 (2d Cir. May 16, 2023) (vacating the district court's decision to exercise supplemental jurisdiction "where at least one of the remaining state law claims raised an unresolved question of state law" and therefore comity counseled "strongly against the exercise of supplemental jurisdiction."); *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 81 (2d Cir. 2018) (same); *Ash v. Jacobson*, No. 16-CV-9548, 2020 WL 2848178, at *6 (S.D.N.Y. June 1, 2020) (same); *Shariar v. Smith & Wollensky Rest. Grp, Inc.*, 659 F.3d 234, 245–56 (2d Cir. 2011) (affirming the district court's decision to exercise supplemental jurisdiction in part because the state law claims did not raise complicated or novel issues of state law); *cf. Winter v. Northrup*,

334 F. App'x 344, 345–47 (2d Cir. 2009) (finding that the district court did not abuse its discretion in retaining jurisdiction over state law claims, "given that (1) discovery had been completed, (2) the state claims were far from novel, and (3) the state and federal claims were substantially identical"); *see also Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (explaining that courts must balance "values of judicial economy, convenience, fairness, and comity . . ." when determining whether to exercise supplemental jurisdiction over state law claims).

Where a district court has dismissed all claims over which it has original jurisdiction, it "must reassess its jurisdiction over the remaining state law claims by considering 'judicial economy, convenience, fairness, and comity.'" *Morton v. County of Erie*, 796 F. App'x 40, 44 (2d Cir. 2019) (quoting *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004); *Jordan v. Chase Manhattan Bank*, 91 F. Supp.3d 491, 511 (S.D.N.Y. 2015) (considering whether to exercise supplemental jurisdiction after dismissing plaintiff's federal claims, and ultimately declining to exercise supplemental jurisdiction over plaintiff's state law claims because "no circumstances counsel in favor of the [c]ourt's exercising supplemental jurisdiction."); *J.E. ex rel. Edwards v. Center Moriches Union Free Sch. Distr.*, 898 F. Supp. 2d 516, 559–60 (E.D.N.Y. 2012) (granting defendants' motion for summary judgment as to the federal claims, and declining to exercise supplemental jurisdiction over plaintiff's state claims because the federal claims were dismissed before trial and because "comity suggests that this case would be better litigated in state court where the conduct of state actors can be adjudicated by the state court under state law" (citing *Saggio v. Sprady*, 475 F. Supp. 2d 203, 212–13 (E.D.N.Y. 2007))); *Baptiste v. W. Hotel*, No. 04-CV-5544, 2005 WL 1020779, at *5 (S.D.N.Y. Apr. 27, 2005) (declining to exercise supplemental jurisdiction after finding there were "no special

circumstances" mitigating in favor of retaining federal jurisdiction in a case after dismissing the plaintiff's federal claims and plaintiff's remaining claims "solely sound[ed] in state law.").

Although all of Plaintiffs' state and federal claims arise from a common nucleus of operative facts, because Plaintiffs' New York Constitution separation of powers claim challenging Part 123 presents novel and unresolved questions of state law, the Court declines to exercise supplemental jurisdiction over the claim.  *See Valencia*, 316 F.3d at 301–02, 307 (finding that the district court abused its discretion by exercising supplemental jurisdiction over a state law claim that turned on issues the Second Circuit considered novel and "unsettled" despite the New York Court of Appeals opining on the issue in a previous case).  No court has decided whether Part 123 is valid under the New York Constitution, and therefore, Plaintiffs' challenge to Part 123 presents novel and unresolved questions of state law.  *See Cambridge Cent. Sch. Dist. v. N.Y. State Educ. Dep't*, 200 N.Y.S.3d 804, 804–05 (App. Div. 2023) (holding, that Part 123 "render[ed] th[e] appeal moot" because the petitioner sought to continue using the "Indians" nickname and imagery prohibited by Part 123, but not deciding its constitutionality); *see also Valencia* at 306 (finding the state law issues that the district court exercised supplemental jurisdiction over were novel and "unsettled" despite the New York Court of Appeals having addressed them in a single previous case, because state courts had not yet had the opportunity to apply that precedent, and, as a result, the limited state caselaw on the matter left the issue unsettled and the district court's conclusions on "[un]sure footing"); *Blume v. Navient Corp*, No. 23-CV-1159, 2024 WL 2923704, at *4 (N.D.N.Y. June 10, 2024) (declining to exercise supplemental jurisdiction over plaintiff's state claims as "implicating unsettled questions of state law" because the state law in question "was only enacted in 2019 . . . and there is little case law addressing [it]"); *Piechowicz v. Lancaster Cent. Sch. Dist.*, No. 17-CV-845, 2022 WL 22782841,

at *17, *19 (W.D.N.Y. Jan. 18, 2022) (declining to exercise supplemental jurisdiction over

plaintiff's claims under New York Civil Rights Law § 79-n, and in the alternative dismissing

them, because § 79-n "presents a novel question of law not yet considered by New York courts,"

as it "'is a relatively new law' which New York courts have not had much opportunity to

consider such that 'there is little guidance' as to its applicability . . . [and] courts that have

considered § 79-n have not done so in the context of school bullying or harassment as is alleged

in the instant case." (quoting *Spring v. Allegany-Limestone Cent. Sch. Dist.*, No. 14-CV-476,

2017 WL 6512858, at *8 (W.D.N.Y. Dec. 20, 2017)), *report and recommendation adopted*, 2022

WL 17540648 (W.D.N.Y. Dec. 8, 2022)).  Because Part 123's constitutionality and scope

present unresolved questions of state law, the Court declines to exercise supplemental

jurisdiction over this claim.

     Plaintiffs' attempts to distinguish *Donohue* and *K.W. ex rel. Brown* are not persuasive.

(Pls.' Opp'n 52–53 (citing *Donohue*, 886 F. Supp. 2d at 133, 148; *K.W. ex rel. Brown*, 275

F.R.D. at 396).)  In *Donohue*, the court declined to exercise supplemental jurisdiction over the

plaintiffs' challenge to a county local law's impact on their ability to negotiate salaries and

benefits because of a parallel, ongoing state action, and to "avoid making a determination as to

novel and complex questions concerning the New York Constitution," including the "dispute as

to the proper application of various nuanced New York statutes."  *Donohue*, 886 F. Supp. 2d at

132–33, 148.  Similarly, in *K.W. ex rel. Brown*, the court declined to exercise supplemental

jurisdiction because bullying in public schools was a "developing" issue in state law, and noted

that state and local governments are "better suited" to creating policy than federal courts when

bullying interferes with learning.  *K.W. ex rel. Brown*, 275 F.R.D. at 400.  Although Plaintiffs

argue that the Court should examine the separation of powers doctrine, which is not novel, rather

than the novelty of Part 123, the courts in *Donohue* and *K.W. ex rel. Brown* relied on the novelty of the state and local laws and policies in declining to exercise supplemental jurisdiction over the plaintiffs' state law claims. *See K.W. ex rel Brown*, 275 F.R.D. at 400 ("[T]he subject of bullying in New York public schools is a developing state legal issue"); *Donohue*, 886 F. Supp. 2d at 148 (finding the state law claims turned on whether a new county law conflicted with state laws and thus "putting aside the . . . constitutional question, what remains is a dispute as to the proper application of . . . [state] statutes."). Accordingly, the Court declines to exercise supplementary jurisdiction over Plaintiffs' claim that Defendants passed Part 123 in violation of the New York State Constitution separation of powers doctrine.[29]

### c. Preliminary injunction

Plaintiffs seek a preliminary injunction. In support, Plaintiffs argue that (1) they will suffer irreparable harm if they are forced to use tax-payer dollars to retire the Indigenous names, logos, and mascots; (2) they are likely to succeed on the merits; and (3) the balance of hardships weighs in the Plaintiffs' favor because the potential injury to Defendants is "non-existent." (Pls.' Conf. Mem. 2–3.)

---

[29] The Court also declines to exercise supplemental jurisdiction because it dismisses all of Plaintiffs' federal claims. *Garrasi v. Wells Fargo Bank, N.A.*, No. 22-921, 2024 WL 191802, at *2 (2d Cir. Jan. 18, 2024) (upholding a district court's dismissal of state law claim where the court also dismissed plaintiff's federal claim (citing *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006))); *Fernandez v. Zoni Language Ctrs., Inc.*, 858 F.3d 45, 46 n.1 (2d Cir. 2017) (affirming district court's decision declining to exercise supplemental jurisdiction over state law claims after dismissing plaintiffs' federal claims); *All. of Auto. Mfrs., Inc. v. Currey*, 610 F. App'x 10, 14 (2d Cir. 2015) (holding it was "not improper for the court to decline to exercise its supplemental jurisdiction" after it properly dismissed the plaintiff's federal claims); *One Commc'ns Corp. v. J.P. Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims[.]" (citing *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 52 (2d Cir. 2009))).

Defendants argue that Plaintiffs have failed to satisfy the elements necessary for a preliminary injunction.  (Defs.' Conf. Mem. 2–3.)

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)); *see also Woodstock Ventures, LC v. Woodstock Roots LLC*, 837 F. App'x 837, 838 (2d Cir. 2021) (same).  The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." *Benisek*, 585 U.S. at 161 (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  A party seeking a preliminary injunction "must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm if the injunction is not granted, (3) that the balance of the equities tips in its favor, and (4) that the injunction serves the public interest." *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 273–74 (2d Cir. 2021); *see also Mendez v. Banks*, 65 F.4th 56, 63–64 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 559 (2024) (explaining that the traditional preliminary injunction standard requires plaintiffs to show (1) "a likelihood of success on the merits or sufficiently serious questions going to the merits . . . ," (2) "that [the plaintiffs] are likely to suffer irreparable injury in the absence of an injunction," (3) "that the balance of hardships tips in [the plaintiffs'] favor," and (4) "that the public interest would not be disserved by the issuance of a preliminary injunction." (quoting *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010) (internal quotation marks and citations omitted)); *Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 529 (2d Cir. 2020) (noting that to obtain a preliminary injunction, "the movant has to 'show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the

preliminary relief'" (quoting *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010), *cert. denied*, 141 S. Ct. 1075 (2021))).

### i. Likelihood of success or sufficiently serious questions going to the merits

Plaintiffs argue that "[they] are likely to succeed on the merits of their [A]mended [C]omplaint." (Pls.' Conf. Mem. 2–3.) Plaintiffs contend that, in the context of the First Amendment, "likelihood of success on the merits is the dominant, if not dispositive, factor." (Pls.' Inj. Mem. 1 (quoting *Alexander v. Sutton*, 747 F. Supp.3d 520, 543 (E.D.N.Y. 2024)).) Defendants argue that Plaintiffs "cannot show any likelihood of success on the merits of their claims." (Defs.' Conf. Mem. 2.)

To justify a preliminary injunction "the movant must establish '(1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.'" *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 183–84 (2d Cir. 2019) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir. 2009)). "The 'serious questions' standard permits a district court to grant a preliminary injunction . . . where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.,* 120 F.4th 59, 82–83 (2d Cir. 2024) (quoting *Citigroup*, 598 F.3d at 35); *Spanski Enters., Inc. v. Telewizja Polska S.A.*, 832 F. App'x 723, 724 (2d Cir. 2020) (quoting same). "The 'serious questions' standard allows courts to 'asses[] the merits of a claim at the preliminary injunction stage' by affording considerable 'flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation.'" *State Farm*, 120 F.4th 83 (quoting

*Citigroup*, 598 F.3d at 35); *see also Gov't Emps. Ins. Co. v. Beynin*, No. 19-CV-6118, 2021 WL 1146051, at *6 (E.D.N.Y. Mar. 25, 2021) ("The value of an approach encompassing the serious questions standard 'lies in its flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation.'"). "Consideration of the merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not the dispositive, factor." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citing *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004)); *Joelner*, 378 F.3d at 620 ("When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor." (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998))).

        As discussed *supra*, (*see supra* sections II.iii.–iv.), Plaintiffs have not plausibly alleged that Part 123 is facially overbroad, facially vague, or infringes the First Amendment rights of New York public school employees and officials.  *See Farrell*, 449 F.3d at 496 ("Facial vagueness challenges may go forward only if the challenged regulation 'reaches a substantial amount of constitutionally protected conduct.'" (quoting *Kolender*, 461 U.S. at 358 n.8)); *Church of Am. Knights of the Ku Klux Klan*, 356 F.3d at 200, 207–08 (finding that the First Amendment was not implicated in challenge to New York's anti-mask law where the uniform's mask "ha[d] no independent or incremental expressive value"); *Kennedy*, 597 U.S. at 514, 529 (finding that a school coach "demonstrated that his speech was private speech, not government speech," when he quietly uttered prayers on the football field after games); *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 172 (2d Cir. 1999) (denying a motion for a preliminary injunction where the government's interest in "staying informed of police officers' public statements about the

Department" outweighed the employees' interest "in the unfettered dissemination of their views regarding the police department").  Accordingly, Plaintiffs have neither demonstrated a likelihood of success on the merits or sufficiently serious questions going to the merits.

### ii.  Irreparable harm

Plaintiffs argue they will suffer irreparable harm if forced to comply with Part 123.  First, Plaintiffs argue it would be "a huge waste of energy, resources and taxpayer dollars" to retire their Indigenous names, logos, and mascots if Plaintiffs later prevail in the lawsuit.  (Pls.' Conf. Mem. 3; *see also* Pls.' Inj. Mem. Reply 2.)  In support, Plaintiffs argue that removing traces of Indigenous names, logo, and imagery will require "precious time and staffing resources."  (Pls.' Inj. Mem. 2.)  Plaintiffs argue that while ordinary compliance costs are typically insufficient to satisfy the irreparable harm requirement, this case "presents extensive and atypical compliance costs to the public that warrant preliminary injunctive relief."  (Pls.' Inj. Mem. Reply 2.)  Second, Plaintiffs argue that since compliance with Part 123 would require public schools to impair the First Amendment rights of Individual Board Member Plaintiffs "and all other District officials and employees, Plaintiffs readily meet the irreparable harm prong."  (Pls.' Inj. Mem. 2.)  In support, Plaintiffs argue that violating Plaintiff's First Amendment rights "for even [a] minimal period[ ] of time, unquestionably constitutes irreparable injury" and that "presumption of irreparable injury flows from a violation of constitutional rights."  (*Id.* at 1 (first citing *Sutton*, 747 F. Supp. 3d at 543; then citing *Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 390 (E.D.N.Y. 2021); and then citing *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020)).)  Finally, Plaintiffs argue that compliance with Part 123 by removing the Indigenous names, logos, and mascots at issue will harm the culture of the school community.  (*Id.* at 2–3.)

Defendants argue that Plaintiffs have failed to identify irreparable harm.  (Defs.' Conf.

Mem. at 2–3.)  First, Defendants argue that "the mere allegation of a constitutional infringement

in and of itself does not constitute irreparable harm" and that Plaintiffs "must first show they are

likely to succeed on the merits of their First Amendment claims."  (Defs.' Inj. Mem. 1–2

(quoting *Pinckney v. Bd. of Educ. of Westbury Union Free Sch. Dist.*, 920 F. Supp. 393, 400

(E.D.N.Y. 1996)).)  Defendants also argue that, since their First Amendment claims challenge

"only 8 NYCRR § 123.5, even if [Plaintiffs] could demonstrate a constitutional harm (which

they cannot), such a harm" would have no relevance "to the enforcement of the other provisions

of Part 123, including § 123.3 (requiring that Indigenous names and imagery be retired by the

end of the 2024–25 school year)."  (*Id.* at 2.)  Second, Defendants argue that "courts have

repeatedly rejected claims . . . that irreparable harm would result from having to devote resources

to complying with a government regulation."  (*Id.*)  Defendants also argue that Plaintiffs'

resource argument is "merely a variation on an argument that implementing Part 123 will involve

financial loss" and that such harms are reparable through money damages.  (*Id.*; *see also* Defs.'

Conf. Mem. at 3.)

  Irreparable harm is "the single most important prerequisite for the issuance of a

preliminary injunction."  *State Farm*, 120 F.4th at 80 (quoting *Faiveley Transp. Malmo AB*, 559

F.3d at 118); *Gov't Emps. Ins. Co. v. Barakat*, 709 F. Supp. 3d 93, 100 (E.D.N.Y. 2024) ("The

showing of irreparable harm is perhaps the single most important prerequisite for the issuance of

a preliminary injunction." (quoting *Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 221

(E.D.N.Y. 2013))).  To establish irreparable harm, "the moving party 'must demonstrate that

absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but

actual and imminent, and one that cannot be remedied if a court waits until the end of trial to

resolve the harm.'"  *State Farm*, 120 F.4th at 80 (alteration in original) (quoting *Faiveley Transp.*

*Malmo AB*, 559 F.3d at 118).  Absent "extraordinary circumstances," injunctions are also

unavailable "[w]here there is an adequate remedy at law, such as an award of money damages."

*Id.* (quoting *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005)).  "The loss

of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes

irreparable injury."  *N.Y. Progress & Prot. PAC*, 733 F.3d at 486 (quoting *Elrod v. Burns*, 427

U.S. 347, 373 (1976); *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d

342, 349 (2d Cir. 2003) ("Where a plaintiff alleges injury from a rule or regulation that directly

limits speech, the irreparable nature of the harm may be presumed.").

        Plaintiffs' harms are not irreparable.  As a threshold matter, Plaintiffs could seek an

extension of the compliance deadline, which would remedy any of Plaintiffs' alleged harms.[30]

*See* 8 NYCRR § 123.3(b) ("Upon a showing of good cause, the commissioner may grant an

extension of the timelines prescribed in subdivision (a) of this section.").  Regardless, since

Plaintiffs have not plausibly alleged a violation of the First Amendment, the harm to Plaintiffs

and the school community is too conjectural.  *See N.Y. Progress & Prot. PAC*, 733 F.3d at 487

(finding irreparable harm where there was a "direct restriction on political expression"); *Safir*,

170 F.3d at 171 (finding that possible chilling effect of a rule requiring police officers to notify

the police department they intend to speak to an audience was a "conjectural chill" and "[was]

not sufficient to establish real and imminent irreparable harm" (citations omitted)); *Blakeman*,

2024 WL 3201671, at *18 ("[A] bare assertion of a constitutional injury, without evidence

_____

        [30]  At oral argument, the Court asked whether Defendants could delay the deadline to
comply with Part 123 until the resolution of Defendants' motion to dismiss and Plaintiffs' motion
for preliminary injunction.  (Hr'g Tr. 63:12–23.)  Defendants later informed the Court in writing
that, while "[t]he Board of Regents does not intend to modify the compliance deadline in 8
NYCRR § 123.3(a), . . . school districts who have demonstrated good cause toward meeting
these goals may request an extension from the Commissioner under subsection (b) [of Part
123]."  (Letter dated Oct. 23, 2024, Docket Entry No. 50.)

'*convincingly show[ing]*' the existence of noncompensable damages, is insufficient to automatically trigger a finding of irreparable harm." (citing *KM Enters. v. McDonald*, No. 11-CV-5098, 2012 WL 540955, at *4 (E.D.N.Y. Feb. 16, 2012))).  Further, any compliance or resource costs are entirely compensable through money damages and are not "irreparable" as a matter of law.  *Moore*, 409 F.3d at 510 ("Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." (citations omitted)); *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) ("[O]rdinary compliance costs are typically insufficient to constitute irreparable harm." (citations omitted)); *SymQuest Grp., Inc. v. Canon U.S.A., Inc*., No. 15-CV-4200, 2015 WL 6813599, at *9 (E.D.N.Y. Aug. 7, 2015), (holding that a requirement to drive sixty miles for access to technical support services was a "mere inconvenience" and "insufficient to establish irreparable harm"), *report and recommendation adopted*, 2015 WL 6813494 (E.D.N.Y. Aug. 28, 2015); *Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp*., No. 19-CV-9193, 2023 WL 5498962, at *6 (S.D.N.Y. Aug. 25, 2023) ("Even in the context of a government agency, courts routinely find 'meritless' the argument 'that potentially wasted and diverted staff resources constitute[s] irreparable harm.'" (alteration in original) (quoting *Shays v. Fed. Election Comm'n*, 340 F. Supp. 2d 39, 48 (D.D.C. 2004)).

### iii.  Balance of harms

Plaintiffs argue that the balance of hardships weighs in their favor in part because "[c]ompared with the irreparable harm [P]laintiffs will face if forced to comply with Part 123 prior to the outcome of this case, the potential injury on the other side of the equation is non-existent."  (Pls.' Conf. Mem. 3.)  In support, Plaintiffs argue that, since Defendants "have allowed school districts to continue to use their school names, logos, and mascots until the end of

the 2024–2025 school year," a brief extension of time that would allow the Court to rule on the merits would "make no difference" and would result in no hardship.  (*Id.*)

Defendants argue that the balance of hardships weighs in their favor because the inconvenience and cost of retiring the Indigenous names, logos, and mascots "weigh[s] lightly against the public interest in furthering a discrimination- and harassment-free learning environment."  (Defs.' Conf. Mem. 3.)

Under the third prong, a court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *State Farm*, 120 F. 4th at 84 (quoting *Yang v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020)).  If there are "sufficiently serious questions going to the merits of its claims to make them fair ground for litigation," courts inquire into whether there is "a balance of the hardships tipping decidedly in favor of the moving party."  *Really Good Stuff, LLC v. BAP Invs., L.C.*, 813 F. App'x 39, 43 (2d Cir. 2020) (quoting *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011)); *see also State Farm Mut. Auto. Ins. Co. v. Parisien*, 352 F. Supp. 3d 215, 234 (E.D.N.Y. 2018) ("Because the [c]ourt finds that there are 'serious questions going to the merits' in lieu of a 'likelihood of success on the merits,' it must further inquire as to whether . . . there is a 'balance of hardships tipping decidedly' in [the plaintiff's] favor." (quoting *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979))); *Martinez v. Cuomo*, 459 F. Supp. 3d 517, 526–27 (S.D.N.Y. 2020) ("Plaintiffs must establish that the balance of hardships tips in their favor regardless of the likelihood of success." (citing *Salinger*, 607 F.3d at 79–80)).

Plaintiffs have not plausibly alleged a constitutional violation or that the costs to comply with Part 123 would cause irreparable harm to the school community, school district, school board, or public school employees.  In addition, Plaintiffs' claimed cost and inconvenience if

they were to retire all Indigenous names and imagery do not outweigh the public interest in furthering a discrimination- and harassment-free learning environment in all of New York's public schools. Accordingly, the balance of hardships tips decidedly in Defendants' favor.

### iv. Public interest

Plaintiffs argue that granting an injunction is also in the public interest. (Pls.' Inj. Mem. 2–3.) In support, Plaintiffs argue (1) that "securing First Amendment rights is in the public interest" and (2) that there is no public interest in "maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." (*Id.* at 2 (quoting *Sutton*, 747 F. Supp. 3d at 543 (citations omitted)).)

Defendants argue that Plaintiffs cannot prove "that the preliminary injunction is in the public interest." (Defs.' Conf. Mem. 2.) In support, Defendants argue that Plaintiffs cannot demonstrate that "the public interest would not be disserved by the issuance of a preliminary injunction." (*Id.* at 3 (quoting *Mendez*, 65 F.4th 56, 63–64 (citation omitted)).)

In analyzing the public interest prong, a court must consider "the public consequences in employing the extraordinary remedy of injunction," *Yang*, 960 F.3d at 135–36 (quoting *Winter*, 555 U.S. at 24), and ensure that the proposed injunction "does not cause harm to the public interest," *Sec. & Exch. Comm'n v. Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012) (per curiam); *see also State Farm,* 120 F.4th at 85 (explaining that courts "consider whether the preliminary injunction is in the public interest, which concerns the 'public consequences in employing the extraordinary remedy of injunction.'" (quoting *Yang*, 960 F.3d at 135–36)). Because Plaintiffs have not plausibly alleged Part 123 is unconstitutional, the public interest factor weighs against granting Plaintiffs' motion for a preliminary injunction. *See Yang*, 960 F.3d at 123–24, 135–36 (finding that a Democratic Party primary presidential candidate, his

pledged delegates, and delegates for another candidate had demonstrated that the public interest would be served by a preliminary injunction requiring the New York State Board of Elections to reinstate qualified candidates on the primary ballot and hold the primary election during the coronavirus pandemic where they had also demonstrated a likelihood of success on the merits of their First and Fourteenth Amendment claims); *N.Y. Progress & Prot. PAC*, 733 F.3d at 488 (explaining that "likelihood of success on the merits is the dominant, if not dispositive factor" in the First Amendment context); *Sutton*, 747 F. Supp. 3d at 554–55 (finding that "the public interest weighs in favor of granting preliminary injunction relief" where the plaintiffs "have shown a clear and substantial likelihood of establishing" that the regulation and challenged policies and practices "violate the First Amendment").

Based on the foregoing, the Court denies Plaintiffs' motion to enjoin the enforcement of Part 123.

### III. Conclusion

For the reasons discussed above, the Court grants Defendants' motion to dismiss. First, the Court grants Defendants' motion to dismiss the constitutional separation of powers claims, as well as the First Amendment and Fourteenth Amendment claims, of School District Plaintiffs, School Board Plaintiffs, and Individual Board Member Plaintiffs suing in their official capacity for lack of capacity. Second, the Court grants Defendants' motion to dismiss Plaintiffs' as-applied and facial vagueness claims for failure to state a claim. Third, the Court grants Defendants' motion to dismiss Plaintiffs' overbreadth claims for failure to state a claim and grants Individual Board Member Plaintiffs leave to amend their Complaints to allege specific facts supporting their First Amendment-based overbreadth claims in their personal capacity. Fourth, the Court grants Defendants' motion to dismiss Individual Board Member Plaintiffs'

First Amendment free speech claims and grants Individual Board Member Plaintiffs in their personal capacity leave to amend their Complaints to allege specific facts supporting their First Amendment free speech claims.  Fifth, the Court grants Defendants' motion to dismiss Individual Board Member Plaintiffs' federal separation of powers claim and declines to exercise supplemental jurisdiction over Plaintiffs' state separation of powers claim.  Any amended complaint must be filed within thirty days of this Memorandum and Order.  If an amended complaint is not timely filed, the Court will direct the Clerk of Court to enter judgment and close this case.  The Court denies Plaintiffs' motion for a preliminary injunction.

Dated:  March 27, 2025
          Brooklyn, New York

                              SO ORDERED:


                              _____s/ MKB_____
                              MARGO K. BRODIE
                              United States District Judge



179 WESTBURY AVENUE, CARLE PLACE, NEW YORK 11514   PHONE (516)334-4500   FAX (516)334-4501   WWW.SOKOLOFFSTERN.COM

CHELSEA WEISBORD
CWESIBORD@SOKOLOFFSTERN.COM

April 25, 2025

**via ECF**

Honorable Margo K. Brodie
United States Chief District Judge
225 Cadman Plaza East, Chambers N626
Brooklyn, NY 11201

          Re:    *Wantagh U.F.S.D. and Wyandanch U.F.S.D., et al.,, v. New York State Board of Regents, et al.*
              Docket No. 2:23-cv-07299 (MKB) (LGD)

Your Honor:

    We represent the plaintiffs in the above-referenced matter. Plaintiffs do not intend to file an amended complaint and request that the Court issue a final judgment.

    We thank you for your consideration.

                                      Respectfully submitted,

                                      7SOKOLOFF STERN LLP

                                      *Chelsea Weisbord*

                                      CHELSEA WEISBORD

cc:    All Counsel of Record (by ECF)

LONG ISLAND   ▪   HUDSON VALLEY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
WANTAGH UNION FREE SCHOOL DISTRICT,
WANTAGH UNION FREE SCHOOL DISTRICT BOARD
OF EDUCATION, ANTHONY GRECO, in his capacity as a
Board of Education Member and a Resident of the School
Community, WYANDANCH UNION FREE SCHOOL
DISTRICT, WYANDANCH UNION FREE SCHOOL
DISTRICT BOARD OF EDUCATION, and CHARLIE
REED, in his capacity as a Board of Education Member
and a Resident of the School Community,

                            Plaintiffs,                        JUDGMENT

     v.                                              23-CV-7299 (MKB)

NEW YORK STATE BOARD OF REGENTS, LESTER
W. YOUNG, JR., in his official capacity as Chancellor
of the New York State Board of Regents, JOSEPHINE
VICTORIA FINN, in her official capacity as Vice
Chancellor of the New York State Board of Regents,
ROGER TILLES, in his official capacity as a member
of the New York State Board of Regents, CHRISTINE
D. CEA, in her official capacity as a member of the New
York State Board of Regents, WADE S. NORWOOD,
in his official capacity as a member of the New York
State Board of Regents, KATHLEEN M. CASHIN, in
her official capacity as a member of the New York State
Board of Regents, JAMES E. COTRELL, in his official
capacity as a member of the New York State Board of
Regents, JUDITH CHIN, in her official capacity as a
member of the New York State Board of Regents,
CATHERINE COLLINS, in her official capacity as a
member of the New York State Board of Regents,
ELIZABETH S. HAKANSON, in her official capacity
as a member of the New York State Board of Regents,
LUIS O. REYES, in his official capacity as a member
of the New York State Board of Regents, SUSAN W.
MITTLER, in her official capacity as a member of the
New York State Board of Regents, FRANCES G. WILLS,
in her official capacity as a member of the New York State
Board of Regents, ARAMINA VEGA FERRER, in her
official capacity as a member of the New York State Board
of Regents, SHINO TANIKAWA, in her official capacity
as a member of the New York State Board of Regents,
ROGER P. CATANIA, in his official capacity as a member

**A-291**

of the New York State Board of Regents, ADRIAN I. HALE,
in his official capacity as a member of the New York State
Board of Regents,

                                Defendants.
---------------------------------------------------------------X

 A Memorandum and Order of Honorable Margo K. Brodie, United States District Judge,

having been filed on March 27, 2025, granting Defendants' motion to dismiss; granting

Defendants' motion to dismiss the constitutional separation of powers claims, as well as the

First Amendment and Fourteenth Amendment claims, of School District Plaintiffs, School

Board Plaintiffs, and Individual Board Member Plaintiffs suing in their official capacity for lack

of capacity; granting Defendants' motion to dismiss Plaintiffs' as-applied and facial vagueness

claims for failure to state a claim; granting Defendants' motion to dismiss Plaintiffs'

overbreadth claims for failure to state a claim; granting Individual Board Member Plaintiffs

leave to amend their Complaints to allege specific facts supporting their First Amendment-

based overbreadth claims in their personal capacity; granting Defendants' motion to dismiss

Individual Board Member Plaintiffs' First Amendment free speech claims and granting

Individual Board Member Plaintiffs in their personal capacity leave to amend their Complaints

to allege specific facts supporting their First Amendment free speech claims; granting

Defendants' motion to dismiss Individual Board Member Plaintiffs' federal separation of

powers claim; and declining to exercise supplemental jurisdiction over Plaintiffs' state

separation of powers claim; and

 An Order having been filed on April 25, 2025, directing the Clerk of Court to enter

judgment, and close the case; it is

 ORDERED and ADJUDGED that judgment is hereby entered in favor of defendants.

A-292

Dated: Brooklyn, New York
     April 28, 2025

Brenna B. Mahoney
Clerk of Court

By:    _/s/Jalitza Poveda_
     Deputy Clerk

A-293

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WANTAGH UNION FREE SCHOOL DISTRICT, WANTAGH UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION, WYANDANCH UNION FREE SCHOOL DISTRICT, WYANDANCH UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION, ANTHONY GRECO, in his capacity as a Wantagh Board of Education Member and a Resident of the School Community, and CHARLIE REED, in his capacity as a Wyandanch Board of Education Member and a Resident of the School Community, | **NOTICE OF APPEAL** Docket No. 23-CV-07299 (LGD) |
| Plaintiffs-Petitioners, | |
| -against- | |
| NEW YORK STATE BOARD OF REGENTS, LESTER W. YOUNG, JR, in his official capacity as Chancellor of the New York State Board of Regents, JOSEPHINE VICTORIA FINN, in her official capacity as Vice Chancellor of the New York State Board of Regents, ROGER TILLES, in his official capacity as a member of the New York State Board of Regents, CHRISTINE D. CEA, in her official capacity as a member of the New York State Board of Regents, WADE S. NORWOOD, in his official capacity as a member of the New York State Board of Regents, KATHLEEN M. CASHIN, in her official capacity as a member of the New York State Board of Regents, JAMES E. COTRELL, in his official capacity as a member of the New York State Board of Regents, JUDITH CHIN, in her official capacity as a member of the New York State Board of Regents, CATHERINE COLLINS, in her official capacity as a member of the New York State Board of Regents, ELIZABETH S. HAKANSON, in her official capacity as a member of the New York State Board of Regents, LUIS O. REYES, in his official capacity as a member of the New York State Board of Regents, SUSAN W. MITTLER, in her official capacity as a member of the New York State Board of Regents, FRANCES G. WILLS, in her official capacity as a member of the New York State Board of Regents, ARAMINA VEGA FERRER, in her official capacity as a member of the New York State Board of Regents, SHINO TANIKAWA, in her official capacity as a member of the New York State Board of Regents, ROGER P. CATANIA, in his official capacity as a member of the New York State | |

A-294

Board of Regents, ADRIAN I. HALE, in his official capacity as a member of the New York State Board of Regents.

Defendants-Respondents.

**PLEASE TAKE NOTICE** that Plaintiffs-Petitioners, WANTAGH UNION FREE SCHOOL DISTRICT AND WANTAGH UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION, by their attorneys, Sokoloff Stern LLP hereby appeal to the United States Court of Appeals for the Second Circuit from the final Judgment of the District Court entered on April 28, 2025, and each and every part thereof, including the Memorandum & Order dated March 27, 2025.

Dated: Carle Place, New York
        April 28, 2025

SOKOLOFF STERN LLP
*Attorneys for Plaintiffs-Petitioners*

By:    STEVEN C. STERN
       CHELSEA WEISBORD
       179 Westbury Avenue
       Carle Place, New York 11514
       (516) 334-4500
       File No. 230101

`

TO:    All Counsel of Record (via ECF)