# 25-1136-cv

## United States Court of Appeals

*for the*

## Second Circuit

WANTAGH UNION FREE SCHOOL DISTRICT, WANTAGH UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION, ANTHONY GRECO, in his capacity as a Wantagh Board of Education Member and a Resident of the School Community,

*Plaintiffs-Appellants,*

WYANDANCH UNION FREE SCHOOL DISTRICT, WYANDANCH UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION, CHARLIE REED, in his capacity as a Wyandanch Board of Education Member and a Resident of the School Community,

*Plaintiffs,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

STEVEN C. STERN
CHELSEA WEISBORD
SOKOLOFF STERN LLP
*Attorneys for Plaintiffs-Appellants*
179 Westbury Avenue, 2nd Floor
Carle Place, New York 11514
(516) 334-4500

– v. –

NEW YORK STATE BOARD OF REGENTS, LESTER W. YOUNG, JR., in his official capacity as Chancellor of the New York State Board of Regents, JOSEPHINE VICTORIA FINN, in her official capacity as Vice Chancellor of the New York State Board of Regents, ROGER TILLES, in his official capacity as a member of the New York State Board of Regents, CHRISTINE D. CEA, in her official capacity as a member of the New York State Board of Regents, WADE S. NORWOOD, in his official capacity as a member of the New York State Board of Regents, KATHLEEN M. CASHIN, in her official capacity as a member of the New York State Board of Regents, JAMES E. COTRELL, in his official capacity as a member of the New York State Board of Regents, JUDITH CHIN, in her official capacity as a member of the New York State Board of Regents, CATHERINE COLLINS, in her official capacity as a member of the New York State Board of Regents, ELIZABETH S. HAKANSON, in her official capacity as a member of the New York State Board of Regents, LUIS O. REYES, in his official capacity as a member of the New York State Board of Regents, SUSAN W. MITTLER, in her official capacity as a member of the New York State Board of Regents, FRANCES G. WILLS, in her official capacity as a member of the New York State Board of Regents, ARAMINA VEGA FERRER, in her official capacity as a member of the New York State Board of Regents, SHINO TANIKAWA, in her official capacity as a member of the New York State Board of Regents, ROGER P. CATANIA, in his official capacity as a member of the New York State Board of Regents, ADRIAN I. HALE, in his official capacity as a member of the New York State Board of Regents,

*Defendants-Appellees.*

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................. i

TABLE OF AUTHORITIES ........................................................................ iii

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF THE ISSUES.................................................................... 2

STATEMENT OF FACTS ............................................................................. 4

    A. The Challenged Regulation and Its Purported Enabling Statute........................................ 4

    B. The Village of Wantagh and Its School District Was Named After A Famous
       Native American Sachem ............................................................................. 11

    C. Appellants Have Committed to Retiring their Native American Imagery and
       Only Seek to Maintain the "Warrior" Name, which is Not Unique to Native
       American Culture ............................................................................. 12

    D. Wantagh UFSD's Response to Part 123 ........................................................ 14

    E. NYSED's Treatment of School Districts With a Warriors Name Has Been
       Haphazard and Contradictory ............................................................................. 18

PROCEDURAL HISTORY.......................................................................... 21

SUMMARY OF ARGUMENT .................................................................... 25

ARGUMENT ............................................................................................... 28

  I. Appellant Greco Stated a Viable Free Speech Claim in His Individual Capacity................ 28

    A. The District Court Erroneously Required Greco to Show His Off-Campus
       Citizen Speech Related to Matters of Public Concern .................................... 29

    B. Even if Held to the Higher Standard, Appellants Plausibly Alleged that Greco
       Communicates as A Private Citizen on Matters of Public Concern When He
       Wears His Warrior Apparel to School Games and Functions.......................... 32

    C. Having Either Found the Public Concern Analysis Inapplicable or it was
       Sufficiently Pled, the District Court Should Have Permitted the Case to Proceed ........ 36

i

D. Part 123 Is an Unconstitutional Content and Viewpoint-Based Regulation and Prior Restraint38

II. Appellants Stated Viable Facial and As-Applied Challenges to Part 123 Under the Overbreadth and Void-For-Vagueness Doctrines ............................................................... 43

A. Part 123 Is Facially Overbroad In Violation of the First Amendment ........................... 45

B. Part 123 is Facially Vague ................................................................................................. 48

C. Part 123 is Facially Vague and Overbroad as Applied to Appellants ............................. 54

III. Appellants District and Board Have the Legal Capacity to Assert Constitutional Challenges to Part 123 .......................................................................................................... 56

CONCLUSION ........................................................................................................................ 61

CERTIFICATE OF COMPLIANCE ....................................................................................... 62

## TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Americans for Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021) .......................................................................45

*Baggett v. Bullitt,*
    377 U.S. 360 (1964) .......................................................................44

*Barzilay v. City of New York,*
    610 F. Supp. 3d 544 (S.D.N.Y. 2022) ..........................................33

*Blackwelder v. Safnauer*,
    689 F. Supp. 106 (N.D.N.Y. 1988) ...............................................44

*Brokamp v. James*,
    66 F.4th 374 (2d Cir. 2023) ..........................................................40

*Buchanan v. City of New York*,
    556 F. Supp. 3d 346 (S.D.N.Y. 2021) ..........................................39

*Carter v. Inc. Vill. of Ocean Beach,*
    963 F. Supp. 2d 203 (E.D.N.Y. 2010).........................................39

*City of New York v. State*,
    86 N.Y.2d 286 (1995).............................................................. 57, 59

*City of Newark v. New Jersey*,
    262 U.S. 192 (1923) .......................................................................58

*Clarke v. Town of Newburgh*,
    237 A.D.3d 14 (2d Dep't 2025)......................................................59

*Connick v. Myers*,
    461 U.S. 138 (1983) .......................................................................33

*Cunney v. Bd. of Trustees of Vill. of Grand View, N.Y.*,
    660 F.3d 612 (2d Cir. 2011) ..................................................... 49, 50

*Dorman v. Satti*,
    862 F2d  (2d Cir. 1988) ..................................................................49

*Farrell v. Burke*,
    449 F.3d 470 (2d Cir. 2006) ..................................................... 43, 44, 47

*Forsyth Cnty., Ga. v. Nationalist Movement*,
    505 U.S. 123 (1992) ........................................................................ 43, 44

*Friend v. Gasparino*,
    61 F.4th 77 (2d Cir. 2023) ......................................................................42

*Frisenda v. Inc. Vill. of Malverne*,
    775 F. Supp. 2d 486 (E.D.N.Y. 2011)......................................................31

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) .......................................................... 28, 29, 30, 32

*Garrison v. Louisiana*,
    379 U.S. 64 (1964) ..................................................................................32

*Golodner v. Berliner*,
    770 F.3d 196 (2d Cir. 2014) ...................................................................33

*Harman v. City of New York*,
    140 F.3d 111 (2d Cir. 1998) ...................................................................37

*Herzog v. Bd. of Educ. of Lawrence Union Free Sch. Dist.*,
    171 Misc. 2d 22 (Nassau Cty. Sup. Ct. 1996)......................................58

*Hill v. Colorado*,
    530 U.S. 703 (2000) ................................................................................49

*In re World Trade Ctr.*,
    *III*, 30 N.Y.3d 377 (2017)......................................................................57

*In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*,
    846 F.3d 58 (2d Cir. 2017) .....................................................................57

*Jackler v. Byrne*,
    658 F.3d 225 (2d Cir. 2011) ...................................................................33

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ................................................................................44

*Lane v. Franks*,
573 U.S. 228 (2014) ......................................................................29

*Latino Officers Ass'n v. Safir*,
170 F.3d 167 (2d Cir. 1999) ...................................................... 36, 37

*Latino Officers Ass'n, N.Y., Inc. v. City of N.Y.*,
196 F.3d 458 (2d Cir. 1999) ...................................................... 34, 36

*Lusk v. Vill. of Cold Spring*,
475 F.3d 480 (2d Cir. 2007) .........................................................39

*Matal v. Tam*,
582 U.S. 218 (2017) ......................................................................40

*Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Emps. & Rest. Emps. Int'l Union*,
239 F.3d 172 (2d Cir. 2001) .........................................................39

*NAACP v. Button*,
371 U.S. 415 (1963) ......................................................................47

*New York Magazine v. Metro. Transp. Auth.*,
136 F.3d 123 (2d Cir. 1998) .........................................................40

*New York State Coal. of Pub. Emps. v. New York State Dep't of Lab.*,
110 Misc. 2d 215 (Albany Cty. Sup. Ct. 1981)...................................58

*New York State Pro. Process Servers Ass'n, Inc. v. City of New York*,
2014 WL 4160127 (S.D.N.Y. Aug. 18, 2014) ....................................43

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983) ........................................................................40

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*,
391 U.S. 563 (1968) .................................................................. 28, 30

*Piscottano v. Murphy*,
511 F.3d 247 (2d Cir. 2007) .................................................. 29, 33, 34

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015) .......................................................... 39, 40, 41, 42

*San Diego v. Roe,*
    543 U.S. 77 (2004) ............................................................32

*Sec'y of State of Md. v. Joseph H. Munson Co.,*
    467 U.S. 947 (1984) ..........................................................46

*Slattery v. Hochul,*
    61 F.4th 278 (2d Cir. 2023) ...............................................49

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ..................................................... 32, 33

*Specht v. City of New York,*
    15 F.4th 594 (2d Cir. 2021) .......................................... 32, 33

*Squicciarini v. Vill. of Amityville,*
    2019 WL 1232093 (E.D.N.Y. Mar. 15, 2019) ............... 30, 38

*Sugar v. Greenburgh Eleven Union Free Sch. Dist.,*
    2018 WL 6830865 (S.D.N.Y. Dec. 28, 2018)....................31

*United States v. National Treasury Employees Union,*
    513 U.S. 454 (1995) ................................................... passim

*United States v. Quattrone,*
    402 F.3d 304 (2d Cir. 2005) ..............................................39

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ..........................................................49

*VIP of Berlin, LLC v. Town of Berlin,*
    593 F.3d 179 (2d Cir. 2010) .................................. 48, 49, 50

*Virginia v. Hicks,*
    539 U.S. 113 (2003) ..........................................................45

*Washington v. Seattle Sch. Dist. No.,*
    *1,* 458 U.S. 457 (1982) .....................................................59

*Williams-Yulee v. Florida Bar,*
    575 U.S. 433 (2015) ..........................................................42

**Statutes**

28 U.S.C. § 1291 ................................................................1

Article I, Section 8 of the New York State Constitution .................................. 25, 38

Article IX of the New York State Constitution ........................................57

N.Y. Educ. Law § 10 ...........................................................6

N.Y. Educ. Law § 12 ...........................................................6

**Rules**

Fed. R. App. P. 32 ...........................................................62

Fed. R. Civ. P. 8 .............................................................35

Fed. R. Civ. P. 12 ......................................................... 27, 56

Fed. R. Civ. P. 17 ............................................................56

**Regulations**

8 NYCRR 123.1 *et seq*.................................................. 4, 5, 6, 18, 19,  50

## JURISDICTIONAL STATEMENT

This Court has appellate jurisdiction under 28 U.S.C. § 1291. On March 27, 2025, the district court issued the Memorandum & Order that is the subject of this appeal and, on April 28, 2025, the district court entered final judgment. (A290-291.) Plaintiffs-Appellants Wantagh Union Free School District, Wantagh Union Free School District Board of Education, and Anthony Greco filed a timely notice of appeal on April 28, 2025. (A292-293.)

## STATEMENT OF THE ISSUES

1.     Did the district court err by requiring Appellant Greco to show he engaged in speech on a matter of public concern to support his First Amendment prior restraint claim?

2.     Did the district court err by finding Appellant Greco failed to adequately plead he engaged in speech on a matter of public concern to support his First Amendment prior restraint claim?

3.     Should the district court have reached the question and determined that Appellants stated a plausible claim that Part 123 is a content-based and viewpoint-based prior restraint on speech?

4.     Should the district court have reached the question and determined that Appellants stated a plausible claim that Part 123 is overbroad because it reaches a substantial amount of constitutionally protected First Amendment activity through viewpoint and/or content-based restrictions that cannot survive strict scrutiny?

5.     Should the district court have reached the question and determined that Appellants stated a plausible claim that Part 123 is unconstitutionally vague by failing to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits?

6.     Should the district court have reached the question and determined that Appellants stated a plausible claim that Part 123 is unconstitutionally vague because it authorizes and/or encourages arbitrary and discriminatory enforcement?

7.     Did the district court err by finding that Plaintiffs-Appellants Wantagh Union Free School District, Wantagh Union Free School District Board of Education, and Anthony Greco, in his official capacity as a Board member, lacked legal capacity to assert constitutional challenges to Part 123?

Plaintiffs-Appellants respectfully submit that the Court should answer each of these questions in the affirmative.

## STATEMENT OF FACTS

### A. The Challenged Regulation and Its Purported Enabling Statute

Appellants' lawsuit challenges the enactment of *Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools*" ("Part 123"), 8 NYCRR 123.1 *et seq*. (A97.) Appellees designated DASA as the enabling statute. (A103.)

#### 1. *Part 123 of the Regulations of the Commissioner of Education*

Part 123 prohibits public schools in the State of New York from utilizing or displaying any Indigenous name, logo, or mascot other than for classroom instruction. (A66, ¶80; A97 [8 NYCRR 123.2].) Part 123 defines "Indigenous name, logo, or mascot" as "a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures, used to represent a public school, including but not limited to such school sports teams." (A66, ¶81; A97 [8 NYCRR 123.1].) This definition excludes a public school, school building, or school district named after an Indigenous tribe. (*Id.*)

Part 123 provides exceptions. First, a tribal nation recognized by the federal or NYS government may utilize an Indigenous name, logo, or mascot for a sports team comprised of tribal members, including a tribal school or intramural league.

(A66-67, ¶82; A98 [8 NYCRR 123.4(a)].) Second, Part 123 permits schools to use Indigenous names, mascots, or logos pursuant to a written agreement between a school and a tribal nation recognized by the federal or NYS government. (A67, ¶83; A98 [8 NYCRR 123.4(b)].) Under this provision of Part 123, the NYS Education Department ("NYSED") arbitrarily acknowledges only written agreements that were submitted before May 3, 2023, and therefore rejects any written agreements submitted after that date. Part 123 does not allow any extensions of this deadline. (A67, ¶84.)

Part 123 also requires public schools to prohibit their officers and employees from utilizing or promoting any Indigenous name, logo, or mascot while on school property or at a school function, except for school officers or employees who are members of a tribal nation and utilizing or promoting that tribal nation's Indigenous name, logo, or mascot. (A67, ¶85; A98 [8 NYCRR 123.5].)

Part 123 required boards of education to commit, via resolution, to eliminating the use of all Indigenous names, logos, and mascots by the end of the 2022-2023 school year. (A67, ¶86; A97 [8 NYCRR 123.3(a)].) And it required those resolutions to identify a plan to eliminate all use of the prohibited name, logo, or mascot by the end of the 2024-2025 school year; Appellees set a deadline of June 30, 2025 to comply with Part 123. (*Id.*) Part 123 allows the Commissioner of Education (the "Commissioner") to grant an extension of these timelines "[u]pon a showing of good

cause." (A67, ¶86; A97 [8 NYCRR 123.3(b)].) Because NYSED did not provide any funding to support its mandate, school districts have been forced to figure out how to fund the significant undertaking of removing and replacing all such names, logos, and mascots from its buildings, grounds, uniforms, etc. (A67, ¶87.)

The penalties for non-compliance are harsh, which "include[e], but [are] not limited to," the removal of school officers and withholding of State Aid for failing to comply with the June 30, 2023 deadline. (A29; *see also* A72, ¶112; A49.)

### 2. The "Enabling" Statute: New York State's Dignity for All Students Act

In September 2010, the NYS Legislature enacted the Dignity for All Students Act ("DASA"), effective July 2012. (A64, ¶73.) New York's Education Law was amended to create a new Article 2, entitled "Dignity for All Students." (*Id.*)

DASA prohibits bullying, harassment, discrimination, and cyberbullying against students in school or at school functions based on their actual or perceived membership in a protected class. (A65, ¶74); *see also* N.Y. Educ. Law § 12. The legislation was designed to prevent incidents of discrimination or harassment, including bullying, taunting, or intimidation, through the institution of preventive, educational measures. (A64, ¶74; A153; *see also* N.Y. Educ. Law § 10.)

The legislative history of the DASA reflects the purpose to combat bullying and harassment in schools. (A64-65, ¶77; *see gen.*, A120-173.) The Bill Jacket

provides, "Although school yard bullies have long had a presence on public school grounds, this bill will help ensure that school administrators and educators have the tools and resources in place to afford all students – and particularly those who are targeted by such bullies – an educational environment in which they can thrive." (A121; *see also* A64-65.)

### 3. *History of Implementation of Part 123 of the Regulations of the Commissioner of Education*

A bill seeking to amend the Education Law to prohibit public schools from using a native name, logo, or mascot were presented to the State Legislature during its 2021-2022 Legislative Session. It was referred to the Assembly Committee on Education but never enacted. (A175-178; *see also* A68, ¶90.) A similar bill was introduced in the 2023-2024 session but was not enacted either. (A180-181; *see also* A68, ¶90.) These bills which sought to amend the Education Law to prohibit public schools from using a native name, logo, or mascot, were introduced in two successive Legislative sessions with no successful enactments by either the Assembly or Senate. (A175-181; *see also* A68, ¶90.) To this day, the NYS Legislature has never enacted a law banning the use of Indigenous names, logos, and mascots. (*Id.*)

The determination of whether and how to conduct an interscholastic sports program for school districts in the State of New York lies within the authority and

discretion of the board of education. (A58, ¶33; *see also* A256 (citing *Appeal of McMillan, 61 Ed. Dept. Rep., Decision No.18,058* (citing *Appeal of Tobin*, 25 Ed. Dept. Rep. 301, Decision No. 11,591) (discussing how "a board of education generally has discretion to determine 'the propriety of [a sports] team name,'" and "may abuse its discretion if a team name mascot, or logo inhibits the creation of 'a safe and supportive [learning] environment.'"). Within their discretion of how to conduct an interscholastic sports program, local boards of education have discretion to determine "the propriety of a sports team name, mascot, or logo. (A58-59, ¶34 (citing *Appeal of Tobin*, 25 Ed. Dept. Rep. 301 (Decision No. 11,591).) Such decisions "will be set aside only upon a showing that the Board has abused its discretion." (*Id.*)

School district boards of education—including Wantagh UFSD—continued to maintain their authority and discretion to determine the propriety of a sports team name, mascot, or logo until Defendants eliminated that authority and discretion when it enacted Part 123 without any authorization from the NYS Legislature.

On December 28, 2022, NYSED released a draft of Part 123, triggering the beginning of the 60-day public comment period. (A70, ¶97.) On April 18, 2023, the Board of Regents voted to adopt Part 123 which took effect on May 3, 2023. (A70, ¶100.) Part 123 set a June 30, 2023 deadline for boards of education to first self-determine if their names, logos, or mascots fall within the scope of Part 123 and, if

so, to commit via resolution to eliminate such names, logos, and mascots by the end of the 2022-2023 school year.

### 4. NYSED Issues "FAQs" and Gives them the Force of Law

In response to the utter confusion created by Part 123, NYSED released an FAQ guide in May 2023. (A81, ¶159; A24-34.) The FAQs do not just explain Part 123 but expand its reach and scope. The FAQs prohibit any name, logo, or mascot that ever bore a connection to Native American culture at any point in time, even if it currently has no such connection. (A81, ¶159; A26; A29.) School districts were required to consult historical documentation, such as yearbooks, to determine if this applied to them. (A81, ¶159; A28.) This effectively expanded the definition of "Indigenous name, logo, or mascot" in Part 123, which does not prohibit names, logos, or mascots that do not currently link to Native American culture, *e.g.* "Warriors." (A81, ¶160; *see also* A97.)

The "Introduction" section of the FAQs states:

> The New York State Board of Regents (BOR) voted unanimously to adopt a new Part 123 of the Regulations of the Commissioner of Education ("the regulation") relating to prohibiting the use of Indigenous team names, mascots, and logos by public schools on April 18, 2023. This regulation was effective on May 3, 2023. The requirements of the regulation reflect a longstanding Department policy (dating back over twenty-two years) and are clear in their purpose.

9

> This guidance, in the form of a frequently asked questions document, reinforces such requirements for the limited number of districts still using such names, mascots, and logos, or using vestiges of their prior use, and provides an aid to implementation.
>
> Specifically, **team names, mascots, and logos derived from, or that have connections to, Indigenous peoples, in the past or at present, which are being used without the express consent of such peoples are contrary to the requirements of the regulation and New York State's Dignity for All Students Act and must change**.

(A26 (emphasis in original).)

At page six of the FAQs, in response to an inquiry about whether a school district can keep its team name if it eliminates all associated imagery, the FAQs seemingly prohibit "vestiges" of the prior use of Indigenous names, mascots, and logos. (A26; A29.) In contrast, Part 123 prohibits the use of Indigenous names, mascots, and logos only; it includes no language suggesting school districts would be prohibited from using non-Native American names like Warriors because they were once connected to Native American images. (A97.) Part 123 (and even the proposed bills submitted to the Legislature) did not reach into "the past" or otherwise include a "vestiges" provision. Accordingly, by retiring the Native American imagery, Wantagh UFSD will not violate Part 123 if it maintains the Warriors mascot. Yet Appellees have taken the position that Wantagh UFSD may not continue to use the Warriors name because of its previous connection to Native American imagery even though Part 123 does not include a "vestiges" provision.

10

**B. The Village of Wantagh and Its School District Was Named After A Famous Native American Sachem**

Wantagh UFSD is located in the Village of Wantagh, which was named in 1891 after a real person, Chief Wantagh, who has a direct historical connection to the area now known as Wantagh. (A60-61, ¶¶42-46, 49-51.) The Wantagh UFSD, which dates back to the late 1800's, also honors Chief Wantagh in name, just like the municipality in which it lies. (A61, ¶52; A63, ¶62.) The "Wantagh Warriors" name and logo dates back to 1956. (A62, ¶54.) Wantagh UFSD has never had a Warriors mascot; in other words, nobody shows up to school functions sporting some type of Warriors costume.

School sports are a popular pastime in Wantagh, with the community attending school games while sporting their Warriors apparel. (A91, ¶ 223.) Warriors apparel also correlates with fundraising and awareness efforts. (A91, ¶224.) For example, members of the school community, including Appellant Greco, wear specialty Warriors apparel in remembrance of 9/11. (*Id.*) Additionally, the Sports Booster Club, a parent-run organization, raises money selling Warriors apparel to fund school sports teams throughout the year. (A91, ¶225.) The proceeds from the Sports Booster Club helps pay for sports scholarships and end-of-year student awards. (*Id.*)

Appellant Greco is member of the Wantagh BOE, and one of the many Wantagh Warriors who regularly attends sports games while wearing his Warriors

11

apparel. Having watched all six of his children graduate from the Wantagh UFSD, Greco has amassed an impressive collection of Warriors apparel which he continues to wear while attending his nieces' sports games and other school games and functions. (A55, ¶12; A91-92, 219-22, 224, 226.) When Greco sits in the stands with his wife and relatives to watch their family members' sports contests, he acts as a parent and spectator, not a Board Trustee (A92, ¶227.) And yet Part 123 prohibits him from wearing the same Warriors apparel his wife and relatives wear. (*Id.*)

Wearing Warriors apparel has also become a form of protest against Part 123, as the Wantagh and other communities who seek to maintain their names and/or logos have come out in force wearing their gear to support the cause. (A268, n. 25.)

The high school's student-run online news site is named "The Warrior." Its website banner and logo include no Native American imagery. (A62, ¶55 (depicting banner for school news site).)

### C. Appellants Have Committed to Retiring their Native American Imagery and Only Seek to Maintain the "Warrior" Name, which is Not Unique to Native American Culture

Warrior is not exclusive to native culture. Many cultures have warriors. (A63-64, ¶¶63-64.) Warrior is not even a Native American word.

The Chairman of the Shinnecock Nation himself, Brian Polite, who was intimately involved in NYSED's implementation of Part 123, publicly commented

that the name "Warrior" is not exclusive to native culture and supports having school districts keep their Warriors team name so long as they remove the Native American imagery. (A63, ¶63.)

The name Warrior dates back to the greatly feared Celtic warriors who lived in Celtic Europe, a culture believed to have started to evolve as early as 1200 B.C., the Iron Age. (A64, ¶65.) There were the great warriors of Ancient Rome and Greece, such as the Trojan and Spartan Warriors from ancient Greece. Warriors from ancient Greek mythology, like Achilles, Hercules, Odysseus, and Perseus, are well-known throughout the world, and have inspired countless movies and tv shows, like Xena: The Warrior Princess. (A64, ¶66.)

The Warrior name can be found throughout human history. Medieval knights served as warriors during the Middle Ages, there were Scottish Warriors, the Mongol Warriors of East Asia, Viking Warriors (also known as sea warriors), Ottoman Mamluk Warriors, Samurai Warriors (the warriors of premodern Japan), Jewish rebel warriors also referred to as the Maccabees, and the Valkyrie warriors (a figure in Norse Mythology depicted as a warrior woman). (A64, ¶67.)

The Warrior name is also used by various schools and institutions of higher education, not only throughout the State of New York, but throughout the country. (A64, ¶68.) At the collegiate level, colleges such as Westmont College, Wayne State University, Bacone College, Sterling College, Merrimack College, Lycoming

13

College, Eastern Connecticut State University, East Stroudsburg University of Pennsylvania, and Wisconsin Lutheran College all use the Warriors name. (A64, ¶69.)

With the removal of Native American imagery and a successful rebrand, the Warriors name would not fall within the definition of "Indigenous name, logo, or mascot" set forth in Part 123. (A97.)

### D. Wantagh UFSD's Response to Part 123

Upon reviewing Part 123, the Wantagh Board decided to retire the district's Native American imagery but fight to keep a rebranded "Warrior" name. (A70, ¶102.) On June 1, 2023, Wantagh UFSD submitted a plan to NYSED entitled "Wantagh Union Free School District NYSED Indigenous Mascot Regulation Board of Education Plan" (the "June 1 Wantagh Replacement Plan.") (A183-188; *see also* A70, ¶103.) In the June 1 Wantagh Replacement Plan, the Wantagh Board acknowledged that Wantagh USFD's logo depicting a Native American individual was implicated by Part 123 and represented it would retire that imagery and rebrand the Warrior name. (A184; *see also* A70, ¶ 104.)

Relying on Part 123's definition of Indigenous name, logo, or mascot, the Wantagh Board reached the opposition conclusion: that it was "equally clear that the Warrior name [once rebranded] would not fit into the definition, as it is not a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations,

14

customs, symbols, or traditions." (A184; *see also* A71, ¶105.) The June 1 Wantagh Replacement Plan referred to the support for a rebranded Warriors name by Shinnecock Chairman Polite. (A185; *see also* A63, ¶ 63; A71, ¶106.) Yet NYSED Assistant Commissioner David Frank denied the Wantagh Board of Education's request to keep the Warrior name. (A71, ¶107.)

On June 14, 2023, Senator Steven D. Rhoads, a Wantagh resident and representative of the 5th Senatorial District, sent a comprehensive letter to the Commissioner, Dr. Betty A. Rosa, urging NYSED to reconsider its decision about the Wantagh Warriors, and the decision to enact Part 123 in general. (A71-72, ¶¶108-110; A190-197.) Senator Rhoads opined that the mere enactment of Part 123 was unlawful, an abuse of discretion, and an overbroad interpretation of DASA that was not intended by the Legislature. (*Id.*) He wrote:

> The broad purpose of the Dignity for All Students Act, (DASA), to create an environment "*free from discrimination, intimidation. Taunting harassment. and bullying on school property, a school bus and/or at a school function,*" is certainly a laudable goal. The decision, however, by the Board of Regents and you, as Commissioner, to institute a blanket statewide ban on the use of indigenous names, logos and mascots without an assessment on a case by case basis whether the use of such items in any way actually promotes a culture of *"discrimination, intimidation. taunting. harassment. and bullying"* is, respectfully, an abuse of discretion and an overbroad interpretation of the statute, unintended by the Legislature.

(A71-72, ¶109; A190 (emphasis in original).)

15

Senator Rhoads also criticized the manner in which Part 123 was drafted, calling it "poor policy" His letter June 14 letter continues:

> The State Education Department's state-wide and universal ban on the use of indigenous names, logos and mascots under the pretext of DASA's charge to create an environment *"free from discrimination. intimidation, taunting. harassment and bullying"* while making absolutely no effort to consider whether the use of such name, logo or mascot, given the history and circumstances of its use, actually creates such an environment, is not only poor policy, but creates a dangerous precedent, particularly in an educational setting…

> I also urge that the SEO create a mechanism for the individual evaluation of continued use of certain names, logos and mascots based upon community history, purpose and whether its continued use will create an environment which DASA was actually intended to avoid.

(A71-72, ¶109; A191-192 (emphasis in original).)

After receiving NYSED's denial, the Wantagh Board revised its Replacement Plan on June 15, 2023 to incorporate the fact that its request to keep the Warriors name was denied. (A72, ¶111; A199.) In this June 15 Board Replacement Plan, the Wantagh Board reiterated that it remained committed to retiring the imagery associated with the current logo but would still like to keep the Warriors name and rebrand it. (A72, ¶112; A199.) The Wantagh Board prepared this plan to comply with Part 123, which threatened removal of school officers and withholding of State

16

Aid if school districts did not comply with the June 30, 2023 deadline. (A72, ¶112; *see also* A29.)

To comply with the deadline imposed by Part 123, the Wantagh Board also passed a resolution with a plan to eliminate the use of prohibited Indigenous names, mascots, and logos by the end of the 2024-2025 school year. (A73, ¶113; A199.) The resolution clarifies, however, that the Wantagh Board's compliance shall in no way serve as a waiver or be construed as a waiver of the District's right to challenge: (a) whether the use of the "Warriors" name does in fact constitute a prohibited "indigenous name, logo or mascot" under Part 123; and (b) whether Part 123 should be repealed and/or determined to be unenforceable by the Commissioner and/or any court of competent jurisdiction. (*Id.*) The Wantagh Board also indicated in its resolution that should Part 123 be repealed and/or determined to be unenforceable, it will immediately reinstate the "Warriors" team name in a manner unconnected with any indigenous imagery. (A73, ¶114; A199.) This forced resolution was passed by the Wantagh Board on June 15, 2023. (A73, ¶115.) This lawsuit followed.

Appellants remain committed to removing any Native American imagery and seek equitable relief that would allow them to retain a rebranded Warriors name. (A53, ¶ 4; A701, ¶ 102.)

17

### E. NYSED's Treatment of School Districts With a Warriors Name Has Been Haphazard and Contradictory

Part 123 is a self-policing regulation; NYSED has left it up to boards of education to determine whether their team names, logos, or mascots are prohibited by Part 123. According to Appellees, it prohibits any name or item that is, or was at any point in time, loosely tied to indigenous people, even though only the FAQs includes language about prior use of a name, logo, or mascot. In other words, NYSED seemingly left it up to the school district to decide where the Board of Regents drew its proverbial line. (A76, ¶127.)

Part 123 fails to include any standards or criteria for school districts to determine the meaning, scope, and application of the regulation and its prohibition against the use of names, logos, and mascots by public schools. (A76, ¶128.) The "definitions" provision of Part 123 (8 NYCRR 123.1) is inherently vague. It does not adequately define what constitutes an Indigenous custom, symbol, or tradition. (A76, ¶129.) It fails to describe the difference between a stereotypical aspect of Indigenous culture, as opposed to a representation that is accurate and respectful. (A76, ¶130.) As a result, persons of common intelligence must necessarily guess at the meaning, scope, and application of Part 123. (A76, ¶131.)

The FAQs indicate that school districts may not use names with "vestiges" of a connection to previous images or logos even though this prohibition is not contained in Part 123. (A81, ¶159; A26; A29.) But nothing in Part 123 itself prevents

Wantagh UFSD from maintaining a rebranded Warrior name once it retires all Native American imagery. (A81, ¶160; *see also* A97.) Even the bills that failed to pass in the State Legislature did not go as far as the FAQs. They just stated that "no public school shall use a native name, logo, or mascot." (A175-178; A180-181.)

Additionally, the Board of Regents and NYSED never issued a list of schools that it considered to violate the new regulation. (A76, ¶132.) Nor was the State forthcoming in responding to inquiries about the scope of the regulation. (*Id.*)

There is no evidence the Board of Regents conducted any review of New York public school logos to see if they might refer to a Native American tribe or individual. (A76, ¶134.) It rather issued a sweeping regulation prohibiting any non-exempt use of an Indigenous name, logo, or image without taking their origin into account. (*Id.*)

In exempting school districts that have an agreement with a tribe, Part 123 arbitrarily conditions the use of an honorific Native American name or symbol based on a school's ability to locate, negotiate, and contract with a tribe that may not even represent the actual interests of the school's constituents, Native American or otherwise. (A77, ¶¶134-136; *see also* 8 NYCRR 123.4(b).) It arbitrarily allows a school district to keep its name, mascot, or logo if it contracted before May 3, 2023 while another district that contracts thereafter would be barred. (A75, ¶123; A77, ¶¶136-137.) Accordingly, the exact same Indigenous name, mascot, or logo would

19

violate Part 123 just because the school district was unable to obtain timely approval from a recognized tribe. (*Id.*)[1]

This also arbitrarily places the legality of a school district's team name, logo, or mascot to the discretion of a tribe that bears no relationship with, or accountability to, the district. (A77, ¶¶137-38.) Accordingly, tribes get to decide whether to excuse a purported DASA violation and allow a school district to continue to use an Indigenous name, symbol, or image. (*Id.*)

In enacting Part 123, Defendants stripped public school districts and boards of education of this inherent authority and discretion and effectively placed it in the hands of tribal members who—unlike school district officials and administrators—have no experience with DASA complaints or compliance issues.

NYSED has allowed the Chenango Valley Central School District to keep its "Warriors" team name because it was not previously connected with Indigenous Nations or peoples. (A78, ¶139.)

The Salamanca City Central School District was exempted from Part 123 and allowed to maintain its Warriors name ***and logo*** which depicts a Native American

---

[1] This happened to the Wyandanch Union Free School District and its Board of Education, which were originally Plaintiffs in this case. After months of negotiations, Wyandanch UFSD secured a written exemption from the Shinnecock Indian Nation to continue to use its Warriors name if it retired its Native American imagery. (A74-75, ¶¶119-120, 122.) And yet NYSED denied Wyandanch UFSD's exemption request, and is requiring Wyandanch UFSD to change its Warriors name, simply because it qualified for an exemption eight days late. IA75, ¶122.)

male after timely reaching an agreement with the Seneca Nation. (A78, ¶142.) Yet Defendants will not permit Appellants to rebrand the "Warriors" name, even without any connection to Native American imagery or logos. (A78, ¶140.) So the regulation/FAQs that were designed to eliminate Native American names, logos, and mascots finds that "Wantagh" is acceptable, but "Warriors" is not. Under these circumstances, Appellees encourage and authorize the arbitrary and discriminatory enforcement of the regulation.

## PROCEDURAL HISTORY

On September 29, 2023, Appellants commenced a federal lawsuit against Defendants by Filing a Verified Petition and Complaint asserting various federal and state law claims challenging Part 123. (A8; *see gen*., A51-94.)

On December 4, 2023, the parties appeared before Magistrate Judge Lee G. Dunst for a pre-motion conference to address Defendants-Appellees ("Appellees") motion under Rule 3(b) of the Division of Business Rules for a determination that four lawsuits filed in the Eastern District of New York (including this case) are related. (A12 [ECF Doc. No. 18]; *see also* A11 [ECF Doc. No. 16].)[2] At that

---

[2] The other three matters were (1) *Massapequa Union Free Sch. Dist., et al. v. NYS Bd. of Regents, et al.*, No. 2:23-cv-07052; (3) *Connetquot Central Sch. Dist., et al. v. NYS Bd. of Regents, et al.*, No. 2:23-cv-07696; and (4) *Amityville Union Free Sch. Dist., et al. v. NYS Bd. of Regents, et al.*, No. 2:23-cv-8011. The Court subsequently determined the cases were related.

December 4, 2023 conference, Appellants sought to expedite discovery notwithstanding the briefing of Appellees' anticipated motion to dismiss, since Part 123 provided school districts with only two years to comply. (A12 [ECF Doc. No. 18, pp. 18-19].) Appellants discussed the potential need to seek a stay of the enforcement of Part 123 pending the outcome of litigation if the case did not move quickly enough to reach an outcome before June 30, 2025 deadline to comply. (*Id.*, p. 19.)

On January 16, 2024, Appellants filed an amended complaint. (A13.) On February 16, 2024, Appellees filed a pre-motion letter in anticipation of moving to dismiss the amended complaint, which Appellants opposed via letter on March 1, 2024. (A13-14 [ECF Doc. Nos. 26, 27].)

On March 5, 2024, the Honorable Margo K. Brodie referred the pre-motion conference on Appellees' anticipated motion to dismiss to Magistrate Judge Lee G. Dunst. (A14 [March 8, 2024 Electronic Order].)

On March 25, 2024, Appellees filed a revised pre-motion letter with new arguments. (A14 [ECF Doc. No. 29].) Appellants filed an opposition letter on April 8, 2024. (A14 [ECF Doc. No. 30].)

On April 26, 2024, the parties appeared before Magistrate Judge Dunst for a second time regarding Appellees' anticipated motions to dismiss in all four related cases. (A15 [ECF Doc. No. 32.]) Magistrate Judge Dunst indicated the goal of the

referral was to assess whether the issues would be narrowed and to discuss briefing, logistics, and scheduling among the four related cases. (A15 [ECF Doc. No. 34, p. 4].)

Appellees' motion to dismiss the Amended Complaint was fully briefed on September 6, 2024, which all motion papers were filed with the district court in accordance with its bundling rule. (A17 [ECF Doc. 40; ECF Doc. No. 41; ECF Doc. No. 42].)

While the parties briefed Appellees' motion to dismiss, Appellants simultaneously conducted discovery on an expedited schedule and then promptly filed a pre-motion letter for summary judgment on September 13, 2024—one week after discovery closed and before Judge Brodie decided the motion to dismiss. [A17 [ECF Doc. No. 43].)

Appellants also sought a prohibitory preliminary injunction to stay the enforcement of Part 123 pending the outcome of litigation. (*Id.*) Appellees filed a letter in opposition on September 20, 2024. (A17 [ECF Doc. No. 45].) Appellants made every effort to fast-track the case to secure a final determination before the then-impending June 30, 2025 deadline to comply with Part 123.[3]

The Court scheduled a pre-motion conference on October 22, 2024 for

---

[3] Wantagh UFSD has since secured a one-year extension of time (from June 30, 2025 to June 30, 2026), based on its partial compliance, to complete any remaining projects necessary to comply with Part 123.

Appellants' anticipated motions for summary judgment and a preliminary injunction. (A18 [Oct. 9, 2024 Electronic Order].) On October 21, 2024, however, the day before the pre-motion conference, the district court issued a new Order directing the parties to be prepared to argue Appellees' motion to dismiss. (A18 [Oct. 21, 2024 Electronic Order].) At the October 22, 2024, the Court declined supplemental jurisdiction over Plaintiffs' Article 78 claims, reserved judgment on the remaining Third through Fifth Causes of Action, and denied Appellants' request to move for summary judgment. (A18 [Oct. 22, 2024 Electronic Minute Order].) The Court accepted additional letters on discrete issues, but refused to permit Appellants to move for summary judgment and, accordingly, Appellants were unable to submit the evidence garnered during discovery to support their claims.

The day after oral argument, Appellees filed a letter stating they would not modify the deadline for Wantagh UFSD to comply with Part 123 based on the pending litigation. (A19 [ECF Doc. No. 50].)

By Memorandum and Order dated March 27, 2025, the Honorable Margot K. Brodie granted Appellees' motion to dismiss the Amended Complaint and denied Appellants' motion for a preliminary injunction. (the "March 27 decision"). (M&O.) (A200-288.) The district court issued final judgment on April 28, 2025. (A290-292.)

Appellants timely appealed. (A292-93.) This appeal is limited to the portion of the March 27 decision that granted Appellees' motion to dismiss Appellants'

claims that: (a) Part 123 is impermissibly vague and overbroad under the First and Fourteenth Amendments of the United States Constitution (Fourth Cause of Action), and (b) Part 123.5 impermissibly restricts Appellant Greco's speech in violation of the First Amendment and Article I, Section 8, of the New York State Constitution by prohibiting him from displaying, on school grounds or at school functions, a prohibited Indigenous team name or logo.[4]

## SUMMARY OF ARGUMENT

Unable to pass legislation, Appellees implemented a confusing, internally inconsistent, and unconstitutional regulation that bears no relationship to its purported implementing statute, DASA. School districts, tasked with self-policing the regulation, are left to guess about the meaning of critical terms and its applicability to their names, logos, and mascots. The regulation is so convoluted that the FAQs necessary to explain it include mandates that significantly expand the reach of the regulation, leaving school districts confused about whether they are just required to follow the regulation or extraneous "requirements" from a guidebook. Since this is an unfunded mandate with severe consequences—the elimination of State funding and removal of public school officers—schools require far more

---

[4] Appellants do not appeal (a) the portions of the March 27 decision that declined to exercise supplemental jurisdiction over Appellees' separation of powers claim and dismissed it without prejudice and (b) the denial of their motion for a preliminary injunction.

precision than the regulation affords. In this vein, Warriors (without the Native American logo the Wantagh Board of Education agreed to remove), apparently satisfies the regulation. But Appellees have interpreted guidance from the FAQs to require Wantagh to eliminate the Warriors name because Wantagh previously used it alongside a depiction of a Native American man. Part 123 is therefore incurably vague and overbroad, both facially and as it has been applied to the Wantagh Warriors.

The regulation violates the First Amendment rights of school representatives like Appellant Anthony Greco and employees of the school district, who are precluded from wearing the Warriors name on their clothing on school grounds—not just at work, but on their own time at their children's sporting events, concerts, and the like. While acknowledging this is private citizen speech, the district court erroneously applied a heightened "matter of public concern" standard from First Amendment retaliation jurisprudence to block Greco's claim without reaching its merits. In doing so, the court applied an overly restrictive definition of matter of public concern, particularly at the Rule 12(b)(6) pleading stage.

The ban is a content-based, viewpoint-based prior restraint that cannot survive strict scrutiny. It bears little connection to its purported enabling statute, DASA, which was designed to prevent bullying and discrimination. Prohibiting the Warriors name, detached from any Native American reference, is not narrowly tailored to

serve a compelling state interest or the least restrictive means readily available or that purpose. The regulation also allows a school district to maintain its Indigenous image or moniker if it obtains timely written approval from a tribe, without any explanation how a school-wide DASA violation magically disappears with a blessing from a non-elected or appointed person with no ties to education.

The district court erroneously avoided these important questions for the school district, board of education and official capacity claims. While municipal entities generally lack capacity to sue the State, this case falls within the exception that grants capacity when the regulation requires it to violate a constitutional proscription. Because the regulation is self-policing in its implementation and enforcement, it requires Appellants to violate the First and Fourteenth Amendments.

This Court should reverse the district court's grant of Appellees' Fed. R. Civ. P. 12(b)(6) motion and remand the case for further proceedings.

# ARGUMENT

## I. APPELLANT GRECO STATED A VIABLE FREE SPEECH CLAIM IN HIS INDIVIDUAL CAPACITY

The district court correctly rejected Appellees' "government speech" argument; correctly held that the language of Part 123 directly implicates expressive activity in schools and at school functions; and correctly found that "Plaintiffs plausibly speak as citizens for purposes of First Amendment protection when they wear team apparel to school games and functions." (A248; A267.)

But the court misapplied *Pickering* and *Garcetti* to this case, which does not involve an employment dispute between employer and employee but a prior restraint on speech by the State government. *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968); *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). In doing so, the court erred in holding Greco failed to sufficiently allege conduct of school officials and employees that implicates protected speech because the speech was not on a matter of public concern. (A250.)

As the district court correctly held, Greco (and other District officials or employees) act as private citizens (not employees) when they attend school games or events as spectators. Since this case neither involves restrictions by Greco's employer nor retaliation for the exercise of free speech, the district court should not have required Greco to prove his speech implicated matters of public concern. As a prior restraint infused with viewpoint and content-based discrimination, Part 123

28

violates the First Amendment under the applicable *NTEU* standard. *United States v. National Treasury Employees Union*, 513 U.S. 454, 481 (1995) ("*NTEU*"). At a minimum, the district court should have denied Appellees' pre-answer motion and let the claims proceed.

### A. The District Court Erroneously Required Greco to Show His Off-Campus Citizen Speech Related to Matters of Public Concern

The district court properly acknowledged that "public employees do not surrender their First Amendment rights to comment on matters of public interest because of their employment." (A259-60 (citing *Garcetti*, 547 U.S. at 417).) But it proceeded to erroneously analyze the prior restraint claim by subjecting Greco's pleading to the heightened standard for First Amendment retaliation claims. In doing so, the district court effectively allows the State government to restrict public officials from engaging in off-campus citizen speech outside the scope of their public responsibilities unless the speech relates to matters of public concern. This makes little sense in the context of this case.

The court relied on a line of cases applicable in the First Amendment retaliation context to hold Greco to the heightened "matter of public concern" standard for government employees. *See, e.g., Lane v. Franks*, 573 U.S. 228, 237 (2014); *Piscottano v. Murphy*, 511 F.3d 247, 270 (2d Cir. 2007); *Garcetti*, 547 U.S. at 418. In those contexts, a public employer may be sued for retaliation only when it

punishes an employee for engaging in employee speech on a matter of public concern. The purpose of this is to allow a public employer to discipline employees for work they perform within the scope of their public employment without running afoul of the First Amendment. *See Garcetti*, 547 U.S. at 419 ("So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.") This allows governments "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. This rubric is a fit for the employer-employee retaliation context because it allows governments to regulate employee context up to the point that the employee's expressive activity reaches matters of public concern.

*Garcetti* and *Pickering* take it further. Under *Garcetti*, the employee may not recover for retaliation unless his speech fell outside the scope of his responsibilities as a government employee. *Garcetti*, 547 U.S. at 421. *Pickering* requires the aforementioned balancing (which notably cannot be undertaken at the motion to dismiss stage). *See Squicciarini v. Vill. of Amityville*, No. 17-CV-6768 (DRH), 2019 WL 1232093, at *9 (E.D.N.Y. Mar. 15, 2019), adhered to on reconsideration, No. 17-CV-6768 (DRH), 2019 WL 2191371 (E.D.N.Y. May 21, 2019) ("[T]he *Pickering*

test is a "fact-sensitive inquiry" and the Defendants bear the burden of satisfying that test. As such, a motion to dismiss is not the appropriate means to determine the balance of interests in this case.") (citing *Sugar v. Greenburgh Eleven Union Free Sch. Dist.*, No. 18 CV 67 (VB), 2018 WL 6830865, at *7 (S.D.N.Y. Dec. 28, 2018)).

This case does not involve either an employer-employee relationship or a retaliation claim. It involves a prior restraint by the State on the ability of a volunteer board member to engage in expressive activity on his own time, detached from the responsibilities of his employment. The district court's ruling effectively allows the State to regulate any off-campus expressive conduct of volunteer school board members that does not touch on matters of public concern without First Amendment repercussions.

Greco's First Amendment expressive activities are not "part and parcel" of his responsibilities as a school board member. He and the other school board members do not sit as board members when they watch their children's sporting events, concerts, or graduations. They are residents, alumni, parents, aunts, uncles, grandparents, and spectators who engage in the same activities as "citizens who do not work for the government," rather than "activities undertaken in the course of performing one's job." *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 506 (E.D.N.Y. 2011).) While the district court acknowledged Greco acted as a private

citizen in these contexts, it nevertheless held him to a higher standard than other private citizens who engaged in the same conduct.

### B. Even if Held to the Higher Standard, Appellants Plausibly Alleged that Greco Communicates as A Private Citizen on Matters of Public Concern When He Wears His Warrior Apparel to School Games and Functions

"The speech of a public employee is protected by the First Amendment when the employee speaks as a citizen on a matter of public concern, rather than pursuant to his employment responsibilities." *Specht v. City of New York*, 15 F.4th 594, 600 (2d Cir. 2021) (citing *Garcetti v. Ceballos*, 547 U.S. at 420-21).

Speech on matters of public concern is at the heart of the First Amendment's protection; accordingly, it "occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *See Snyder v. Phelps*, 562 U.S. 443, 451, 452 (2011) (collecting cases). This is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Id.* (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74–75 (1964)). The Supreme Court has cautioned that when considering whether public employee speech addressed a matter of public concern, "the boundaries of the public concern test are not well defined." *Id.* (quoting *San Diego v. Roe,* 543 U.S. 77, 83 (2004) (*per curiam*)).

Speech involves a matter of public concern when it can "be fairly considered as relating to any matter of political, social, *or other concern to the community*, or

when it is a subject of legitimate news interests; that is a subject of general interest and of value and concern to the public." *See Snyder*, 562 U.S. at 453 (emphasis added) (citations omitted); *Specht*, 15 F.4th at 600. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011) (quoting *Connick v, Myers*, 461 U.S. 138, 147 (1983)). This standard applies both to verbal speech as well as an employee's expressive conduct. *See Barzilay v. City of New York,* 610 F. Supp. 3d 544, 575 (S.D.N.Y. 2022) (citing *Piscottano*, 511 F.3d at 270).

To identify matters of public concern, courts "consider the motive of the speaker, cognizant that speech on a purely private matter does not pertain to a matter of public concern and, conversely, that an individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large[.]" *Specht*, 15 F.4th at 600 (quoting *Golodner v. Berliner*, 770 F.3d 196, 203 (2d Cir. 2014)).

In *NTEU*, the Supreme Court had no problem finding the prohibited—but unspecified—appearances, speeches, or articles were matters of public concern simply because they "were addressed to a public audience, were made outside the workplace, and involved content largely unrelated to their government employment." *NTEU*, 513 U.S. at 466.

33

Courts have found expressive activity through clothing to involve a matter of public concern. For example, in *Latino Officers Ass'n, N.Y., Inc. v. City of N.Y.*, 196 F.3d 458 (2d Cir. 1999), the plaintiffs were NYPD officers who wanted to march in a Puerto Rican Day Parade while wearing their uniforms. This Court held the plaintiffs' interest in communicating ethnic pride as members of the NYPD was not a matter only of private concern but was a matter of public concern to the community. *Id.* at 466. In *Piscottano*, 511 F.3d 247, the plaintiffs, State-employed correctional officers, engaged in expressive activity by wearing clothing affiliated with their motorcycle club. *Id.* at 276. The court held their expressive conduct, which demonstrated pride in and approval of the organization that was criticized by others, constituted speech on a subject that is a matter of public concern. *Id.*

Like the plaintiffs in *Latino Officers Ass'n* and *Piscottano*, Greco wears his Wantagh Warriors apparel to demonstrate pride in and support for his school, teams, and programs. (A90, ¶218; A91-92, ¶¶221, 226-27, 231-32.) This is particularly evident when he wears his Warriors apparel on school grounds, engaging in expressive conduct that conveys a particularized message on a matter of public concern (*i.e.*, his identity as a Wantagh Warrior in a community where Wantagh sports is a popular past time), his support of the school and its teams, and now

34

political protest[5] against the Part 123's impending elimination of the name. These all trigger First Amendment protection.

The Amended Complaint explains that when Greco wears his school apparel he dons a symbol that signifies his group and viewpoint association. The Warrior team name and logos are a common symbol of group or viewpoint association; after all, mascots are a cherished tradition in sports intended to facilitate a sense of pride and unity among teams and fans. Particularly within the Wantagh community, where school sports are a popular pastime and the bleachers are filled with students, parents, and faculty members, wearing school apparel expresses their solidarity. (A91, ¶224.)

The Amended Complaint alleges: "As a proud father, uncle, and community member, Plaintiff-Petitioner Greco has amassed quite the collection of Warriors gear over the years. He wears his Warriors apparel to sports games and other school

_____

[5] To the extent the Court declined to consider that individuals wear the Warriors apparel to protest the regulation, it should have been considered under the liberal pleading standard, which does not require a complaint to recite every basis for which the plaintiffs engaged in activity protected by the First Amendment. *See* Fed. R. Civ. P. 8(a) (requiring "short and plain statement of the claim"); Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). While the district court granted leave to replead this claim, Appellants submit this was unnecessary and repleading would have only delayed this Court's review of this case since (a) the district court denied Appellant's motion for a preliminary injunction; and (b) the Part 123 clock was ticking with the school district facing the State withholding of funds and removal of its officers for non-compliance. It was only after this appeal was filed that the State granted Wantagh an extension of time to comply, based on its partial compliance to date.

functions to support not only student athletes, but the school community as a whole." (A91-92, ¶226.) This is particularly poignant in the wake of the enactment of Part 123, when Greco and other members of the community have made it a point to wear their team gear in protest of the regulation and support of maintaining the team name.

Sports team apparel also correlates with fundraising efforts. (A91, ¶¶224-225.) He purchases and wears the apparel in support of the Sports Booster club, funding scholarships and end-of-year student awards, which he regularly attends. (A91, ¶225.) And Greco and others wear specialty Warriors apparel in remembrance of 9/11. (A91, ¶224.) But Part 123 prohibits him from engaging in these forms of expression.

### C. Having Either Found the Public Concern Analysis Inapplicable or it was Sufficiently Pled, the District Court Should Have Permitted the Case to Proceed

The prior restraint of Appellants' speech under Part 123 is subject to the balancing under the *NTEU* standard. *See NTEU,* 513 U.S. at 481. Application of the *NTEU* standard turns on whether a government employee's expression is restricted "through a generally applicable statute or regulation, as opposed to a particularized disciplinary action, and there is no doubt that the former is involved here." *Latino Officers Ass'n, New York*, 196 F.3d at 464 (quoting *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171-72 (2d Cir. 1999) ("Where a restraint is accomplished through a

generally applicable statute or regulation, we must make sure that the regulation's sweep is reasonably necessary to protect the efficiency of the public service.") (cleaned up)). Under the *NTEU* standard, the government's "burden is particularly heavy." *Harman v. City of New York,* 140 F.3d 111, 118 (2d Cir. 1998).

To justify such a restriction, the government "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the government." *Id.* (quoting *NTEU,* 513 U.S. at 465). When this standard applies, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.*

Part 123 readily fails under this rigorous standard. Appellees argued below that Part 123 would not pass the *NTEU* (or *Pickering*) balancing test because "'the State's policy of ensuring a discrimination- and harassment-free learning environment for all students by prohibiting the use of Indigenous names, mascots, and logos' outweighs Individual Board Member Plaintiffs' interest in expressing support for their schools." (A258). The recited harm is mere conjecture, particularly at the motion to dismiss stage.

Even in briefing the motion for a preliminary injunction, Appellees were unable to provide a single example of a DASA violation relating to the Wantagh

Warriors. And they can't because none exist. They offered no examples of race-based incidents or identified any students or individuals who suffered harm because of discrimination as a result of the Warriors name (or, for that matter, logo). While Greco engaged in numerous expressive activities furthered by donning the Warriors apparel, Appellees were unable to show any articulable basis to support their claim that permitting officials to wear Warriors gear—or permitting the school to use the rebranded Warriors name—perpetuated discrimination or harassment.

For the same reasons that Part 123 cannot satisfy the "narrow tailoring" requirement of strict scrutiny, (*see supra* Point I(D)), it also cannot satisfy the *NTEU* standard. The district court incorrectly folded *Pickering*'s requirements into its analysis of the *NTEU* standard. As a prior restraint, Part 123 is undoubtedly subject to the *NTEU* balancing test, not *Pickering*, which applies to retaliation claims. Regardless, the balancing of the governmental interest in either test is inappropriate at the motion to dismiss stage. *See Squicciarini*, 2019 WL 1232093, at *9.

### D. Part 123 Is an Unconstitutional Content and Viewpoint-Based Regulation and Prior Restraint[6]

The Amended Complaint plausibly alleged that Part 123 is an unconstitutional content and viewpoint-based regulation and prior restraint on speech. The district

---

[6] Greco's free speech claim under Article 1, Section 8 of the New York State Constitution is subject to the same analysis as his free speech claim under the First Amendment and therefore should be reinstated along with its federal counterpart.

court did not analyze these issues after having dismissed the First Amendment claims on other grounds. (A269.) Yet Part 123's status as an unconstitutional content and viewpoint-based regulation and prior restraint provides yet another reason to reverse the district court's dismissal of the First Amendment claims.

Under the Free Speech Clause of the First Amendment, a government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (citation omitted). For this reason, certain types of regulations of expression are presumptively constitutional.

Suppression of speech based on its content before its actual expression is a "prior restraint" of speech. *See United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005); *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 486 (2d Cir. 2007). Prior restraints are the most serious and the least tolerable infringement on First Amendment rights and thus come with a "heavy presumption" against constitutional validity. *See Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 176 (2d Cir. 2001). This is because prior restraints "carry risks of overinclusiveness and underinclusiveness." *NTEU,* 513 U.S. at 481. (O'Connor,

---

*See Carter v. Inc. Vill. of Ocean Beach,* 963 F. Supp. 2d 203, 212 (E.D.N.Y. 2010), *aff'd,* 415 F. App'x 290 (2d Cir. 2011); *Buchanan v. City of New York*, 556 F. Supp. 3d 346, 365 (S.D.N.Y. 2021) (citation omitted).

J., concurring in the judgment in part and dissenting in part). This Court considers "prior restraints to be particularly abhorrent to the First Amendment in part because they vest in governmental agencies the power to determine important constitutional questions properly vested in the judiciary." *New York Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 131 (2d Cir. 1998).

"Content-based laws—those that target speech based on its communicative content—are also presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163 (collecting cases). Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. *Id.* (collecting cases).

Viewpoint discrimination occurs when the government "within the relevant subject category . . . has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 582 U.S. 218, 248 (2017). It is an "egregious form of content discrimination" and is "presumptively unconstitutional." *Id.*; *see also Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 62 (1983) ("Viewpoint discrimination is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of 'free speech.'"); *Brokamp v. James*, 66 F.4th 374, 392 (2d Cir. 2023) ("The Supreme Court has repeatedly emphasized the First Amendment's intolerance for content

40

discrimination—most obviously, government censorship of controversial, unpopular, or simply disfavored viewpoints.").

Part 123 constitutes a prior restraint, as it suppresses speech based on its content and before its actual expression. Part 123 goes one step further by imposing a viewpoint-based prohibition of speech before its expression. (A98.)

The prohibition of school district's names, logos, and mascots is a content-based restriction. Likewise, prohibiting public officials and employees (like Greco) from wearing apparel or carrying signs that bear Indigenous names or logos imposes that content-based restriction on them. The restriction on publication of existing names, logos, or mascots is a content-based restriction.

The regulation also effects a viewpoint-based restriction. Part 123 does not eliminate all school names, logos, and mascots; it only eliminates the Native American ones or those that once bore a connection to Native American names or imagery. Distinguishing these names, logos, and mascots from others effects a viewpoint-based restriction. And by allowing some school districts to keep the same name because they have an agreement with a Native American tribe or because the identical name was not historically connected to Native American imagery in that locale, exacerbates the arbitrary nature of the distinction.

As a content and viewpoint-based prior restraint on expression, Part 123 is presumptively unconstitutional and triggers strict scrutiny review. *See Reed*, 576

41

U.S. at 163 (content-based restrictions are subject to strict scrutiny). To overcome strict scrutiny, the burden is on the state actor (here Appellees) to demonstrate the restriction serves a compelling state interest, which is narrowly tailored to achieve that end. *Id.* at 163. Narrow tailoring requires that the restriction on speech be necessary to serve the asserted compelling interest, precisely tailored to serve that interest, and the least restrictive means readily available for that purpose. *See Friend v. Gasparino*, 61 F.4th 77, 91 (2d Cir. 2023). Strict scrutiny is a high burden because regulations of speech based on its content are presumptively invalid. *See Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015); *Reed*, 576 U.S. at 176, (Breyer, J., concurring) (explaining that strict scrutiny leads to almost certain legal condemnation).

Appellees cannot come close to carrying the demanding burden to satisfy strict scrutiny. While providing a discrimination and harassment-free learning environment for all students may be a compelling governmental interest in general, the application is overreaching. Part 123 is not narrowly tailored to advance that interest and thus impermissibly restricts expressive conduct protected by the First Amendment.

The blanket ban of Native American names, logos, and mascots—particularly in communities that themselves already bear Native American names—is anything but narrowly tailored. Part 123 ironically prohibits only the "Warriors" part of the

42

"Wantagh Warriors" moniker under the guise of eliminating Native American references (allowing the Native American name). And the fact that some schools are permitted to keep their Warriors name undermines any claim the regulation was narrowly tailored to advance the hypothetical interest of creating discrimination-free schools.

## II.  APPELLANTS STATED VIABLE FACIAL AND AS-APPLIED CHALLENGES TO PART 123 UNDER THE OVERBREADTH AND VOID-FOR-VAGUENESS DOCTRINES

Appellants plausibly alleged that Part 123 is facially unconstitutional under both the overbreadth and void for vagueness doctrine.

Courts disfavor facial challenges *outside* the context of the First Amendment unless plaintiffs can demonstrate the law is impermissibly vague in all applications. *See New York State Pro. Process Servers Ass'n, Inc. v. City of New York*, 2014 WL 4160127, at *10-11 (S.D.N.Y. Aug. 18, 2014), *aff'd sub nom., Clarke v. de Blasio*, 604 F. App'x 31 (2d Cir. 2015). *Id.* But, here, where First Amendment rights are at stake, the rules differ.

In the freedom of expression arena, an overbroad or vague regulation may be subject to facial review and invalidation even though its application in the case under consideration may be constitutionally unobjectionable. *See Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992) (collecting cases); *Farrell v. Burke*,

449 F.3d 470, 496 (2d Cir. 2006); *see also Blackwelder v. Safnauer*, 689 F. Supp. 106, 126, n.19 (N.D.N.Y. 1988) (holding an exception to limited scope of review of the facial validity of a statute under the vagueness doctrine exists where the statute abuts upon sensitive areas of basic First Amendment freedoms; in such cases, the considerations underlying vagueness analysis may merge with those that support the First Amendment overbreadth doctrine) (citing *Baggett v. Bullitt,* 377 U.S. 360, 372 (1964); *Kolender v. Lawson,* 461 U.S. 352, 359 (1983)). Thus, Appellants can challenge the constitutionality of Part 123, regardless of the nature of any as-applied claims.

In fact, overbreadth challenges are an exception to the general rule against third-party standing, providing a plaintiff standing to strike down a regulation based, not on how it affects him, but how it might be applied to third parties not before the court. *See Farrell*, 449 F.3d at 498. This "is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court." *See Forsyth Cnty*, 505 U.S. at 129; *see also Farrell*, 449 F.3d at 498-99 (overbreadth challenges are based upon the hypothetical application of a regulation to third parties, the purpose of which is to prevent the chilling of constitutionally protected conduct). The district court agreed the overbreadth doctrine provides an exception to the rule against third-party standing, which Appellees had not challenged. (A245, n. 19.) As set forth below, Appellants

stated viable facial and as-applied claims under the overbreadth and void-for-vagueness doctrines.

### A. Part 123 Is Facially Overbroad In Violation of the First Amendment

As discussed above, the district court erred in finding the Amended Complaint failed to plausibly allege Part 123 impacted First Amendment protected speech. Accordingly, the district court never reached the question of whether Part 123 is a substantial burden on free speech. (A250-251.) Because Part 123 poses a substantial burden on free speech in violation of the First Amendment's overbreadth doctrine, this Court should reverse district court's Rule 12 dismissal.

When a regulation does not impact the First Amendment, a plaintiff bringing a facial challenge must establish that no set of circumstances exists under which the law would be valid or show that the law lacks a "plainly legitimate sweep." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (citation omitted). In the First Amendment context, however, a law is unconstitutionally overbroad if it punishes a substantial amount of protected free speech, judged in relation to a legitimate sweep. *Id.*; *Virginia v. Hicks*, 539 U.S. 113, 122 (2003).

"Where, as here, [Part 123] imposes a direct restriction on protected First Amendment activity, and where the defect in the statute is that the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly

subject to facial attack." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 968 (1984).

Part 123 should be invalidated as overbroad because it reaches a substantial amount of constitutionally protected First Amendment activity through viewpoint and content-based restrictions that cannot survive strict scrutiny. In other words, Part 123 is unconstitutionally overbroad because a substantial number of its applications are unconstitutional, judged in relation to its purported legitimate sweep.

Part 123 lacks any tailoring to Appellees' purported goal, which is to prevent DASA violations. (*See supra* Point I(C).) It does not even provide a mechanism to determine whether a DASA violation has occurred, or is likely to occur, in a particular school district to justify a team name, logo, or mascot change. Instead, it purports to end discrimination and harassment in school districts without any showing such discrimination existed *ab initio*.

Appellants have no record of complaints, DASA or otherwise, relating to Appellants' Warriors name and/or logos, which date back to 1956. Part 123 creates a sweeping, policy-based determination that strays far beyond the scope of DASA. In doing so, it creates an unnecessary risk of chilling the speech and expression of school employees and the school community at large, in violation of the First Amendment.

Part 123 is also overbroad because it prohibits school districts from utilizing certain names just because they were once used in conjunction with prohibited names or logos. Here, Wantagh is barred from using the "Warriors" name just because it previously used the name and a Native American logo. At the same time, school districts that never had Native American imagery are permitted to use the Warriors name. Appellees' prohibition on "rebranding" to eliminate Native American connections demonstrates the overbreadth of the regulation.

The regulation's absurdity is reflected in the fact that Wantagh may become the Chiefs (the Massapequa UFSD mascot) and Massapequa may become the Warriors, since neither used the other's mascot in conjunction with Native American imagery. But the regulation prohibits the Massapequa Chiefs and the Wantagh Warriors.

As set forth above, First Amendment overbreadth challenges are an exception to the general rule against third-party standing. *See Farrell*, 449 F.3d at 498. Accordingly, in determining whether a regulation is substantially overbroad, a court may examine possible applications of the regulation in factual contexts in addition to those of the plaintiff in the instant case. *See NAACP v. Button,* 371 U.S. 415, 432–33 (1963). While Greco is a member of the Wantagh Board, this Court must also factor in Part 123's infringement of the First Amendment rights of *all* current and future officials and employees within each school district. This includes not only

other board members but administrators, teachers, paraprofessionals, custodial and maintenance staff, etc.

When moving to dismiss Greco's free speech claims, Appellees fixated on his job title and duties, claiming his "high level" status as an unpaid Board of Education Trustee somehow transforms his expressive activity into government speech (a doctrine the district court properly rejected). But all Wantagh school district employees are impacted by the restrictions of Part 123. This includes, for example, a teacher who happens to live in the District and wants to wear a shirt to her child's lacrosse game to support the Warriors against a neighboring rival. And it includes a custodian who has lived in Wantagh his whole life and wants to walk on the high school track after hours wearing his Warriors shirt in protest of Part 123. Part 123 places a presumptively unconstitutional content and viewpoint-based prior restraint on such expressive activity.

### B. Part 123 is Facially Vague

As one of the most fundamental protections of the Due Process Clause, "the void-for-vagueness doctrine requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (citation omitted).

"The degree of vagueness tolerated in a statute varies with its type: economic regulations are subject to a relaxed vagueness test, laws with criminal penalties to a stricter one, and laws that might infringe constitutional rights to the strictest of all." *Id.* (citation omitted). When a statute "is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Id.* (citation omitted). Here, the district court appropriately applied the heightened standard: "Because [Greco] alleged that Part 123's implementation provision raises First Amendment concerns, … the Court finds that the appropriate test is whether Part 123 'reaches a substantial amount of constitutionally protected conduct.'" (A233-34 (citing *Dorman v. Satti*, 862 F2d 436, 436 (2d Cir. 1988) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982)).

A statute can be impermissibly vague for either of two independent reasons. "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *See Slattery v. Hochul*, 61 F.4th 278, 294 (2d Cir. 2023) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). "Animating this first vagueness ground is the constitutional principle that individuals should receive fair notice or warning when the state has prohibited specific behaviors or acts." *Cunney v. Bd. of Trustees of Vill. of Grand View, N.Y.*, 660 F.3d 612, 621 (2d

Cir. 2011) (collecting cases). Under the second vagueness ground, statutes must "provide explicit standards for those who apply" them to avoid "resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.*

Part 123 is unconstitutionally vague under both of these two independent bases. As a general matter, because Part 123 implicates First Amendment rights, the vagueness doctrine demands a greater degree of specificity. *See VIP of Berlin*, 593 F.3d at 186.

The "definitions" provision of Part 123 (8 NYCRR 123.1) is unconstitutionally vague because it fails to give adequate warning of the boundary between the constitutionally permissible and impermissible applications of the statute. In other words, it fails to provide a reasonable opportunity to know what conduct is prohibited by law, leaving the public uncertain as to the conduct it prohibits.

As alleged in the Amended Complaint, Part 123 does not adequately define what constitutes an Indigenous "name," "symbol," or "image," while also failing to explain the difference between a stereotypical aspect of Indigenous culture, as opposed to a representation that is accurate and respectful. (A76, ¶129-30; A86-87, 197-98.) Part 123 also does not define what constitutes an "Indigenous custom, symbol, or tradition." As a result, persons of common intelligence must necessarily

guess at the meaning, scope, and application of Part 123. Appellees just assume that Board members and administrators throughout New York will know what an Indigenous symbol, image, custom, or tradition is even though Part 123 provides zero examples of what could be construed as an Indigenous symbol, image, custom, tradition. With no attempt to define these concepts, anything could arguably fall under the regulation. For instance, would the mere use of an image of a feather (which hold significant spiritual value in Native American culture) or an arrow (which also has symbolic meaning in Native American culture) fall within the scope of Part 123? There are several birds, i.e., eagles, owls, ravens, falcons, and hawks, that are symbolic of Native American culture; arguably, a school district that utilizes these birds as symbols could step into a violation of Part 123.

Part 123's inherent vagueness is exacerbated by the fact that Part 123 is a self-policing regulation, requiring boards of education to determine whether it prohibits their team names, logos, and mascots, and then face dire consequences if they guess wrong. (A76, ¶127.)

The fact that the Board of Regents and NYSED have never issued a list of schools/names/mascots it considered to violate Part 123 (A76, ¶132), further demonstrates the vagueness problem.

The blatant inconsistency between Appellees' characterization of Part 123 in its post-enactment May 2023 FAQ packet compared to the language of the regulation

itself also raises incurable void-for-vagueness concerns. After enacting Part 123, NYSED released an FAQ guide in May 2023 indicating it would prohibit any name, logo, or mascot that bore any connection to Native American culture at any point in time, even if not currently. (A81, ¶ 159; A24-34.) Appellants plausibly alleged this was an impermissible expansion of the definition of "Indigenous name, logo, or mascot" as set forth in Part 123, which says no such thing. (A65, ¶72.) To the extent Appellees claim that was its intended scope all along, there can be no doubt Part 123, as it was enacted, was unconstitutionally vague in failing to provide notice of school districts that they may have to change their team names even in the absence of any existing Native American imagery.

The district court was wrong to determine that the NYSED's after-the-fact FAQ guide somehow helped resolve void-for-vagueness concerns regarding Part 123. It only shined a bright light on Part 123's inescapable lack of clarity. The FAQ guide did not provide guidance to school districts on what Part 123 prohibits but flipped the script on school districts by prohibiting the "vestiges" of the prior use of Indigenous names, mascots, and logos—something that appears nowhere in Part 123 itself. (A26; A240-241.) In this regard, it provided little clarity to school districts on the regulation itself. Instead, it caused deep confusion among school districts as to what Part 123 actually prohibits. It remains entirely unclear to Appellants how a re-branded Warrior name would violate the plain language of Part 123.

Part 123 is also unconstitutionally vague under the second independent reason because it not only encourages, but authorizes, inconsistent, arbitrary and discriminatory enforcement. In enacting Part 123, Appellees took the rigid stance that all Indigenous name, symbol, or images (whether stereotypical or accurate) violate DASA by subjecting students to a discriminatory and hostile learning environment. (A97-98; *see gen.*, A24-34, A48-49.) And yet, if a school name, logo, or mascot depicting an Indigenous name, symbol, or image (even if stereotypical) can acquire written approval from a recognized tribe, the DASA violation magically dissipates.

Appellees assert that a re-branded Warriors name violates DASA for Wantagh while simultaneously allowing the Salamanca City Central School District to maintain its Warriors name *along with a logo depicting a Native American male*. (A78, ¶142.) Appellees' arbitrary enforcement of Part 123 does not align with the basis for which it claims to have implemented the regulation. Part 123's exemption that allows Native American employees to wear Indigenous names, logos, and mascots, while prohibiting other employees from doing the same is also arbitrary and inconsistent—a product of the vagueness of the regulation.

Despite the stated basis—to provide students with a discrimination and harassment-free learning environment—Appellees allowed tribal members (who are neither elected State officials nor representatives of public school districts) to decide

whether to excuse a purported DASA violation and allow a school district to continue to use an Indigenous name, symbol, or image. Yet boards of education have authority and discretion to decide how to conduct an interscholastic sports program, including determining "the propriety of a sports team name, mascot, or logo." (A58-59, ¶¶ 33-34 (citing *Appeal of McMillan*, 61 Ed. Dept. Rep., Decision No.18,058; *Appeal of Tobin*, 25 Ed. Dept. Rep. 301, Decision No. 11,591).) In enacting Part 123, Appellees stripped public school districts and boards of education of this inherent authority and discretion and effectively placed it in the hands of tribal members who—unlike school district officials and administrators—have no experience with DASA complaints or compliance issues.

### C. Part 123 is Facially Vague and Overbroad as Applied to Appellants

In addition to being facially unconstitutional, Part 123 is also unconstitutionally overbroad and vague as applied to Appellants.

Part 123's application to the Warriors name also reveals the regulations' inherent vagueness and overbreadth. As discussed above, Wantagh UFSD committed to retiring any Native American imagery and seeks only to maintain a re-branded Warriors name, a name that is, *e.g.*, commonly associated with a popular NBA franchise and other sports franchises. (A53-54, ¶ 4.)

It is undisputed that Part 123 does not prohibit use of the Warrior name alone; otherwise NYSED would not have allowed other schools, like Chenango Valley

Central School District, to continue to use Warriors. (A65, ¶ 71; A78, ¶ 139.)[7] While the May 2023 FAQ packet (vaguely) addresses the Wantagh UFSD's desire to utilize a re-branded Warriors name, Part 123 itself does not. Once Wantagh UFSD retires its Native American imagery, its use of the Warriors name will not implicate the plain language of Part 123. But Appellees have applied the FAQs to prohibit the Wantagh UFSD from using Warriors in any capacity because of it was once connected to Native American imagery.

And this makes little sense. As students move on through the schools, the previous connection to Native American imagery will dissipate and Warriors will assume its ordinary meaning detached from any Native American art. Even the Chairman of the Shinnecock Nation himself, someone who was intimately involved NYSED's implementation of Part 123, publicly commented that the name "Warrior" is not exclusive to native culture and that he supports having school districts keeping their Warriors team names so long as they remove any Native American imagery. He called this a "no-brainer." (A53, ¶ 3; A65, ¶ A74-75, ¶121; A78, ¶ 141.)

---

[7] As discussed in the Amended Complaint and above, a warrior is a universal cultural symbol, not just a Native American one. (A63-64, ¶¶ 63-69.)

### III.    APPELLANTS DISTRICT AND BOARD HAVE THE LEGAL CAPACITY TO ASSERT CONSTITUTIONAL CHALLENGES TO PART 123[8]

The district court erred in finding Wantagh UFSD, its Board of Education, and Greco, in his official capacity as a Board member, lacked capacity to challenge the constitutionality of Part 123.

Fed. R. Civ. P. 17(b) provides that state law governs whether a party has capacity to sue or be sued. *Id.* While public school districts generally lack capacity to raise constitutional challenges against the State, as the New York Court of Appeals has stated, "the capacity rule is not absolute…. [T]he assertion of some constitutional rights may, by their nature, present special circumstances to which the general rule must yield." *Id.* at 29-30.

The New York Court of Appeals recognizes at least four exceptions to the general "capacity to sue" rule when: (1) a public corporation has express statutory authorization to bring suit; (2) the legislation adversely affects a public corporation's proprietary interest in a specific fund of moneys; (3) the statute impinges upon Home Rule powers of a public corporation constitutionally guaranteed under article IX of the New York State Constitution; and (4) the public corporation asserts that, if it is

---

[8] The district court held Greco has a personal capacity to sue under the First and Fourteenth Amendment and noted Appellees never argued otherwise in their motion to dismiss. (A215, n. 8.) Accordingly, any "capacity to sue" analysis is limited to the First and Fourteenth Amendment claims asserted against Wantagh UFSD, its Board of Education, and Greco in his official capacity only.

obliged to comply with the statute, that compliance will force the corporation to violate a constitutional proscription. *See In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 846 F.3d 58, 63 (2d Cir. 2017) (citing *City of New York v. State*, 86 N.Y.2d 286, 291 (1995)). As Justice Rivera held in his concurring opinion in *In re World Trade Ctr. III*, the Court of Appeals has "never stated that this list is exhaustive" when discussing the four recognized exceptions to the general capacity-to-sue rule. *In re World Trade Ctr. III*, 30 N.Y.3d 377, 402 (2017) (Rivera, J., concurring).

The fourth exception applies, as enforcement of Part 123 would force it to violate a constitutional proscription. As set forth above, Appellants plausibly alleged in the Amended Complaint that the enforcement of Part 123 would result in a violation of school officials and employees' First Amendment free speech rights because it prevents their freedom of expression as parents and community members and because of its overbreadth and vagueness. (*See supra* Point II.)

Because Part 123 requires school districts to enforce the regulation within its own schools, Appellants would be forced to violate the constitutional rights of their employees or face draconian penalties, *i.e.*, the withholding of State Aid and the removal of school officers. Accordingly, the fourth recognized exception applies here, providing Appellants with legal capacity to pursue their constitutional claims. *See Herzog v. Bd. of Educ. of Lawrence Union Free Sch. Dist.*, 171 Misc. 2d 22, 27

57

(Nassau Cty. Sup. Ct. 1996) (school district had capacity to challenge constitutionality of a state law where it argued compliance would require it to violate constitutional proscriptions); *see also New York State Coal. of Pub. Emps. v. New York State Dep't of Lab.*, 110 Misc. 2d 215, 216 (Albany Cty. Sup. Ct. 1981), *modified*, 89 A.D.2d 283 (2d Dep't 1982), *aff'd,* 60 N.Y.2d 789 (1983) ("The right of a local Board of Education to sue the State Commissioner of Education has frequently been upheld including actions involving the question of constitutionality of State statutes.") (collecting cases).[9]

The district court also erroneously rejected Appellants' Fourteenth Amendment vagueness and overbreadth challenges with a blanket pronouncement that "municipal entities lack capacity to sue their State creators under the Fourteenth Amendment." (A221 (citing *City of Newark v. New Jersey*, 262 U.S. 192, 196 (1923).) But that oversimplification ignores the constitutional proscription exception under which New York municipalities may sue the State. *See City of New York v.*

---

[9] If Part 123 is left intact, Wantagh UFSD will also be forced to enforce a regulation that the U.S. Department of Education's Office for Civil Rights ("DOEOCR") recently found violates Title VI of the Civil Rights Act of 1964, which is a federal statute that prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance. *See* https://www.ed.gov/about/news/press-release/secretary-mcmahon-visits-massapequa-high-school-announces-finding-school-mascot-probe. Although the DOEOCR's May 30, 2025 finding is not part of the appellate record, since it was issued after Judgment was issued, Appellants request the Court take judicial notice of this matter of public record.

*State*, 86 N.Y.2d at 291. It also ignores the Supreme Court's decision in *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982), in which the high court granted the school district's Equal Protection challenge to a Washington State school segregation law. *Id.* And it ignores the fact that Appellants do not challenge State legislation, as the Legislature declined to enact the regulations challenged here. Part 123 and the FAQs are regulations implemented by the Commissioner of Education.

It is well settled, and the district court acknowledged, that state law governs whether a party has the capacity to sue. In *Clarke v. Town of Newburgh*, 237 A.D.3d 14, 29 (2d Dep't 2025), the constitutional proscription exception led the Appellate Division to recently consider whether a town's compliance with the New York Voting Rights Act would force it to violate the Equal Protection Clause of the Fourteenth Amendment. *Id.* ("Accordingly, to succeed on their constitutional argument, the defendants must establish that compliance with the NYVRA would force them to violate the Equal Protection.") Although the court ultimately decided the record did not support an Equal Protection violation, it still undertook a comprehensive analysis of the facial challenge to the statute to determine whether it forced the town to violate voters' Equal Protection rights. *Id.* at 30-39 ("the defendants failed to establish as a matter of law that compliance with the vote dilution provisions of the NYVRA would force them to violate the Equal Protection Clause of the Fourteenth Amendment."). The district court in this case sidestepped

that analysis by globally declaring that municipalities may not bring Fourteenth Amendment challenges without considering the Fourteenth Amendment under the constitutional proscription exception.

The regulation at issue here—Part 123—was so unquestionably vague that it required Appellees to publish an FAQ guide to explain it. But the FAQ guide did not just explain Part 123 or how to comply with it. It expanded it. School districts, like Wantagh, were left to wonder whether they are required to enforce a restriction that is not even contained in the regulation itself. Forcing the institutional Appellants to enforce an unquestionably vague regulation provides them with the capacity to bring the Fourteenth Amendment claim.

## CONCLUSION

For the foregoing reasons, Plaintiffs-Appellants respectfully submit that this Court should reverse the district court's dismissal of their federal and state constitutional claims and remand the case to the district court for further proceedings, together with such other relief as this Court deems proper and just.

Dated: Carle Place, New York
August 11, 2025

SOKOLOFF STERN LLP
*Attorneys for Plaintiffs-Appellants*

By: _Chelsea Weisbord_____
Steven C. Stern
Chelsea Weisbord
179 Westbury Avenue
Carle Place, New York 11514
(516) 334-4500

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 13,381 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Time New Roman.

Dated: August 11, 2025
Carle Place, New York